IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AMMER QADDUMI, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:24-CV-1002-RP |
| JAY HARTZELL, *in his individual capacity*, SHARON WOOD, *in her individual capacity*, and INTERIM UT PRESIDENT JAMES E. DAVIS, *in his official capacity*, | § § § § § § | |
| Defendants. | § § | |

### ORDER

Before the Court is Defendants Jay Hartzell, in his individual capacity, ("Hartzell"), Sharon Wood, in her individual capacity ("Wood"), and Interim UT President James E. Davis's ("Davis"), in his official capacity (collectively, "Defendants") Motion to Dismiss. (Dkt. 37). Plaintiff Ammer Qaddumi ("Qaddumi") filed a response, (Dkt. 41), and Defendants filed a reply, (Dkt. 44). Having considered the parties' submissions, the record, and the applicable law, the Court will grant the motion in part and deny the motion in part.

### I. BACKGROUND

Qaddumi challenges his suspension from the University of Texas at Austin ("UT"), where Defendants currently work or previously worked as administrators, as a violation of his constitutional rights. Qaddumi was involved in planning a protest, to include a "walk out of class," "guest speaker," and two "teach-in[s]", about ongoing violence in Gaza in April 2024 as a member of the Palestine Solidarity Committee ("PSC"). (2d. Am. Compl., Dkt. 30, at 1–4). He alleges these planned protest activities were peaceful in nature, but university officials claimed that protests held by aligned groups at "Columbia, Rutgers, and Yale" were "creating campus encampments" (apparently referencing the Students for Justice in Palestine ("SJP") student group, a separate entity

1

with groups on those campuses) and have disrupted university operations to such a degree that they foresaw this, too, would disrupt university activities. (*Id.* at 5). UT issued a directive to students ordering them not to hold the event, or to face discipline under the university rules. (*Id.* at 4). Qaddumi alleges the PSC responded to UT's directive and explained that the planned protest was peaceful and educational in nature, and that they had no plans for setting up an overnight "encampment." (*Id.* at 6).

Separately, in March 2024, the Governor of Texas issued an executive order defining PSC as a "radical" organization and defining as "antisemitic" phrases that PSC uses at protests, such as "from the river to the sea, Palestine will be free," and stating views many of its members hold, such as saying that Israel's current policies compare to those of Germany during World War II, are also antisemitic. (*Id.*). The executive order instructed UT to "ensure that [its] policies are being enforced and that groups such as the [PSC] and [SJP] are disciplined for violating [UT] policies." (*Id.* at 7).

Qaddumi, along with other students, proceeded with the April 2024 protest despite the directive to cancel it. (*Id.* at 10). Members of the UT Police Department arrived at the protest and called for students to disperse their protest, and Qaddumi alleges he relayed their instructions to the crowd. (*Id.*). On accusations of criminal trespass, UT police officers subsequently arrested Qaddumi among other students. (*Id.* at 11). After his arrest, Qaddumi alleges he and his fellow protesters were released and charged with no crimes. (*Id.*).

At the protest, Qaddumi alleges that counter-protesters were present holding Israeli flags and signs criticizing Palestine, who were not arrested. (*Id.* at 8). Qaddumi also alleges that students have held similar protests in the past who were not arrested or subject to a police response, such as an August 2020 demonstration in response to the murder of George Floyd; an April 2023 demonstration about compensation for graduate student work; and an April 2024 protest about the university firing staff members focused on advancing diversity and inclusion. (*Id.* at 8–9).

In July 2024, UT initiated disciplinary proceedings against Qaddumi, alleging that his participation in the April protests violated UT's institutional rules. (*Id.* at 11). In the proceedings, Qaddumi defended his actions and explained that the allegations by UT against him relied on statements made by students and groups with which he had no affiliation. (*Id.* at 11). UT sought his suspension for three semesters. (*Id.*). A September decision by UT's Student Conduct Panel found Qaddumi had failed to comply with a university directive but found that Qaddumi should be subject to a deferred suspension, meaning he could remain at UT. (*Id.* at 12). But subsequently, UT's Student Conduct and Academic Integrity ("SCAI") office appealed the decision not to suspend Qaddumi to a University Appellate Officer. (*Id*). The University Appellate Officer issued a decision in October 2024 finding that because Qaddumi both engaged in inciting conduct and failed to comply with a directive, he would be suspended from UT for one year, until August 2025. (*Id*). This decision is final and not administratively appealable. (*Id.*). Until then, Qaddumi cannot attend class, visit campus, or earn credits toward his degree. (*Id.*).

Based on these allegations, Qaddumi asserts causes of action for violation of the First Amendment under 42 U.S.C. § 1983 ("Section 1983"). (*Id.* at 12–15). He requests declaratory and injunctive relief reinstating him as a student in good academic standing, along with damages from Wood and Hartzell in their individual capacities. (*Id.* at 15). Defendants filed a motion to dismiss the claims against each defendant under Federal Rule of Civil Procedure 12(b)(6) and 12(b)(1). (Mot., Dkt. 37).

## II. LEGAL STANDARD

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area*

*Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on

the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id*. In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

### III. DISCUSSION

Pursuant to 42 U.S.C. § 1983, Qaddumi brings a content and viewpoint discrimination claim and First Amendment retaliation claim, seeking (1) injunctive relief against Davis in his official capacity for his ongoing suspension as a violation of his constitutional rights, (2) damages against Wood and Hartzell in their individual capacities, and (3) a declaratory judgment that the directive to cancel the protest and disciplinary action against Qaddumi violated the First Amendment. (*See* 2d. Am. Compl., Dkt. 30, at 15). Defendants moved under Federal Rule of Civil Procedures 12(b)(1) and 12(b)(6) to dismiss Qaddumi's claims in their entirety. (Mot., Dkt. 37). The Court will first address the individual capacity claims for damages raised against Hartzell and Wood, which it concludes should be dismissed, before moving onto the official capacity claims for injunctive relief raised against Davis, which it concludes should proceed.

### A. Individual Capacity Claims

#### 1. Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Public officials are protected from suit by qualified immunity so long as their conduct does not violate a clearly established constitutional right. *Carnaby v. City of Houston*, 636 F.3d

5

183, 187 (5th Cir. 2011). "To determine whether a public official is entitled to qualified immunity, [the court must] decide (1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (internal quotations omitted). "A right is clearly established when 'it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Jones v. Lowndes Cnty.*, 678 F.3d 344, 351 (5th Cir. 2012)).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)). While there is no requirement that caselaw directly on point exist, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

Hartzell and Wood argue that qualified immunity requires dismissal of Qaddumi's individual capacity claims because they did not, by allegedly deciding to cancel the protest, violate "clearly established" law. (Mot., Dkt. 37, at 15). As discussed in more detail below, political speech in a public forum enjoys First Amendment protection, *Boos v. Barry*, 485 U.S. 312, 318 (1988), and in the context of schools, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Morgan v. Swanson*, 659 F.3d 359, 402 (5th Cir. 2011) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). But in school settings, school officials may restrict First Amendment speech to mitigate a foreseeable "substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. Courts have differed on the question of whether to apply *Tinker's* holding to the university (as opposed to school) context. As

6

this Court has previously recognized, "neither the Fifth Circuit or Supreme Court has squarely held whether *Tinker* governs at the university level." *Students for Just. in Palestine, at Univ. of Houston v. Abbott*, 756 F. Supp. 3d 410, 425 (W.D. Tex. 2024).

So, it is at least unclear whether *Tinker* applies to the speech prohibitions at issue. *See id.* As a result, the Court finds Hartzell and Wood did not violate a clearly established constitutional right that was placed beyond debate, such that any reasonable official would have known their conduct violated the First Amendment. When applying *Tinker* in the university context, courts must be especially sensitive to preserving the free speech rights of adults on the college campus, institutions meant to promote free exchange of ideas and learning. *Id.* at 426. But the existence of uncertainty surrounding the potential application of *Tinker*, a fact-bound inquiry affording discretion to school administrators to assess disruptions, means that clearly established law did not prohibit Hartzell and Wood's actions toward Qaddumi. In the situation presented, a reasonable official could have believed that *Tinker* applied in some form, such that they could examine the social media advertisements for the protest, consider past similar protests at UT or around the country, form the belief that the planned protests at issue would cause substantial disruption to campus activities, and act to cancel the protest as a result. (*See* Mot., Dkt. 37, at 9). Similarly, a reasonable official could also have believed they, via engaging in UT's disciplinary process, could suspend a student for protesting after violating a university directive not to protest. (*Id.* at 12). Those beliefs may have been incorrect (and Qaddumi's ongoing suspension may ultimately be found to violate the Constitution for purposes of the official capacity analysis, as discussed below) but they do not necessarily show plain incompetence or a knowing legal violation, as is required to proceed with an individual-capacity damages suit. *See Taylor*, 575 U.S. at 825. As such, Hartzell and Wood's alleged actions, while possibly unconstitutional, fall outside the realm where every official in their circumstances would know based on existing precedent that they are violating a clearly established right. *Id.*; *see also*

7

*Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 347 (5th Cir. 2017). The Court finds Hartzell and Wood cannot be sued in their individual capacities for damages and will dismiss them from this case.[1]

### B. Official Capacity Claims

The Court turns next to the official capacity claims against Davis, through which Qaddumi seeks injunctive relief as to his suspension. For the reasons set out below, the Court will find based on the pleadings that Qaddumi has sufficiently stated a claim against Davis in his official capacity as to forward-looking injunctive relief. Accordingly, the Court will deny Defendants' motion as to those claims.

Qaddumi challenges his ongoing suspension as resulting from (1) viewpoint discrimination and (2) retaliation for his First Amendment-protected acts of expression. The Court finds that Qaddumi has sufficiently pled these claims against Davis.[2] "[T]he First Amendment rights of speech and association extend to the campuses of state universities." *Widmar v. Vincent*, 454 U.S. 263, 268−69 (1981). This protection also applies to on-campus demonstrations. *Shamloo v. Mississippi State Bd. of Tr. of Insts. of Higher Learning*, 620 F.2d 516, 521 (5th Cir. 1980). More specifically, UT's "open, outdoor portions of the campus" are a "designated forum for student expression, subject only to

---

[1] The Court's finding that (1) it is not clearly established that *Tinker* does not apply to universities, and that (2) *Tinker* affords discretion to school officials to enforce some degree of restrictions on student protest where foreseeable substantial disruption exists, goes only to the question of qualified immunity to an individual capacity damages suit, i.e., whether Hartzell and Wood had clearly established law any official in their circumstances would have known to follow. It does not bear on the official capacity claim and the question of whether Qaddumi's ongoing suspension violates the First Amendment.

[2] The claim against Davis is treated as a claim against UT. *Kentucky v. Graham,* 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.") (quotation marks omitted). UT (via Davis in his official capacity) may be held liable under Section 1983 if "(1) there is a constitutional violation; (2) an official policy or custom; and (3) a showing that the official policy or custom was the operational force behind the constitutional violation." *See Bellard v. Gautreaux*, 675 F.3d 454, 462 (5th Cir. 2012); *see also Jingping Xu v. Univ. of Texas M.D. Anderson Cancer Ctr.*, 595 F. App'x 341, 344 (5th Cir. 2014) (applying same to UT).

time, place, and manner regulations and a small number of enumerated content-based restrictions." *See Justice for All v. Faulkner*, 410 F.3d 760, 768–69 (5th Cir. 2005).

Accordingly, UT cannot restrict Qaddumi's speech or expression on campus except through content- and viewpoint-neutral time, place, and manner restrictions, narrowly tailored to serve a significant government interest, which leave open alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Also, content-neutral restrictions are not those that rest solely on the discretion of an official to permit or forbid certain speech. Rather, even if UT "may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining" permission from a school official "in that official's boundless discretion." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988).

Qaddumi also cannot face disciplinary action based on the application of university policies that constitute viewpoint discrimination. *See Shamloo*, 620 F.2d at 521–22 ("university students are usually immunized from suspension . . . in retaliation for the exercise of their First Amendment rights," and "disciplinary action" such as suspension "may not be based on [] disapproved content of [] protected speech."); *Texas A&M Queer Empowerment Council v. Mahomes*, No. 25-992, 2025 WL 895836, at *10 (S.D. Tex. Mar. 24, 2025) (the First Amendment "takes precedence" over applying university codes of conduct where the two conflict). Viewpoint discrimination exists "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)). The Supreme Court has "emphasized that the First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints." *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 667–68 (2010) (collecting cases). It is also "viewpoint discrimination" for university officials to censor speech because it is "offensive or

inappropriate" in their "subjective judgment." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019); *see also Texas A&M Queer Empowerment Council*, 2025 WL 895836, at *8.

Now, *Tinker*'s framework does permit schools to prohibit certain expression of certain viewpoints, but only upon a showing that the expression would cause a "substantial disruption" of school activities. *Tinker*, 393 U.S. at 514. The school official "must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509. Even should *Tinker* be assumed to apply to universities, (and as described above, the Fifth Circuit and the Supreme Court have not held as much), its application must be consistent with the characteristics of the university environment. *Students for Just. in Palestine*, 756 F. Supp. 3d at 426; *Healy v. James*, 408 U.S. 169, 180 (1972) (First Amendment analysis at the university level must be done "in light of the special characteristics of the environment in the particular case" as the Supreme Court "made clear in *Tinker*"). The Supreme Court has long recognized that universities are "vital centers for the Nation's intellectual life," to the extent that "danger . . . from the chilling of individual thought and expression" "is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. 819 at 835–36. In other words, what may be a substantial disruption in a secondary school environment may not be a substantial disruption in a university environment; what may disrupt a secondary school could even be fundamental to universities. *Students for Just. in Palestine*, 756 F. Supp. 3d at 426; *see also Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 627 (E.D. Va. 2016). The characteristic of universities as an environment for vigorous debate may be "outcome determinative" when deciding whether a restriction on student speech is viewpoint discrimination versus a valid restriction of foreseeable disruption to campus activities. *Students for Just. in Palestine*, 756 F. Supp. 3d at 425–26.

Also, the Supreme Court has held that a state university cannot expel a student in retaliation for engaging in an activity protected by the First Amendment. *See Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 669–71 (1973). Thus, to establish a retaliation claim under the First Amendment, a plaintiff student has the burden to show that (1) his or her speech was constitutionally protected and (2) that the speech was a "substantial" or "motivating" factor in the challenged decision. *Oliver v. Univ. of Texas Sw. Med. Sch*, No. 3:18-CV-1549-B, 2019 WL 536376, at *19 (N.D. Tex. Feb. 11, 2019); *O'Neal v. Alamo Cmty. Coll. Dist.*, No. SA-08-CA-1031-XR, 2010 WL 376602, at *11 (W.D. Tex. Jan. 27, 2010) (collecting cases); *Doe v. Harrell*, 841 F. App'x 663, 669 (5th Cir. 2021). If the plaintiff satisfies their initial burden, the burden shifts to the defendant to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct. *Oliver*, 2019 WL 536376, at *19.

Qaddumi has plausibly pled a claim challenging his suspension as retaliatory and as viewpoint discrimination. Among other facts, Qaddumi alleges that (1) the Governor instructed Defendants to target protests that supported Palestine with restrictions and discipline, and Defendants sought to do so by forbidding Qaddumi's protest and subsequently suspending Qaddumi; (2) Qaddumi was suspended not because of his actions alone, but because of actions of other students who share similar political sentiments but no other affiliation; and (3) other students on the scene of the protest, who did not have the same views as Qaddumi, were not similarly disciplined, nor have other similar protests on different topics historically resulted in UT forbidding protests and subsequently suspending students. (2d. Am. Compl., Dkt. 30, at 1−12). Taken in the light most favorable to Qaddumi, these facts give rise to a reasonable inference that Qaddumi experienced viewpoint discrimination and retaliatory suspension.

Defendants argue that Qaddumi must plead retaliatory animus on the part of individual(s) involved in his suspension to allege a First Amendment retaliation and viewpoint discrimination

11

claim. However, Defendants do not offer authority requiring pleading animus on the part of one or more individuals to plead a claim for First Amendment retaliation. The cases they cite do not support that conclusion. (Mot., Dkt. 37, at 23). First, Defendants cite the *Nieves v. Bartlett* standard, (*id*.), which requires a First Amendment retaliation plaintiff to show a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury." 587 U.S. 391, 398–99 (2019) (citing *Hartman v. Moore*, 547 U.S. 250, 259 (2006)). However, under *Nieves*, pleading a claim for First Amendment retaliation does not require retaliatory animus on the part of some individual. Rather, the Supreme Court has emphasized that under the *Nieves* test, a plaintiff can also show retaliation via "objective evidence" that the plaintiff was punished when "otherwise similarly situated individuals not engaged in the same sort of protected speech were not." *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024). Qaddumi has offered that sort of evidence by identifying counter-protestors on the scene who were not disciplined. Also, Qaddumi alleges that UT has permitted students to similarly protest about other topics, like UT workers' conditions and racial justice, without later suspending them for protesting. (2d. Am. Compl., Dkt. 30, at 8–9).

Defendants also cite First Amendment retaliation cases that do not stand for the proposition that Qaddumi must plead an individual's animus to plead a claim for retaliation for his First Amendment views. Defendants cite *Mandawala v. Ne. Baptist Hosp., Counts 1, 2, & 11*, 16 F.4th 1144, 1152 (5th Cir. 2021). (Mot., Dkt. 37, at 10). There, the Fifth Circuit held that a plaintiff student did not state a claim for First Amendment retaliation by his school, because he was required to, and did not, allege (1) the "school" had retaliatory intent and (2) "non-retaliatory" grounds did not independently justify the school's discipline. Here, Qaddumi has pled both retaliatory intent on the part of UT and that no grounds but his protected speech justified his suspension. Defendants also cite *Harrell*, 814 F. App'x at 667. (Mot., Dkt. 37, at 23). But *Harrell* dealt with a different situation; the Fifth Circuit found in the unpublished decision that the plaintiff had not alleged that the

defendants knew of his protected speech, rendering it implausible that the speech was a "substantial or motivating" factor in his dismissal. 841 F. App'x at 670.[3]

Even taking as true that pleading some form of animus or discriminatory motive on the part of individual UT officials involved in his disciplinary process may be required, Qaddumi has pled facts that could give rise to that inference. For one, Qaddumi's allegations show a heightened environment amongst UT officials surrounding disciplining students for protesting in support of Palestinian rights. Qaddumi alleges that UT officials were motivated to restrict the speech of pro-Palestine student groups in particular, because Governor Abbott ordered that universities adopt policies that limit pro-Palestine protests and student groups, such as disciplining pro-Palestine student groups and banning students from making certain statements about Israel's policies toward Palestine. (2d. Am. Compl., Dkt. 30, at 7). This Court has already recognized that the Governor's order to universities likely violated the First Amendment as a form of viewpoint discrimination, *see Students for Just. in Palestine*, 756 F. Supp. 3d at 427 ("GA-44-compliant university policies [likely] impose impermissible viewpoint discrimination."), and Qaddumi has pled that university officials derived their motive to suspend him from that order. This creates a plausible inference that at least some individual officials involved in Qaddumi's disciplinary process had a desire to discriminate against his views.

Also, Qaddumi pleads that he was not a member of the SJP, but rather a distinct organization, the PSC. Qaddumi alleges the PSC and SJP share political views but no other affiliation, and that they do not employ the same tactics, nor do they typically collaborate. (2d. Am. Compl., Dkt. 30, at 5). Qaddumi alleges that UT officials cited past protests by the SJP as motivation

---

[3] Also, that pleading an official capacity claim against Davis requires showing that an "official [UT] policy or custom was the operational force behind [a] constitutional violation" would underscore that pleading individual discriminatory animus on the part of some individual at UT is not required. *See Bellard*, 675 F.3d at 462; *Jingping Xu*, 595 F. App'x at 344.

13

for their decision to suspend Qaddumi. *Id.* In other words, Qaddumi alleges he was suspended at least in part because of the prior actions of a student group of which he is a not a member but only shares similar views. *Id.* Overall, Qaddumi's allegations suffice to create a plausible inference that retaliation for his protected speech and viewpoint discrimination caused his suspension in violation of the First Amendment.

The Court also declines to dismiss Qaddumi's claims because of the "collateral bar rule." Defendants argue that Qaddumi cannot challenge his suspension because of the general rule that when an individual is restrained from speech or expression, they must challenge the restraint directly, not challenge their subsequent discipline. *See Walker v. City of Birmingham*, 388 U.S. 307, 320 (1967). Qaddumi responds that the collateral bar rule does not apply because it only applies to judicial orders, i.e., court-ordered injunctions which may be challenged through judicial appeals. *U.S. v. Dickinson*, 465 F.2d 496, 510 (5th Cir. 1972) ("[I]t is only the orders of judicial authorities which must be tested in the courts before deliberate transgression."). Defendants do not provide any authority that the collateral bar rule applies in the context of a state university cancelling a protest and subsequently disciplining a student in retaliation for their views, and this Court declines to extend this rule far beyond its apparent reach.[4]

Finally, the Court turns to Qaddumi's request for "declaratory" relief as to the cancellation of the April 2024 protest as a violation of his constitutional rights. Defendants argue that Qaddumi cannot seek retrospective declaratory relief calling the cancellation of the April 2024 protest unconstitutional, because *Ex Parte Young*'s exception to sovereign immunity only allows for prospective equitable relief from an ongoing constitutional violation, not backward-looking

---

[4] Beyond the fact that no caselaw suggests the collateral bar rule applies here, extending the collateral bar rule to apply as broadly as Defendants suggest would amount to holding students cannot launch First Amendment challenges against a university's retaliatory actions against protected speech, so long as universities prohibit the speech close enough in time to its planned occurrence that the students cannot legally challenge it ahead of time. The Court declines to hold as much.

14

declaratory relief. *See Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 425 (5th Cir. 2020). The Court agrees with Defendants and dismisses Qaddumi's request for declaratory relief. However, Qaddumi indicates that his request for declaratory relief was intended as an aspect of a potential injunctive order and that he ultimately wishes to clear his academic record via an injunction from the Court. (Resp., Dkt. 41, at 16). To the extent Qaddumi's requested injunctive relief of halting his suspension requires relief from the Court to reinstate his good academic standing, Qaddumi may articulate that request as part of a proposed injunction.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendants' motion to dismiss, (Dkt. 37), is **GRANTED IN PART AND DENIED IN PART**. Specifically, Defendants' motion is **DENIED** with respect to the claims for injunctive relief against Davis in his official capacity. Defendants' motion is **GRANTED** in all other respects. Defendants Hartzell and Wood are **DISMISSED** as parties in this case.

**SIGNED** on June 13, 2025.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE