1

1          ***UNCERTIFIED ROUGH DRAFT***

2          This unedited rough transcript draft is uncertified

3    and may contain incorrect punctuation, misspelled proper

4    names and/or terminology, an occasional reporter's note,

5    and/or inaccurate/nonsensical word combinations. There

6    WILL BE discrepancies between this form and the final

7    form.

8

9          Please keep in mind that the final certified

10   transcript's page and line numbers WILL NOT match the

11   rough draft due to the addition and/or editing of title

12   pages, indices, appearances of counsel, paragraphing,

13   formatting, and other changes.

14

15         Due to the need to correct entries prior to

16   certification, parties agree to use this transcript

17   draft only for the purpose of augmenting counsel's notes

18   and may not be cited or used in any way or at any time

19   to rebut or contradict the certified transcription of

20   the proceedings and should not be distributed in any

21   form to anyone who has no connection to this case.

22

23

24

25

2

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE WESTERN DISTRICT OF TEXAS

3                      AUSTIN DIVISION

4       _____

5       AMMER QADDUMI,

6              Plaintiff,

7         v.                          Civil Action No.

8       UT AUSTIN PRESIDENT JAMES E.        1:24-cv-01002

9       DAVIS, in his official capacity,

10             Defendant.

11      _____

12           VIDEOTAPED DEPOSITION OF AMMER QADDUMI

13      DATE:        Friday, November 14, 2025

14      TIME:        9:10 a.m.

15      LOCATION:    Butler Snow LLP

16                1400 Lavaca Street, Suite 1000

17                Austin, TX 78701

18    OFFICIATED BY: John Quin Beckelheimer

19    JOB NO.:        7684424

20

21

22

23

24

25

3

1                    A P P E A R A N C E S

2     ON BEHALF OF PLAINTIFF AMMER QADDUMI:

3          SEAN HEALEY, ESQUIRE

4          Ahmad, Zavitsanos & Mensing, P.C.

5          1221 McKinney Street, Suite 2500

6          Houston, TX 77010

7          shealey@azalaw.com

8          (713) 600-4934

9

10    ON BEHALF OF DEFENDANT UT AUSTIN PRESIDENT JAMES E.

11    DAVIS:

12        DARREN G. GIBSON, ESQUIRE

13        DANIEL M. JOZWIAK, ESQUIRE

14        Michael Best & Friedrich LLP

15        515 Congress Avenue, Suite 2500

16        Austin, TX 78701

17        darren.gibson@michaelbest.com

18        daniel.jozwiak@michaelbest.com

19        (512) 409-2311

20        (720) 398-0052

21

22

23

24

25
↟

4

1              A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF DEFENDANT UT AUSTIN PRESIDENT JAMES E.

3    DAVIS:

4        MATTHEW H. FREDERICK, ESQUIRE

5        The University of Texas at Austin

6        2304 Whitis Avenue, FAC 438

7        Austin, TX 78712

8        matthew.frederick@austin.texas.edu

9        (512) 232-7734

10

11   ALSO PRESENT:

12       Tim Desadier, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

5

```
1                    I N D E X

2  EXAMINATION:                           PAGE

3     By Mr. Gibson                       8

4

5                 E X H I B I T S

6  NO.           DESCRIPTION             PAGE

7  Exhibit 1     Austin Chronicle Article    60

8  Exhibit 2     File 24815 - video         98

9  Exhibit 3     screenshots               102

10 Exhibit 4     collection of posts       119

11 Exhibit 5     Popular University for Gaza

12               document                  122

13 Exhibit 6     Bates UTAustin 8515 - Israel Block

14               Party                     148

15 Exhibit 7     Bates Qaddumi273 - meeting notes  152

16 Exhibit 8     screen shots of text msgs  161

17 Exhibit 9     Copy of letter from the text

18               exchange from exh 8       186

19 Exhibit 10    QAD251 - video exhibit    199
```

```
20   Exhibit 11     qad00006                         204

21   Exhibit 12     video - no bates number - get it

22                  to you                           213

23   Exhibit 13     Qaddumi00045 - video             216

24   Exhibit 14     Supplemental Rule 26 Disclosures 259

25
```
⌃

6

```
 1              P R O C E E D I N G S

 2              THE VIDEOGRAPHER:  Going on the record.

 3   The time is 9:10 a.m.

 4              MR. GIBSON:  Good morning.

 5              THE VIDEOGRAPHER:  Wait.  You have to

 6   swear in.

 7              THE OFFICER:  Good morning.  My name is

 8   John Quin Beckelheimer.  I'm the reporter assigned by

 9   Veritext to take the record of this proceeding.  We're

10   now on the record at 9:10 a.m.

11              This is the deposition of Ammer Qaddumi

12   taken in the matter of Ammer Qaddumi vs. UT Austin
```

13    President James Davis on November 14, 2025, at Butler

14    -- Butler Snow, 1400 Lavaca Street, Suite 1000,

15    Austin, Texas.

16                    I'm a notary authorized to take

17    acknowledgements and administer oaths in Texas.

18                    Additionally, absent an objection on

19    the record before the witness is sworn, all parties

20    and the witness understand and agree that any

21    certified transcript produced from the recording of

22    this proceeding:

23                        - is intended for all uses permitted

24                          under applicable procedural and

25                          evidentiary rules and laws in the

⬆

7

1                          same manner as a deposition recorded

2                          by stenographic means; and

3                        - shall constitute written stipulation

4                          of such.

5                    At this time will everyone in

6    attendance please identify yourself for the record,

7    beginning with Mr. Gibson?

8                    MR. GIBSON:  Darren Gibson; partner

9    with Michael Best & Friedrich on behalf of the

10   defendant.

11                   THE VIDEOGRAPHER:  Go ahead.

12                   MR. JOZWIAK:  Daniel Jozwiak also on

13   behalf of the defendant.

14                   MR. FREDERICK:  Matthew Frederick; UT

15   Austin.

16                   MR. HEALEY:  Sean Healey for plaintiff

17   Ammer Qaddumi.

18                   MR. QADDUMI:  And Ammer Qaddumi,

19   plaintiff.

20                   THE VIDEOGRAPHER:  Okay.  And -- no.

21   Sorry.  Never mind.

22                   THE OFFICER:  Okay.  Thank you.

23   Hearing no objection, I'll now swear in the witness.

24                   Please raise your right hand.

25   //

8

```
 1   WHEREUPON,

 2                       AMMER QADDUMI,

 3   called as a witness and having been first duly sworn

 4   to tell the truth, the whole truth, and nothing but

 5   the truth, was examined and testified as follows:

 6                   THE OFFICER:  You may now proceed.

 7                   MR. GIBSON:  Thank you.

 8                       EXAMINATION

 9   BY MR. GIBSON:

10       Q    Good morning, Mr. Qaddumi.  My name is

11   Darren Gibson.  I'll be asking you questions today,

12   and I'm counsel for UT Austin in this case.  Could you

13   please state your full name for the record?

14       A    Ammer-Milton Anan Qaddumi.

15       Q    What was the word after Milton?  I

16   apologize.

17       A    Anan.

18       Q    Anan?

19       A    Yeah.

20       Q    Is that your father's name?

21       A    Yes.

22       Q    Thank you.  And where do you live?

23       A    I go to school at UT, and so I live in West
```

24    Campus, 23rd -- 907 West 23rd Street.

25        Q    What's your zip code?

9

1        A    78705.

2        Q    Thank you.  Have you been deposed before?

3        A    First time.

4        Q    I'd just like to go over some basic ground

5    rules so that you and I conduct this in a way that it

6    works for everyone, including the court reporter.

7    It's very important that you answer verbally to my

8    questions.  Naturally, you might tend to nod your head

9    or say "uh-huh" or "uh-uh," but for the court reporter

10   to get down an accurate transcript, we need to make

11   sure we have verbal responses.  So if I ask you to

12   provide a verbal response, that's why I am not trying

13   to, you know, be rude or anything.

14       A    Understood.  Understood.

15       Q    If you don't understand a question, please

16   ask me to clarify.  But would you agree that if I ask

17    you a question and you answer, you're answering based

18    on understanding the question I've asked?

19         A    Yes.

20         Q    Your counsel may object and he will say

21    "Objection to form" to questions.  If he does that,

22    you're still able to answer unless he instructs you

23    not to answer.

24         A    Okay.

25         Q    So he may object, but please go ahead and
↑

10

1    provide an answer unless he instructs you not to.

2         A    Okay.

3         Q    If you need a break, just let me know.  We

4    can take a break.  The only thing is if there's a

5    question pending, you can't take a break while I've

6    asked after I've asked a question but before you

7    answer.  But other than that, you can take a break.

8    And so if you need a break, just let me know.

9         A    Okay.

10      Q    Are you taking any medications or under any

11  medical conditions that would affect your ability to

12  testify truthfully today?

13      A    No.

14      Q    I'd just like to go over some defined terms

15  for us and for the court reporter so that when we use

16  these terms, everyone knows what we mean.  Can we

17  agree that "PSC" refers to the Palestinian Solidarity

18  Committee, the student organization at UT Austin?

19      A    The -- the actual name is Palestine

20  Solidarity Committee.

21      Q    Oh.  I apologize.  Thank you.

22      A    But -- but yes.

23      Q    Palestine.  Thank you.  Can we agree that

24  the "SJP" refers to the students for Justice for

25  Palestine, the national organization?  Did I misstate

⬆

11

1  that too?

2                 MR. HEALEY:  Objection to form.

3                    And just for the record, I, you know, I

4       want it to be very clear that we're distinguishing

5       between National SJP and the individual chapter.

6                    MR. GIBSON:  You're violating the rules

7       of the local rules.  You can object to form if you

8       have an objection to form, and I'm literally doing

9       what you're just asking me to do.  I'm defining

10      different terms, so please don't --

11                   MR. HEALEY:  Yeah.

12                   MR. GIBSON:  Okay.  Great.

13                   THE WITNESS:  I -- I can answer?  Thank

14      you.  Yeah.  So -- so the national organization you're

15      referring to is National SJP.  SJP itself is kind of a

16      brand, so -- so it's not -- there is a kind of a

17      technical distinction between them.

18      BY MR. GIBSON:

19          Q    That's why I wanted to do this before.

20          A    Sure, sure.

21          Q    So if we use, if I use "National SJP," does

22      -- can we agree that that "National SJP" refers to the

23      National Students for Justice for Palestine

24      organization?

25          A    Sure.  And if it's easier, you can say

12

1   "NSJP."  That's -- that's colloquially -- colloquially

2   how it's referred to.

3       Q    Okay.  Can we agree that the April 24th

4   protest, if I say that -- that refers to the protest

5   on UT's Austin's campus on April 24, 2024, at which

6   you were arrested and which is the subject of this

7   lawsuit?

8                 MR. HEALEY:  Objection.  Form.

9                 THE WITNESS:  Yes.  That is the -- that

10  is the protest.

11  BY MR. GIBSON:

12      Q    Okay.  What are you seeking out of this

13  lawsuit?

14      A    I'm seeking relief from the suspension that

15  is on my record, on my current record from UT Austin.

16      Q    And what relief do you want?

17      A    I would like the suspension that is

18  currently on my record to be removed from my record.

19      Q    And when you say "your record," what do you

20  mean by that?

21      A     So UT keeps a disciplinary record, from my

22  understanding, and from my understanding of the rules,

23  a suspension will remain permanently on that record

24  and so I'd like it to be removed.

25      Q     And when you say your suspension, are you

♠

13

1  referring to the suspension that resulted from the

2  April 24th protest?

3      A     The suspension that resulted from --

4      Q     Related to the April 24th?

5      A     Related to the April 24th rules that --

6  rules allegations related to the April 24th protest.

7      Q     And I'm going to try very hard not to speak

8  over you, and this is -- in normal conversation,

9  people do what you and I just did.

10      A     Sure.

11      Q     We talk at the same time we will start

12  talking and while the other person's talking.  It's

13  totally natural.

14       A    Sure, sure.

15       Q    For the purpose of our court reporter and

16  for the purpose of today, I would ask that you let me

17  finish my question before you start answering and I

18  will try to do the same to you.  I may interrupt if I

19  think that you are going off, you know, on a tangent

20  that I didn't ask you about, but if I do that, feel

21  free to say you're not done with your answer.  I bet

22  your counsel will tell me to, but I'm just trying to

23  get us down the road and try to get out of here as

24  quickly as possible.

25       A    Sure.  Sure.  Sounds good to me.

                                                    14

1       Q    Okay.  So you, as I understand it, you're

2  requesting that your suspension be removed from the UT

3  Austin's disciplinary records?  Is that correct?

4       A    Yes.

5       Q    What, when you say "suspension removed," do

6  you mean any reference to the fact that you were

```
 7   suspended removed from  --

 8        A    Yes.  Sorry.  Yes.

 9                  MR. HEALEY:  Objection to the form.

10                  Sorry.  We got all mixed up there.

11                  THE WITNESS:  Yes.

12   BY MR. GIBSON:

13        Q    You were also subject to a second

14   disciplinary matter; correct?  Relating to allegations

15   that you violated that suspension by coming on campus?

16                  MR. HEALEY:  Objection to the form.

17                  THE WITNESS:  Yes.

18   BY MR. GIBSON:

19        Q    Are you seeking any relief with respect to

20   that second disciplinary matter through this lawsuit?

21        A    I don't believe so.

22        Q    Okay.  So you would be -- you're not seeking

23   for the university to have to modify your disciplinary

24   records with respect to the second disciplinary

25   matter?
```

1                    MR. HEALEY:  Objection to the form.

2                    THE WITNESS:  The result of the second

3    disciplinary matter is deferred suspension, which is

4    not something that will appear on my record and it's

5    something that will still allow me to graduate on

6    time, and so I'm not necessarily seeking relief from

7    that.

8    BY MR. GIBSON:

9         Q    Okay.  And when you say your record, do you

10   mean your transcript?

11        A    I think there's a distinction in UT rules

12   between the transcript and the record.

13        Q    Okay.  So the -- are you seeking to have

14   your suspension removed from your transcript?

15        A    That would be -- that would be good as well,

16   but I really would like to have it removed from my

17   permanent record, which according from my

18   understanding, UT keeps a permanent copy of.

19        Q    Okay.  Anything else?  How old are you?

20        A    I am 22.

21        Q    What's your birthday?

22        A    ███████████  2003.

23        Q    And where were you born?

24        A    Houston.

25        Q    And did you grow up in Houston?

                                                    16

1        A    I did.

2        Q    And where did you go to high school?

3        A    I went to Carnegie Vanguard High School.

4        Q    And what year did you graduate?

5        A    I graduated in 2021.

6        Q    Okay.  Did you start at the fall of -- UT in

7   the fall or did you start at UT in the fall of 2021?

8             MR. HEALEY:  Objection to the form.

9             THE WITNESS:  I started actually at UT

10  San Antonio for -- from fall '21 till spring '22 and

11  then transferred to UT Austin in fall of '22.

12  BY MR. GIBSON:

13       Q    And just for the record, and thank you for

14  being specific on the University of Texas entity we're

15  talking about, I should have included that in my

16  defined terms.  If we say "UT" or "UT Austin," can you

17  and I agree that that refers to The University of

18    Texas at Austin?

19         A    Sure.

20         Q    Great.  And if we're referring to any other

21    UT institution, we'll use UT and the name.

22         A    Yeah.

23         Q    So thank you for doing that already.  So you

24    started at UT Austin after a year at the University of

25    Texas, and it's San Antonio?  Is that correct?

                                                    17

1          A    Yes.

2          Q    Got it.  Okay.  And what other universities

3    or why did you go to UT San Antonio first?

4          A    I attended UT San Antonio as part of the

5    coordinated admissions program, which provides a

6    pathway for students to attend a different UT system

7    school for their freshman year and then transfer to UT

8    Austin for the remainder of their college career.

9          Q    And what's your major at UT Austin?

10         A    Double major in Economics and Government.

11    Q    And why did you want to attend UT Austin?

12              MR. HEALEY:  Objection to the form.

13              THE WITNESS:  My dad went to UT.  I

14    grew up coming to Austin on weekends to go see

15    football games and grew up with kind of, you know,

16    that culture and I believe UT to be a very good school

17    with very good students, very good professors.

18    BY MR. GIBSON:

19    Q    So you said you're a double major in

20    Government and Economics?  Is that correct?

21    A    Correct.

22    Q    Why are you pursuing those fields?

23              MR. HEALEY:  Objection to the form.

24              THE WITNESS:  I'm pursuing those fields

25    -- Economics really was kind of, well, the marriage of
⬆

18

1    Economics and Government is something that I felt was

2    -- was practical for me to better explore my interest

3    in policy.  I'm hoping to attend law school after

4    graduation and I -- I believe those majors help --

5    help with that.

6    BY MR. GIBSON:

7         Q    Okay.  So can you please name your immediate

8    family members?

9                   MR. HEALEY:  Objection to the form.

10                  And wait for a question.

11   BY MR. GIBSON:

12        Q    Can you please name your immediate family

13   members?

14        A    Yes.

15        Q    What are they?  Who are they?

16        A    My father, Anan Qaddumi; my mother, Sara

17   Qaddumi; my sister, Lamar Qaddumi; my brother, Rafi

18   Qaddumi; and then my sister, Zina Qaddumi.

19        Q    Are you the oldest of the children?

20        A    Yes.

21        Q    How old is your sister, Lamar?

22        A    Lamar is 21 years old.

23        Q    Does Lamar go to The University of Texas at

24   Austin?

25        A    She does.

19

```
 1    Q    And how old is your brother, Rafi?

 2    A    Rafi is -- Rafi, sorry.  Rafi is 14.

 3    Q    And how do you spell Rafi?  I apologize.

 4    A    R-A-F-I.

 5    Q    Okay.  And is he going to school in Houston?

 6    A    He is.

 7    Q    And how old is your sister, Zina?

 8    A    She is 11.

 9    Q    Does she go to school in Houston?

10    A    She does.

11    Q    You said your father, Anan, went to -- or

12  did I pronounce that correctly?

13    A    Anan.  Anan.

14    Q    Your father Anan went to University of Texas

15  at Austin?  Is that correct?

16    A    Yes.

17    Q    Do you know approximately when he graduated?

18    A    Yes.

19    Q    When was that?

20    A    I believe it was around '89 or '90.

21    Q    Was he a member of PSC when he was at the
```

22    University of Texas at Austin to your knowledge?

23         A    To my knowledge.  No.

24         Q    And did your mother, Sara, go to college?

25         A    She did.

20

1         Q    Where did she go to college?

2         A    She went to the University of Houston.

3         Q    Do you know if she graduated?

4                   MR. HEALEY:  Objection to the form.

5                   THE WITNESS:  Yes.

6    BY MR. GIBSON:

7         Q    Approximately when did she graduate?

8         A    Approximately two -- early 2000s, maybe, or

9    mid 2000s.

10        Q    Were any of your immediate family members at

11   the protest on April 24th?

12        A    Yes.

13        Q    Which ones?

14        A    My father and my sister, Lamar.

15       Q    Did you have any extended family members at

16   the April 24th protest?

17       A    No.

18       Q    Do you have any extended family members that

19   live in Texas?

20       A    I do.  Yes.

21       Q    Aunts and uncles and cousins and such?

22            MR. HEALEY:  Objection to the form.

23            THE WITNESS:  Yes.

24   BY MR. GIBSON:

25       Q    Were any of those extended family members at
↟

                                                    21

1    the protest on April 24th?

2            MR. HEALEY:  Objection to the form.

3            THE WITNESS:  No.

4    BY MR. GIBSON:

5        Q    Is your sister, Lamar, a member of PSC?

6        A    No.

7        Q    Which -- what does it mean to be a member of

8    PSC to your understanding?

9                    MR. HEALEY:  Objection to the form.

10                    THE WITNESS:  Being a member of PSC, I

11    think, in the understanding of how that term has been

12    used, is to be on the leadership like board of the

13    group.

14    BY MR. GIBSON:

15        Q    And is that also called the steering

16    committee?

17        A    Correct.

18        Q    Okay.  What term do you want to use today

19    and what -- well, let me take that.  What's the

20    correct term for the leadership group of the PSC?

21        A    We just say steering committee member, but

22    for the sake of efficiency, I think member is fine.

23        Q    Okay.  So do you have members of PSC outside

24    of the steering committee?

25        A    Not per se.

22

1      Q     Okay.  What do you mean not per se?

2      A     There's no official like membership status

3  for people who are or students who are not on the

4  leadership committee.

5      Q     Is there an advisor to PSC?

6                MR. HEALEY:  Objection to the form.

7                THE WITNESS:  What?  What do you mean?

8  BY MR. GIBSON:

9      Q     My understanding of student PSC is a

10  recognized student organization at UT Austin; correct?

11                MR. HEALEY:  Objection to the form.

12                THE WITNESS:  I don't -- I don't know

13  if -- if that same status applies now with the

14  suspension.

15  BY MR. GIBSON:

16      Q     When you were in 2024 -- and most of my --

17  let's -- you raise a good point.  Let's presume that

18  my questions refer to the academic year 2023/2024 when

19  most of the events that we're talking about, we'll

20  talk about today, took place.  Okay?

21      A     Okay.

22                MR. HEALEY:  Objection to the form.

23  BY MR. GIBSON:

24      Q     And at that time, was the PSC a registered

25  student organization at UT?

⬆

                                                              23

1                      MR. HEALEY:  Objection to the form.

2                      THE WITNESS:  Yes.

3    BY MR. GIBSON:

4         Q    And is it your understanding that registered

5    student organizations need to have an advisor?

6         A    No.

7         Q    Did the PSC have an advisor?

8         A    I don't believe so, or not to my knowledge.

9         Q    There were no -- no one affiliated with the

10   university was serving as an advisor to the PSC

11   organization to your knowledge?

12                     MR. HEALEY:  Objection to the form.

13                     THE WITNESS:  Not to my knowledge.

14   Okay,

15   BY MR. GIBSON:

16        Q    Okay.  Are any of your extended family

17   members members of the PSC?

18                     MR. HEALEY:  Objection to the form.

19                THE WITNESS:  No.

20   BY MR. GIBSON:

21        Q    To your knowledge, have any of your family

22   members been members of PSC at any time in the past?

23        A    Yes.

24        Q    Which ones?

25        A    My sister, Lamar, was a member last year.
⬆

                                                 24

1         Q    So she was on the steering committee for the

2    year 2024, '25?

3                     MR. HEALEY:  Objection to the form.

4                     THE WITNESS:  Yes.

5    BY MR. GIBSON:

6         Q    Any other extended family, immediate or

7    extended family members who have been members of PSC

8    in the past to your knowledge?

9         A    No.

10        Q    So we will see documents later today that

11   refer to SJP affiliated organizations at other

12    colleges and universities.  Is that something you are

13    -- have an understanding of that there are

14    organizations around the country at different

15    colleges, universities similar to PSC that are

16    affiliated with the SJP?

17                    MR. HEALEY:  Objection to the form.

18                    THE WITNESS:  I think the way the term

19    SJP being used in this context really refers to NSJP.

20    Other groups, other colleges affiliate with NSJP for

21    messaging viewpoint in a similar way that PSC has in

22    the past.

23    BY MR. GIBSON:

24        Q    Okay.  So there are -- we'll see documents

25    that refer to Columbia SJP, Rutgers, New Brunswick

⤷

                                                            25

1    SJP, Tufts SJP.  Do you recall seeing those type of

2    documents during the course of your disciplinary here

3    matter relating to the protest?

4                    MR. HEALEY:  Objection to the form.

5                    THE WITNESS:  Yes.

6    BY MR. GIBSON:

7         Q    And is it your understanding that those are

8    student or that refers to student organizations at

9    those universities that are -- have an affiliation

10   with the NSJP?

11                  MR. HEALEY:  Objection to the form.

12                  THE WITNESS:  Any -- any student at any

13   university can create an SJP chapter and just call it

14   SJP.  SJP, Students for Palestine, is like a brand.

15   There -- there's no like there membership status or

16   anything needed to call yourself that.  So I -- I

17   wouldn't say every organization with the name

18   necessarily shares the same type of affiliation.

19   BY MR. GIBSON:

20        Q    What is the PSC's purpose or mission?

21                  MR. HEALEY:  Objection to the form

22                  THE WITNESS:  PSC's mission is to

23   promote awareness of the Palestinian cause on -- on

24   UT's campus to UT students.

25   //

1    BY MR. GIBSON:

2        Q    Do -- when were you a member of the PSC?

3        A    I was a member of the PSC from fall '23

4    until -- until fall or spring of '25.

5        Q    Spring of '25?  Approximately what month in

6    spring of '25 were you no longer a member of PSC?

7        A    I was no longer a member beginning of May.

8    I'd say kind of end of the academic year.

9        Q    And who can be members of PSC?

10                MR. HEALEY:  Objection to the form.

11                THE WITNESS:  Students who apply to be

12    members.

13    BY MR. GIBSON:

14        Q    So to be a member of PSC, which you've

15    testified as to be on the steering committee of the

16    PSC, you need to be a student at UT Austin?  Is that

17    correct?

18        A    Yes.

19        Q    Okay.  And you, were you a student at UT

20    Austin while you were suspended?

21                MR. HEALEY:  Objection to the form.

22                THE WITNESS:  I was not registered for

23   classes or permitted to be on campus, but I think

24   myself and fellow and my fellow peers still viewed me

25   as a student.

27

1   BY MR. GIBSON:

2         Q    And you remained on the steering committee

3   of PSC while you were suspended up through May 2025?

4   Is that correct?

5         A    Yes.

6         Q    And as Jenna Homsi, she was on the steering

7   committee of PSC for the academic year 2023, '24?  Is

8   that correct?

9         A    Yes.

10        Q    Was she a student during that time?

11        A    She was a student.  Yes.

12        Q    She was a student the fall semester?

13             MR. HEALEY:  Objection to the form.

14             THE WITNESS:  In the fall semester, she

15   was a student.

16    BY MR. GIBSON:

17        Q    Was she a student in the spring 2024

18    semester?

19        A    She wasn't registered for classes, but I

20    don't believe she had graduated at the time until the

21    end of that semester.

22        Q    To your knowledge, when did she graduate?

23        A    In spring of '24.

24        Q    So she was -- so she had -- but she wasn't

25    taking classes in spring of 2024?  Is that correct?

                                                        28

1        A    No.

2        Q    Do you have any understanding of why she

3    didn't graduate in December of 2023 if it appears she

4    had completed all of her coursework?

5                MR. HEALEY:  Objection to the form.

6                THE WITNESS:  No.

7    BY MR. GIBSON:

8        Q    You don't know why?

```
 9      A    No.

10      Q    Why did you join PSC?

11      A    I'm Palestinian-American and I grew up going

12 to protests in Houston and kind of playing a small

13 part in the community there.  I wanted to play a

14 bigger role in the pro-Palestinian community here.

15      Q    Who was on the steering committee, the PSC

16 steering committee for the 2023/2024 academic year?

17      A    You would like me to name everyone?

18      Q    Yes, please.

19      A    If my memory serves me correctly, it was

20 myself, Maher Naofal.

21      Q    Can you spell those names for me?  Sorry.

22      A    Sure.  You -- you want first and last?  I --

23 I think, actually, hold on just a minute.  Yeah.  I

24 think I disclosed, yeah, that information before.

25      Q    So let's do this now.  Okay.  Maher, you
⌃
```

29

```
 1 said?
```

2       A     Yes.

3       Q     That's M-A-H-E-R?  What's the last name?

4       A     Naofal.

5       Q     How do you spell that?

6       A     N-A-O-F-A-L.

7       Q     And was he on the steering committee both

8   semesters of that year?

9       A     Yes.

10      Q     Okay.  Who else?

11      A     Raneem Mahrouq.

12      Q     Could you spell that, please?

13      A     R-A-N-E-E-E-M, M-A-H-R-O-U-Q.

14      Q     Okay.

15      A     Hay Saidi.

16      Q     Can you spell that, please?

17      A     H-A-Y, S-A-I-D-I.

18      Q     Okay.

19      A     Jenna Homsi, J-E-N-N-A, H-O-M-S-I.

20  Mohammed, M-O-H-A-M-M-E-D, Zakzok, Z-A-K-Z-O-K.  How

21  many is that?

22      Q     That is, including yourself, one, two,

23  three, four, five.

24      A     Five, six.  Sorry.  Six.  I think Rama, R-A-

25  M-A, Hammoudah, which is H-A-M-M-O-U-D-A-H.  And then

⌃

30

1    I believe Adam Elhamdi, E-L-H-A-M-D-I.  Oh.  E-L-H-A-M

2    -D-I.  I believe that's it.

3         Q    And you didn't -- I do not believe you

4    disclosed Maher Naofal, Rama Hammoudah, or Adam

5    Elhamdi in your initial disclosures regarding

6    potential witnesses in this case.  Is there a reason

7    those witnesses were not disclosed?

8              MR. HEALEY:  Objection to the form.

9              THE WITNESS:  No.  I thought I had.

10   BY MR. GIBSON:

11        Q    Were all of those three witnesses, and I'm

12   going to use first names just to be easier, Maher,

13   Rama, and Adam, were they on the steering committee at

14   the time of the April 24th protest?

15        A    Yeah.

16        Q    Were they involved in planning the April

17   24th protest?

18        A    Yeah.

19        Q    Okay.  You were the unofficial spokesperson

20   for the PSC while you were on the steering committee?

21   Is that correct?

22        A     That's how I refer to myself.

23        Q     What other sort of roles did each person

24   play on the steering committee?  You described

25   yourself as the unofficial spokesperson.  Would you
⌃

                                                    31

1    provide any other roles to anyone else on the steering

2    committee?

3                    MR. HEALEY:  Objection to the form.

4                    THE WITNESS:  No.

5    BY MR. GIBSON:

6         Q     Was anyone the overall leader of the

7    steering committee?

8         A     No.

9         Q     Was anyone responsible for communicating

10   with any third party organizations?

11        A     No.

12        Q     You would consider the SJP the guiding body

13    of the PSC; correct?

14                        MR. HEALEY:  Objection to the form.

15                        THE WITNESS:  The NSJP?

16    BY MR. GIBSON:

17        Q    Correct.  The NSJP as the guiding body of

18    the PSC?

19        A    Yeah.

20        Q    And what does that mean to you?

21        A    It means we share viewpoint, we look to NSJP

22    for ideas about campaigns, social media posts.

23    Broadly things of that nature.

24        Q    To your knowledge, who runs the NSJP?

25        A    I don't know.
⌃

                                                            32

1         Q    Did you describe it as being run by former

2    members of SJP organizations across the country?

3         A    I believe that's who runs it.

4         Q    You believe that's who runs it?  Do you --

5    are you -- strike that.  Do you know anyone who is

6    involved in running the NSJP?

7         A    I don't think so.

8         Q    Do you have no knowledge of any individuals

9    who help run NSJP?

10                   MR. HEALEY:  Objection to the form.

11                   THE WITNESS:  I know perhaps one

12    person, but I don't -- I don't -- I haven't spoken

13    with them in a while.  I'm not sure they're still

14    affiliated.

15    BY MR. GIBSON:

16        Q    And who's that person?

17        A    Nura, N-U-R-A, Bawab, B-A-W-A-B.

18        Q    Do you know where this person is located?

19        A    I think she's in Dallas.

20        Q    Do you know what her profession is?

21        A    No.

22        Q    Have you communicated with this person

23    previously?

24        A    Yes.

25        Q    How did you communicate with Nura Bawab?

33

1    And I apologize if I mispronounce names.

2        A    Yeah.  I think it was over the -- the Signal

3    Messaging app.

4        Q    Have you ever met -- and how do you

5    pronounce your last name again?

6        A    Bawab.

7        Q    Bawab?  It's B-A-W-A-B?

8        A    Yes.

9        Q    Thank you.  Have you ever met Nura Bawab?

10       A    Yes.

11       Q    When did you meet Nura Bawab?

12       A    I met her maybe three or four years ago.

13       Q    In what context?

14       A    I believe it was at a conference.

15       Q    What conference?

16       A    It was a conference put on by National SJP.

17       Q    And to your understanding, what was the

18   purpose of the conference?

19       A    To bring different students from different

20   universities together to exchange ideas on how we can

21   better promote the Palestinian cause on our respective

22   campuses.

23       Q    And approximately when did this conference

24    occur?

25         A    I believe it was in February of '23.

&uarr;

34

1         Q    Have you been to any other National SJP

2    conferences or events?

3         A    Yes.

4         Q    What other NSJP conferences or events have

5    you been to?

6         A    There was one conference in DC.

7         Q    When was that?

8         A    That was in November of '24.

9         Q    Did anyone else from PSC attend the

10    Washington DC conference in November '24?

11         A    Yes.

12         Q    Who else attended?

13         A    My sister, Lamar, Hay, and then Lamya Seyam.

14         Q    Can you spell Lamya's name?

15         A    Yeah.  L-A-M-Y-A, S-E-Y-A-M.  I'm not sure

16    who else.  I think -- I think that could be it.

17    Q    Was anyone else from UT Austin present at

18  that conference to your knowledge?

19    A    I don't -- I don't think so.

20    Q    And were there people from other SJP

21  affiliated schools in Texas at the Washington DC

22  conference?

23                MR. HEALEY:  Objection to the form.

24                THE WITNESS:  Yes.

25  //

35

1  BY MR. GIBSON:

2    Q    Which schools do you recall having attendees

3  present?

4    A    From Texas, I believe UT Dallas and

5  University of Houston.

6    Q    Let's start with the February 2023

7  conference.  Where did that occur again?

8    A    UCLA.

9    Q    Do you recall meeting members of the

10   National SJP at that conference?

11        A    Yes.

12        Q    Do you recall their names?

13        A    Nura.

14        Q    Did you meet anyone else besides Nura who

15   was a member of the National SJP at that conference?

16        A    No.  I don't think so.

17        Q    Do you recall meeting anyone from the

18   National SJP at the Washington DC conference in

19   November of 2024?

20        A    No.  Aside from -- aside from Nura.  No.

21        Q    So Nura was the only person that you recall

22   meeting from National SJP at either conference?

23        A    Yeah.

24        Q    Okay.  Are you currently a member of NSJP?

25        A    No.

⬆

                                                          36

1        Q    Are you currently affiliated with NSJP in

2   any way?

     3      A    No.

     4      Q    Okay.  Did you ever attend any conferences

     5  regarding student organizing in other locations?

     6      A    No.

     7      Q    Did you ever attend a conference in Detroit?

     8      A    Oh.  Yes.  That's not a -- that wasn't a

     9  student organizing conference.

    10      Q    Oh.  Okay.  What conference was that?

    11      A    That was a pro-Palestinian, pro-Palestine

    12  conference.

    13      Q    For like activists?  Who are --

    14      A    Broad.  Broadly, just general.  Yeah.

    15      Q    Have you been to other pro-Palestinian

    16  rights conferences besides the one in Detroit?

    17      A    I don't think so.

    18      Q    Did you meet anyone from NSJP at the Detroit

    19  conference?

    20      A    No.

    21      Q    Was anyone you met at either of these three

    22  conferences at the April 24th protest to your

    23  knowledge?

    24      A    Nura Bawab was there.

    25      Q    To your knowledge, was she arrested?

1      A    No.

2      Q    Did you disclose Nura Bawab as a witness in

3  this case?

4      A    I can't recall.

5      Q    Did you communicate with Nura Bawab

6  regarding planning for the April 24th protest?

7      A    No.

8      Q    Did any, to your knowledge, did anyone from

9  PSC communicate with Nura Bawab regarding planning for

10  the April 24th protest?

11      A    Not to my knowledge.

12      Q    To your knowledge, are members of the PSC

13  from the 2023/2024 period that we discussed, are any

14  of those individuals members of the NSJP?

15      A    Not to my knowledge.

16      Q    Did you know Niro was coming to the April

17  24th protest?

18              MR. HEALEY:  Objection to the form.

19              THE WITNESS:  Yes.

20  BY MR. GIBSON:

21    Q    How did you know that?

22    A    She -- I had invited her to an event the day

23   before that she was -- it was a speaker panel and she

24   was on that panel.

25    Q    Got it.  Okay.  Have you ever had Texas --

38

1    have you ever attended a Texas wide retreat for SJP

2    affiliated organizations at Texas Universities?

3    A    Yes.

4    Q    When did that occur or how many -- let me

5    strike that.  How many have you attended?

6            MR. HEALEY:  Objection to the form.

7            THE WITNESS:  I -- just one.

8   BY MR. GIBSON:

9    Q    When did that occur?

10    A    I believe it was prior to fall '24 semester

11   to the fall '24 semester, like the weeks leading up to

12   it.

13    Q    It was August?  Was it in August?

14    A    That seems -- probably.

15    Q    Okay.  Did you attend one in August 2022?

16    A    No.

17    Q    It would've been in August 2023?  If it was

18    in August, it would've been in 2023?

19              MR. HEALEY:  Objection to the form.

20              THE WITNESS:  No.  I -- I think it

21    would've been -- it would've been 2024.

22    BY MR. GIBSON:

23    Q    It was August 2024?

24    A    Yeah.

25    Q    After the protest?

⌃

39

1    A    Yeah.

2    Q    What happened at the NSJP conference in

3    November of 2024?

4    A    Just sharing of ideas among students from

5    different universities.

6    Q    Were there any materials shared?

7        A     What do you mean?

8        Q     Were there any material --

9        A     Physical materials?

10       Q     Paper or toolkits or other types of

11    materials from the NSJP organization to its members?

12                MR. HEALEY:  Objection to the form.

13                And wait till he is done asking the

14    question before you answer it.

15                THE WITNESS:  No.

16    BY MR. GIBSON:

17       Q     You've received those types of materials

18    from NSJP in other circumstances; correct?

19                MR. HEALEY:  Objection to the form.

20                THE WITNESS:  I personally have not.

21    No.

22    BY MR. GIBSON:

23       Q     Okay.  How did you come into possession of,

24    we'll start with, the Popular University for Gaza

25    Toolkit that was produced in this case?

⌃

1       A    That I believe was sent to PSC.  PSC, I

2  believe, had its own email and so it was there.

3       Q    Who sent that to PSC?

4       A    Like a newsletter.

5       Q    Who?  I mean, like what person or entity

6  sent the Popular University for Gaza Toolkit to the

7  PSC to your knowledge?

8       A    Yeah.  It, to my knowledge, it was sent by

9  NSJP as like a newsletter format.

10      Q    Okay.  So this email address for PSC you

11 mentioned, what's the email address, like literally

12 the email address?

13      A    The last time I was aware of it -- it was

14 just the name Palestine Solidarity Committee, spelled

15 out, at gmail.com.

16      Q    At Gmail?  Do you have access to that?

17      A    No.

18      Q    Who does?

19      A    I don't know.

20      Q    Did you have access to that email address

21 when you were on the PSC?

22      A    For a time.

23      Q    What time period?

24      A    When I joined and then at some point in --

25    at some point in the last year, I was -- I was removed
⬆

41

1    from access.

2         Q    When do you recall being removed from

3    access?

4         A    I can't remember.  I just checked one day.

5    It was --

6         Q    Do you know who has control over that email

7    address?

8         A    No.

9         Q    Who else had control of that email address

10   when you had access to it?

11        A    That email is shared between all the members

12   of of PSC.

13        Q    Do you know who's on the PSC currently?

14        A    No.

15        Q    You don't know who's on the steering

16   committee of the PSC?

17        A    No.

18       Q     Have you been to any PSC events since you

19   returned to campus?

20       A     One.

21       Q     Which event was that?

22       A     It was like a teaching, like a informative

23   event.

24       Q     Do you know who was leading that event?

25       A     I -- I don't think I knew their name.  No.

                                                                42

1        Q     Do you know anyone currently affiliated with

2    the PSC?

3        A     If -- affiliated in -- in what way?

4        Q     Who regularly attends their events?

5              MR. HEALEY:  Objection to the form.

6              THE WITNESS:  No.

7    BY MR. GIBSON:

8        Q     Did you ever forward yourself emails from

9    the Palestine Palestine Solidarity Committee Gmail

10   account to your personal email account?

11       A    I think so.

12       Q    Did you produce any such emails in this

13  case?

14       A    Yes.

15       Q    You did?  To your knowledge, did any of

16  those emails from the

17  palestinesolidaritycommittee@gmail.com email address,

18  which I will go, for going forward, call the PSC Gmail

19  address, did any of those emails from the PSC Gmail

20  address relate to the April 24th protest?

21       A    I believe so.

22       Q    Is it your recollection that you produced

23  those emails in this case?

24       A    Yeah.

25       Q    Okay.  Between October of 2023 and April of

                                                        43

1   2024 is the only SJP event that you went to the

2   conference in Washington DC that you described in

3   November of -- you said that was in November of 2024?

4        A     Yes.

5        Q     Thank you.  I apologize.  Did you go to any

6    PS -- or excuse me.  Did you go to any SJP events

7    between October of 2023 and April 24, 2024?

8        A     No.

9        Q     Do you ever, during that period, did you

10   ever get on conference calls organized by the NSJP

11   regarding organizing at affiliated organizations?

12       A     No.

13       Q     Did you otherwise have any organizing

14   activities with the NSJP during that time period?

15       A     No.

16       Q     Do you have any organizing activities with

17   other SJP affiliated student organizations at other

18   universities during that time period?

19                MR. HEALEY:  Objection to the form.

20                THE WITNESS:  No.

21   BY MR. GIBSON:

22       Q     Did you attend an event in Los Angeles in

23   November of 2023 or relating to Palestinian rights

24   activism?

25       A     No.

44

1      Q    Did you go to Los Angeles in November of

2  2023?

3      A    No.

4      Q    Okay.  Did you have any communications with

5  NSJP from October of 2023 through April 24, 2024?

6      A    No.

7      Q    When did you -- did you have any

8  communications with NSJP before that?

9            MR. HEALEY:  Objection to the form.

10            THE WITNESS:  One, I guess.

11  BY MR. GIBSON:

12     Q    And what were those communications

13     A    At -- at the conference.  That was in

14  February of 2023.

15     Q    Any other communications that you recall?

16     A    No.

17     Q    Okay.  You said you invited Nura Bawab to be

18  a speaker at your event on April 23, 2024?

19     A    Correct.

20     Q    How did you do that?

21     A    I believe I messaged her on Signal and

22    proposed to her the idea and invited her, you know, to

23    come down for that event.

24        Q    Did you produce any Signal communications in

25    this case?

45

1        A    I did.

2        Q    Did you conclude your communications with

3    Nura Bawab?

4        A    No.

5        Q    Is there a reason why not?

6        A    Because they've -- they've since been

7    deleted.

8        Q    Who deleted them?

9        A    I think the app itself deleted them.

10       Q    So how did you have other communications

11    from Signal that you produced?

12       A    Well, when someone creates a Signal group

13    chat, you can create a group chat with disappearing

14    messages.  I think my communication Nura had, I think,

15    she had disappearing messages.

16        Q    And so is the -- so if you go into your

17    Signal app right now, do you have any communications

18    with Nura Bawab?

19        A    I don't believe so.

20        Q    But your communications with the PSC

21    Steering Committee, those still exist in your app?

22                    MR. HEALEY:  Objection to the form.

23                    THE WITNESS:  Yeah.

24    BY MR. GIBSON:

25        Q    Do you have communications with other -- any

⌃

                                              46

1    individual that you've identified as a witness in this

2    case on Signal?

3                    MR. HEALEY:  Objection to the form.

4                    THE WITNESS:  Not outside what I've

5    already provided and as like the screenshots I've

6    already provided.

7    BY MR. GIBSON:

8        Q    So who all have you -- do you have

9    communications with on Signal that are related to this

10    case in any way as witnesses that you've identified

11    other than the PSC communications that you've

12    provided?

13        A    No one else.

14        Q    Do you communicate with your father on

15    Signal?

16        A    No.

17        Q    Communicate with your sister?

18             MR. HEALEY:   Objection to the form.

19    BY MR. GIBSON:

20        Q    Lamar?

21        A    Are you talking about at the time?

22        Q    At any time have you ever communicated with

23    your sister Lamar on Signal?

24        A    Yes.

25        Q    Have you -- did you ever communicate with

47

1    your sister Lamar on signal about the April 24th

2    protest?

3        A    No.

4        Q    Did you use Signal to communicate with a

5    broader group about the April 24th protest?

6                    MR. HEALEY:  Objection to the form.

7                    THE WITNESS:  No.

8    BY MR. GIBSON:

9        Q    Are you aware if anyone of from the PSC used

10   signal in a chat or a chat called Sunbird, I believe,

11   to communicate with protestors at the April 24th

12   protest?

13                   MR. HEALEY:  Objection to the form.

14                   THE WITNESS:  I'm not familiar with

15   that.  No.

16   BY MR. GIBSON:

17       Q    Did you have any -- you don't know anything

18   about that?

19                   MR. HEALEY:  Objection to the form.

20                   THE WITNESS:  No.

21   BY MR. GIBSON:

22       Q    Are you aware sitting here today that that

23   occurred?

24                   MR. HEALEY:  Objection to the form.

25                   THE WITNESS:  No.

48

1    BY MR. GIBSON:

2         Q    Where is that?

3                   MR. HEALEY:  How long have we been on

4    the record?

5                   THE OFFICER:  One hour.  One minute.

6                   MR. HEALEY:  Thanks.

7                   Ammer, just you can let everyone know

8    if you need a break at any time.

9                   THE WITNESS:  Oh.  Sure.

10   BY MR. GIBSON:

11        Q    So you are not aware that on April 24, 2024,

12   members of the protest were communicating through

13   Signal?

14                  MR. HEALEY:  Objection to the form.

15                  THE WITNESS:  I mean, I'm -- I'm sure

16   they were.  I -- I don't know anything about it, but

17   I'm --

18   BY MR. GIBSON:

19        Q    You weren't aware that there was

20    coordination among the attendees through a Signal

21    chat?

22                    MR. HEALEY:  Objection to the form.

23                    THE WITNESS:  Can you be more specific?

24    BY MR. GIBSON:

25        Q    Were you aware that on April 24, 2024, there
⬆

49

1    was coordination among the attendees at the protest by

2    using a Signal chat?

3                    MR. HEALEY:  Objection to the form.

4                    THE WITNESS:  I -- I wasn't involved in

5    any, so I'm -- I'm not aware of any specific

6    conversations because I'm -- I'm not involved in any

7    of those.

8    BY MR. GIBSON:

9        Q    That wasn't my question.  Whether you were

10    aware of specific conversations or whether you were

11    involved, were you aware that attendees at the protest

12    were coordinating in communicating with each other

13    about the protest on April 24th?

14                    MR. HEALEY:  Objection to the form.

15                    THE WITNESS:  No.

16    BY MR. GIBSON:

17        Q    There -- have you ever heard of the Sunbird

18    Signal chat of the Sunbird Signal account?

19                    MR. HEALEY:  Objection to the form.

20                    THE WITNESS:  I don't think so.

21    BY MR. GIBSON:

22        Q    Have you ever been subscribe to the Sunbird

23    Signal account?

24        A    I don't think so.

25        Q    You ever heard of the Sunbird signal
⬆

                                                    50

1    account?

2                    MR. HEALEY:  Objection to the form.

3                    THE WITNESS:  No.

4                    MR. GIBSON:  What's the basis of the

5    objection to the question "Have you ever heard of

6    Sunbird Signal account?"

7                    MR. HEALEY:  Well, I mean, it assumes

8    facts not in evidence, the existence of this Sunbird

9    Signal event.

10                    MR. GIBSON:  I did not assume.  I said,

11    "Have you ever heard of it?"  Doesn't assume it

12    exists.

13    BY MR. GIBSON:

14        Q    Are you aware of a Signal account called the

15    Longhorn Liberated Zone?

16        A    No.

17        Q    Can you describe what activities the PSC

18    took to execute on its mission while you were a member

19    of PSC?

20                    MR. HEALEY:  Objection to the form.

21                    THE WITNESS:  Like you'd like me to

22    explain what?  What exactly?

23    BY MR. GIBSON:

24        Q    The type, what types of activities the PSC

25    engaged into engaged pursue its mission?

51

```
 1       A    PSC, when I was a member, we held different

 2   types of events like educational teaching events,

 3   demonstrations, like letter writing campaigns, email

 4   campaigns, things of that nature.

 5       Q    Expressive activities?

 6                MR. HEALEY:  Objection to the form.

 7                THE WITNESS:  Yeah.

 8   BY MR. GIBSON:

 9       Q    And you had other protests and

10   demonstrations prior to April 24, 2024; correct?

11       A    Yes.

12       Q    You had many of them?

13                MR. HEALEY:  Objection to the form.

14                THE WITNESS:  Yeah.

15   BY MR. GIBSON:

16       Q    And you were a member for -- did I get it

17   correctly?  You were a member for the two, both

18   academic years when you were here?

19       A    Yes.

20       Q    Okay.  So for approximately two academic

21   years, fall of 2022 through April of 2024,

22   approximately how many demonstrations or protests did
```

23    the PSC organize on campus?

24        A    I don't know an exact number.  Maybe like

25    10.

52

1        Q    And you also had other events that weren't

2    protests; correct?

3        A    Correct.

4        Q    Like the panel discussion you talked about

5    that occurred on April 23, 2024; correct?

6        A    Yes.

7        Q    So you would have protests, you would have

8    panel discussions, I think you mentioned teach-ins?

9    Is that correct?

10        A    Correct.

11        Q    What's a teach-in?

12        A    A teach-in is like a lecture about a certain

13    topic.

14        Q    What else?  What other type of events or

15    activities did you engage in?

16          MR. HEALEY:  Objection to the form.

17          THE WITNESS:  There might have been art

18  builds.

19  BY MR. GIBSON:

20    Q    What's an art build?

21    A    Like making signs for protests.  Yeah.

22          MR. HEALEY:  Darren, I don't want to

23  cramp your style, but we've been going for almost an

24  hour and 10 minutes.  I would like to use the restroom

25  if that's all right and we can just take a five-minute

ⵯ

                                                  53

1  break.

2          MR. GIBSON:  Yeah.  Let me just finish

3  this line of questioning and then we can take a break.

4          MR. HEALEY:  Sounds good.

5  BY MR. GIBSON:

6    Q    So engaged in art builds?  You have film

7  screenings?

8    A    Yes.

9                    MR. HEALEY:  Objection to the form.

10   BY MR. GIBSON:

11        Q     Was there a thing called Cafe Resistance?

12        A     Yes.

13        Q     What Is Cafe Resistance?

14        A     That's like a cultural event.

15        Q     What do you mean?

16        A     So there's music, poetry, dancing,

17        Q     There's also a separate Palestinian culture

18   night; correct?

19        A     Not to my knowledge.  No.

20        Q     So you -- do you recall just in April of

21   2024 there was a resistance art gallery on April 1,

22   2024?  Do you recall that?

23        A     Yes.

24        Q     Do you recall the film screening on April 4,

25   2024?

⌃

                                                    54

1        A     I -- I guess so.

2      Q    Do you recall having a Cafe Resistance event

3   on April 12, 2024?

4      A    I -- I'm not sure these are all the correct

5   dates but, I mean, these sound like events that we

6   would've done.

7      Q    And, I mean, I understand you're not

8   testifying to the accuracy of the date, but does it

9   seem like you likely could have had a Palestinian

10  cultural night on April 19, '24?

11              MR. HEALEY:  Objection to the form.

12              THE WITNESS:  No.

13  BY MR. GIBSON:

14      Q    No, that didn't happen?

15              MR. HEALEY:  Objection to the form.

16              THE WITNESS:  You -- you might be

17  referring to something else.

18  BY MR. GIBSON:

19      Q    You didn't have a Palestine culture night on

20  April 19, 2024?

21              MR. HEALEY:  Objection of the form.

22              THE WITNESS:  Yeah.  I -- I think

23  you're referring to something else.

24  BY MR. GIBSON:

25      Q    What do you think I'm referring to?

55

```
 1        A     A different organization, different student

 2   organization putting on a different event, not -- not

 3   a -- it's not a Palestinian event.

 4        Q     What's that organization?

 5        A     I think there's an Arab Student Association.

 6        Q     And then you had the guest speaker panel on

 7   April 23, 2024, right?

 8        A     Yes.

 9        Q     Are you a member of the Arab Student -- you

10   said Arab Student Union?

11        A     Arab Student Association.

12        Q     Association.  Sorry.  Are you a member of

13   that organization?

14        A     Yes.  Is it possible to -- to take our

15   break?

16        Q     Yeah.  Absolutely.  Sorry.  I was just

17   literally trying to get through that list.

18        A     Sure, sure.

19        Q     Yeah.  We can take a five-minute break.
```

20          MR. HEALEY:  Yep.  Sounds good.  Thank

21  you.

22          THE VIDEOGRAPHER:  Going off the

23  record.

24          (Off the record.)

25          THE VIDEOGRAPHER:  Back on the record.
⬆

                                          56

1  Time is 10:34.

2  BY MR. GIBSON:

3      Q    So Ammer, did you speak with anyone other

4  than your attorney during the break?

5      A    No.

6      Q    We were talking about the various activities

7  that the PSC engages in.  And I wanted to ask you, to

8  your knowledge, did the PSC work with the Dean of

9  Students' office to plan the events you referenced on

10  campus?

11      A    When necessary.

12      Q    And to your understanding, when is that

13    necessary?

14        A    To reserve spaces.

15        Q    That's the only time it's necessary for you

16    to communicate with the Dean of Students' office

17    regarding PSC events?

18                    MR. HEALEY:  Objection to the form.

19                    THE WITNESS:  That's -- that's usually

20    been the case.

21    BY MR. GIBSON:

22        Q    Did you find the Dean of Students' office

23    helpful?

24                    MR. HEALEY:  Objection to the form.

25                    THE WITNESS:  I believe so.  Yeah.

^

                                                        57

1    BY MR. GIBSON:

2        Q    WWhat events do you recall, what PSC events

3    do you recall involved coordination with the Dean of

4    Students' office?

5        A    I recall the Israel Block Party Protest

6    having some coordination with Dean of Students.  And

7    then this wasn't a Dean of -- this wasn't an event,

8    but PSC reserves space for these panels, these

9    informative panels, and I believe we've coordinated

10   with Dean of Students for that as well.

11       Q    Do you ever recall coordinating with the

12   Dean of Students on protest other than the Israeli

13   Block Party or Israel block party that you referenced?

14       A    Maybe.  I -- I believe we messaged someone

15   in the Dean of Students about going to Greg Plaza for

16   April 24th.

17       Q    Prior to that, do, and other than the Israel

18   Block Party, do you recall communicating with the Dean

19   of Students regarding any other protest or

20   demonstrations?

21       A    Off the top of my head, I don't recall.

22       Q    Do you remember any communications about the

23   November -- I think you mentioned a November 9, 2023,

24   protest that occurred?

25                MR. HEALEY:  Objection to the form.

58

1                    THE WITNESS:  I can't recall if -- if

2    anyone from PSC had reached out to Dean of Students

3    about that.

4    BY MR. GIBSON:

5        Q    Okay.  Tell me about the -- well, I'll ask

6    you questions about the Israel Block Party.  What's

7    the Israel Block Party?

8        A    The Israel Block Party is a celebration of

9    Israel that is held annually on UT's campus and it's

10   the largest celebration of Israel on any campus in

11   North America.  As a Palestinian, I view this event to

12   be one that appropriates elements of my culture and

13   tries to paint a different narrative than the one that

14   -- that we try to promote of -- about the truth of --

15   of my people's suffering.

16       Q    What happens to your understanding?  Do you

17   attend the Israel Block Party?

18       A    No.

19       Q    Can you see it happening from your -- have

20   you sort of observed it before?

21                   MR. HEALEY:  Objection to the form.

22                   THE WITNESS:  Not -- I haven't been

23   really been able to.

24    BY MR. GIBSON:

25        Q    And you said that the PSC has a protest that
↑

59

1    it's occurring during the Israel Block Party?  Is that

2    correct?

3        A    Correct.

4        Q    And what's happening at your protest?

5            MR. HEALEY:  Objection to the form.

6            THE WITNESS:  At the protest, I recall

7    us chanting during passing periods, sort of trying to

8    call attention to the -- what's being -- what's being

9    left unsaid with this event.  A lot of the same chance

10   that I think we use at other demonstrations.  Yeah.

11   BY MR. GIBSON:

12       Q    Did you work with the Dean of Students'

13   office in April of 2024 to organize your protest to

14   the Israel Block Party?

15       A    I believe PSC did.  Yeah.

16       Q    And do you remember that?  Let me just mark

17    as an exhibit.  Do you have any disputes that they

18    were helpful?

19                    MR. HEALEY:  Objection to the form.

20    BY MR. GIBSON:

21        Q    Or do you agree that they were helpful?

22    That's a better question.

23                    MR. HEALEY:  Object to the form.

24                    THE WITNESS:  I don't think I was ever

25    the one to handle the communications, but I think

⬆

60

1    there were representatives who were helpful.

2    BY MR. GIBSON:

3        Q    Who were those representatives that were

4    helpful?

5        A    I think the one, her name was Sade.

6        Q    Sade Dawson-Love?

7        A    Yes.

8        Q    First exhibit.  I'm handing you what's been

9    marked as Exhibit number 1.

10                    (Exhibit 1 was marked for

11                    identification.)

12                    MR. HEALEY:  Thank you, Darren.

13    BY MR. GIBSON:

14        Q    This is an article from the Austin Chronicle

15    that includes statements from you.  I'll give you a

16    chance to read it.  Do you see your quotes are --

17    start at the fifth paragraph, "PSC member and student

18    Ammer Qaddumi."  Do you see that?

19        A    Yes.

20        Q    Do you disagree with anything in those two

21    paragraphs where you're quoted?

22                    MR. HEALEY:  Objection to the form.

23                    And you can take your time to read

24    those paragraphs before you answer.

25                    THE WITNESS:  Yes, sir.  I just need a
⬆

                                                        61

1    second to read through it.

2    BY MR. GIBSON:

3    Q    Could you see your quotations on the fifth

4  paragraph and sixth paragraph?  You're referenced in

5  the fifth paragraph?

6    A    Yeah.

7    Q    You're quoted in the sixth paragraph;

8  correct?

9    A    Yes.

10    Q    Do you have any disagreement with those

11  statements?

12    A    No.

13    Q    Okay.  Those are accurate to your

14  recollection?  Those are -- the sixth paragraph is an

15  accurate quote from you?

16    A    Yes.

17    Q    And then below that, the 11th paragraph,

18  starting quote, "[UT] understands."  Do you see that

19  paragraph?

20    A    Yes.

21    Q    Is that an accurate quote from you?

22    A    I think in this quote I'm referencing the

23  interactions that I've had with Sade at the time.

24  That was, I think, the only person I had ever had

25  direct communication with, and she has -- she's been

62

1   helpful in the past as well.

2        Q    And she's been helpful in PSC organizing --

3   I'm sorry.  Excuse me.  She's been helpful in

4   coordinating the organization of PSC events with the

5   Dean of Students office?

6                   MR. HEALEY:  Objection to the form.

7                   THE WITNESS:  I think she's a staff

8   with Dean of Students who had been kind of a

9   representative that we communicated with.

10  BY MR. GIBSON:

11       Q    And when you say she's helpful, you mean

12  helpful in working with you on PSC events?

13                  MR. HEALEY:  Objection to the form.

14                  THE WITNESS:  Yes.

15  BY MR. GIBSON:

16       Q    Did you communicate with anyone else from

17  the Dean of Students staff prior to April 24th

18  regarding any PSC events?

19       A    Me personally, no.

20       Q    Okay.  Prior to April 24th, and we'll get to

21  April 24th, but prior to that time, anyone from the

22  Dean of Students staff ever make any comments that

23  suggested they viewed your viewpoint negatively

24  regarding Palestine or Israel or anything there

25  related?

63

1       A    No.

2       Q    And in fact, you said they were served to

3   streamline the process for demonstrating; correct?

4            MR. HEALEY:  Objection to the form.

5            THE WITNESS:  That's what the quote

6   says.  Yes.

7   BY MR. GIBSON:

8       Q    And that's what you said?

9       A    Yes.

10      Q    Did you call, would you describe Sade as

11  helpful?

12           MR. HEALEY:  Objection to the form.

13           THE WITNESS:  Sade was helpful.

14    BY MR. GIBSON:

15         Q    Prior to April 24, 2024, had anyone, any

16    administrator at UT ever communicated anything to you

17    that indicated they had a negative view of your

18    viewpoints regarding the Israel Palestine situation?

19         A    I don't think -- I don't think so.

20         Q    Okay.  And to your knowledge, had anyone,

21    any UT administrator ever communicated any negative

22    viewpoint towards the PSC and its mission prior to

23    April 24th?

24         A    I think if -- if I would have the liberty of

25    -- of being able to explain, I don't recall there ever
♠

64

1    being a direct explicit communication in from any UT

2    administrators explicitly saying they like disagree

3    with our viewpoint, they want to like limit our

4    viewpoint.  However, in the entire year, leading up to

5    April 24th, particularly in the few weeks leading up

6    to it, there was a noticeable, at -- at the very

 7   least, indifference anytime we expressed a concern

 8   about like our safety as students or about our safety

 9   as pro-Palestinian advocates.  When we've communicated

10   with -- with UT officials, and there -- there are many

11   instances that warranted, certainly warranted support

12   from UT administration, at least the statement and --

13   and myself and other students, I think we felt UT

14   administration was not being supportive and protective

15   of us.  They weren't being directly condemning

16   explicitly, like in -- in words.  But their general

17   attitude towards us was different than the way I felt

18   they were treating other -- other groups of students.

19        Q    Which administrators are you referring to?

20        A    Broadly to Jay Hartzell's administration.

21        Q    Any particular person besides President

22   Hartzell?

23        A    No.

24        Q    Did you ever, well, did you ever communicate

25   any concerns regarding your safety based on your

1  viewpoint to President Hartzell?

2       A    There was an email campaign that PSC ran in

3  which myself and other students sent emails to the

4  effect of, if I recall correctly, to the effect of

5  demanding accountability, you know, for student

6  safety.

7       Q    Okay.  When was this email campaign?

8       A    I can't recall exactly.  It was -- it was

9  sometime that year.  I -- I can't recall if it was

10 fall or spring.

11      Q    Sometime between October and April of 2024?

12      A    October of 2023 and April 2024.

13      Q    Thank you.  Sometime in that period?

14      A    Yes.  I believe so.

15      Q    Did you send an email to President Hartzell?

16      A    I can't recall.  I can't recall if I -- if I

17 did or did not.

18      Q    Do you recall producing any of these emails

19 that were sent in this litigation?

20      A    No.

21      Q    Do you know anyone who did send an email to

22 President Hartzell?

23      A    No.  But I -- I don't know who did and who

24 didn't.

25      Q    Okay.  But your understanding is there was

66

1    an email the PSC organized an email campaign where

2    students were to send emails to President Hartzell

3    expressing concerns about their safety as based on

4    their support of the Palestinian cause?

5                    MR. HEALEY:  Objection to the form.

6                    THE WITNESS:  I believe that was -- I

7    believe that's what that email campaign was about.

8    BY MR. GIBSON:

9       Q    But you don't remember sending one yourself;

10   correct?

11      A    I can't recall.

12      Q    And you are not aware of, you can't identify

13   a specific individual that sent one of those emails?

14      A    No.

15      Q    Do you know if your sister sent one of those

16   emails?

17      A    I'm not sure.

18      Q    Okay.  Do you know how many emails were

19  sent?

20      A    No.

21      Q    So you're not sure that a single email was

22  sent?

23              MR. HEALEY:  Objection to the form.

24              THE WITNESS:  I -- I don't -- it wasn't

25  a thing where you keep tab, where like we kept tabs on

⬆

67

1   who did and didn't.  We -- it was like just putting

2   out a call to send emails, which I think -- I think

3   people did.

4   BY MR. GIBSON:

5       Q    Okay.  Do you know what if there was any

6   response to those emails?

7       A    I think if there was any response, it was --

8   it was like a secretary kind of template response that

9   -- that didn't really address like the specific

10  concerns that students needed to addressing.

11      Q    Did you see this response?

12      A    No.  I just heard these -- I just heard

13   things from people.

14      Q    Who did you hear this from?

15      A    I can't recall.

16      Q    Okay.  Do you know who sent this alleged

17   response?

18      A    No.

19      Q    And your statement is based on the -- am I

20   understanding your testimony correctly that based on

21   the university's response to this email campaign, you

22   believe they did not take the safety of students

23   supporting the Palestinian cause seriously?  Is that

24   my understanding?

25              MR. HEALEY:  Objection to the form.
⬆

                                             68

1    BY MR. GIBSON:

2       Q    Is my understanding correct?

3              MR. HEALEY:  Objection.

4                    THE WITNESS:  Not -- not based off of

5      this alone.

6      BY MR. GIBSON:

7          Q    Okay.  What else?

8                    MR. HEALEY:  Objection to the form.

9                    THE WITNESS:  There were several events

10     that transpired over the course of that year which we

11     demanded accountability for.  On October 12th, PSC

12     held a -- a teach-in on campus in the evening, and we

13     were harassed by three older men who -- who sort of

14     stormed in, screamed at us, hurled insults, told us

15     they were going to go back to Israel to kill more

16     Arabs, calling us effing terrorists, and, you know,

17     telling us just all sorts of terrible things, throwing

18     -- throwing papers at us.  And there's video of this.

19     And we -- someone in PSC filed a report, I think, with

20     UT Police about it.  I spoke with several news outlets

21     about it.  So it was very well known.  It's -- it is

22     very publicly known.  This was like a -- an issue that

23     demanded accountability.  There's a national article.

24     Actually, there's an NBC article about it as well.  So

25     it's no secret that this was -- this was a -- a

⌃

69

1  terrible event that would threaten student safety and

2  UT administration did not, in my view, demonstrate

3  adequate support or assurance for myself or my family

4  that my safety was being insured by those who -- those

5  who were responsible for my safety being UT

6  administration.

7  BY MR. GIBSON:

8      Q    What did you want them to do?

9      A    To condemn that.  To condemn these men

10 coming in and -- and harassing students based on our

11 viewpoint.

12     Q    How would they condemn them?

13               MR. HEALEY:  Objection to the form.

14               THE WITNESS:  What?

15 BY MR. GIBSON:

16     Q    What do you mean condemn them?

17     A    By issuing a statement.

18     Q    Do you know if UT took any action in

19 response to the complaint?

20               MR. HEALEY:  Objection to the form.

21               THE WITNESS:  I do know that Jay

22    Hartzell's office did issue a statement, but that

23    statement did not, in my view, adequately address our

24    concern and -- and demonstrate a real concern for my

25    safety and other student safety, other pro-Palestinian

70

1    student safety.

2    BY MR. GIBSON:

3        Q    Why not?

4        A    Just because it -- it just did not.  It --

5    the -- the language was like, as someone who, if -- if

6    someone impartial, in my view, read this, it would --

7    it doesn't give the indication that this is like

8    something that is strongly condemned and that student

9    safety is of the utmost priority.

10       Q    You said there's a video of this, that this

11   event?

12       A    Yes.

13       Q    Did you produce it?

14       A    I'm not sure.  I'm not sure.

15      Q    Do you have this video?

16      A    I am not sure if I have the video, but the

17  video is posted in several places online.

18      Q    So the PSC filed a report?  Who in the PSC

19  filed a report?

20              MR. HEALEY:  Objection to the form.

21              THE WITNESS:  I can't recall exactly.

22  I believe - I can't recall exactly.  It was a while

23  ago.

24  BY MR. GIBSON:

25      Q    Have you seen this report?

᠕

                                                    71

1      A    No.

2      Q    Do you have a copy of this report?

3      A    No.

4      Q    Who did they file the -- oh.  I'm sorry.

5  Who was this report filed with?

6      A    I'm not sure about all the specifics of --

7  of the report.  I'm -- I'm not sure who it was

8  directly filed with.  All I've heard is it was filed

9  with UT Police.

10       Q    With UT Police?  Who -- who told you that?

11       A    One of, -- one of the people who were -- who

12  were on steering at the time.  I can't -- I can't

13  remember who would -- who exactly.

14       Q    So one of the PSC members on the steering

15  committee told you about this, but you can't remember

16  precisely who?

17                 MR. HEALEY:  Objection to the form.

18                 THE WITNESS:  Yes.

19  BY MR. GIBSON:

20       Q    Do you know if there was an investigation?

21       A    What I heard was there was an investigation

22  that found no wrongdoing.

23       Q    Who told you that?

24       A    I think it was, again, a -- a member of the

25  PSC.  The person, I think there was one person who was

72

1  kind of took on the task of handling that.

2       Q    Do you remember who that was?

3       A    No.

4       Q    Did you produce any documents relating to

5  this event in your production?

6       A    I'm not sure.

7       Q    Were there communications about this event

8  on the PSC steering committee Signal chat?

9       A    I don't think so.

10      Q    Did anyone ever identify who these three

11  older men were?

12           MR. HEALEY:  Objection to the form.

13           THE WITNESS:  I think -- I think there

14  might have been a screenshot.  I don't -- I don't

15  think -- I don't think so.  There might have been a

16  screenshot I saw somewhere, but I can't recall

17  exactly.

18  BY MR. GIBSON:

19      Q    And you didn't know who they were?

20      A    No.  We didn't know who they were.

21      Q    Did anyone in the PSC know who they were?

22           MR. HEALEY:  Objection to the form.

23  BY MR. GIBSON:

24      Q    To your knowledge?

25      A    No.

73

1       Q    Did they seem to be of average student age?

2                 MR. HEALEY:  Objection to the form.

3                 THE WITNESS:  No.  They were older men

4    who were very aggressive and we're definitely not

5    students.

6    BY MR. GIBSON:

7       Q    Got it.  And you wanted the university to

8    take action to assure your safety?

9                 MR. HEALEY:  Objection.  Objection to

10   the form.

11                THE WITNESS:  To -- to show that they

12   care about our safety and that this type of aggression

13   against students with my viewpoint is -- is

14   unacceptable on -- on campus.

15   BY MR. GIBSON:

16      Q    Would that include having university

17   administrators attend events?

18                MR. HEALEY:  Objection of the form.

19                    THE WITNESS:  Not necessarily.

20   BY MR. GIBSON:

21       Q    Could it?

22                    MR. HEALEY:  Objection to the form.

23                    THE WITNESS:  Perhaps.

24   BY MR. GIBSON:

25       Q    If you're asking the university to help
⬆

                                                        74

1    ensure safety, then you think that having university

2    administrators and employees at events is a reasonable

3    response to that request for safety?

4        A    Perhaps it is.

5        Q    You think having law enforcement attend

6    events could also be a reasonable response to help

7    ensure safety at events?

8                    MR. HEALEY:  Objection to the form.

9                    THE WITNESS:  Perhaps it could.  None

10   of those things happened though.

11   BY MR. GIBSON:

12      Q    So you're saying that administrators didn't

13  never attended PSC events?

14              MR. HEALEY:  Objection to the form.

15              THE WITNESS:  I think there were a few

16  events where administrators did attend that event.

17  Actually, I think there was an administrator in

18  attendance who had left like very soon before those

19  men arrived.  But I -- I don't -- I don't know what

20  material, tangible action anyone else in PSC was

21  expecting.  What -- what I was expecting was just a

22  statement condemning this kind of behavior so that

23  others did not feel empowered to then continue in that

24  behavior like -- like they did -- like they did

25  further along in the year.

                                                    75

1  BY MR. GIBSON:

2      Q    So you said there was other events where

3  things occurred?  What other events?

4              MR. HEALEY:  Objection to the form.

5              THE WITNESS:  Yes.  There were other

6    events in West Campus, which is a predominantly

7    student neighborhood.  There's a man who was stabbed

8    for having a Palestinian flag.  This was something

9    that, again, PSC promoted and was -- was public

10   knowledge in -- in local media that this was

11   essentially a hate crime.  And so, again, myself, you

12   know, I expected UT to issue some sort of condemnation

13   of this type of behavior just to show pro-Palestinian

14   students that -- that they, that, you know, our safety

15   is -- is of concern to our administration.  I recall

16   UT issuing a statement saying "Because it happened off

17   campus, it's not our issue."  Something to that

18   effect.

19   BY MR. GIBSON:

20        Q    Okay.  When did this occur?

21              MR. HEALEY:  Objection to the form.

22              THE WITNESS:  I believe it was -- I

23   believe it was like January or February of 2024.

24   BY MR. GIBSON:

25        Q    And what, to your knowledge, what

76

1    circumstances indicated that the person was stabbed

2    based on any expressive activity in support of

3    Palestine?

4        A    There's direct testimony from him and from

5    his family.  I believe there were also eyewitnesses

6    who -- who like spoke in local media.

7        Q    Yeah.  And to your recollection, what did

8    they -- what circumstances gave rise to their

9    conclusion that it was based on that intent?

10                MR. HEALEY:  Objection to the form.

11                THE WITNESS:  The -- the story of what

12   happened has -- has been like, posted on local news.

13   The story that, as I recall it, is the Palestinian,

14   the pro-Palestinian man was in his truck with a flag

15   hanging out and an agitator came up and tried to steal

16   his flag, tried to like, you know, like steal it from

17   him, and the man pulled back because he didn't want

18   his -- his flag to be stolen and then the assaulter

19   that stabbed him.

20   BY MR. GIBSON:

21       Q    Anything else?  Any other events that made

22   you feel that the university was not responding

23    appropriately to your concerns of safety?

24         A    Multiple students just reported on just in

25    conversation that they had -- they had received verbal
↟

                                                        77

1    abuse and threats from other students or other people

2    around campus.  And I -- I've heard that they reported

3    those to the university.  Yeah.

4         Q    Do you have names of any students who made

5    reports to the university?

6         A    No.

7         Q    You have -- you don't know of single, you

8    can't name a single person who allegedly made a report

9    of this behavior?

10                   MR. HEALEY:  Objection to the form.

11                   THE WITNESS:  I can't recall.  Yeah.

12   BY MR. GIBSON:

13        Q    Did you ever make such a report?

14                   MR. HEALEY:  Objection to the form.

15                   THE WITNESS:  I don't think so.

16   BY MR. GIBSON:

17       Q    You said in connection with the man who was

18   stabbed in West Campus that the university made a

19   statement is your recollection?

20       A    My recollection is they issued a statement

21   saying that because this was not on campus that they

22   are -- that they're delegating the issue or some other

23   word to law enforcement and they may -- I don't recall

24   them making any further comment.

25       Q    Any other events that you would point to
↟

78

1    that made you feel the university wasn't adequately

2    addressing your safety concerns?

3                    MR. HEALEY:  Objection to the form

4                    THE WITNESS:  For safety concerns, I --

5    I don't think there were any other events where we

6    were concerned about safety concerns.

7    BY MR. GIBSON:

8        Q    Any other events where you've -- so let me

 9    go back.  This line of questioning started with me

10    asking you whether university administrators had ever

11    made any statements that indicated to you a bias

12    against your viewpoints regarding Palestine.

13                 MR. HEALEY:  Objection to the form.

14    BY MR. GIBSON:

15        Q    And you indicated you could not point to any

16    specific statements, but there were certain events

17    that occurred that made you feel the university wasn't

18    adequately responding to those events; correct?

19        A    Correct.

20        Q    Are there any other instances or events that

21    you believe reflect the university's biased against

22    your viewpoints on Israel and Palestine?

23        A    Yes.

24        Q    What are those?

25        A    The Israel Block Party Protest that took
⌃

                                                        79

 1    place a few weeks prior to the April 24th protest is

2    an annual protest, so it's one that PSC holds every

3    year in the same fashion.  And unlike prior years,

4    which in -- which I attended those -- those protests,

5    this -- this past year in 2024, PSC was investigated

6    by the Dean of Students for potential rules

7    violations.  And while PSC was not found responsible,

8    was not found guilty of any violations, the fact that

9    there is even an investigation is -- is very different

10   and very strange, sort of -- sort of a departure from

11   how they treated us in the past.

12        Q    To your knowledge, do you know why there was

13   an investigation?

14        A    Only on the speculation.

15        Q    What's your speculation?

16             MR. HEALEY:  Objection to the form.

17             THE WITNESS:  I believe the governor's

18   executive order, which had been issued a week prior,

19   influenced the university's attitude towards us.

20   BY MR. GIBSON:

21        Q    Are you referring to the governor's

22   executive order regarding antisemitism on college

23   campuses?

24        A    The executive order in which he named PSC as

25   a group that universities should target and punish.

80

1        Q     And why do you think that executive order

2   influenced decision makers at the university?

3        A     Because this was an annual protest that was

4   held in the same manner and the only difference was

5   the existence of this executive order, which had only

6   come out a week prior.

7        Q     Had the PSC been subject to any disciplinary

8   actions prior to the Governor Abbott's executive

9   order?

10       A     Not to my recollection.

11       Q     Do you remember attending a speech by a Bari

12   Weiss?

13       A     Yes.

14       Q     Tell me about that?  What happened at that?

15       A     Bari Weiss was invited to speak at UT and I

16   attended a walkout in protest of -- of her and her --

17   her anti-Palestinian, hateful views.

18       Q     Was there any disciplinary action relating

19   to the PSCs walk out of the Bari Weiss event?

20                MR. HEALEY:  Objection to the form.

21                THE WITNESS:  No.  Because PSC was not

22    involved in that.

23    BY MR. GIBSON:

24        Q    Who was involved in that?

25        A    From my understanding, it was a group of
↥

                                                          81

1    students who took it upon themselves after PSC had

2    made it -- had kind of made it clear to the students

3    that we were not going to be doing it.

4        Q    Do you know if any disciplinary action

5    occurred relating to the walkout of the Bari Weiss

6    event?

7        A    I don't recall any disciplinary action,

8    however, I do recall YouTube making a very public

9    statement public in -- in the sense that it was a

10   Tweet in which they used fairly strong language and

11   accused myself and other students generally as being

12   like -- as coordinating and conceiving this

13    disruption.  They -- they made it sound very -- used

14    very strong language for this which -- which

15    highlights the lack of language they use when -- when

16    we have concerns that need addressing.

17         Q    Did did the walkout disrupt the event?

18                   MR. HEALEY:  Objection to the form.

19                   THE WITNESS:  Probably.

20    BY MR. GIBSON:

21         Q    Is that a violation of university rules to

22    disrupt an event?

23                   MR. HEALEY:  Objection to the form.

24                   THE WITNESS:  I'm not sure what the

25    specific rule is.

                                           82

1    BY MR. GIBSON:

2         Q    To your understanding though, is it a

3    violation, without knowing the specific rule, to your

4    understanding, is it a violation of university rules

5    to disrupt an event that's taking place?

6            MR. HEALEY:  Objection to the form.

7            THE WITNESS:  I don't -- I think I've

8    heard -- I think I've heard of a -- I think I've heard

9    of some type of rule, but I'm -- I'm not too sure.

10   BY MR. GIBSON:

11      Q    Okay.  Were you subject to any disciplinary

12   action based on that event?

13      A    No.

14      Q    Do you remember going to an event involving

15   a speaker called Yaron Brooke?

16      A    No.

17      Q    Okay.  Was that the only walkout of a

18   speaker event that you engaged in?

19            MR. HEALEY:  Objection to the form.

20            THE WITNESS:  No.

21   BY MR. GIBSON:

22      Q    What other walkouts did you engage in?  And

23   when I say that, at UT?

24      A    I believe there was a walkout in fall of

25   2022 against like a former member of like the Israeli

1   military.

2       Q    Did any --

3       A    No.  The -- sorry.

4       Q    Sorry.  Any others?  Any others that you

5   recall?

6       A    No.

7       Q    Did anything happen to you based on -- in

8   participating in a walkout of that speaker in the fall

9   of 2022?

10              MR. HEALEY:  Objection to the form.

11              THE WITNESS:  No.

12  BY MR. GIBSON:

13      Q    Are you aware of PSC organizing any other

14  walkouts or counter protests at other events?

15              MR. HEALEY:  Objection to the form.

16              THE WITNESS:  Not to my recollection.

17  BY MR. GIBSON:

18      Q    Do you recall the Dean of Students office

19  confirming many requests to use outdoor space made by

20  the PSC in 2023 and 2024?

21              MR. HEALEY:  Objection to the form.

22              THE WITNESS:  Am I aware?  Yeah.  If

23  I'm thinking of the right scenarios, I -- I think so.

24   Yeah.

25   //

&uarr;

84

1   BY MR. GIBSON:

2        Q    So because you mentioned previously that you

3   coordinated with Sade Dawson-Love with respect to

4   various events and protests; correct?

5        A    Correct.

6        Q    And is that the person you would request to

7   reserve outdoor spaces at UT?

8                    MR. HEALEY:  Objection to the form.

9                    THE WITNESS:  I believe so.

10   BY MR. GIBSON:

11       Q    And do you recall her approving, prior to

12   April 24, 2024, approving numerous requests by the PSC

13   to reserve outdoor space?

14       A    I believe so.

15       Q    Do you recall her ever telling you you

16   couldn't reserve outdoor space?

17                    MR. HEALEY:  Objection to the form.

18                    THE WITNESS:  I believe so.

19     BY MR. GIBSON:

20          Q    Which one?  Which events did she ever tell

21     you couldn't use outdoor space?

22          A    It wasn't for an event.  It was for the

23     panels, the informative panels, which we reserve a

24     space for a week.  And the typical space we reserve

25     was in use, which we -- which we weren't aware of, and

85

1     she told us we couldn't use it so we had to find a

2     different location.

3          Q    Did she assist you in finding a different

4     location?

5          A    I -- probably.

6          Q    Did she ever attempt to preclude you from

7     engaging in any expressive activity?

8          A    No.

9          Q    Do you recall meeting with anybody else from

10    the Dean of Students regarding expressive activity

11    prior to April 24, 2024?

12         A    No.

13         Q    Do you recall meeting with anyone from the

14    Dean of Students' office to discuss the PSC's counter-

15    protest at the Israel Block Party?

16         A    No.

17         Q    You didn't meet with anyone?

18              MR. HEALEY:  Objection to the form.

19    BY MR. GIBSON:

20         Q    From the Dean of Students' office about that

21    event?

22         A    No.

23         Q    Do you know if anyone from PSC met with the

24    Dean of Students' office regarding that event?

25         A    I'm not sure.

⬆

86

1         Q    Were you the person that would typically

2    meet with the Dean of Students' office or communicate

3    with the Dean of Students' office regarding holding

4    events?

5                      MR. HEALEY:  Objection to the form.

6                      THE WITNESS:  No.

7    BY MR. GIBSON:

8        Q    Who was?

9                      MR. HEALEY:  Objection to the form.

10                     THE WITNESS:  I think it would just be

11   different.  It wasn't, I don't think, any one

12   particular person.

13   BY MR. GIBSON:

14       Q    So it could be any member of the PSC could

15   meet with the Dean of Students' office to discuss

16   organization of a particular event?

17                     MR. HEALEY:  Objection to the form.

18                     THE WITNESS:  Yes.

19   BY MR. GIBSON:

20       Q    Going back to the Israel Block Party, that

21   is what's referenced in Exhibit 1; correct?

22       A    Yes.

23       Q    When you were interviewed, did you

24   communicate any of the concerns that you've

25   communicated today about the university's response to

87

1   the PSC?

2        A    The -- which response?

3        Q    Today you've -- I just want to -- you have

4   communicated today that you had concerns regarding the

5   university's response to safety concerns expressed by

6   members of the pro-Palestine community; correct?

7        A    Correct.

8        Q    But in this article, you talk about the

9   university's response to PSC having a demonstration at

10  the Israel Block Party; correct?

11       A    I'm sorry.  Can you repeat that?

12       Q    In this article, Exhibit 1, you talk about

13  the university's response to the PSC's protest at the

14  Israel Block Party?

15       A    Yes.

16       Q    During this interview, did you communicate

17  any of the concerns you've expressed today about the

18  university's response to prior concerns about safety?

19       A    There's a good chance I did.  Yeah.  Whether

20  the -- whether the reporter includes in the articles

21    another thing.

22         Q    Got it.  Do you recall specifically

23    expressing those concerns?

24         A    I mean, it's been a while.  I can't -- I

25    can't recall.

↑

88

1         Q    Okay.  Were there any conflicts that

2    occurred between the Israel Block Party attendees and

3    the PSC members at the IBP protest?

4                   MR. HEALEY:  Objection to the form.

5                   THE WITNESS:  No.  I don't think so.

6    BY MR. GIBSON:

7         Q    Were there any conflicts that day that you

8    recall that between the PSC and others outside the PSC

9    relating to the protest?

10         A    By conflicts, you mean -- you mean what

11    exactly?

12         Q    Interactions where words were expressed,

13    physical interactions, harassment, anything like that?

14        A    I -- I don't recall being at the protest for

15    the its entire duration and go on for like a few

16    hours, I believe.  I think people who were there at

17    times when I was not there said that there were --

18    there were like UT officials who were being a little

19    bit more kind of micromanaging of -- of the students

20    who were at the protest.  Sade might have been among

21    them, but I -- I heard that UT officials were being a

22    little bit more like surveillance or surveilling --

23    surveilling that, our demonstration, a little bit more

24    closely.

25        Q    And you had, you wanted UT to take more

⌃

                                                         89

1    actions to protect the safety of PSC members; correct?

2        A    Yeah.

3        Q    Okay.  Do you have a problem that with there

4    being UT administrators surveilling the protest,

5    whatever that -- I'm not sure what you mean by that?

6                 MR. HEALEY:  Objection to the form.

7            THE WITNESS:  So when I say

8    surveilling, I mean there were more of them present

9    than -- than I -- I had -- I recall there being in

10   like prior years, which is one thing.  But then there

11   were more, there were more critiques from what I've

12   heard that -- that they would -- that they would tell

13   people like -- like they would be more strict about

14   the passing period.  They'd be more strict about

15   certain -- certain things that, which I just -- I

16   heard the -- there were things they did that were

17   different from prior years.

18   BY MR. GIBSON:

19        Q    What's the passing period?

20        A    A passing period is the period in which

21   classes will usually, like, you know, end and students

22   will then be walking into their next like class.

23        Q    Okay.  So this protest was occurring during

24   a academic day, during the week?

25        A    Yes.
⌃

1      Q    And classes were letting in and out and

2   students were going, were walking through the campus?

3                 MR. HEALEY:  Objection to the form.

4                 THE WITNESS:  Correct.

5   BY MR. GIBSON:

6      Q    And where was the PSC's protest?

7      A    On campus.

8      Q    Where on campus?

9      A    On Speedway.

10     Q    Where?  Where on Speedway?

11     A    Speedway and 21st Street, I believe.

12     Q    Is that near the PCL?

13     A    Yes.

14     Q    And when you say they were being more strict

15   about the passing period, what do you mean to your

16   understanding?

17     A    To my understanding, in prior years there

18   was like some bleed, like, in -- in the chanting it

19   would like bleed maybe a few, like 30 seconds, a

20   minute over the passing period.  And in my past

21   experience it's sort of been understood that, like,

22   that's fine, it's whatever a minute, what, big deal.

23   But then from what I recall is in, at this protest,

24   they were kind of more hard line, like when the past

25  few was over and the chant went -- went over, they
⬆

91

1  would go to whoever seemed to be leading a chant,

2  said, "Hey, you can't -- you can't be going over the -

3  - the passing period," like, "Passing period ended and

4  you still kept chanting."  Yeah.  These are things I

5  heard.  I wasn't directly there to witness those, but.

6       Q    Do you recall any other ways in which

7  university officials were treating the 2024 IBP

8  protest differently than in prior years?

9            MR. HEALEY:  Objection to the form.

10            And just for the record, when you say

11  "IBP," do you mean Israel Block Party?  I don't think

12  we ever clarified that.

13            MR. GIBSON:  Yes.  I do.

14            THE WITNESS:  Administration dictated

15  that we could not hold the protest in the same place

16  that we'd held it in prior years.  Usually that

17  would've been on the steps of the McCombs Building

18  across from Greg Plaza.  They dictated that we could

19  not do it there and -- and so it ended up being at the

20  corner of 21st and Speedway.  Off the top of my head,

21  I can't recall other -- the other ways in which they

22  might have acted differently.

23  BY MR. GIBSON:

24      Q    Do you know why they, what reason was

25  offset for not having the protest at the McCombs

↟

                                                    92

1   Building and instead moving it to a different

2   location?

3       A    I don't recall them really offering a

4   reason.

5       Q    Did were you -- I'm sorry.  I didn't mean to

6   interrupt you.

7       A    They -- they just -- they just said, yeah,

8   to move it.

9       Q    Were you communicating with anyone from UT

10  administration regarding the IBP protest?

11      A    I did not.  No.

12      Q    Okay.  So anything you heard from the

13  university was secondhand from other members of the

14  PSC?

15              MR. HEALEY:  Objection to the form

16              THE WITNESS:  For a fair number of --

17  of things.  I was not like the direct correspondent.

18  There was someone else doing it that I would then ask.

19  BY MR. GIBSON:

20      Q    Who was the person responsible for

21  communicating with the university regarding the IBP

22  protest?

23      A    I, again, this is something that's shared

24  among all members so I can't remember who exactly.  It

25  -- it could have been Jenna, but again, I'm not -- I'm

93

1  not entirely sure.

2              MR. HEALEY:  Darren, are you at a

3  natural stopping point for a break, or?

4                    MR. GIBSON:  I don't need a break to

5        keep going.  I would like to keep going.  If you need

6        a break, we can take a break.

7                    THE WITNESS:  I actually was -- how

8        much time are we at?

9                    THE OFFICER:  Two hours and eight

10       minutes.

11                   MR. HEALEY:  So it's been about an hour

12       since --

13                   THE WITNESS:  A while.  Oh.  So, I

14       mean, I -- I was actually kind of about to -- to ask

15       if -- if that would be okay.

16       BY MR. GIBSON:

17           Q    How long of a break do you need?

18           A    10 minutes, 5, 10 minutes.  Yeah.

19                   MR. HEALEY:  Okay.  Let's -- yeah.  I

20       think last time we said five minutes it was more like

21       10.  Let's make sure we're back in 10.

22                   THE WITNESS:  Yeah.  Yeah.  Ten.  Yeah.

23       Okay.

24                   THE VIDEOGRAPHER:  Going off the

25       record.  Time is 11:31.

94

1          (Off the record.)

2          THE VIDEOGRAPHER:  Back on the record.

3   The time is 11:41.

4   BY MR. GIBSON:

5      Q    I just want to go back to the incident

6   regarding the stabbing that you mentioned previously.

7   Are you aware that the Austin Police Department

8   identified and indicted a suspect for that?

9      A    Yes.

10     Q    Do you want -- but you want more than that

11  to be done?

12          MR. HEALEY:  Objection to the form.

13          THE WITNESS:  This was something that

14  happened in the student neighborhood, so it's not on

15  campus but it's adjacent.  And myself and my family,

16  we were very concerned that something like this could

17  happen and felt that it's the university's

18  responsibility to reassure us that they care and that

19  they will, like, they condemn or they'll take

20  measures, something to reassure us, which they did not

21  do.

22   BY MR. GIBSON:

23        Q     Did you ask them to?

24        A     Publicly.

25        Q     How -- how so?

⬆

95

1        A     And -- and speaking to media, there was the

2   witnesses.  Sorry.  The -- the victim.  There was like

3   a, actually, like a press conference soon after at

4   city hall.  It was like, you know, a public press

5   conference.

6        Q     You attended that press conference?

7        A     I did.  I mean, it's -- it's no secret that

8   this is -- that this is an event of concern.

9        Q     I just want to confirm something which I

10   think is pretty clear.  Let me know when you have a --

11   we were just asking about these, actually.  Image.

12   There you go.  You see an image?

13        A     I do.

14        Q     That is not you, is it?

15      A    No.

16      Q    Do you know who that is speaking?  And let

17  me -- you could turn that one up.

18              MR. HEALEY:  One second.  Yeah.  What

19  I'm -- I'm getting extremely quiet sound.

20              MR. GIBSON:  Yeah.  Can we turn this

21  one up?

22              MR. HEALEY:  Do you know how we do

23  that?  It's a touch screen.

24              MR. GIBSON:  Is it touch screen?

25              THE OFFICER:  No.  He --

&

96

1              MR. GIBSON:  I think it's over here.

2  He's got it.  Got you.

3              MR. HEALEY:  That's doing the

4  brightness.  I'll let you take care of that.

5              MR. GIBSON:  Yeah.  I'll just -- it was

6  louder before.  It's as loud as the monitor.  Well,

7  I'll unplug those.

8     BY MR. GIBSON:

9        Q     But you can see this?

10       A     I can.

11       Q     Ammer, can you hear?

12       A     No.  Not -- not really.

13       Q     But that's not you?

14       A     No.  It is not me.

15       Q     And does this look familiar in terms of an

16   event that you attended?

17       A     No.

18       Q     Okay.  That's all I wanted to confirm.  And

19   just for the record, this is a video that was attached

20   to --

21              THE OFFICER:  Do you want to stop

22   sharing?

23              MR. GIBSON:  Oh.  Thank you.

24              A video that was attached to Dr.

25   McGee's deposition.  Declaration, excuse me.

97

1    Regarding events she references regarding Yaron Brooke

2    that she redresses in her declaration.

3                   MR. HEALEY:  Was that produced to us?

4                   MR. GIBSON:  Yes.

5                   MR. HEALEY:  As an attachment to her

6    declaration?

7                   MR. GIBSON:  Pretty sure.

8                   MR. HEALEY:  Can you tell me the Bates

9    number?

10                  MR. GIBSON:  I cannot.  We'll confirm.

11   We'll confirm.  And if it wasn't, certainly the

12   declaration was sent to you.

13                  MR. HEALEY:  The declaration was

14   produced?

15                  MR. GIBSON:  I think the exhibits were

16   produced, but I'm not sure if the videos were

17   produced.  If not, we can certainly produced the

18   videos that were attached.

19                  MR. HEALEY:  Okay.  The exhibits, just

20   so you know, in the declaration, just say like

21   document produced in its native format or something

22   like that.  They're just slip sheets.  So yeah.  I'll

23   need to know what the base number is.

24                  MR. GIBSON:  I will --

25                  Can we do that?

⬆

98

1               MR. JOZWIAK:  Yeah.

2               MR. GIBSON:  Thank you.

3               Could you enter that as an exhibit?

4               THE OFFICER:  I can.  Yes.

5               MR. GIBSON:  It's Exhibit 2 and it is,

6      just for the record, the file number is starts with

7      24815.

8               (Exhibit 2 was marked for

9               identification.)

10     BY MR. GIBSON:

11          Q    Okay.  Okay.  So you've described yourself

12     as PSC's unofficial spokesperson; correct?

13          A    Correct.

14          Q    Were you responsible for managing the PSC's

15     Instagram account?

16          A    No.

17          Q    Who was?

18          A    That was a shared responsibility.

19     Q     Did all of the members have the ability to

20  modify the Instagram account?

21               MR. HEALEY:  Objection to the form.

22               THE WITNESS:  I think most of them did,

23  if not all of them.

24  BY MR. GIBSON:

25     Q     Did you?

                                                          99

1     A     Yes.

2     Q     Did you occasionally post or content onto

3  the PSC's Instagram account?

4     A     Yes.

5     Q     Did you also follow the SJP Instagram

6  account?

7               MR. HEALEY:  Objection to the form.

8  BY MR. GIBSON:

9     Q     At that time, April 2024?

10     A     Did --

11               MR. HEALEY:  Objection to the form.

12                THE WITNESS:  Did -- did I personally

13   follow which account?

14   BY MR. GIBSON:

15        Q    The SJP's National account?

16        A    NSJP's account?  I believe so.  I did.

17   Yeah.

18        Q    So are you familiar with the Gaza Solidarity

19   encampment that occurred at Columbia University on or

20   about April 17, 2024?

21        A    Yes.

22        Q    Okay.  Are you aware that that Gaza

23   Solidarity encampment including -- excuse me.  Are you

24   aware that the Gaza Solidarity encampment at Columbia

25   included occupation of parts of the university against

↟

                                              100

1    university directives?

2                MR. HEALEY:  Objection to the form.

3                THE WITNESS:  I believe so.

4    BY MR. GIBSON:

 5      Q    And you're aware that it included disruption

 6  of the university's operations?

 7              MR. HEALEY:  Objection to the form.

 8              THE WITNESS:  I believe so.

 9  BY MR. GIBSON:

10      Q    They canceled classes?

11              MR. HEALEY:  Objection to the form.

12  BY MR. GIBSON:

13      Q    Are you aware of that?

14      A    Yeah.  I heard that happen.  Yeah.

15      Q    Are you aware that it also included

16  destruction of university property?

17              MR. HEALEY:  Objection to the form.

18              THE WITNESS:  I might have heard

19  something about that.

20  BY MR. GIBSON:

21      Q    Okay.  And are you aware that it resulted in

22  mass arrests?

23              MR. HEALEY:  Objection to the form.

24              THE WITNESS:  Yes.

25  //

101

1   BY MR. GIBSON:

2       Q    Okay.  And are you aware of other types of

3   events involving solidarity with Gaza that occurred at

4   Rutgers and Tufts in April of 2024?

5       A    I've heard references but I'm not too

6   familiar with them.

7       Q    Okay.  But you're aware that there were

8   events of a, not exactly the same, but similar in

9   nature to the Columbia event that occurred at Rutgers

10  and Tufts?

11              MR. HEALEY:  Objection to the form.

12              THE WITNESS:  Perhaps.  I mean, I

13  haven't heard too much about those ones.

14  BY MR. GIBSON:

15      Q    But you're pretty familiar with the Columbia

16  one?

17      A    Columbia one was -- was pretty well known

18  among all, among many people.

19      Q    What is the Popular University of Gaza?

20              MR. HEALEY:  Objection to the form.

21  BY MR. GIBSON:

22      Q    Or, I apologize.  Popular University for

23    Gaza.  What is that?

24          A    I think that's in reference to a campaign in

25    which students took space on their campuses to show

102

1     solidarity for -- for Gaza amidst the genocide.

2           Q    And what do you mean took space?

3           A    Taking space just means having a place

4     where, I mean, my understanding was you just have a

5     place where students can go to like be in community

6     with one another in expressing their solidarity for

7     Palestine.

8           Q    And it refers to engaging in activities,

9     activities similar to what occurred at Columbia;

10    correct?

11          A    Objection to the form.

12                   THE WITNESS:  Not necessarily.

13    BY MR. GIBSON:

14          Q    Back to -- here we go.  I'm handing you

15    what's been marked Exhibit 3.

16                    (Exhibit 3 was marked for

17                    identification.)

18                    MR. HEALEY:  Thank you, Darren.

19    BY MR. GIBSON:

20        Q    I'll give you a chance to look at these.

21    Take your time.  So we'll go -- we'll just -- I'll

22    start with the question.  You don't have to read the

23    entire document because they're individual posts.  You

24    are free to read anything I ask you questions about,

25    but I'd ask that you not necessarily read every single

 

                                        103

1    page in the document because I don't think it's

2    necessary to answer my questions.  But if you feel

3    need to after I answer your question, feel free to.

4        A    Okay.

5        Q    Okay.  So --

6        A    Yeah.  Sorry.  You -- you can go ahead.

7        Q    The first page is -- this is a National,

8    appears to be, a National SJP post.  As noted on the

9   upper righthand corner, that is, as I understand it,

10  the account that is posting.  It says National SJP;

11  correct?

12      A    Correct.

13      Q    And it says "From Columbia to our

14  university's call to action," it has a picture of a

15  tent liberated zone, on the tent it says "Disclose,

16  divest, defend Gaza"; correct?

17      A    That is what it says.

18      Q    Okay.  And that was posted on April 19th?

19      A    Okay.

20      Q    Is it your understanding that the Columbia

21  encampment that we previously referenced was ongoing

22  at this time?  Is that your understanding?

23      A    I'm not familiar with the exact dates, but

24  perhaps.  Yeah.

25      Q    If you could turn the next to the next page.
⌃

                                                    104

1   This is the National SJP'S announcement regarding the

2    Popular University for Gaza; correct?

3        A    Correct.

4        Q    This is what, according to the SJP, the

5    Popular University for Gaza means, right?

6                    MR. HEALEY:  Objection to the form.

7                    THE WITNESS:  Well, if -- if I can just

8    have a second to read through it?

9    BY MR. GIBSON:

10        Q    Sure.

11        A    Okay.

12        Q    So your understanding, just to confirm, this

13    is the National SJP's announcement of the Popular

14    University for Gaza?

15        A    Yeah.  It appears to be that.

16        Q    And quote, it talks about creating

17    "Autonomous zones on several university campuses"?

18    That's on the first line; correct?

19        A    It says chapters have done that.

20        Q    Right.  And then it says "Today, April 20,

21    2024, National Students for Justice in Palestine

22    announces the Popular University for Gaza, a

23    coordinated pressure campaign against university

24    administrators and trustees to immediately divest from

25    the Israeli state."  Did I quote that correct?

105

1                MR. HEALEY:  Objection to the form.

2                THE WITNESS:  Yeah.  You quoted that

3    correctly.

4    BY MR. GIBSON:

5        Q    Thank you.  And then it discusses what the

6    Popular University for Gaza is, and at the bottom, the

7    last paragraph states in the second sentence, "In the

8    footsteps of our comrades at Rutgers New Brunswick,

9    SJP Tufts, SJP Columbia, SJP Yales for Palestine, and

10   many more SJP chapters across the nation will seize

11   the university and force the administration to divest

12   for the people of Gaza."  Did I read that correctly?

13       A    You did.

14       Q    So that's what, according to the National

15   SJP, the intent of the Popular University for Gaza was

16   this statement?

17               MR. HEALEY:  Objection to the form.

18               THE WITNESS:  Okay.

19   BY MR. GIBSON:

20    Q    Do you agree with that?

21    A    It says what it says.

22    Q    Yeah.  Well, was that your understanding of

23  what the purpose of the national university for Gaza

24  was?

25    A    Yeah.  I understood the purpose in the

⬆

106

1  second sentence of the first paragraph, which says a

2  pressure campaign against universities to immediately

3  divest from Israel.

4    Q    And it also did you also understand the

5  purpose for to be that SJP chapters across the nation

6  will seize the university?

7    A    I -- I think the -- the definition and the

8  interpretation of that word will -- will be tenuous

9  depending on who's reading that.

10    Q    Okay.  What did it mean to you at the time?

11  What did you understand "In the footsteps of our

12  comrades at those schools"?  What did that mean to

13    you, "The SJP chapters across the nation will seize

14    the university"?

15                     MR. HEALEY:  Objection to the form.

16                     THE WITNESS:  I view that as fiery

17    language to try to excite pro-Palestinian students.  I

18    I didn't interpret it as a -- as a call to destroy

19    property or to encourage students to be mass arrested.

20    I didn't interpret any of those things.

21    BY MR. GIBSON:

22        Q    Okay.  So this -- then page 3 is the a print

23    of the National SJP's Instagram post regarding Popular

24    University for Gaza.  Do you agree with that?

25        A    Yep.

                                                        107

1         Q    And it includes that same sentence we just

2    read, "In the footsteps of our comrades" is the last

3    sentence on the text?

4                     MR. HEALEY:  You can take a second to

5    find it.

6                    THE WITNESS:  Sorry.  Yes.  Yes.  It

7    says that.

8    BY MR. GIBSON:

9         Q    It's very small print.  I apologize, but

10   that --

11        A    It says that.

12        Q    Great.  So if you turn to the next page,

13   page 4, this is the PSC ATX Instagram account;

14   correct?

15        A    Correct.

16        Q    And that is the Instagram account for the

17   PSC at UT Austin?

18        A    Correct.

19        Q    Okay.  And the PSC, am I understanding

20   correctly that this is a repost of the SJP's --

21   actually, no.  It's not a repost.  It is a independent

22   post using the same image that was used in the SJP

23   post regarding the Popular University for Gaza.  Is

24   that correct?

25        A    Yes.
⬆

108

1    Q    Do you know -- did you make this post?

2    A    No.

3    Q    Do you know who did?

4    A    No.

5    Q    Okay.  That in this post, PSC ATX says "We

6  are all SJP," and then I think it just simply uses the

7  same language or approximately the same language?

8    A    I -- I think there's -- there's a -- a

9  change to that tenuous word you referred to earlier.

10  Instead of seize, it says "we will take back."

11    Q    You're right.  Does --

12    A    I -- I think that's the one change that I

13  noticed.  Yeah.

14    Q    Okay.

15            MR. HEALEY:  Ammer, just wait for him

16  to ask questions before you give answers.

17            THE WITNESS:  Oh. Yeah.

18            MR. HEALEY:  You guys are kind of

19  talking over each other a little bit.

20  BY MR. GIBSON:

21    Q    The following day, the National SJP creates

22  a post shown on page 5; correct?

23    A    Correct.

24      Q    It says "Campuses in revolt.  Six Gaza

25  solidarity encampments have erupted so far and more

                                                    109

1   are on the way"?

2                   MR. HEALEY:  Objection to the form.

3   BY MR. GIBSON:

4       Q    Did I read that correctly?

5       A    You did.

6       Q    And this post is liked by PSC ATX as shown

7   on the bottom under the post, liked by?

8       A    Okay.

9       Q    Am I -- is that your understanding?

10      A    That -- that is what is shown.

11      Q    Do you know who liked this post?

12      A    No.

13      Q    Do you know who at the PSC was managing the

14  PSC's Instagram account at this time?

15                  MR. HEALEY:  Objection to the form.

16                  THE WITNESS:  Access to the Instagram

17    was shared among several people, so I -- I don't know

18    who.  It could have been anyone at any time.

19    BY MR. GIBSON:

20        Q    Okay.  The next page is another National SJP

21    post and this quote, this is a post from the National

22    SJP that says "The Popular University for Gaza is a

23    coordinated mass movement of students, faculty, and

24    staff dedicated to preventing our universities from

25    operating their daily functions"?
⬆

                                                    110

1                MR. HEALEY:  Objection to the form.

2                MR. GIBSON:  What's your objection to

3    form?  Did I -- I'm reading.

4                MR. HEALEY:  You said operating and it

5    says in the document performing.  So you misstated the

6    document.

7    BY MR. GIBSON:

8        Q    "From performing their daily functions."

9    Great.  Let me reread it.  "The Popular University for

10    Gaza is a coordinated mass movement of students,

11    faculty, and staff dedicated to preventing our

12    university from performing their daily functions.  We

13    have created a climate" --

14                    MR. GIBSON:  And also I would request

15    that you wait until I ask a question before you

16    object.

17    BY MR. GIBSON:

18        Q    "We have created a climate that will force

19    administrators to fully divest from the Zionist entity

20    or allow their university's reputation to shatter."

21    Did I read that correctly?

22        A    Yes.

23        Q    Does this seem to indicate this is what the

24    National SJP intended for the Popular University

25    university for Gaza to do?
⬆

                                                    111

1                    MR. HEALEY:  Objection to the form.

2                    THE WITNESS:  This is, I mean, it's --

3    it's flowery language to say the same thing that was

4    said in the earlier statement, just to pressure

5    universities to divest from Israel.

6    BY MR. GIBSON:

7        Q    You think dedicated to preventing our

8    universities perform from performing their daily

9    functions is flowery language?

10               MR. HEALEY:  Objection to the form.

11               THE WITNESS:  This is -- that's not how

12   I interpreted the -- the campaign.  I mean, I

13   interpreted the campaign as being pressuring

14   universities to divest from Israel.  I think that's

15   how others in PSC interpret it as well.

16   BY MR. GIBSON:

17       Q    Why do you believe that?

18       A    Just based off of the conversations I -- I

19   recall us having.

20       Q    Did you ever make any public statements to

21   distinguish your campaign from this campaign, from

22   this description of the Popular University for Gaza?

23       A    What -- what do you mean by -- by

24   distinguish from?

25       Q    You said you didn't understand the Popular

112

1  University for Gaza to include preventing our

2  universities from performing their daily functions?

3       A    PSC did, I think it's later in here, did

4  post a schedule of what our sort of event that we

5  titled Popular University would be and it doesn't

6  allude to anything like this.

7       Q    And that was posted after the event had

8  started; correct?

9       A    No.

10      Q    Do you see in the text of page 6, I'm going

11  to read, the sentence that starts by "Establishing

12  spaces"?  I'm going to read it.  "By establishing

13  spaces for popular education on campus, we will

14  disrupt the university's operations, usurp its

15  existing structures and undermine its elite reputation

16  to force university administrators to either cut ties

17  with the Zionist entity or allow their universities to

18  shatter."  Did I read that correctly?

19      A    You did.

20      Q    Did you ever publicly disagree with that

21  statement or the statement that's in the post itself?

22       A    I -- I was never asked about -- I -- no.  No

23  one ever asked me to make a statement confirming or

24  disagreeing or what have you with these statements.

25       Q    And in fact, the PSC tended to like the

↥

113

1  National SJP's post, right?

2                 MR. HEALEY:  Objection to the form.

3                 THE WITNESS:  I don't see a like on

4  this one.

5  BY MR. GIBSON:

6       Q    Do you know if it did like this one?

7       A    I'm not sure.  It doesn't -- doesn't appear

8  on -- on this exhibit.

9       Q    If you turn to page 9 is another National

10  SJP post on April 22nd regarding the Popular

11  University of Gaza; correct?  Excuse me.  Popular

12  University for Gaza?

13       A    Correct.

14      Q    And again, it says "We will disrupt

15  university operations, usurp its existing structures

16  and undermine its elite reputation until our demands

17  are met."  Do you see that?

18      A    Yes.

19      Q    Okay.  So then if you turn to page 11, on

20  April 23rd, the PSC announced the Popular University

21  at The University of Texas at Austin; correct?

22      A    Yes.

23      Q    It says "Classes canceled.  Reclaim our

24  space" on Wednesday, April 24th; correct?

25      A    Correct.

⌃

                                                      114

1      Q    Then it says "Join us Wednesday, April 24th

2  in walking out of class and reclaiming our space as we

3  demand divestment.  Now we will be meeting at Greg Gym

4  at 11:40 and marching to occupy the south lawn";

5  correct?

6      A    That's what it says.

7        Q    And then it says "In the footsteps of our

8    comrades at Columbia SJP, Rutgers, New Brunswick,

9    Yale, and countless other countries" -- excuse me,

10    "countless others across the nation, we will be

11    establishing the Popular University for Gaza and

12    demanding our administration divest from death.  We

13    will be occupying this space throughout the entire day

14    so be sure to bring blankets, food and water, face

15    masks, and lots of energy.  As a reminder, please be

16    sure to respect our space and listen to organizers in

17    order to help keep us all safe."  That's what it says,

18    right?

19        A    That's what it says.

20        Q    Okay.  Did you listen to organizers during

21    the April 24th protest?

22             MR. HEALEY:  Objection to form.

23    Objection to the form.

24             THE WITNESS:  Did  -- did I listen to

25    organizers?  Yes.  I -- I was among them.  Yes.

1    BY MR. GIBSON:

2        Q    Right.  So that phrase doesn't mean listen

3    to university staff?  That means listen to PSC

4    organizers?

5                MR. HEALEY:  Objection to the form.

6                THE WITNESS:  I mean, I believe that's

7    how most people would interpret that.  Yes.

8    BY MR. GIBSON:

9        Q    Got it.  And this post was liked by National

10   SJP as shown on the second page; correct?

11       A    Yes.

12       Q    The next page, excuse me, page 13 is a

13   schedule that was posted on April 24th; correct?

14       A    Correct.

15       Q    What time do you understand this to have

16   been posted?

17       A    Prior to me coming to campus.

18       Q    Do you have any way to prove that?

19                MR. HEALEY:  Objection.

20                THE WITNESS:  About that, I'm not sure.

21   BY MR. GIBSON:

22       Q    Okay.  Did you post it?

23       A    No.  I don't think so.

24       Q    Okay.  Did you help plan for the April 24th

25    protest?
♠

                                                    116

1        A    Yes.

2        Q    Tell me about that?  What did you do to help

3    plan the April 24th protest?

4        A    So on the schedule, we have written "Guest

5    speaker 12:00 p.m."  I was coordinating that guest

6    speaker who had been in attendance at the speaker

7    panel the night before.

8        Q    Who was that?

9        A    He's -- he's a -- he was a study, like a --

10   what's the word?  He was on -- he was a student from

11   Gaza who was in the US on like a non-profit

12   fellowship.

13       Q    What's the person's name?

14       A    His name is Atta Khaled.

15       Q    Could you spell it, please?

16       A    A-T-T-A, K-H-A-L-E-D.

17       Q    And his first name?

18    A    That -- that's his first and last name, Atta

19    Khaled.

20    Q    Oh.  Thank you.  So did you also coordinate

21    with your other fellow PSC members to help plan this

22    event?

23    A    Yes.

24    Q    What -- what did did you do with them to

25    help plan the event?

↑

117

1    A    I think just helping decide on the time and

2    maybe how to fill some of the time I think how -- how

3    to like spread -- spread the different events or the

4    different time slots that are listed.

5    Q    How did you know access to the PSC's

6    Instagram was shared among the committee?

7    A    Upon joining those who are like walking,

8    well, those who welcomed us in onto the board told us

9    and shared access with us.

10    Q    I am going to go back to Exhibit number 9,

11    if you could turn to the April 20th --

12                    MR. HEALEY:  Sorry.  Darren, there is

13    no exhibit number nine.

14                    MR. GIBSON:  I'm sorry.  Exhibit number

15    3.  Thank you.

16    BY MR. GIBSON:

17        Q    Exhibit number 3, the PSC's post on April

18    20th?

19                    MR. HEALEY:  Objection to the form.

20                    THE WITNESS:  What -- what page is

21    that?

22    BY MR. GIBSON:

23        Q    Sure.  It is page 4.

24        A    Okay.

25        Q    It says, and you talked about this language

                                              118

1    distinction before, it says "We will take back our

2    university"; correct?

3        A    That's what it says.  Yes.

 4        Q     What does that mean to you?

 5        A     It means taking space to being community

 6    with other fellow pro-Palestinian students.

 7        Q     And that can mean a lot of different things,

 8    right?

 9        A     Sure.

10        Q     It could mean what happened at Columbia?

11              MR. HEALEY:  Objection.  Form.

12              THE WITNESS:  Perhaps.

13    BY MR. GIBSON:

14        Q     It could mean what happened at UT Dallas the

15    next day?

16              MR. HEALEY:  Objection to the form.

17    BY MR. GIBSON:

18        Q     Or in three days from that post; correct?

19              MR. HEALEY:  Objection.

20              THE WITNESS:  It could also mean what

21    we posted, which explicitly outlined what ours would

22    be, which was different from those.

23    BY MR. GIBSON:

24        Q     And you didn't post that again until you say

25    the morning of the event?

119

1       A    It was definitely before the event started.

2       Q    But you didn't post it?

3            MR. HEALEY:  Objection to the form.

4            THE WITNESS:  I don't think I myself

5  clicked the button to post it, but I was aware that it

6  was posted.

7  BY MR. GIBSON:

8       Q    How were you aware?

9       A    I think -- I think I had talked to someone

10 either over the phone or in person.

11      Q    Okay.  Next exhibit.  I'll hand you what's

12 been in marked Exhibit 4.

13           (Exhibit 4 was marked for

14            identification.)

15      A    Thank you.

16           MR. HEALEY:  Thanks, Darren.

17           MR. GIBSON:  Sure.

18 BY MR. GIBSON:

19      Q    And I understand that this is not -- you may

20 not -- this collection of posts and commentary doesn't

21 come from you, but I would like to turn to a post

22    that's noted on here, this number 8, Bates stamp

23    12502.

24                    MR. HEALEY:  That's the number in the

25    bottom right corner.

⌃

120

1                     THE WITNESS:  Oh.  Okay.  502.  Yep.

2    Yep.

3    BY MR. GIBSON:

4          Q    This is a post from SJP UTD; correct?

5          A    Correct.

6          Q    And that is -- do you understand that to be

7    the SJP chapter at the University of Texas, UT Dallas?

8          A    Yes.

9          Q    It's -- and that post is used in the same

10   imagery that was originally posted by in SJP and by

11   PSC regarding the Popular University for Gaza?

12                    MR. HEALEY:  Objection to the form.

13                    THE WITNESS:  Yes.

14   BY MR. GIBSON:

15    Q    Okay.  And in fact, this post includes the

16   modified language that you or the PSC used in its post

17   regarding "take back our university" instead of

18   "seize"; correct?

19                    MR. HEALEY:  Objection to the form.

20                    THE WITNESS:  Yep.  Appears so.

21   BY MR. GIBSON:

22    Q    And are you aware that on April 23, 2024,

23   that SJP at the University of Texas UT Dallas stormed

24   the president's office and occupied the building for

25   nine hours as part of their Popular University for
↟

                                                    121

1   Gaza event?

2                    MR. HEALEY:  Objection to the form.

3                    THE WITNESS:  I -- I think I was aware.

4   Yeah.

5   BY MR. GIBSON:

6    Q    How do -- how were you aware?

7                    MR. HEALEY:  Objection to the form.

8                    THE WITNESS:  I think there were social

9    media posts about it.

10   BY MR. GIBSON:

11       Q    Did you have any communications with anyone

12   at UT Dallas SJP regarding that event prior to the

13   event?

14       A    No.

15       Q    Do you know anyone at UT Dallas SJP at that

16   time?

17       A    I -- I don't think so.

18       Q    Do you remember if UT Dallas had been at the

19   -- anyone from UT Dallas had been at the SJP

20   conferences you mentioned earlier in your deposition?

21       A    I -- I cannot recall them being at the

22   February 2023 one.  I recall them being at the

23   November 2024 one, which happened after all of this.

24       Q    Okay.  That -- all right.  I'm going to hand

25   you what's marked Exhibit -- I think we're on 5.

```
 1                    (Exhibit 5 was marked for

 2                    identification.)

 3        A    Thank you.

 4             MR. HEALEY:  Thanks, Darren.

 5   BY MR. GIBSON:

 6        Q    It's a document produced by you.  It's

 7   reflected by the Bates number below.

 8             MR. HEALEY:  Objection to the form.

 9   BY MR. GIBSON:

10        Q    Okay.  Do you agree with that?

11        A    I remember disclosing this.  Yes.

12        Q    And --

13             MR. HEALEY:  Darren, wait.  Could we go

14   off the record for just a second?

15             MR. GIBSON:  No.

16             MR. HEALEY:  So I'm wondering if there

17   was a page ripped off the front of this.

18             MR. GIBSON:  They were printed with

19   cover pages and then those were removed.

20             MR. HEALEY:  Okay.  Got you.  Great.

21             MR. GIBSON:  There's no pages missing

22   from it.

23   BY MR. GIBSON:

24        Q    Okay.  Is this the -- what is this document?

25        A    This is a toolkit newsletter or -- or a
```

123

1    toolkit that was sent to PSC, and I think it was like

2    a newsletter format, not -- not targeted at us,

3    specifically just for students like us.

4         Q    Did you produce the newsletter that this was

5    a part of?

6         A    I think this was the only thing that was in

7    that email.

8         Q    And do you have a copy of the email?

9         A    I don't think so.

10        Q    How did you get this document.

11        A    Earlier, I said I forwarded something from

12   the PSC email thinking it was this.  Thinking back on

13   it now, this might have been in the PSC Google Drive.

14   I might have just like shared it with myself from

15   there.  I don't think I sent myself the email.  I

16   don't think I have access to the email.

17        Q    Who would?

18        A    I'm not sure.

19      Q    So someone who has access to the PSC's Gmail

20  account would have access to that email?

21      A    Yeah.

22      Q    Or do you know who sent this from the

23  National SJP?

24      A    No.

25      Q    Do they put names on anything?
⤴

                                                        124

1       A    I don't think so.  I'm not sure I even saw

2   the email itself, but I just -- yeah.  I -- I've seen

3   this.

4       Q    Somehow you came into possession of this,

5   but you're not -- you don't recall exactly how?

6               MR. HEALEY:  Objection to the form.

7               THE WITNESS:  Yeah.  It might -- I --

8   yeah.  Yeah.

9   BY MR. GIBSON:

10      Q    Have you provided your attorney the emails

11  from your -- that you forwarded yourself from the PSC

12    Gmail account to yourself?

13                    MR. HEALEY:  I'm going to instruct you

14    not to answer to the extent it requires you to

15    disclose the contents of a privileged attorney client

16    conversation.

17                    THE WITNESS:  Sure.  Sure.

18                    Thinking back on on it, I -- I don't

19    think I forwarded myself any emails from the PSC

20    email.

21    BY MR. GIBSON:

22        Q    That's interesting.  So you testified

23    earlier today that you did.

24        A    Yeah.  And -- and reflecting back on it, I -

25    - I think that was a misremembering.

                                                        125

1        Q    And as you testified earlier, I think you've

2    spoken with your attorney since you'd made that

3    testimony earlier this morning; correct?  And you

4    don't have to tell me what you talked about, but since

 5    telling me you forwarded emails from your PSC -- from

 6    the PSC account to yourself, you then spoke to your

 7    attorney on a break and now you're telling me

 8    something different; correct?

 9              MR. HEALEY:  Object to the form.

10              THE WITNESS:  I -- I mean, I -- I can

11    explain if -- if you're interested to know the

12    alternative method that I think is more plausible in

13    how I came into possession of this.  If you -- if

14    you're interested.

15    BY MR. GIBSON:

16        Q    I think you already did.  And these are

17    additional information you'd like to share with about

18    that?

19              MR. HEALEY:  And Ammer, again, I mean -

20    -

21              MR. GIBSON:  I asked him a question.

22    Please do not provide speaking objections indicating

23    how your client should answer the question.

24              MR. HEALEY:  I'm not actually

25    objecting.

126

1            MR. GIBSON:  You're violating the rules

2    right now.

3            MR. HEALEY:  I don't believe I am, but,

4    you know, proceed.  Just, you know, if you're going to

5    ask a question.

6            MR. GIBSON:  I did ask him a question.

7    Please stop.

8            THE WITNESS:  Yeah.  I mean, I mean, I

9    I can -- I can offer you the -- the way that I think I

10   actually did come to possession of this if you're

11   interested.  I -- I don't think I forwarded myself

12   emails.

13   BY MR. GIBSON:

14      Q    Please do.  I thought you had already done

15   it, but please do.

16      A    Yeah.  I believe I disclosed, well, I mean,

17   I'm not -- I'm not -- there was another lawsuit, so

18   I'm not sure.  But I'm -- PSC, we'd have weekly

19   meetings, and in those meetings any relevant

20   information would be included in meeting notes and

21   this was one of the things in the meeting notes

22   pertaining to the April 24th protest.  And at the time

23    when I had access to those, which I no longer do, I

24    had downloaded this in -- in the spirit of offering to

25    the best of my ability whatever was relevant and --

  &#8593;

127

1    and within my possession for -- for discovery in -- in

2    this case.

3        Q    So you said there were weekly meetings of

4    the PSC?

5        A    Yes.

6        Q    And notes were kept of those meetings?

7        A    Yes.

8        Q    Who kept -- who took the notes?

9        A    That was the responsibility that was shared

10    among -- among all the members.

11        Q    So you kept notes?  You took notes

12    sometimes?

13              MR. HEALEY:  Objection to the form.

14              THE WITNESS:  Sometimes.

15    BY MR. GIBSON:

16    Q    Okay.  Have you produced any of those notes

17  in this case?

18              MR. HEALEY:  Objection to the form.

19              THE WITNESS:  I'm not sure.  I don't

20  have access to the notes.

21  BY MR. GIBSON:

22    Q    Do you have personally have any notes?

23    A    No.

24    Q    What about the ones you created?

25    A    No.

128

1    Q    You don't have access to those?

2    A    No.

3    Q    Do you know who does?

4    A    Whoever has access to the PSC accounts.

5    Q    Do you know who that is?

6    A    No.

7    Q    Okay.  You mentioned another lawsuit.  What

8  lawsuit are you talking about?

9      A    It might be ongoing.  It's a lawsuit against

10   the governor's executive order, which is being led by

11   the Council on American Islamic Relations, and it was

12   representing several student orgs, student groups

13   around Texas.

14      Q    Did it include the PSC?

15            MR. HEALEY:  Objection to the form.

16            THE WITNESS:  At a time, it -- it

17   included the PSC.

18   BY MR. GIBSON:

19      Q    And did you have any communications with

20   anyone about that lawsuit?

21      A    With those lawyers?

22      Q    From the Council on Islamic Relations?

23      A    Correct.

24      Q    And did you provide them documents?

25      A    Yes.

⬆

129

1      Q    When did you do that?

2      A     This was -- this was like the summer

3  following, like, the April 24th protests.

4      Q     So the summer of 2024?

5      A     Yeah.  I -- I think around July or so.

6      Q     Have you included all of the documents you

7  provided to that council in your production in this

8  case?

9      A     No.

10     Q     Why not?

11     A     Because they're not in my possession.

12     Q     They -- they were in your possession and you

13  -- how did you send them to the council?

14               MR. HEALEY:  Objection to form.

15               THE WITNESS:  Yeah.  I sent them via

16  the PSC email.

17  BY MR. GIBSON:

18     Q     So at the time, you were on the PSC email

19  and forwarded emails from the PSC email to the counsel

20  for the plaintiffs in what I will call the SJP

21  lawsuit?

22     A     Correct.

23     Q     For purposes of that lawsuit?

24     A     Correct.

25     Q     Do you know the name of the attorney?

130

1      A    I can't remember his name right now.

2              MR. GIBSON:  We need subpoena the

3    attorney.

4    BY MR. GIBSON:

5      Q    Do you remember sending it to Christopher

6    Choate of the John T. Floyd Law Firm?

7      A    No.

8      Q    Did you send it to someone at the Council on

9    Islamic Relations?

10     A    Yeah.

11     Q    Lena Masri, Does that sound familiar?

12     A    No.

13     Q    Gadeir Abbaszxc?

14             MR. HEALEY:  Objection to the form.

15   BY MR. GIBSON:

16     Q    Does that name sound familiar as the counsel

17   that you sent these documents to?

18     A    Maybe.

19     Q    So that person works with the CAIR Legal

20    Defense Fund, according to the docket, the federal

21    docket sheet.  Do you know what the CAIR Legal Defense

22    Fund is?

23        A    Just make sure no the -- no.

24        Q    Okay.  So you -- it is possible you sent it

25    to Gadeir, but it's also possible you sent it to
⌃

                                                  131

1    someone at the Council on American Islamic Relations?

2    Is that -- am I understanding your testimony

3    correctly?

4        A    Yeah.

5        Q    Okay.  Do you know if you included your

6    communications with these attorneys on your privilege

7    log?

8        A    I'm not sure.

9        Q    Okay.  All right.  So getting back to this

10    document, where is this document in your possession

11    currently?

12        A    Like if you -- yeah.  I -- I'm not sure.  I

13    have to -- I have to go check.  Is it, I mean, it's

14    probably a file on my computer.

15         Q    Okay.  But it could be attached to an email,

16    but it's probably a file?

17         A    I think.

18              MR. HEALEY:  Objection to the form.

19              THE WITNESS:  I think it's most likely

20    a file on my computer.

21    BY MR. GIBSON:

22         Q    Okay.  If we could go through this document,

23    Exhibit number -- we are on 5.  If you could turn to

24    page 3?  I'm sorry.  Before I do that, just to go

25    back, this is a toolkit that was provided to the PSC
⬆

                                                    132

1    from the National SJP; correct?

2         A    Yes.

3         Q    Okay.  And this is a toolkit for the Popular

4    University for Caza; correct?

5         A    Correct.

6      Q    Okay.  And then it has a tier system and

7  risk assessment on page 3; correct?

8      A    Correct.

9      Q    And it says it identifies three different

10  tiers of risk for different types of activities;

11  correct?

12      A    Correct.

13      Q    And in the red tier, that's described as

14  high risk action, potential legal ramifications, risks

15  to students' academic status, legal institutional

16  risks to SJP student conduct charges?  You see that?

17  And then below that, it describes the types of event

18  or types of actions that would be considered part of

19  red tier; correct?

20      A    Correct.

21      Q    And it says "Encampment/occupation";

22  correct?

23      A    Yes.  Correct.

24      Q    And including the Gaza solidarity encampment

25  described below that says "Taking back space on campus

133

1    by setting up an encampment in a central location and

2    commit to occupying that space is a group until

3    demands are met"?  You see that?

4        A    I do.

5        Q    Okay.  It also has "State university host

6    popular education events build community"?

7                MR. HEALEY:  Objection to the form.

8    BY MR. GIBSON:

9        Q    That describes another red tier high risk

10   action; correct?

11       A    Correct.

12       Q    And in your -- in the post we saw about --

13   the PSC's post about it's planned event for the 24th,

14   it said it was going to occupy campus, right?

15               MR. HEALEY:  Objection to the form.

16               THE WITNESS:  That -- that was the

17   language that was -- that was used.  Yes.

18   BY MR. GIBSON:

19       Q    So that would've be in the red tier

20   occupation; correct?

21               MR. HEALEY:  Objection to the form.

22               THE WITNESS:  Not necessarily.

23   BY MR. GIBSON:

24    Q    That the SJP is telling you that an

25  occupation is red tier; correct?

↑

                                                      134

1    A    Not -- not necessarily.  No.  It says

2  "Taking back space by setting up an encampment," which

3  that's -- that's not the same thing.

4    Q    And you were planning on bringing tents and

5  setting up tents; correct?

6    A    No.

7    Q    Did you talk about with your fellow members

8  about how many tents to bring to the protest?

9    A    There was, if I recall correctly, there was

10  a conversation where the idea of bringing one or two

11  tents for the symbolic imagery might be a cool idea,

12  but I don't think I pursued that idea beyond just

13  mentioning, "Oh, it might be cool."

14    Q    I mean, that's about you.  I'm talking about

15  the plan for the event, including occupying the south

16  lawn and putting up tents; didn't it?

17      A    That was not part of the plan.  No.

18      Q    Oh.  Okay.  The plan was to occupy the south

19  lawn; correct?

20              MR. HEALEY:  Objection to the form.

21              THE WITNESS:  The plan was as described

22  in the social media post from Exhibit 4 or Exhibit 3.

23  Exhibit 3.

24  BY MR. GIBSON:

25      Q    That wasn't my question.  The plan was to
⬆

                                                    135

1   occupy, included occupation of the south lawn;

2   correct?

3       A    You can use -- yes.  You can use that word.

4       Q    And in fact, the PSC used that word, was

5   going to occupy the south lawn; correct?

6       A    Yes.

7       Q    You told the world you were going to do

8   that?

9              MR. HEALEY:  Objection to the form.

10                    THE WITNESS:  Yes.  But -- but, you

11    know, qualified here it says by setting up an

12    encampment, that's not what PSC's intention was.

13    BY MR. GIBSON:

14        Q    Then yellow tier is described as a medium

15    risk action with known risks to SJP's status as a

16    recognized entity, possible administrative

17    repercussions on individual members; correct?

18        A    That's what it says.

19        Q    And when it refers to known risk to SJP

20    status as a recognized entity, is that referring to

21    the local SJP chapter and to your understanding?

22        A    I believe so.  Yeah.

23        Q    So they're really like translating this to

24    this event that we should read SJP in this document to

25    refer to PSC meaning?
⌃

                                                          136

1        A    Yeah.  Correct.  Yes.  Yes.

2                    MR. HEALEY:  Okay.  Objection to the

 3   form.  Because the question --

 4                    MR. GIBSON:  That's all you get to say.

 5   Please do not --

 6                    MR. HEALEY:  Objection.  Form.

 7                    MR. GIBSON:  You're done.  Please don't

 8   add words to try to suggest how he should answer the

 9   questions.

10                    MR. HEALEY:  Oh.  I apologize.  I

11   wasn't actually going to do that, Darren.

12                    MR. GIBSON:  Well, okay.  We're done.

13                    MR. HEALEY:  I just was a little bit

14   late on the objection.  I wanted to apologize.

15   BY MR. GIBSON:

16        Q    So then below it says a liberated zone

17   protest or walkout is a yellow tier action; correct?

18        A    Oh.  Yes.

19        Q    And that includes things like establish an

20   autonomous liberated zone in a university space, walk

21   out of class, or work or host a protest on campus?

22        A    That's what it says.

23        Q    Do you agree that that also describes the

24   intent of what occurred on April 24th?

25                    MR. HEALEY:  Objection to the form.

137

1                     THE WITNESS:  That roughly -- that

2    roughly describes what PSC ended up planning.

3    BY MR. GIBSON:

4        Q    Okay.  And so that you were aware that at

5    least the SJP was telling you that was a yellow tier

6    action that could include possible administrative

7    repercussions on individual members?

8                     MR. HEALEY:  Objection to the form.

9                     THE WITNESS:  At the time, I wasn't

10   cognizant of what tier we were operating in within --

11   within the parameters of this toolkit.

12   BY MR. GIBSON:

13       Q    You used this toolkit to help plan this

14   event; correct?

15       A    I did not use it to the extent that other

16   people use it.  I -- I referenced it maybe once, but I

17   did not personally did not use this as like a -- as

18   like a -- as a bible for how to plan PSC's event.

19       Q    I like to then turn to page 303, Bates

20   number 10, "State university/encampment logistics and

21    tips."  This is tips on setting up a state university

22    or encampment?  Is that what your understanding?

23        A    That's what it says.

24        Q    Okay.  And then it says, the third bullet

25    point says, "Know your school's code of conduct,

⬆

138

1    familiarize yourself with the specific policies you

2    are breaking.  This is crucial in understanding the

3    type of risk you will take"?

4                MR. HEALEY:  Objection to the form.

5    BY MR. GIBSON:

6        Q    Did I read that correctly?

7        A    You did.

8        Q    Did you familiarize yourself with the

9    specific policies, the specific UT policies prior to

10    engaging in the April 24th protest?

11                MR. HEALEY:  Objection to the form.

12                THE WITNESS:  I did.

13    BY MR. GIBSON:

14      Q    And that's because they recommended you to,

15  right?

16      A    No.

17      Q    Now, why did you do that?

18      A    Because I wanted to ensure we were not

19  breaking any rules and we -- we were being compliant

20  with university policy.

21      Q    Then a few more bullet points down, it

22  starts with "Assess who."  Do you see that?

23      A    Yes.

24      Q    Right above that it says "One of the things

25  you should think about is a jail fund."  Can you see

⬆

139

1  that?

2              MR. HEALEY:  Objection to the form.

3  BY MR. GIBSON:

4      Q    Right above "Assess who," there's a

5  reference to a jail fund?

6      A    Yes.  Yes.

7        Q    Okay.  Did -- are you aware of whether a

8   jail fund was established for the April 24th protest?

9        A    I believe so.  Yes.

10       Q    Who -- when was that established?

11       A    I'm not sure.  I mean, probably while

12   arrests were ongoing.

13       Q    Why do you think that?

14       A    I think that's the practice is -- is when

15   arrests or -- or arrests were taking place, from my

16   understanding, for a extended period, I don't think

17   people would've waited to set one up until after.  I

18   think they probably would've done it maybe within an

19   hour.  But I was already arrested.  I -- I wasn't --

20   I'm not familiar with when it was actually set up.

21       Q    Are you aware of a jail fund being

22   established in advance of the April 24th protest?

23       A    No.

24       Q    When you were arrested, did you access a

25   jail fund?

140

1    A    No.

2    Q    Did someone bail you out?

3    A    By bail, you mean like with money?

4    Q    Yeah.

5    A    No.

6    Q    Okay.  Did anyone post a bond?

7              MR. HEALEY:  Objection to the form.

8              THE WITNESS:  No.

9    BY MR. GIBSON:

10   Q    Then that bullet point says "Assess who is

11   willing to take what type of risks create a tier

12   system of those willing to take high risk action, red

13   card, medium risk, yellow card, and low no risk green

14   card."  Do you see that?

15   A    I do.

16   Q    Did the PSC do that?

17             MR. HEALEY:  Objection to the form.

18             THE WITNESS:  I don't believe so.

19   BY MR. GIBSON:

20   Q    Were you identified to be the police

21   negotiator?

22             MR. HEALEY:  Objection to the form.

23             THE WITNESS:  Somewhat.

24   BY MR. GIBSON:

25      Q    Okay.  Was that pre-established prior to the

141

1    event that you would be sort of the spokesperson of

2    the event?

3        A    I think it was established that I would be

4    the spokesperson.  It wasn't clearly established that

5    I would be the police liaison, but I was available for

6    that position and I did fill that position when --

7    when the time was necessary.

8        Q    And under this documentation, the last

9    sentence of the SJP'S toolkit says "This person,"

10   referring to the police negotiator, "does not directly

11   concede to police requests, does not give any

12   information to police, and does not escalate the

13   police"?

14       A    I'm sorry.  Where is this?

15       Q    I'm sorry.  If you turn to page 305?

16       A    Oh.  Okay.

17       Q    I apologize.  You see the reference to

18    police negotiator?

19        A    Yes.

20        Q    The -- I read the last sentence, "This

21    person does not directly concede to police requests,

22    does not give any information to police, and does not

23    escalate police."  Did I read that correctly?

24        A    You did.

25        Q    Did you understand that was your role as the

                                                    142

1    police spokesperson?

2        A    No.

3                MR. GIBSON:  Okay.  I think we need to

4    eat lunch, so maybe take a break.

5                MR. HEALEY:  Oh.  Lunch would be great.

6                MR. GIBSON:  How long have we been on

7    the record?

8                THE VIDEOGRAPHER:  Going off the

9    record.  Time is 12:43.

10                (Off the record.)

11                    THE VIDEOGRAPHER:  We're back on the

12    record.  Time is 1:40.

13    BY MR. GIBSON:

14        Q    Okay.  So did you speak to anyone other than

15    your lawyer during the break?

16        A    Just a Chick-fil-A salesperson.

17        Q    Wanted to ask you about, follow up a little

18    bit regarding Nura Bawab.  What all have you

19    communicated with Nura about?

20        A    Have -- I communicated with her about most

21    of what I communicate with her about just had to

22    pertain to the speaker panel event.  That was the day

23    before she -- yeah.

24        Q    Did you communicate with her after that

25    time?

↑

                                              143

1        A    No.

2        Q    You said you saw her at a conference after

3    that?

4      A    Yeah.  Just I saw her and we said hi, but

5   like no conversation really.

6      Q    And you've had no communications with her

7   other than at that conference?

8      A    Yeah.

9      Q    I also want to ask you to follow up on the

10  SJP litigation.  When do you recall sending that email

11  to the counsel for plaintiffs in that case?

12     A    I think it was in the summer.

13     Q    Summer of 2024?

14     A    Yeah.

15     Q    Did you send similar emails to your current

16  counsel?

17              MR. HEALEY:  Objection to the form.

18              And I'll instruct you not to answer to

19  the extent you have to disclose the contents of our

20  privileged conversations.

21              THE WITNESS:  You're asking if I sent

22  similar emails to --

23  BY MR. GIBSON:

24     Q    Current counsel?

25     A    Not with content.  No.  What I -- I'm not

144

1    sure what you mean by --

2        Q    And so you said, I think you said, you had

3    access to the PSC's Gmail account through while you

4    were on the PSC, right?

5        A    Yeah.

6        Q    And that it did not end until spring of

7    2025?  Is that correct?

8        A    Sometime in there.

9        Q    Okay.  So you had access to the PSC Gmail

10    account through approximately April of 2025?

11                MR. HEALEY:  Objection to the form.

12                THE WITNESS:  I think I might have lost

13    access before that.

14    BY MR. GIBSON:

15        Q    When do you think you lost access?

16        A    I can't recall exactly.  It was -- I just,

17    like, went to check one day and I'd been like logged

18    out.

19        Q    Do you approximately when that occurred?

20        A    I mean, it could have been around -- it

21    could have been around spring break, maybe.

22    Q    Of 2025, this past year?

23    A    Maybe.  Yeah.

24    Q    Did you forward any communications from the

25  PSC Gmail account to your attorneys in this case?

⬆

145

1    A    No.

2    Q    Why not?

3    A    I just -- I didn't think any of it was

4  necessary to forward.

5    Q    You forwarded emails from the PSC account to

6  the attorneys in the SJP litigation; correct?

7    A    Well, because that was a case that was

8  representing PSC as an organization.  I'm not PSC.

9    Q    Did you take any actions to preserve those

10  documents that were -- that you had access to in which

11  you were a representative of the PSC prior to April of

12  2025 other than sending documents to counsel and SJP?

13    A    By -- by preserve, you mean like saving

14  them, downloading them?

15     Q     No.  There -- were there communications?  I

16  think you had already established that there were

17  communications on that email address related to the

18  April 24th protest; correct?

19     A     Yeah.

20     Q     And so there would be email communications

21  to and from that Gmail account that would be relevant

22  to this case?

23              MR. HEALEY:  Objection to the form.

24              THE WITNESS:  I -- not necessarily.  Do

25  you, I mean, I -- I'm not sure exactly what emails

146

1  there were.  Like, I'm not sure what the exact content

2  of any emails that were sent to them were.  So I'm --

3  I'm not sure if -- if that would necessarily be the

4  case.

5  BY MR. GIBSON:

6     Q     What were the content of the emails you

7  forwarded to the SJP counsel?

8       A    Mostly just -- just whatever was -- was

9    necessary for the -- the, like, the discovery or

10   whatever they needed.  Whatever they requested.

11      Q    And what was that?  Can you describe the

12   documents that you forwarded to the counsel in SJP?

13      A    I think it was mostly meeting notes.  Not

14   just April 24th.  Like they -- the discovery requests

15   asked for a very expansive, like, assort assortment of

16   like documents, and so I think we sent like meeting

17   notes.

18      Q    When you say "we," was anyone else involved

19   in doing that?

20      A    Yeah.  It was, I mean, it's just shared

21   responsibility, like most tasks in the organization.

22      Q    Who was that?  Who shared in the

23   responsibility of reviewing the PSC's Gmail account

24   and forwarding relevant information to the counsel for

25   SJP?

147

1      A     I mean, everyone who was on the board at the

2  time contributed in -- in conversations about what we

3  needed to submit.

4      Q     To your knowledge, are any of those same

5  people still in do have access to that PSC Gmail

6  account?

7      A     To my knowledge.  No.

8      Q     Okay.  Did you ever -- you never forwarded a

9  single one of those emails to your counsel in this

10  case?

11      A     No.

12      Q     And you've mentioned that the, to your

13  knowledge, the way that you obtained the Popular

14  University for Gaza Toolkit was through communications

15  from the SJP through that email account?  Is that

16  correct?

17      A     At -- at the time when I had -- when I had

18  access to the accounts, I, as you said, preserved.  I

19  just downloaded this from the PSC like Google account,

20  I think.  I think.  I'm pretty sure that's how I got

21  ahold of this.

22      Q     When you no longer had access to the

23  account, do you know why your access was cut off?

24      A     Because I was taken off the board.

25      Q     And who was on the board in 2024/2025?

⬆

148

1  Let's go through those names.  I realize I don't think

2  I asked that question, so we need to ask, establish

3  that.

4      A    So that would be myself, Lamar, Hiya,

5  Raneem, Maher, and then -- and then Lamya.

6      Q    Can you spell Lamya?

7      A    Lamya, L-A-M-Y-A.  And then --

8      Q    Is Lamya's last name Seyam?

9      A    Seyam.  And then Ryan, R-Y-A-N, Quiroz,

10  which is Q-U-I-R-O-Z, I think.  Naba, N-A-B-A, Sheikh,

11  S-H-E-I-K-H.  And then -- and then Hadi, H-A-D-I,

12  Nourredine.

13      Q    Can you spell that?

14      A    N-O-U-R, I think it's -- I think it's two

15  Rs, I think, E-D-I-N-E.

16      Q    Anything else to talk about that?  Any other

17  questions about this stuff?  Okay.  I also want to go

18  back a little bit on Exhibit 6.

19                    (Exhibit 6 was marked for

20                    identification.)

21                    THE OFFICER:  This is a new exhibit?

22                    MR. GIBSON:  Yes.

23                    MR. HEALEY:  Thanks, Darren.

24    BY MR. GIBSON:

25        Q    This is Exhibit 6, Bates stamped UT Austin
↟

                                                        149

1    8515.  This is about the Israeli or Israel Block

2    Party.  Excuse me.  Is this a document indicating the

3    outcome of an inquiry by the Dean of Students of the

4    PSC regarding the actions at the Israel Block Party?

5        A    Yes.

6        Q    And it says "After reviewing the

7    documentation, conducting a preliminary investigation,

8    our office has determined that the organization will

9    not be found in violation of the institutional rules

10   at this time."  You see that?

11       A    Yep.  That is what it says.

12    Q    So do you think this document indicates any

13    sort of bias against the PSC based on its pro-

14    Palestinian views?

15    A    I do.

16    Q    Why is that?

17    A    Its existence is a departure from how the

18    university has treated pro-Palestinian actions like

19    that exact same action in the past.  The -- the exact

20    same type of demonstration has taken place every year

21    and it was never investigated up until this moment.

22    Q    Do you know why it was investigated?

23    A    I, again, that's speculation because this --

24    I -- I believe it was because it took place very

25    shortly after the governor issued his executive order
↟

150

1    calling against calling for universities to target

2    groups like PSC.

3    Q    Do you see the paragraph below?  It says,

4    I'm sorry.  The one, two, three -- fourth paragraph

5      says this, "The office of the Dean of Students staff

6      is available to assist your organization in planning

7      future events or demonstrations and can provide

8      support to ensure your event can take place

9      successfully without causing a disruption to

10     authorized activities."  Do you see that?

11          A    I do.

12          Q    And you had -- you saw this letter when it

13     came out; correct?

14                    MR. HEALEY:  Objection to the form.

15                    THE WITNESS:  I believe so.  Yes.

16     Yeah.

17     BY MR. GIBSON:

18          Q    And so the Dean of Students' office was

19     inviting the organization to have a conversation about

20     future events; correct?

21                    MR. HEALEY:  Objection to the form.

22                    THE WITNESS:  Not necessarily.  I mean,

23     this -- this is -- they're kind of stating a known --

24     they're just stating the obvious and that that's --

25     that's their function.

151

1   BY MR. GIBSON:

2       Q    So you already knew that the Dean of

3   Students' office, their function was to assist the PSC

4   in planning events and demonstrations and to provide

5   support to ensure that the events could take place

6   without causing a disruption?

7                 MR. HEALEY:  Objection to the form.

8                 THE WITNESS:  That -- that is supposed

9   to be their purpose.  Yes.

10  BY MR. GIBSON:

11      Q    Is -- do you understand that is their

12  purpose?  When you say that's supposed to be their

13  purpose, do you disagree that that is their purpose?

14      A    I mean, in -- in my interaction with the

15  Dean of Students, they have -- they have been,

16  representatives like Sade, have been helpful.

17      Q    Okay.  Did you contact the Dean of Students

18  about the events on April 24th before the event

19  occurred?

20      A    I -- I did contact Sade and I believe -- I

21  believe I did.  Yeah.

22      Q    And your contact was to reserve Gregory

23   Plaza?  Is that correct?

24        A    To inquire about -- to inquire about Gregory

25   Plaza.

⌃

152

1         Q    And what was Sade's response?

2         A    If I recall correctly, she said we could be

3    there temporarily, but that we would have to leave

4    since we wouldn't actually have that space reserved.

5    So we could -- we could, what -- what I think she

6    implied is you -- we could meet there but then go

7    somewhere else.  Like we can't -- we wouldn't be able

8    to stay there.

9         Q    Did she -- did you have a meeting with her?

10        A    No.  Just an email.

11        Q    You have an email?  Do you have that email?

12        A    I -- I think.  I think so.

13        Q    Did you produce it in this case?

14        A    I thought I did.

15        Q    So you have an email saying that you could

16    temporarily use Gregory Plaza?

17        A    Yes.

18        Q    Okay.  I'm going hand you what's been marked

19    Exhibit 7.  This is Qaddumi 273.  Is this -- do you

20    recognize this document?

21              (Exhibit 7 was marked for

22              identification.)

23        A    Yes.  The -- these are -- these are meeting

24    notes.

25        Q    Okay.  Well, this is -- it says it's the

⬆

153

1    NSJP toolkit?

2        A    That's -- that's a link to the -- the

3    toolkit, which is Exhibit 5.

4        Q    Okay.  And then this document says it's the

5    2024 Popular University for Gaza campaign; correct?

6        A    Yes.  That is -- that is what is written at

7    the top.

8        Q    And is this format, this initial page and

9   the risk assessment, is that something that was

10   provided in the SJP toolkit?

11       A    I believe so.  It seems like it's been

12   somewhat adapted.

13       Q    Okay.  And then is it my understanding that

14   the below is the risk assessment, at least some

15   mention of the risk assessment that PSC made regarding

16   the event?  Is that correct?

17       A    It appears so.  Yes.

18       Q    So it says "Impact on us."  Does that mean -

19   - and then there's scolding by the university loose

20   cannons among the general body.  My understanding is

21   that the "Impact on us," the bold, is from the

22   template from the SJP.  But you are not -- the non-

23   bolded language is what was typed in here by the PSC?

24              MR. HEALEY:  Objection to the form.

25              THE WITNESS:  Yeah.  I think the bolded

↟

154

1   language is like template and then what's -- what's

2    not bolded is the actual content, the meat of whatever

3    was supposed to be in here.

4    BY MR. GIBSON:

5        Q    That was typed in by members of the PSC?

6        A    Yes.

7        Q    And do you know who typed that in?

8        A    No.

9        Q    And so it says "The impact on us is scolding

10   by the university follow UTD's model, push limit,

11   don't break rules."  What does that mean?

12             MR. HEALEY:  Objection to the form.

13             THE WITNESS:  I mean, I -- I can't

14   really speculate on whoever wrote it what they meant.

15   But the way, I imagine I would've interpreted it at

16   the time it was a while ago, is similar to the thing

17   about you chant for 30 seconds or a minute into the --

18   after the end of the passing period, you know, the

19   technical rule is right when the clock strikes you

20   stop, but if it bleeds over a little bit, it's

21   technically -- that's technically not past period.

22   But it's like also not flagrantly breaking the rule.

23   It's just that that's what I interpret as pushing the

24   limit, not a flagrant violation.

25   //

155

1    BY MR. GIBSON:

2        Q    And then below it says "Impact on chapter

3    suspension.  Talk to Sade about this possibility."

4    That's what it says, right?

5        A    Yes.

6        Q    So is it my understanding that the PSC

7    understood that suspension of the chapter could be an

8    outcome of their event?

9        A    I think myself and others sensed the

10   environment of hostility that was -- that was sort of

11   growing and had been growing at UT.  And so while we

12   weren't going to be doing anything, or while I don't

13   believe we were going to do anything that was going to

14   be violating rules like we clearly said here, don't

15   break rules given the hostility of -- of the campus

16   and the administration and the government.  That was

17   unfortunately something that we started to consider

18   could be an unfortunate outcome of anything that we

19   did.

20      Q    If you turn to page 3 of this document,

21   Qaddumi 275, is location.  It says "Walk out to Greg

22   Plaza 10 minutes before class ends.  Action item:

23   contact Sade about Greg Plaza scheduling."  It says

24   "March to Tower encampment on South Lawn"; correct?

25      A    That is the wording used.
⌃

                                                    156

1       Q    So the plan was to put an encampment on

2    South Lawn?

3       A    Well, the plan is right before under

4    logistics date and time where it goes from 11:40 until

5    seven.

6       Q    So your plan was having an encampment on the

7    south lawn from 11, from noon to seven?  Well, to noon

8    to 6:45 at least?

9              MR. HEALEY:  Objection to the form.

10             THE WITNESS:  That's the word used

11   here.  I -- I did not type it.  I did not understand

12   that to be what we were doing.

13    BY MR. GIBSON:

14         Q    Did you ever -- you had access to this

15    document; correct?

16         A    Yes.

17         Q    Did you ever tell anyone to correct this

18    document that was incorrect according to your

19    understanding?

20         A    I don't think any of us expected this

21    document to be for anyone else's eyes.  Like, so I

22    don't -- I don't what whatever's written here.  I

23    mean, to us, what mattered is what we executed and our

24    plan that we wish to execute was what was

25    aforementioned.

⬆

157

1         Q    So you wish to -- okay.  So if you turn to

2    the prior page, it also refers to an encampment and a

3    tent with "Liberated zone" written on it; correct?

4         A    That is what it says.

5         Q    Okay.  You previously testified that the

6   plan was to not bring tents?

7        A    I think where this is coming from is earlier

8   in this -- in this deposition, you brought up an

9   exhibit that I had disclosed in which there were

10  messages where we discussed bringing one or two tents,

11  if I recall correctly.  Or if I'm interpreting this

12  correctly, in the same vein of, like, it would be cool

13  to have a tent with liberated zone for like the

14  visual.  After further conversations and consultations

15  with the rules and with each other, we did not end up

16  executing on bringing none -- no one from PSC brought

17  a tent on April 24th.

18       Q    But you are aware that multiple tents were

19  established in the South Lawn on April 24, set up on

20  the South lawn on April 24, 2024?

21       A    Yeah.  That had nothing to do with me or

22  anyone who's on PSC membership.

23       Q    Even though you guys were planning to have

24  an encampment as of the time you wrote this document?

25                 MR. HEALEY:  Objection to the form.

158

1              THE WITNESS:  The document says one

2    thing.  If I recall correctly, that that was not ever

3    a -- a concrete part of the plan.

4    BY MR. GIBSON:

5         Q    Who wrote these notes?

6         A    I'm not sure.  It could have been anyone who

7    was on the -- the leadership at the time.

8         Q    Did you write these notes?

9         A    No.

10        Q    Could have been anyone but you?

11             MR. HEALEY:  Objection to the form.

12             THE WITNESS:  I -- no.  I -- I feel I

13   would recall if I had written these.  I -- I don't

14   remember writing these.

15   BY MR. GIBSON:

16        Q    Okay.  But your testimony is anyone on the

17   PSC committee could have written these notes except

18   for you?

19        A    I -- I don't believe I wrote these notes.

20        Q    But anyone else could have?

21             MR. HEALEY:  Objection to the form.

22             THE WITNESS:  That is -- yes.

23   BY MR. GIBSON:

24    Q    Okay.  On the last page when it talks about

25    supplies, it talks about tents, tent or tents;

↑

159

1    correct?

2        A    It says -- it says for Jenna to reach out to

3    SDS to buy a tent.  I'm not sure if she did that at

4    all or I'm not sure what happened with that, but none

5    of us brought tents.

6        Q    What's SDS?

7        A    SDS is -- it's another student group.  It's

8    a --

9        Q    What does it stand for?

10        A    Students for a Democratic Society.

11        Q    It also, under the above, that it talks

12    about tell people to bring blankets/tarps.  So why

13    would people need to bring blankets or tarps?

14                MR. HEALEY:  Objection to the form.

15                THE WITNESS:  So the plan was to be on

16    the lawn for the duration of the day.  It's a grassy

17    lawn.  The idea, in simple terms, was essentially a

18    picnic, and so for people to be out on the grassy lawn

19    for extended period of time, blankets and tarps were

20    needed to not sit and get your pants and shorts all

21    muddy and wet from the grass.

22    BY MR. GIBSON:

23         Q    It says -- let's go down to these action

24    items that are highlighted.  "Action item: Hiya post

25    by tomorrow."  Do you know what she was supposed to

1    post, supposed to post by tomorrow?  What that refers

2    to?

3         A    I think that could either refer to the post

4    on April 23rd or the scheduled post which we posted

5    the morning of the 24th.

6              MR. HEALEY:  He says that emailed him

7    about using -- he says he produced.  He produced.

8    BY MR. GIBSON:

9         Q    Okay.  And also it says you're asking SDS to

10    help buy supplies.  Jenna was also supposed to reach

11    out to them to, in addition to the tent, to buy

12    supplies and set up for the day?

13                    MR. HEALEY:  Objection to the form.

14                    THE WITNESS:  That is what it says.

15    BY MR. GIBSON:

16        Q    And then it says "Raneem reach out to DEI

17    people."  What is DEI people?

18        A    DEI stands for diversity, equity and

19    inclusion.

20        Q    Who are DEI people?

21        A    If I recall correctly, there was a coalition

22    of students who were advocating against the -- against

23    the sort of anti-DEI policies of the government, which

24    then UT was enforcing.  So they had -- they had had

25    demonstrations and -- and their own sort of events

161

1    throughout the year.  Yeah.

2        Q    Got it.  And it also says "Jenna reach out

3    to Donza."  Do you know what that a reference to?

4         A    Donza, I believe, is a -- there're a native

5    dance group.  So they perform native dance rituals

6    like protection rituals and -- and things of that

7    nature.

8         Q    And then it, finally, it says "Ammer

9    contacts Sade for Greg Plaza"?

10        A    Yes.

11        Q    Okay.  There's that next.  All right.  I'm

12   going to hand you Exhibit 8, I think we are.

13             (Exhibit 8 was marked for

14             identification.)

15        A    Yes.  Thank you.

16             MR. HEALEY:  Thanks, Darren.

17   BY MR. GIBSON:

18        Q    I would like to start by just getting the

19   order of these pages correct because the first page,

20   as I understand it, appears to be related to the date

21   of approximately April 20th and then the, starting on

22   the second page, we jumped to April 24th.  Four pages

23   starting with 256, 257, 258, 259, and 260, and then I

24   think we go back to April 20th.  And so I would like

25   to just get this correct first so that we all know how

162

1    to go through this document.

2         A    Okay.

3         Q    So the first page says it copies, looks

4    like, the SJP post we've looked at before.  And

5    someone -- do you know who that's a picture of, that

6    picture?

7         A    That's Raneem.

8         Q    So Raneem says "Everyone is posting this.

9    Do we want to too?"  And then Hiya says "I think we

10   should.  Also, I'm worried if we don't tell GB we're

11   working on something then SDS is going to try to do

12   something on their own."  So does this appear to you

13   to be occurring early, like, I want to say,

14   approximately on April 20th or around April 20th when

15   the PSC did in fact post this, something similar to

16   this on the PSC's Instagram?

17                   MR. HEALEY:  Objection to the form.

18                   THE WITNESS:  I imagine that was --

19   that was around April 20th.

20   BY MR. GIBSON:

21     Q     Okay.  And these are what I understand to be

22     screenshots that you produced based on, am I correct,

23     taking a shot, a screenshot?

24     A     Yes.

25     Q     Is it of your phone or did you take these

⌃

163

1     from a screenshot of your computer or how did you

2     create this document or these images?

3     A     These might be from my computer.

4     Q     Okay.  Okay.  So is it your recollection

5     that you took screenshots from your computer of this

6     text stream?

7     A     Yes.

8     Q     And this text stream is on Signal?  Is that

9     correct?

10     A     Yes.

11     Q     And do you have Signal also on your phone?

12     A     Yes.

13     Q     You use a Signal app from both your phone

14    and your computer?  Is that correct?

15                    MR. HEALEY:  Objection to the form.

16                    THE WITNESS:  I can.  Yeah.

17    BY MR. GIBSON:

18        Q    And do you use it on both of your phone and

19    your computer?

20                    MR. HEALEY:  Objection to the form.

21                    THE WITNESS:  I'd say usually my phone,

22    but they're -- they're synced so whatever I do on

23    either one shows up on the other.

24    BY MR. GIBSON:

25        Q    Got it.  Okay.  So I'm going to jump,

⬆

164

1    because I -- well, let's look at 256 quickly.

2        A    Okay.

3        Q    This stream is at 9:32 a.m. and it talks

4    about "What do you think about responding by saying

5    nothing?"  You've written "Instagram demonstrated an

6    intention to violate policies.  It also includes the

```
 7    schedule.  Can someone please post?  I'm driving to

 8    campus so someone is asking to post the schedule"?

 9                    MR. HEALEY:  Sorry, Darren.  What page

10    are you on now?

11                    MR. GIBSON:  Sorry.  On 259 and then

12    260.

13    BY MR. GIBSON:

14        Q    "Where are you guys going to meet?  Are

15    y'all at the PLC?"  "It's technically going to going

16    to be a violation, but I guess we do it or we could do

17    it in front of Tower instead, but that obstructs

18    people's movements."  Right.  My understanding is

19    these texts are from the morning of April 24th,

20    starting on 256 to 260.  Does that appear to be

21    correct to you?

22        A    256 to 260.  Correct.  Yes.

23        Q    And then I think it goes back to April 20th

24    on page 261?

25        A    Yes.
```

1        Q     Because then at the bottom of page 261,

2    you'll see it says April 21st?

3        A     Yes.

4        Q     So my understanding is, again, cutting out

5    256 to 260, that everything prior to the bottom of 261

6    is from April 20th and then at the bottom of April of

7    261, we start with April 21st?  Does that appear

8    correct to you?

9        A     You said everything aside from the first

10   page?

11       Q     The first page is April 20th, right?

12       A     Yes.  Yes.

13       Q     And then we have one, two, three, four --

14   five pages that are April 24th and then we on 261 we

15   go back to April 20th, does that appear to be correct?

16       A     Yes.

17       Q     Great.  Okay.  Now I'm going to then that

18   way we know how to go through these.  So let's go back

19   to the first page.

20             MR. HEALEY:  Darren, do you want to go

21   off the record to reorder the document or are you

22   good?

23             MR. GIBSON:  It's printed double-sided.

24   We can't reorder it.

25                    MR. HEALEY:  Oh.  Okay.
↟

166

1                    MR. GIBSON:  So it is what it is.  This

2    is the order in which they were produced.

3    BY MR. GIBSON:

4        Q    So starting with April 20th, on page 255,

5    there's a reference from Hiya that says "Also, I'm

6    worried if we don't tell GB we're working on something

7    then SDS is going to drive to do something on their

8    own."  Do you know why she, why Hiya said that?

9        A    So GB refers to General Body.  These are

10   like students who just attend our events.  This is

11   kind of in reference to, if you go back to Exhibit 7

12   where it says "Loose cans among the general body,"

13   there's a concern that like if we don't -- if we don't

14   organize an event which would be compliant and -- and

15   would follow, you know, would -- would be safe for

16   everyone, then some other students might organize an

17   event which might not be as safe for -- for students

18    because perhaps they don't have as much experience as

19    PSC does.

20         Q    I'm go back to Exhibit number 7.  When was

21    Exhibit number 7 created to your recollection?

22         A    It would've been probably around the time of

23    April 28th.  April 21st.

24         Q    Okay.  Going back to exhibit -- that's not

25    it.  5275.  So this document is labeled, the file of
↑

1     the document is copy of 2024 Popular University for

2     Gaza campaign 4/23/24, so it's dated April 23, 2024.

3     Okay.  According to the metadata on the document you

4     produced to us, that is produced at Exhibit 7.  Okay.

5     Do you have any reason to doubt that it was at least

6     that it was created on April 23, 2024?

7          A    No.

8               MR. HEALEY:  Objection to the form.

9     BY MR. GIBSON:

10         Q    Okay.  So now going back to exhibit -- we're

11    just looking at are text messages.  So if we skipped

12    to -- we looked at the first page, which was April

13    20th.  We skipped to page 261.  That is my

14    understanding of the next text from April 20th.  And

15    there's a discussion with Jenna Homsi where she says

16    "Going to be honest with y'all, we do not have the

17    capacity, the resources, the community, et cetera, are

18    in to do an encampment."  Do you see that?

19              MR. HEALEY:  Objection to the form.

20              THE WITNESS:  I do see that.

21    BY MR. GIBSON:

22        Q    Okay.  Do you remember this discussion

23    happening of whether or not there was the resources to

24    do an encampment?

25              MR. HEALEY:  Objection to the form.
♠

                                                   168

1              THE WITNESS:  I believe so.

2    BY MR. GIBSON:

3        Q    Okay.  And it looks like there was a -- that

 4    this discussion occurred before Exhibit 7 we were

 5    looking at where there was a discussion of an

 6    encampment; correct?

 7        A    Yes.

 8        Q    Okay.  Then if you turn to the next page,

 9    262, Raneem asks, in the second text from Raneem --

10    oh.  First.  The first text from Raneem, "Did anyone

11    talk to Sadie yet?"  And then you respond, "Yeah.  I

12    reached out to Sade, just asked about Greg."  Is that

13    -- what are you referring to there?

14        A    I'm referring to asking Sade about Greg

15    Plaza.

16        Q    And it says, "Just asked about Greg."  And

17    that's at 11:10 a.m. on April 21st; correct?

18        A    I believe so.

19        Q    Then Raneem says, "Are we going to ask about

20    amplify?"  Well, it says, "Are we going to ask ABT

21    amplified noise or are we going to do that anyways

22    until they asked us to stop?"

23              MR. HEALEY:  Objection to the form.

24    BY MR. GIBSON:

25        Q    Is that what he said?

169

1    A    That's what she said.  Yeah.

2    Q    Oh.  I'm sorry.  Raneem is a woman?  I

3    apologize.  And then Jenna says, "We said the second

4    one."  That's her response; correct?

5    A    Correct.

6    Q    And is your understanding that Jenna is

7    referring to the option of "We're going to do that

8    anyways until they ask us to stop?"

9    A    It appears that's what she's referring to.

10   Q    And do you recall on April 24th that

11   amplified sound was set up on Greg Plaza until there

12   was a request to take it down?

13              MR. HEALEY:  Objection to the form.

14              THE WITNESS:  I don't recall there

15   being amplified sound systems set up.

16   BY MR. GIBSON:

17   Q    Do you recall there being equipment there?

18   A    To the extent of what people in PSC would've

19   brought, it would've -- maybe there were some

20   megaphones, maybe, and then of course when Kelly Soucy

21   and Aaron Voyles told us no amplified sound, we said,

22   "Okay."  We complied and we did -- and we did not use

23   this.

24        Q    But you knew that was going to be a problem

25   in advance per Raneem's text here, right?

↟

170

1                   MR. HEALEY:  Object to the form.

2                   THE WITNESS:  I think we were familiar

3    with the policy on amplified sound.

4    BY MR. GIBSON:

5        Q    But you did it anyways?

6                   MR. HEALEY:  Object to the form.

7                   THE WITNESS:  We did not do it.

8    BY MR. GIBSON:

9        Q    You brought the equipment anyways?

10       A    Well, we didn't use the equipment.  There's

11   no rule against bringing equipment.  We just didn't

12   use it.

13       Q    Because -- but you were planning to use it

14   unless -- until they told you not to?

15                    MR. HEALEY:  Object to the form.

16                    THE WITNESS:  We -- we did not use the

17    equipment.

18                    MR. GIBSON:  Objection.  Nonresponsive.

19    BY MR. GIBSON:

20        Q    You were planning to use it until they told

21    you not to; correct?

22                    MR. HEALEY:  Object to the form.

23                    THE WITNESS:  I personally don't recall

24    having an intention to pick up a megaphone myself and

25    use it.  Whoever -- whoever's had the intention to do

᛭

                                                          171

1    it, they -- I didn't see anyone do it.

2    BY MR. GIBSON:

3        Q    It looks like Raneem had the intention right

4    by her statement?  In fact, in fact, it looks like the

5    PSC as a group had the intention "We going to do that

6    anyways until they ask us to stop"?

7                    MR. HEALEY:  Object to the form.

8          THE WITNESS:  I don't think -- I don't

9    think, I mean, I -- I don't think anyone used

10   amplified sound that day.

11          MR. GIBSON:  Objection.  Nonresponsive.

12   BY MR. GIBSON:

13       Q    But the intent was to use it until you were

14   asked to stop; correct?

15          MR. HEALEY:  Object to the form.

16          THE WITNESS:  Proposing the idea of

17   using amplified sound until they ask us to stop is

18   similar in spirit to the idea of pushing the limit

19   without breaking the rule.  We -- I don't think myself

20   or anyone else had any intention of breaking a rule.

21   If we were asked at any point to not do something, we

22   would comply, and we in fact did comply.

23   BY MR. GIBSON:

24       Q    You were in fact asked not to have the

25   protest; weren't you?  And you didn't comply with that

1    directive; did you?

2              MR. HEALEY:  Object to the form.

3              THE WITNESS:  I -- not -- not

4    necessarily.

5    BY MR. GIBSON:

6        Q    Were you asked not to have the protest on

7    April 24th?

8              MR. HEALEY:  Object to the form.

9              THE WITNESS:  We were not -- we were

10   asked to not hold the protest as planned.  If I recall

11   correctly, the language and the definition of what the

12   university thought we had planned is different from

13   what I believe we actually had planned.  We were

14   compliant with -- with all directives that -- that we

15   were given.

16   BY MR. GIBSON:

17       Q    "We should tell people to bring drums too."

18   Do you see that?

19             MR. HEALEY:  Object to the form.

20             THE WITNESS:  I do see that.

21   BY MR. GIBSON:

22       Q    Did you tell people to bring drums?

23       A    I don't recall telling people to bring

24   drums.

25       Q    Did it -- do you recall anyone from PSC

⬆

173

1   telling people to bring drums?

2       A    I'm not sure.

3       Q    You're not sure?

4               MR. HEALEY:  Object to the form.

5               THE WITNESS:  I'm not privy to every

6   private conversation they have with --

7   BY MR. GIBSON:

8       Q    That wasn't my question.  Do you recall

9   anyone from PSC telling people to bring drums?

10      A    No.

11      Q    There were lots of -- there were people, I

12  don't know about lots, there were people with drums at

13  the April 24th protest; weren't there?

14              MR. HEALEY:  Object to the form.

15              THE WITNESS:  I recall seeing -- I

16  recall seeing someone with a drum.

17  BY MR. GIBSON:

18      Q    And that violates university rules; doesn't

19    it?

20              MR. HEALEY:  Object to the form.

21              THE WITNESS:  I don't believe so.

22    BY MR. GIBSON:

23        Q    You don't believe that using a drum during a

24    protest during class hours violates university rules?

25              MR. HEALEY:  Object to the form.
⬆

                                                   174

1               THE WITNESS:  I -- I think at the time

2    it -- it was not a violation of UT policy to have a

3    drum.  We had in fact had drums at multiple

4    demonstrations prior and there was never an issue

5    brought up by any UT officials.

6    BY MR. GIBSON:

7        Q    At the bottom, this is now on April 21st,

8    Hiya says, "How many temp tents is he getting?  We'll

9    ask" --

10              MR. HEALEY:  Sorry, Darren.  What page?

11              MR. GIBSON:  Sure.  At the bottom of

12    262.  This is on April 21st.

13    BY MR. GIBSON:

14        Q    "How many tents is he getting?"  That's

15    Hiya; correct?

16        A    Yes.

17        Q    And then Hiya says "We should encourage

18    people to bring their own tents"?

19                MR. HEALEY:  Object to the form.

20    BY MR. GIBSON:

21        Q    That's what Hiya says, right?

22                MR. HEALEY:  Object to the form.

23                THE WITNESS:  No.  She -- "Should we."

24    BY MR. GIBSON:

25        Q    Should we?  Oh.  Sorry.  Right.  She asked
♠

                                                        175

1    "Should we encourage people to bring their own tents?"

2        A    She did say that as -- as a question.

3        Q    Did you encourage people to bring their own

4    tents?

5      A    No.

6      Q    But they brought them anyway?

7           MR. HEALEY:  Objection.

8           THE WITNESS:  I -- I don't know.

9  BY MR. GIBSON:

10     Q    You're aware that lots of people set up

11  tents on the South lawn during the protest on April

12  24th, right?

13          MR. HEALEY:  Object to the form.

14          THE WITNESS:  I saw some images

15  circulate in the days after I got out of jail.  Prior

16  to that, I was not aware of people bringing tents.

17  BY MR. GIBSON:

18     Q    Jenna's response, "I'm afraid if it's too

19  many tents we'll get shut down quicker and people will

20  think they're staying" and then Raneem says "Maybe

21  just three.  One might -- it's nice for

22  representation.  One might be lame."  Is that what --

23  is that correct?  Did I read that correctly?

24     A    You did.

25     Q    Then you respond, "I think it would be cool

176

```
1    to have multiple.  We'll likely get asked to take them

2    down unless we have lots of people tense though"?

3                    MR. HEALEY:  Object to the form.

4    BY MR. GIBSON:

5        Q    Did I read that correctly?

6                    MR. HEALEY:  Object to the form.

7                    THE WITNESS:  That's correct.

8    BY MR. GIBSON:

9        Q    "It's apparently a fire hazard according to

10   UT policy."  Is that what you said?

11       A    That is what is here.  Yes.

12       Q    And Is that your understanding that having

13   tents set up was a fire hazard or cutting according to

14   UT policy?

15       A    I recall reading that somewhere in -- in the

16   UT Policy handbook.

17       Q    Okay.  I apologize.  Who's Donza again or

18   what's Donza?

19       A    Donza is --

20                   MR. HEALEY:  Object to the the form.

21   BY MR. GIBSON:

22       Q    Oh.  The dance group?
```

23     A    Donza is the native dance group.

24     Q    You told me that.  I apologize.  So you

25   didn't say "I think we should tell them that PYM is
⋔

                                                    177

1   taking the lead on that (and they can coordinate with

2   them?)"

3                 MR. HEALEY:  Object to the form.

4   BY MR. GIBSON:

5     Q    Then my question is what are you referring

6   to, "I should tell them that PYM is taking the lead on

7   that"?

8     A    I think that's in reference to the prior

9   message which Hiya was pinging the question of also

10   PSL is asking if we need support with security.

11     Q    And PSL again is?

12     A    PSL is the Party for Socialism and

13   Liberation.

14     Q    And what is the, to your knowledge, the

15   Party for Socialism and Liberation?

16      A    They're a community organizing group in

17    Austin left, and they -- they do participate in

18    similar activism to -- to what we had done.

19      Q    And then what's PYM that you're referring

20    to?

21      A    PYM is another community group, the

22    Palestinian Youth Movement.

23      Q    And they were going to take the lead on

24    security?

25      A    Yeah.

                                                            178

1      Q    And in the videos we see individuals with

2    yellow vests on attending the protest?

3                MR. HEALEY:  Object to the form.

4    BY MR. GIBSON:

5      Q    Are those individuals, to your knowledge,

6    people from PYM who would be designated as security

7    people?

8                MR. HEALEY:  Object to the form.

```
 9              THE WITNESS:  I -- I don't think all of
10   them were.  No.
11   BY MR. GIBSON:
12       Q    Who are -- why were certain individuals
13   wearing yellow vests?
14              MR. HEALEY:  Object to form.
15   BY MR. GIBSON:
16       Q    To your knowledge?
17       A    The people wearing yellow vests were, I
18   think, part of the security team.  I think we refer to
19   them as McMarshals.  They were, some of them, were
20   from groups like PYM, but I think some of them were
21   also students who volunteered and they kind of served
22   as extra eyes and ears to make sure everything we did
23   went smoothly.
24       Q    Were you communicating with any of those
25   people during the course of the protest?
```
⌃

```
 1       A    No.
```

2      Q     Okay.  So the next page?

3      A     Is 266?

4      Q     266.  Correct.  It looks like a screenshot

5  from an email from Sade Dawson-Love.  Is this the

6  email you were referring to previously?

7      A     It is.

8      Q     Okay.  Do you have the original of this

9  email?

10      A     I would have to go back and check if -- if

11  this is from my personal email, then I would have it.

12  But I'm, based off the screenshot, I'm not sure if

13  this is my personal email or if it's the PSC email.

14      Q     It says "To me," right?

15      A     Me is, if it's on your device, it'll just --

16  whatever your email is, it'll just say "Me."

17      Q     It says "Sorry for the delay in my response.

18  I haven't felt well today.  Greg Plaza is reserved

19  tomorrow from 5 to 10 p.m.  The space isn't a free

20  speech area, it is a reservable space during business

21  hours so you can gather there and walk to another

22  location.  Otherwise, our team will give you a warning

23  to move to another location if you don't reserve the

24  space."

25      A     That is what it says.

180

1       Q     Read that correctly?

2       A     Yep.

3       Q     And then you asked "Should we try to

4   reserve"; correct?

5                   MR. HEALEY:  Object to the form.

6                   THE WITNESS:  That that is -- that is

7   what I said.

8   BY MR. GIBSON:

9       Q     And did you reserve the space?

10      A     I don't -- I don't think so.  The message

11  right after, I think, alludes to why, because we

12  didn't intend to be there for very long.  That wasn't

13  the idea.  And Sade did say we can gather there and

14  then walk to another location, which is exactly what

15  we intended to do.

16      Q     Okay.  So did you include all of the

17  communications on this Signal chat in your production?

18      A     Yes.

19      Q     Okay.  So do you see -- I have a question.

20    I'd like to go to page 420?

21         A    So 250, 255?

22         Q    Correct.  So you see how each sort of bubble

23    call out of each text has -- it has a size, it has a

24    certain width that's in gray on the black background?

25         A    Yes.
^

                                                    181

1          Q    Okay.  So at the bottom of this page we see

2    Raneem Mahrouq is the next text on the screen;

3    correct?

4          A    Correct.

5          Q    We don't see the actual text?

6          A    Yes.

7          Q    If you go, what we all agreed is the next

8    page for April 20th, which is page 261, we don't see

9    any texts from Raneem Mahrouq and we only see a text

10   from Jenna Homsi?

11         A    Yes.

12              MR. HEALEY:  Object to the form.

13    BY MR. GIBSON:

14         Q    Does it appear that there are texts missing

15    on April 20th between the last text we see on page 255

16    and the first text we see on page 261?

17                   MR. HEALEY:  Object to the form.

18                   THE WITNESS:  Perhaps.  If it was, if

19    it was something relevant and -- and responsive, then

20    I would've included it.

21    BY MR. GIBSON:

22         Q    Well, I just thought you testified that you

23    included all the text in this chat in this production,

24    and it would you agree it appears that does this

25    production does not now include all texts in the chat?
⌃

                                                            182

1                   MR. HEALEY:  Object to the form.

2                   THE WITNESS:  I've included all

3    messages in the chat that are related to the case.

4    BY MR. GIBSON:

5         Q    That's not what the -- that's not what you

 6    stated earlier.  You did not limit your testimony to

 7    all texts in the chat related to the case, so my

 8    understanding is you have not provided the entire chat

 9    but you have provided selected portions of the chat

10    that you have determined are relevant to the case?

11              MR. HEALEY:  Object to the form.

12    BY MR. GIBSON:

13       Q    Is that your testimony?

14       A    I mean, if I recall correctly, there's some

15    messages that are -- that are like not relevant to the

16    content that is like included here.

17       Q    And we would have to look at the Signal chat

18    to find what those full messages are?  Is that

19    correct?

20       A    And any messages that are -- that are

21    pertinent and relevant and responsive to discovery for

22    this case are included in this -- in this disclosure.

23       Q    That wasn't my question.  For us to be able

24    to see the messages that aren't on here, we would have

25    to look at at your Signal account?  Is that correct?

183

1     A     I suppose so.

2     Q     Okay.  Also going down, starting again on

3     261, April 21st, "Who's going to powwow tomorrow,"

4     right?  That's from Mohammed.  That does not continue

5     on the next page; correct?  So it looks like there's

6     missing texts after that?

7               MR. HEALEY:  Object to the form.

8     BY MR. GIBSON:

9     Q     Would you agree?

10              MR. HEALEY:  Ammer, you can look

11    through the document

12    BY MR. GIBSON:

13    Q     Again, I'm on the bottom of 261.

14    A     Yeah.

15    Q     Does that text is cut off and we don't see

16    that continued on the next page; do we?

17    A     Yeah.  It -- powwow, this is in reference to

18    a native event that was happening, I guess, either the

19    21st or 22nd, which is nothing to do with anything

20    relevant to the subject matter of the case and so it

21    wasn't responsive to any of the requests.

22    Q     Okay.  So if you turn to page 268?

23    A     Okay.

24      Q    Does this appear to be the morning of April

25   24th?
↑

184

1       A    I believe so.

2       Q    Okay.  And the first text that we see is a

3    text from Jenna Homsi attaching a PDF, and it's your

4    understanding that's the PDF notice to Jenna canceling

5    the event?

6       A    Yes.

7       Q    Okay.  She says "I don't know that that even

8    means anything, but it is concerning"?

9            MR. HEALEY:  Object to the form.

10           THE WITNESS:  That is what it says.

11   BY MR. GIBSON:

12      Q    Did that mean something to you?

13           MR. HEALEY:  Object to the form.

14           THE WITNESS:  I responded by wanting to

15   get another opinion.

16   BY MR. GIBSON:

17    Q    Who's Rhiannon?

18    A    She is a faculty at the -- at UT Law.

19    Q    What's her last name?

20    A    At UT Law School.  Rhiannon Hammam, H-A-M-M-

21  A-M.  She has a legal background and I thought it

22  would be helpful.

23    Q    Did you reach out to her?

24    A    I did not.  No.

25    Q    Do you know if anyone else did?
↑

1    A    No.

2    Q    You don't know?

3    A    I don't know.  Or actually, I -- I don't --

4  I don't believe so.  I don't believe so.  I think it

5  would be -- yeah.  So someone would've said something

6  if they --

7            MR. HEALEY:  Ammer, if you consulted

8  with Rhiannon to obtain legal advice, you don't have

9  to disclose the contents of that conversation.

10                    THE WITNESS:  Thank you.

11   BY MR. GIBSON:

12       Q    Did you get a legal opinion regarding this

13   matter, this cancellation notice?

14       A    I can't recall if -- if I personally

15   requested and got one.

16       Q    Okay.  Do you -- are you aware if the PSC

17   got a legal opinion relating to this notice of

18   cancellation?

19       A    I don't think we did.  I'm not sure we did

20   prior to -- prior to the event.

21       Q    Okay.  Mohamed says, "I think they don't

22   understand that we're not making an encampment LOL."

23   Did I read that correctly?

24       A    You did.

25       Q    Do you know why Mohamed added "LOL" at the
↟

                                                      186

1   end of that?

2       A    I think -- and I think it's -- it is a -- a

3 document that -- that I've disclosed.  The -- the

4 notice kind of, I think, inflates -- inflates what we

5 were planning to do and it references, you know, to

6 the disruptive encampment at Columbia and says "We

7 will not allow our campus to be taken in a similar

8 fashion, and because you have an intention to violate

9 rules, you're not permitted to hold this event."  And

10 so I think the LOL is kind of directed towards the

11 kind of ridiculousness of that equation, kind of the

12 baseless equation.

13  Q Equation?  You mean equating your event to

14 Columbia?

15  A Yes.

16  Q Handing you what's Exhibit number 9.

17    MR. HEALEY:  Thanks Darren.

18    (Exhibit 9 was marked for

19     identification.)

20 BY MR. GIBSON:

21  Q Does this appear to be the copy of the

22 letter that's referenced in this text chain?

23  A Yes.

24  Q Okay.  Okay.  Can you go to, I think, at the

25 bottom of 268, we go back to 256 because the, if

187

1  you'll notice, and I just want to make sure we're all

2  in agreement, the bottom of 268 is at 9:17 a.m. and

3  the top of 256 is 9:32 a.m.

4      A    Okay.

5      Q    That appears to be a screenshot of

6  prohibited items or actions from Chapter 13 of the UT

7  code of conduct.  Does that appear to be the case?

8      A    Yes.

9      Q    And Hiya says, "We can just say it's a large

10  crowd of people and we always wear face masks to avoid

11  getting sick in large gatherings."

12              MR. HEALEY:  Object to the form.

13  BY MR. GIBSON:

14      Q    Is that what she said?

15      A    That Is what she said.

16      Q    Okay.  And then she says, her next is "Ask a

17  lawyer first if that's a good idea or if we should

18  just wait and let it play out first."

19              MR. HEALEY:  I object to the form.

20  BY MR. GIBSON:

21    Q    Is that a response?

22    A    I believe so.  Yes.

23    Q    Below there's a reference to Nabulsi.  Who's

24  Nabulsi?

25    A    Nabulsi is, I believe, he is another -- he
⬆

188

1  is like a -- he's like a community member.  He's like

2  a -- he's like a community member that -- that Raneem

3  had reached out to.

4    Q    Do you know his last name?

5    A    I think that is his last name.

6    Q    What's his first name?

7    A    Mohammed.

8    Q    What organization is he associated with?

9    A    I'm not sure.  I think it could be PYM.

10    Q    Does he live in Austin to your knowledge?

11    A    No.

12    Q    Where does he live?

13    A    I think he lives in Houston.

14    Q    Have you met him?

15    A    I have.

16    Q    In what context did you meet him?

17    A    Different events in Houston, different

18 demonstrations, community events.

19    Q    Is he like a family friend?

20              MR. HEALEY:  Object to the form.

21              THE WITNESS:  Yeah.

22 BY MR. GIBSON:

23    Q    You are not -- are you related to him in any

24 way?

25    A    No.

↑

189

1    Q    Okay.  Okay.  So I'd like to turn to 259,

2 because I -- it appears to me that -- oh, no.  So if

3 you look at actually 258, my understanding is that the

4 name above a text reflects, is the same width as the

5 text below it or certainly the first text below the

6 name as we see in all the other ones.  And then the

 7    subsequent text may be different widths, but on all

 8    the other texts it shows the name and then the same

 9    width as the text.  And on the bottom of 258 it

10    appears to be a text from Raneem Mahrouq, but the text

11    below it is much wider suggesting that the text from

12    Raneem Mahrouq has been not included in the text

13    string.  Does that seem correct to you?

14                    MR. HEALEY:  Object to the form.

15                    THE WITNESS:  Perhaps.

16    BY MR. GIBSON:

17        Q    And this is now the morning of the event at

18    10:14 a.m., and it appears you have did not include

19    all of those texts in this production?  Is that

20    correct?

21        A    Again, I think if it was -- if it was

22    responsive to the discovery requests, I would have

23    included.

24        Q    It appears the entire chain is responsive to

25    the discovery request.  But you're selecting certain

190

1   texts that you are choosing to produce and not

2   producing others; correct?

3                   MR. HEALEY:  Object to the form.

4                   THE WITNESS:  I'm not sure.  I mean, I

5   would -- I would've submitted, I mean, if if the -- if

6   the message was responsive, it would've been included.

7   BY MR. GIBSON:

8       Q    So I'd like to go then to page 259.  There's

9   a text from someone on the chain, we don't know whom,

10  not you, that says "Start developing an unwritten plan

11  around arrest, who's willing, who's not, so y'all know

12  how to navigate escalation.  Assign a liaison that

13  will help you communicate with admin, someone who

14  doesn't plan to be arrested or whether or rather isn't

15  willing to get arrested."  So do you know who wrote

16  that?

17                  MR. HEALEY:  Object to the form.

18                  THE WITNESS:  Yeah.  That's -- that's

19  Raneem.

20  BY MR. GIBSON:

21      Q    Okay.  And Raneem is saying this is --

22  that's her recommendation?

23                  MR. HEALEY:  Object to the form.

24                  THE WITNESS:  Yeah.  It appears so.

25   //
⬆

191

1   BY MR. GIBSON:

2        Q    It's not coming from someone else?

3               MR. HEALEY:  Object to the form.

4               THE WITNESS:  It might.  It might.  I

5   mean, I -- I can't -- I can't really speak to that.

6   It might have come from a conversation with someone,

7   but I'm not sure.

8   BY MR. GIBSON:

9        Q    Okay.  Did you develop a plan around arrests

10  and who was willing and who's not?

11              MR. HEALEY:  Object to the form.

12              THE WITNESS:  No.  I -- I don't know.

13  I wasn't involved.  If -- if there was one, I wasn't

14  part of it.  I don't recall.

15  BY MR. GIBSON:

16       Q    What was your personal plan around the

17  possibility of arrest?

18      A    I had no intention of -- I didn't even

19   entertain the thought of there being a possibility of

20   arrests.

21      Q    Well, you got a text that it certainly

22   entertained the thought of the possibility of arrest;

23   correct?

24      A    Yeah.  That -- yeah.  That's here.

25      Q    But you never thought that?

＾

                                        192

1      A    No.  Because we were going to be fully

2   compliant.

3      Q    And then at 10:20 a.m., Hiya sends out the

4   schedule and says "Can someone post?  I'm driving to

5   campus RN."  You see that?

6      A    I do.

7      Q    Where did my copies of the other exhibits --

8   the exhibits are -- I don't know where they were.  Can

9   I just look at your exhibits really quickly?

10      A    Sure.

11      Q    Thank you.  So I'd like you to turn to

12  exhibit --

13      A    Oh.  Are you looking for the posts?  I think

14  the posts were --

15      Q    No.  No.  No.  I want to look at this one.

16      A    Oh.  Sure.

17      Q    Okay.  Okay.  I don't think you can even

18  read this.  Okay.  Never mind.  I apologize.  They're

19  not out of order.

20      A    No -- no worries.  I -- I can -- I can put

21  it.  Thank you.

22      Q    Yeah.  Okay.  And then if you could just

23  turn to page 260 on Exhibit number 8?

24      A    Eight?  All right.

25      Q    In the middle of the page, Raneem says, "Are

                                                        193

1  we making this info from this morning open to the

2  public or nah?"

3              MR. HEALEY:  Object to the form.

4    BY MR. GIBSON:

5        Q    Do you know what -- is she referring to the

6    notice of cancellation to your knowledge?

7        A    I think so.  Yeah.

8        Q    And did you make it, did you tell the public

9    that it occurred?

10                  MR. HEALEY:  Object to the form.

11                  THE WITNESS:  That we received the

12   email?  No.

13   BY MR. GIBSON:

14       Q    Okay.  And then it says "What are we doing

15   about the orange barricade?"  And you say "Step over

16   them.  As long as we don't damage them, we should be

17   fine."

18                  MR. HEALEY:  Object to the form.

19   BY MR. GIBSON:

20       Q    You see that?

21       A    I do.

22                  MR. HEALEY:  Object to the form.

23   BY MR. GIBSON:

24       Q    What are you referring to?  Which orange

25   barricades?

194

1       A     I think --

2                    MR. HEALEY:   Object to the form.

3                    THE WITNESS:   Sorry.

4                    I think there were some like temporary

5    plastic, like chain sort of like dividers that had

6    been set up on the lawn.  I think that's what she was

7    referring to.  Yeah.  But it's not -- it wasn't a

8    barricade, it just like a little.

9    BY MR. GIBSON:

10      Q     Got it.  Okay.  And as I understand it, the

11   last text is at 11:26.  Do you see that at the bottom

12   of page 260 is a post from 11:26?

13      A     Yes.

14      Q     Raneem says "It's technically going to be a

15   violation."  Do you know what she's referring to?

16   It's technically --

17      A     I think she's referring to the orange, that

18   she called them barricades, but I don't know what

19   she's basing that statement off of.  I -- I don't

20   think she referenced a -- a policy or anything when

21   she made that statement.

22    Q    And it says, "But I guess we do it or we

23  could do it in front of Tower instead, but that

24  obstructs people's movement," right?

25    A    That is what it says.

⌃

                                                    195

1     Q    Okay.  And then I understand the next text

2   from that day is, I think 269, as I have it.  So she

3   texted 11:26 and the next text we have is Raneem.

4              MR. HEALEY:  Where are y'all?

5              MR. GIBSON:  At 1:47 p.m.

6   BY MR. GIBSON:

7     Q    Do you see that?

8     A    Yes.

9     Q    We have no text in this chain from 11:26 to

10  1:47 p.m.  Do you see that?

11    A    I do.

12    Q    Were there communications on this chain

13  between 11:26 and 1:47 p.m. that have not been

14  produced?

15      A    No.

16      Q    So you guys were texting heavily between 11

17   -- from 11:26, prior to 11:26, and then texting again

18   very heavily after 1:47, but nothing in between?

19              MR. HEALEY:  Object to the form.

20              THE WITNESS:  Correct.

21   BY MR. GIBSON:

22      Q    So if you -- you were arrested just before 1

23   p.m.?  Is that correct?

24      A    Correct.

25      Q    If you go to 269, Mohamed at 2:18 says
↟

                                              196

1    "They're going to charge the lawn.  Should we

2    disperse?"  Do you see that?

3       A    I do.

4       Q    So Mohammed hadn't dispersed by this point;

5    correct?

6              MR. HEALEY:  Object to the form.

7              THE WITNESS:  I -- I don't know.  I --

8    I mean, anything that happened after I was arrested

9    has nothing to do with me and so I can't speak to any

10   of that.

11   BY MR. GIBSON:

12        Q    On two -- could you turn to page 271?

13   Raneem states at the bottom of her string of text,

14   "Where are our demands?"  Do you see that?  What were

15   your -- what were the PSC's demands?

16                    MR. HEALEY:  Object to the form.

17                    THE WITNESS:  I believe she's

18   referencing the demands to -- for UT to divest, to

19   disclose their investments in companies that support

20   the killing of Palestinians and demanding that you

21   should divest from those companies.  I -- I believe

22   that's what she's referring to.  Perhaps also

23   accountability from our administration to their

24   students.

25   //

197

1    BY MR. GIBSON:

2        Q    So if you could turn to the note, Exhibit

3    number 9?

4                MR. HEALEY:  If we're moving to a new

5    exhibit, is this a good time to take a break for

6    everybody?

7                THE WITNESS:  Yeah.  Yeah.  I was about

8    to say.

9    BY MR. GIBSON:

10       Q    Would you like a break?

11       A    I think, yeah.  I think a break would be

12   good.

13               MR. GIBSON:  How long have we been on

14   the record?

15               THE VIDEOGRAPHER:  Four hours, 31

16   minutes.

17               MR. GIBSON:  Thank you.  We can take a

18   break.

19               THE VIDEOGRAPHER:  Okay.  Going off the

20   record.  Time is three o'clock.

21               (Off the record.)

22               THE VIDEOGRAPHER:  Back on the record.

23   BY MR. GIBSON:

24       Q    So I think we are -- I'd like to show you

25   some videos and ask you a few questions.

⬆

198

1              MR. HEALEY:  Are the videos going to

2      play on these screens again?

3              MR. GIBSON:  Yes.

4              THE WITNESS:  We have to get real close

5      to listen then.

6              MR. GIBSON:  We have -- okay.  And I

7      can't choose the volume output.  My apologies.  For

8      some reason it's forcing it to go to that one.  I

9      don't know why.

10             MR. HEALEY:  Yeah.  I mean --

11             THE WITNESS:  Oh.  Is this the sound?

12     BY MR. GIBSON:

13        Q    Yeah.  Had no, but it's coming out of that

14     one, so you'll need to plug that into that.

15        A    Oh.  Wait.  I think wasn't -- I thought I

16     also had some coming out of this.  It was nothing

17     coming out of this.

18             MR. HEALEY:  No.  I think it was all

19   coming out of mine.

20                 THE WITNESS:  Oh.  Okay.  Oh.  That's

21   his brightness.  That's his brightness.

22                 MR. HEALEY:  So, I mean, if you bring

23   that over here, I can plug it into the aux port on

24   this particular screen and then maybe, you know, via -

25   -
♠

                                                    199

1                 THE WITNESS:  It's the same video,

2   right?

3                 MR. HEALEY:  Yeah.  Yeah.  It's --

4   they're all showing the same thing.  It's just that

5   the sound settings are not right.

6                 MR. GIBSON:  It's on the other side, by

7   the side.  Yeah.  I think so.  I think so.  Looks

8   weird.  Weird.

9                 (Video played.)

10   BY MR. GIBSON:

11      Q    Okay.  Okay.  Pause.  All right.  So I'm

12   going to mark this Exhibit 10.  This is Qaddumi 251

13   and it's going to play.

14                    (Exhibit 10 was marked for

15                    identification.)

16                    (Video played.)

17   BY MR. GIBSON:

18       Q    Okay.  Does that video at the beginning show

19   you speaking to two members of UT staff?

20       A    It does.

21       Q    Okay.  Do you know who those individuals

22   are?

23       A    Yeah.  They identified themselves in the

24   video as Kelly Soucy and Aaron Boyles.

25       Q    And how many convers, how many times did you
⬆

                                                  200

1    interact with Dr. Voyles and Dr. Soucy on that day?

2        A    I think twice.

3        Q    Do you recall meeting them at the PCL at the

4    -- before the crowd gathered at Gregory Plaza?

5       A    Yes.

6       Q    What do you recall from that conversation?

7       A    I recall Dr. Soucy and -- is it Dr. Voyles?

8       Q    I think it is.  Yes.

9       A    Dr. Voyles approached me and a couple other

10   PSC members and I remember Dr. Soucy asking if we had

11   seen the email notice and we were -- we told her we

12   had, and that was essentially the extent of the

13   conversation.  She -- she just said, "Okay, so you

14   know, there's that email," but she didn't really --

15   she didn't issue any directive or anything.  She just

16   kept referring back to this email and being very

17   vague.

18       Q    And she didn't tell you to disperse?

19       A    No.  She did not.

20       Q    Did she tell you that they would be happy to

21   meet with you to plan a demonstration that would not

22   violate university policy?

23       A    I don't know if she said that, but I believe

24   that was in the email and -- and she kept referring to

25   the email.

201

1      Q     But do you remember Dr. Voyles telling you

2  that they would be happy to meet with you to plan a

3  demonstration event that would not violate university

4  policy?

5                    MR. HEALEY:  Objection to the form.

6                    THE WITNESS:  I -- I don't recall

7  either of them saying that in person, but I do recall

8  that being in the email notice.

9  BY MR. GIBSON:

10     Q     And then they met you in front of Gregory

11  Plaza?

12     A     Correct.

13     Q     Do you remember meeting them twice, speaking

14  to them twice in front of Gregory Plaza?

15                    MR. HEALEY:  Object to the form.

16                    THE WITNESS:  I -- I think I only spoke

17  with them once.  I -- I don't think I spoke with them

18  twice.

19  BY MR. GIBSON:

20     Q     Do you remember them giving you a directive

21  to disperse when you spoke with them in front of

22  Gregory Plaza?

23    A    No.

24    Q    They tell you that you cannot proceed with

25    the event?

202

1    A    They told us there were -- they were

2    concerned about three potential policy violations,

3    which were the policy against amplified sound, the

4    policy against tents, and the policy against face

5    masks for identity, and I addressed personally the two

6    about amplified sound and tents and my colleague Jenna

7    addressed the one about face masks.

8    Q    And the person we see on the video talking

9    about face masks.  That's your sister?

10    A    On -- in this video, that was my sister.

11    Yeah.

12    Q    But they -- your testimony today is that

13    they never told you that you could not proceed with

14    your event on the morning of the 24th?

15    A    I don't recall them issuing a directive like

16    that.

17         Q    Okay.  That directive is in the letter;

18    correct?  You are not permitted to hold your event on

19    the university campus?  That's in Exhibit 9?

20                   MR. HEALEY:  Object to the form.

21                   THE WITNESS:  What I understood from

22    the -- the email notice as well as from my

23    conversations that I had with Soucy and Voyles on the

24    day was that we were not allowed to proceed with an

25    event which violated institutional rules.

↑

203

1    BY MR. GIBSON:

2         Q    That's not what it says; is it?  It says

3    "Please be advised that you are not permitted to hold

4    your event on the university campus."  Did I read the

5    first sentence of the bolded paragraph correctly?

6         A    You did.  The -- but the email also states

7    in the second paragraph, "The Palestine Solidarity

8    Committee Student Organization's event Popular

9   University for Gaza, which is planned for tomorrow,

10  has declared intent to violate our policies and rules

11  and disrupt our campus operations," so I understood

12  that this is the pretext for which that subsequent

13  directive is given.  Now when you -- and they cite

14  which rule violation they're -- they're alluding to in

15  the footnote of this -- of this email and it says of

16  PSC, "UT Austin registers student organization PSC

17  encouraging people to wear face masks in violation of

18  Chapter 13 105 AI of the institution rules."  So I

19  understood we're not -- PSC is not permitted to hold

20  the event because it violates this rule because it

21  violates institutional rules, that being the rule on

22  face masks.  I understood that if we satisfied that

23  rule and did not violate that rule, there would be no

24  -- there is no violating a policies or rules or intent

25  to do such, and thus this is not the event that

1   requires cancellation.

2       Q    I'll hand you an exhibit.  I don't have a

3   copies.  My apologies.  You can take your time to look

4   at it.

5       A    Sure.

6       Q    It's one of your own produced documents.

7                 MR. HEALEY:  Hand it to me first and

8   then I'll look at it.

9                 THE WITNESS:  Sure.

10                MR. HEALEY:  Before you ask the

11  questions, what number was that?

12                MR. GIBSON:  This is number 11.  And

13  the Bates mark is --

14                (Exhibit 11 was marked for

15                identification.)

16                MR. HEALEY:  Qaddumi 000006.

17  BY MR. GIBSON:

18      Q    Does this document look familiar?

19      A    Yes.

20      Q    Who is the person in the black sunglasses

21  and black hat that you're speaking to?

22      A    I believe that was -- I think his name's

23  John.

24      Q    What's his last name?

25      A    John Siebels.  Siebels.

205

1      Q    And how do you spell that to your knowledge?

2      A    I believe it's S-I-E-B-E-L-S.

3      Q    And of course I've lost my -- there we go.

4   And what is his role in this?  Because at least the

5   context of my question, I'm not trying to hide

6   anything, is that it appears that you are speaking to

7   him often throughout the course of this protest, that

8   while you're present and coordinating and

9   communicating with him, often is seen in pictures and

10  videos.  Do you -- does that sound familiar?  Does

11  that sound accurate as to what occurred that day that

12  you con consulted with this person or spoke to this

13  person often during the course of the protest?

14              MR. HEALEY:  Object to the form.

15              THE WITNESS:  Not exactly accurate.  I

16  was, I think, consulting more with -- with Jenna, who

17  -- who's pictured here.

18  BY MR. GIBSON:

19      Q    So Jenna is the person with the maroon

20    backpack and long hair?

21        A    Yes.

22        Q    So who is John Siebels?  Why is he there?

23        A    He's community.

24                MR. HEALEY:  Objection.  Form.

25                THE WITNESS:  He's a community member.
⬆

206

1    I believe he -- he does activist work with PSL and he

2    was here helping with the -- the security team or the

3    Marshal, the Marshals, since he's here wearing a

4    yellow vest.

5    BY MR. GIBSON:

6        Q    Had you met him before?

7        A    Maybe once or twice.

8        Q    In what context?

9        A    Similar context, like a -- a demonstration.

10        Q    And do you know where he -- does he live in

11    Austin?

12        A    I believe so.

13     Q     Do you -- did you email with him?

14     A     No.

15     Q     How did you communicate with him?

16     A     I did not really communicate with him.  I

17  think I did not communicate with him at all at this

18  point.  Maybe after the fact I might have messaged him

19  on Signal, but I hadn't really communicated with him

20  at this point.

21     Q     Do you have those Signal communications?

22     A     I'm not sure.

23     Q     Did you look for them in connection with

24  producing documents in connection with this case?

25     A     I looked through all my chats.  I hadn't --
⚓

207

1  I didn't discuss anything with him related to this

2  case.

3     Q     Did you discuss anything with him related to

4  this protest?

5     A     I might have discussed if I discussed

6    anything with him over message, it would've been for

7    the disciplinary hearings that I had the following

8    fall.

9         Q    Was he a witness in those hearings?

10        A    He was.

11        Q    That's yours.  Sorry.  And the video we

12   looked at is Exhibit --

13        A    Exhibit 10?

14        Q    Ten.  The person who took that video is your

15   father?  Is that correct?

16        A    Yes.

17        Q    And he was present during the protest?

18        A    Yes.

19        Q    Did you ever leave the protest or disperse

20   from the protest?

21             MR. HEALEY:  Object to the form.

22             THE WITNESS:  Do you want to unplug?

23   BY MR. GIBSON:

24        Q    Oh.  Yes.  Thank you.  Sorry.  Thank you.

25        A    Can you repeat the question?
⌃

208

1    Q    Did you ever leave the protest on the day of

2    until be before your arrest?

3    A    Yes.

4    Q    When did you leave the protest?

5    A    After I communicated the dispersal order

6    with the crowd.

7    Q    And then did the crowd reform on Speedway?

8    A    Yeah.

9    Q    And then did you rejoin that crowd on

10    Speedway?

11    A    I think rejoin is a -- is a

12    mischaracterization.

13    Q    So how did you get from dispersing from the

14    protest to being on Speedway in the front of the

15    crowd?

16    A    So after communicating the dispersal

17    directive at Jester Circle, which is, you know, over

18    there, me and a few other, well, firstly I was -- I

19    actually waited behind with police to ensure people

20    were dispersing in a -- in a organized way, like, in

21    like a safe way.  Then I left and I -- and I stood

22    somewhere in this area with a few other organizers

23    just trying to talk over what just happened because

24    this was crazy.  And then meanwhile, people are

25    leaving, but then because they're all being funneled
⬆

209

1    down the -- the same route, they naturally reformed.

2    And then my sister calls me telling me that police are

3    threatening to arrest those people who are at this

4    point over here while I'm over there.  So after that

5    phone call, then I run over because I want to make

6    sure she and my dad are safe and also that people are

7    understanding that we don't want there to be any

8    escalation that we should just disperse.

9         Q    So you've been -- and you admit that you had

10   received instructions from the police to disperse

11   prior to that time?

12        A    Which I complied with.

13        Q    And then you rejoined a crowd that had

14   gathered again and got to the front and started

15   engaging with that crowd again?

16             MR. HEALEY:  Object to the form.

17                    THE WITNESS:  I -- I ran to the front

18    of this crowd to encourage people, once again, to

19    comply with the -- with the police directive, not to

20    rejoin them in -- in chanting.

21    BY MR. GIBSON:

22        Q    Did the protest disperse immediately upon

23    receiving the police's instructions?

24        A    The protest dispersed as the police

25    instructed us to.  Yes.

&uarr;

                                                      210

1         Q    You received an instruction and then you

2    marched all the way down to Jester Circle; correct?

3         A    Per the police instruction.  Yes.

4         Q    And then did the protest to your -- then the

5    protest dispersed?

6         A    Correct.

7         Q    And did it reform?

8         A    Yes.

9         Q    And there were people locking arm in arm;

10    correct?  When it reformed?

11                    MR. HEALEY:  Object to the form.

12    BY MR. GIBSON:

13        Q    On Speedway?

14                    MR. HEALEY:  Object to the form.

15                    THE WITNESS:  I don't -- I don't

16    recall.

17    BY MR. GIBSON:

18        Q    But your testimony is that the reason people

19    reformed the protest on Speedway is because they had

20    no other choice?  Is that my understanding of your

21    testimony?

22                    MR. HEALEY:  Object to the form.

23                    THE WITNESS:  If you'd like to look at

24    a map then to -- to better understand, yes.  That is

25    my testimony.

211

1    BY MR. GIBSON:

2        Q    Okay.  And your father was asking you to

3    leave that SPL space prior to your arrest; wasn't he?

4              MR. HEALEY:  Object to the form.

5              THE WITNESS:  There's a video in which

6    there's police who were walking up to me looking --

7    looking unfriendly at that point.  He says, "I'm --

8    let's go, let's go."

9    BY MR. GIBSON:

10       Q    And you didn't leave; did you?

11             MR. HEALEY:  Object to the form.

12             THE WITNESS:  I -- I couldn't leave.  I

13   was arrested.

14   BY MR. GIBSON:

15       Q    Had he been asking you to leave prior to

16   that?

17       A    No.  He himself was leaving.

18       Q    You standing here today, you have no

19   knowledge of any communications, coordinated

20   communications regarding this protest on Signal chats

21   as the protest was ongoing; correct?  And even after

22   people started getting arrested, the protest did not

23   disperse; did it?

24             MR. HEALEY:  Object to the form

25   //

212

1   BY MR. GIBSON:

2       Q    To your knowledge from what you've heard?

3       A    I mean, I --

4            MR. HEALEY:  Object to the form.

5            THE WITNESS:  I can't speak to anything

6   that happened after I was arrested.  I -- I wasn't

7   involved in any of that, any -- any of those events

8   that transpired.

9   BY MR. GIBSON:

10      Q    And you have presented your side of this

11  story numerous times during the course of your student

12  misconduct case; correct?

13      A    I have.

14      Q    Do you stand behind the statements that you

15  made in the course of that case?

16           MR. HEALEY:  Object to the form.

17           THE WITNESS:  I think so.

18  BY MR. GIBSON:

19      Q    Do you have any reason sitting here today to

20  change any of the statements that you made during the

21    course of that case?

22                    MR. HEALEY:  Object to the form.

23                    THE WITNESS:  I -- I would have to look

24    at -- I'd have to look back at it, but I don't -- I

25    don't think so.

↑

                                                      213

1    BY MR. GIBSON:

2         Q    Okay.

3                    MR. HEALEY:  I can't see the video.

4                    MR. GIBSON:  Hold on.

5    BY MR. GIBSON:

6         Q    Okay.  I'm marking Exhibit number 12.  Yes.

7    We are.  This is Exhibit C to the Soucy Declaration

8    that was filed in the SJP case, which my understanding

9    is we have produced and we have produced this video

10   certainly.  Do you have -- I don't have a Bates number

11   for this because it's -- we'll get it too.  Yeah.  But

12   we'll get it Bates.  Okay.  And if it hasn't been

13   produced, we'll let you know.  But my understanding,

14    it's been produced.  Okay.  I'm going to play this for

15    you.

16                    (Exhibit 12 was marked for

17                    identification.)

18                    (Video played.)

19    BY MR. GIBSON:

20        Q    Okay.  Just pausing it.  That's you standing

21    in front of the crowd; correct?  To see you?

22        A    I -- I believe I was there for a moment.

23    Yes.

24        Q    Okay.  And you recall receiving this

25    directive?

↑

214

1        A    Yes.

2        Q    Did you comply with it within 10 minutes?

3        A    Yes.

4        Q    Did you continue to engage in protest

5    activities with the crowd, including leading chance

6    prior to this, prior to dispersing?

7              MR. HEALEY:  Object to the form.

8              THE WITNESS:  No.

9    BY MR. GIBSON:

10        Q    You didn't lead chants prior to dispersing?

11             MR. HEALEY:  Object to the form.

12             THE WITNESS:  No.

13             (Video played.)

14   BY MR. GIBSON:

15        Q    And you're not -- you're walking pretty

16   slowly there; aren't you?

17             MR. HEALEY:  Object to the form.

18             And if you're going to ask questions

19   about the video, could you pause the video?

20   BY MR. GIBSON:

21        Q    You're walking pretty slowly there?

22             MR. HEALEY:  Objection to the form.

23             THE WITNESS:  I'm -- I'm walking.

24   BY MR. GIBSON:

25        Q    Would you describe it as a slow walk?

215

1              MR. HEALEY:  Object to the form.

2              THE WITNESS:  I mean, I'm walking.  I'm

3  -- and I'm complying with the directive to move south

4  and disperse south.

5              MR. GIBSON:  Objection.  Nonresponsive.

6  BY MR. GIBSON:

7      Q    Would you describe it as a slow walk?

8              MR. HEALEY:  Object to the form.

9              THE WITNESS:  I mean, no.  Not

10  necessarily.

11  BY MR. GIBSON:

12      Q    All right.

13              THE OFFICER:  This is Exhibit 12,

14  right?

15              MR. GIBSON:  Yep.  That's enough.

16              THE WITNESS:  And then you want to

17  unplug that video?

18  BY MR. GIBSON:

19      Q    Yeah.  Thank you.  Appreciate you reminding

20  me.

21      A    Of course.

22              (Video played.)

23  BY MR. GIBSON:

24      Q    Oh.  That's not the one I wanted.  Sorry.

25      A    Just so you know, I can see your screen.
⬆

                                                    216

1       Q    Yeah.  Stop.  Yes.  Hold on just a second.

2   Okay.  This is going to be Qaddumi 00045, marked as

3   Exhibit 13.  And play it first.

4                 (Exhibit 13 was marked for

5                 identification.)

6                 (Video played.)

7   BY MR. GIBSON:

8       Q    Okay.  This is you marching to Jester Circle

9   leading the crowd?  Is that correct?

10                MR. HEALEY:  Darren, can you pause the

11  exhibit when you're asking the questions?

12  BY MR. GIBSON:

13      Q    This is marching to Jester Circle with you

14  in the lead of the crowd; correct?

15                MR. HEALEY:  Object to the form.

16                THE WITNESS:  Going in the direction

17  that the police direct us to -- to go.

18                    (Video played.)

19   BY MR. GIBSON:

20        Q    What did he just say?

21                    MR. HEALEY:  Object to the form.

22   BY MR. GIBSON:

23        Q    If you speak the language that he's

24   speaking?

25        A    Yeah.  Direct translation is from -- from
⬆

                                                    217

1    one water to another water, but the actual translation

2    is from the river to the sea.

3         Q    Got it.  And then does he --

4         A    Palestine will be free.

5         Q    Okay.  At this point, the crowd has stopped

6    and you are talking to the police about what?

7                    MR. HEALEY:  Object to the form

8                    THE WITNESS:  About dispersal.

9                    (Video played.)

10   BY MR. GIBSON:

11      Q    There's hundreds of people there?

12                MR. HEALEY:  Object to form.

13   BY MR. GIBSON:

14      Q    There's hundreds of people there at least.

15   Would you agree?

16      A    It looks like a lot of people.

17                (Video played.)

18   BY MR. GIBSON:

19      Q    And the police had instructed everyone to go

20   east towards the stadium; correct?

21                MR. HEALEY:  Object to the form.

22                THE WITNESS:  No.

23   BY MR. GIBSON:

24      Q    Where did they tell you to go?  Where?

25      A    I understood that they told us to go to the

⬆

                                                    218

1   spot and then disperse from this spot.

2      Q    And never -- you never got a directive that

3   the crowd was to disperse east towards the stadium?

4       A    I think you might be referring to a

5    different, to -- I think you're referring to something

6    else.

7       Q    What am I referring to?

8       A    I think --

9              MR. HEALEY:  Object to the form.

10             THE WITNESS:  I think you're referring

11   to another clip in which Officer Lobrutto, it

12   discusses the idea of going down 21st Street towards

13   the stadium and then dispersing there, which is not

14   what ended up being the directive.

15   BY MR. GIBSON:

16      Q    But he said he instructed you to disperse

17   east; correct?  In that directive?

18             MR. HEALEY:  Object to form.

19             THE WITNESS:  That -- that was not a

20   directive.  That was him saying that's the idea that

21   he needed to discuss with his supervisors, and

22   apparently his supervisors didn't like that idea so we

23   ended up going south instead of east.

24   BY MR. GIBSON:

25      Q    And they -- and did he tell you where to

219

1    disperse to from here?

2        A    Those hand motions that he was making.

3        Q    What did you understand that to mean?

4        A    Disperse.  Just that's what he told me is

5    just disperse.  Just that's that's the video shows.

6    That's -- that's that's what he told me.

7                (Video played.)

8    BY MR. GIBSON:

9        Q    I'm going to jump ahead a little bit.  And

10   the crowd still hasn't dispersed; has it?

11       A    No.  Not yet.

12       Q    Still hasn't dispersed?

13               MR. HEALEY:  Object to the form and

14   playing the video while the question is pending.

15   BY MR. GIBSON:

16       Q    This is many minutes later.  Still hasn't

17   dispersed; has it?

18       A    I -- I believe this was still within the 10

19   minute timeframe that they had provided us.

20       Q    Got it.  So I'm just -- all right.

21       A    Do you want to --

22      Q    Thank you.  Let's go.  Let's -- all right.

23  I don't think we need to look at that video.

24      A    Do you know how much time we've been on the

25  record?

220

1              THE OFFICER:  Five hours back.

2              MR. HEALEY:  I think he means since the

3  last break.

4              MR. GIBSON:  Do you have any questions?

5  More to, I mean, it's good he's already given his

6  version.

7              MR. HEALEY:  Just, I mean, you know,

8  just let everyone know when you want to break.

9              THE WITNESS:  Yeah.  I was just

10  curious.

11  BY MR. GIBSON:

12      Q    Oh.  Who's Audrey McCabe?  Aubrey McCabe, my

13  apologies.

14      A    She -- she was a student who would attend a

15    lot of PSC events.

16          Q    She was a witness at your disciplinary

17    hearing?

18          A    Yes.

19          Q    How does -- is she a friend of yours?

20          A    Yeah.

21          Q    Is she your girlfriend?

22          A    No.

23          Q    Do you have a girlfriend?

24                    MR. HEALEY:  Object to the form.

25                    THE WITNESS:  Is that relevant?

                                                    221

1    BY MR. GIBSON:

2          Q    I get to ask questions.  The relevancy isn't

3    something that happens here.  That's for the court.

4          A    Okay.  I mean, I haven't told many people,

5    so tight lips.

6          Q    Do you have a girlfriend?

7          A    Yes.

8        Q    Do you have -- did you have a girlfriend at

9    the time of April 24th?

10        A    No.

11        Q    Okay.  Were you seeing anyone at the time of

12    April 24th?

13              MR. HEALEY:  Object to the form.

14              THE WITNESS:  No.

15    BY MR. GIBSON:

16        Q    Okay.  Just checking.  That was really what

17    my question was about was whether you were -- there

18    was someone that was particularly close to you at the

19    time of April 24th that I was not aware of.

20              MR. HEALEY:  Object to the form, if

21    that was a question.

22              MR. GIBSON:  It wasn't a question.  I

23    was explaining to him why I asked it.

24              MR. HEALEY:  Got you.

25    //

1    BY MR. GIBSON:

2        Q    Covered that you were, I think we've

3    referenced this already, but you were subject to a

4    second disciplinary proceeding relating to a violation

5    of your suspension; correct?

6                    MR. HEALEY:  Object to the form.

7                    THE WITNESS:  Correct.

8    BY MR. GIBSON:

9        Q    And your initial suspension barred you from

10   entering campus; correct?

11       A    Correct.

12       Q    And you entered campus despite that bar;

13   correct?

14       A    At the time I didn't necessarily believe I

15   was violating the suspension.

16       Q    If you have testified under oath that you

17   were barred from camp from entering campus; correct?

18       A    Yeah.  I was.

19       Q    And you entered campus; correct?

20                   MR. HEALEY:  Object to the form.

21                   THE WITNESS:  Technically.  Yes.

22   BY MR. GIBSON:

23       Q    You were on Speedway; correct?

24       A    No.

25       Q    Where were you?

⬆

223

1       A    I was on 21st Street.

2       Q    On 21st Street?  And that resulted in a

3   deferred suspension; correct?

4       A    Correct.

5       Q    And you stated that you're not challenging

6   anything about the second disciplinary proceeding or

7   deferred suspension in this case; correct?

8                MR. HEALEY:  Object to the form.

9                THE WITNESS:  I don't believe I am.

10  No.

11  BY MR. GIBSON:

12      Q    And this deferred suspension and the

13  expiration of your initial suspension allowed you to

14  return to UT Austin this fall; correct?

15      A    Correct.

16      Q    And you register for classes?

17      A    I am.

18      Q    Are you taking classes?

19    A    I am.

20        Q    So are you prohibited in any way from

21    participating in the educational program of The

22    University of Texas at Austin?

23                MR. HEALEY:  Object to the form.

24                THE WITNESS:  I don't believe so.

25    //
↑

                                        224

1    BY MR. GIBSON:

2        Q    What classes are you taking right now?

3        A    You want me to read my schedule?  I take an

4    Arabic class, Politics of International Trade, Intro

5    to the Middle East, I think The Rise of Islam is the

6    specific subject and then a Government Research

7    course.

8        Q    So I'm sorry if I miss.  Arabic, Intro to

9    Middle East, Government research?  That was three

10    classes.  Did I miss any?

11        A    Politics of International Trade.

12    Q    Got it.  So that's a full-time schedule?

13    A    Full schedule.

14    Q    Do you plan to graduate?

15    A    That's the plan.

16    Q    When is your planned graduation date?

17    A    Spring of 2026.

18    Q    And you are not in the PSC currently?

19    A    No.

20    Q    Why not?

21    A    I felt I'd contributed what I could

22    contribute and that it was -- it was a good time to

23    let other students do with it what they -- what they

24    wanted to.

25    Q    Is the PSC still active on campus?

⬆

                                                              225

1              MR. HEALEY:  Object to the form.

2              THE WITNESS:  I -- I'm not entirely

3    sure.  I'm not entirely sure.

4    BY MR. GIBSON:

```
 5        Q     Are you active in any other government or

 6   student organizations?

 7        A     Yes.

 8        Q     What other student organizations?

 9        A     The Arab Student Association.

10        Q     Any others?

11        A     For now, that's it.

12        Q     Do you hold any sort of officer or steering

13   committee or similar type of position with the Arab

14   Student Organization?

15        A     Yes.

16        Q     What's your position?

17        A     Event coordinator.

18        Q     Is that referred to as the ASA?

19        A     The ASA.  Correct.

20        Q     And in connection with being the event

21   coordinator of the ASA, do you work on planning events

22   on campus?

23        A     I don't actually think we've done any on

24   campus events thus far, but generally I think -- I

25   think we will be doing on campus events.
```

226

1      Q    Have you had any problems or have any

2    problems from the university regarding your

3    involvement in the ASA?

4                   MR. HEALEY:  Object to the form.

5                   THE WITNESS:  No.

6    BY MR. GIBSON:

7      Q    Have you -- has there been any limits on any

8    expressive activity imposed on the ASA since you've

9    been a member?

10     A    The ASA doesn't necessarily participate in

11   expressive activity to the same degree in the same way

12   the PSC did, so that hasn't really been an opportunity

13   for the university to -- to say anything.  However, I

14   mean, myself and other students are very wary of

15   participating in any explicit activity because fear of

16   retribution from the administration.

17     Q    What does the ASA do?

18                  MR. HEALEY:  Objection.  Form.

19   BY MR. GIBSON:

20     Q    And what's its mission?

21     A    ASA's mission is to share Arab culture with

22   students at UT to build community among Arab students,

23    and so we do that through events.  A lot of them off

24    campus, some of them on campus.  Yeah.

25        Q    To your knowledge, has the ASA had on campus

227

1    events since April 24, 2024?

2        A    Yes.

3        Q    Have any of those been prohibited by the

4    university to your knowledge?

5        A    Well, I wasn't allowed to attend any of them

6    really, so I -- I'm not exactly sure.  Yeah.  I -- I'm

7    -- I'm not sure.

8        Q    Have -- since you've returned to campus this

9    in September, or I think it was mid-August?  Whenever

10    the semester started is when you returned?  Is that

11    correct?

12        A    Correct.

13        Q    It was August 1st or 2nd?

14            MR. HEALEY:  Object to the form.

15            THE WITNESS:  I think it was more like

16    August, like, 20th.

17    BY MR. GIBSON:

18        Q    Okay.  Whenever it was, have you attended

19    any ASA events on campus since you returned to campus?

20        A    Yes.

21        Q    What events have you attended?

22        A    I think we've only had one on campus and it

23    was a workshop, Tatreez, Palestinian embroidery.

24    Yeah.  So we did that like a month ago or something

25    like that.

♠

                                                      228

1        Q    Have you ever reached out to the Dean of

2    Students' office as the events coordinator of ASA

3    regarding coordinating ASA events on campus?

4        A    No.

5        Q    Why not?

6        A    I haven't had to yet.

7        Q    Okay.  What are your plans after you finish

8    your undergraduate degree?

9        A    I hope to attend law school.

10       Q    When do you want to do that?  Do you plan to

11  go immediately after you complete?

12       A    Ideally.

13       Q    Okay.  Have you started that process?

14       A    I have.

15       Q    Have you taken the LSAT?

16       A    I just took it last weekend, actually, it

17  was going to be the --

18            MR. HEALEY:  Day after his originally

19  scheduled deposition.

20            THE WITNESS:  Yeah.

21  BY MR. GIBSON:

22       Q    It's a good reason to move a deposition.  I

23  hope we were able to accommodate that schedule.  Not

24  the actual reason it was moved?

25       A    Yeah.  Not -- not the actual reason, but it

⌃

229

1  was convenient.  It was convenient.  Yes.

2      Q      Do you know where you would like to go to

3  law school?

4      A      The best school I can get into.  I'm going

5  to apply, you know, around.

6      Q      Will you apply to UT?

7      A      Yes.

8      Q      So despite your arrest and suspension, you

9  still would like to attend law school at the

10  University of Texas?

11      A      UT Law School is a very good school and I

12  found that despite the harassment from administration,

13  the students and the faculty at UT are really great.

14  And so if I have the opportunity to -- to attend law

15  school here, I -- I would do that.

16      Q      When you say harassment from administration,

17  and I think we exhausted that topic earlier today, for

18  events that occurred prior to April 24, 2024?  Is that

19  your recollection as well?

20      A      Yes.

21      Q      Have you been subject to harassment by the

22  administration after April 24, 2024?

23      A      There were -- so there was a period at the

24  start of fall 2024 where I was not suspended like

25  officially from university and I was still allowed to

230

1    attend classes pending the disciplinary procedures.

2        Q    In the fall of 2024?

3        A    In fall of 2024.  During that time or in the

4    summer proceeding that, UT had established an event

5    response in readiness department in which they placed

6    Officer Joe Lobrutto as the director of that

7    department and Mr. Lobrutto would be present at -- at

8    any like pro-Palestinian event that was on campus

9    while I was still permitted to be on campus.  He would

10   be at, and this contributed to this idea of like

11   surveillance, which like we felt -- we felt like we

12   were being watched by the university.  PSC had been

13   notified that it was being investigated.  Of course

14   there was a -- there was this legacy.  The arrests

15   were still very fresh and the university has not done

16   anything to like apologize for the way they treated

17   students and the university has defended the way that

18   they -- that they violently permitted the violent

19   arrest of students on campus for promoting a pro-

20   Palestinian viewpoint.  And so I feel, yeah, as a

21   Palestinian-American student, I feel like my

22   university has become a little bit antagonistic

23   towards me and people like me because of those things.

24        Q    So it's just so I understand, it's based on

25   Officer Lobrutto being present for PSC events?

                                                      231

1         A    That's one tangible reason.

2         Q    And it's based on the university's response

3    to the arrest that occurred in April of 2024?

4                   MR. HEALEY:  Object to the form.

5                   THE WITNESS:  Their -- their general

6    attitude around -- around at all.

7    BY MR. GIBSON:

8         Q    How have they communicated their general

9    attitude?  You mentioned the fact that they have

10   defended the response to the April 2024 protest and I

11   presume you mean there's statements around that?

12        A    Correct.

13     Q     What other ways have they exhibited their

14     general attitude that you describe as creating a

15     negative environment for you?

16     A     Well, by punishing me, suspending me for

17     that.  By suspending PSC as an organization by

18     punishing all other students who had been arrested

19     with punishing them with deferred suspension and

20     probation.  And now with the recent implementation of

21     even more strict rules on expressive activities on

22     campus, coupled of course with the governor's

23     executive order, which kind of precedes all of that.

24     Q     Anything else?

25          MR. HEALEY:  Object to the form.
⌃

                                                         232

1          THE WITNESS:  Not off the top of my

2     head.  No.

3     BY MR. GIBSON:

4     Q     Do you know if, going back to going to law

5     school, any other law schools that you intend on

6    applying to specifically?

7                        MR. HEALEY:  Object to the form.

8                        THE WITNESS:  Is this going to be used

9    against me?

10   BY MR. GIBSON:

11        Q    No.  Well, I don't know what to -- I don't

12   know what it means by the university, by UT Law for

13   purposes of determining your entrance to law school.

14        A    Oh.  I don't know.

15        Q    I would -- I had -- it will likely be used

16   in this lawsuit, the answer to the question, but I

17   don't know what you mean by otherwise.

18        A    Okay.

19                        MR. HEALEY:  If that was a question,

20   object to the form.

21                        MR. GIBSON:  He asked me a question.  I

22   was trying to answer him.

23                        THE WITNESS:  Yeah.  I mean, I -- I

24   plan on applying to a few schools in Texas and then

25   maybe some schools outside Texas.  Those are more

233

1    expensive than those, sir.  Yeah.

2    BY MR. GIBSON:

3        Q    Do you know if any of the school's

4    application processes that you're applying to require

5    disclosure of your prior student discipline?

6        A    I'm not sure if for the case by case for

7    each school.  What I am aware of is that in UT's

8    policy, the permanent disciplinary record, which my

9    suspension will permanently be on, is -- is

10   confidential.  Say for among a few exceptions, any

11   school that I apply to for admission for -- for for

12   grad school, they can request to see my disciplinary

13   record and UT, within their policy, is -- can provide

14   my record to those schools, which I think will harm

15   me.  And I think that's a further enforcement of what

16   I think is already an -- an unjust punishment.  An

17   unjust punishment.

18       Q    Understood.  Go to --

19            MR. HEALEY:  On the record time since

20   last break?  What was the record time since last break

21            THE OFFICER:  It was 5:24.

22            MR. HEALEY:  Darren, how much longer do

23   you intend to go today?

24   BY MR. GIBSON:

25       Q    Maybe another hour.  You want to take a

⬆

                                              234

1    break?  Would you like a break, Ammer, or do you want

2    to finish up?

3                MR. HEALEY:  I think if we're going to

4    be going for another hour --

5                MR. GIBSON:  I'd like to ask Ammer that

6    question.

7                THE WITNESS:  It's up to you.  You --

8    you were saying or -- or what?

9    BY MR. GIBSON:

10       Q    Or finish up, I think, probably in about an

11   hour.

12       A    Do you think there'll be another natural

13   stopping point within that hour?

14       Q    Probably not.  No.  So I think if you want a

15   break, we should take a break now.

16       A    We'll take a break now.

17        Q    That sounds great.

18              (Off the record.)

19              THE VIDEOGRAPHER:  Back on the record.

20   Time is 4:15.

21   BY MR. GIBSON:

22        Q    So I'd like to talk about the various

23   organizations that you were part of the coordination

24   of the April 24, 2024 protests.  We looked at some

25   communications where certain organizations were going

&#8593;

235

1    to be involved with dancing and some were security and

2    some were being requested to bring tents.  Do you

3    recall some of that?

4              MR. HEALEY:  Objection to form.

5              THE WITNESS:  Yeah.  I recall some of

6    those.  Yeah.

7    BY MR. GIBSON:

8         Q    So those are the kind of organizations I'm

9    talking about.  What -- can you name all the

10  organizations that were part of the coordination for

11  the April 24th event?

12      A    I don't know if I can name all of them.

13      Q    Try?

14              MR. HEALEY:  Object to the form.

15              THE WITNESS:  Well, Students for a

16  Democratic Society, Party for Socialism and

17  Liberation, Palestinian Youth Movement, Donza.  Yeah.

18  I mean, I can -- yeah.  I can't remember any other

19  ones.

20  BY MR. GIBSON:

21      Q    What about the ASA?

22      A    No.

23      Q    To an outsider, it might seem like the ASA

24  would be an organization you would coordinate with for

25  the purposes of having this event.  Can you explain

^

236

1  why that's the case why you wouldn't, when you would -

2  - why you would coordinate with these other

3   organizations but not with the ASA regarding this

4   event?

5                    MR. HEALEY:  Object to the form.

6                    THE WITNESS:  So the -- most of the

7   aforementioned organizations are like political in

8   nature.  ASA is cultural in nature.  So the two don't,

9   a lot of the time, they don't mix.  Sometimes they do,

10  but not -- not usually.

11  BY MR. GIBSON:

12       Q    Understood.  That's helpful, thank you.  Is

13  PSL the Party for Socialism and Liberation?

14       A    Yes.

15       Q    And SDS would be Students for a Democratic

16  Society?

17       A    Correct.

18       Q    And PYL is Palestinian Youth Movement?

19                    MR. HEALEY:  Object to the form.

20                    THE WITNESS:  PYM.

21  BY MR. GIBSON:

22       Q    I'm sorry.  PYM is Palestinian Youth

23  Movement?

24       A    Correct.

25       Q    Mentioned I don't remember any of those.  On

237

1    the program, there's something from FJP Scholastic

2    side?

3                     MR. HEALEY:  What exhibit are we

4    looking at?

5    BY MR. GIBSON:

6        Q    I was just looking at the program, but I'm

7    looking at Exhibit 7, page 3, page 275.

8        A    At 7.

9        Q    Okay.  Page 3?

10       A    Okay.

11       Q    There's a reference to in the logistics

12   second program, FJP.  What's FJP?

13       A    FJP stands for Faculty for Justice in

14   Palestine.  So this -- yeah.

15       Q    And is that, to your knowledge, is that a UT

16   faculty organization?

17       A    Yes.  I'm not sure if it's like university

18   affiliated officially, but yes.

19       Q    Did you communicate with anyone from the

20   FJP?

21      A    I believe so.

22      Q    Who is?

23      A    A professor.  Her name is Karma, K-A-R-M-A,

24   Chavez.

25      Q    Okay.  Is that C-H-A-V-E-Z?

238

1       A    Yeah.  I think so.

2       Q    Okay.  And anyone else from the FJP?

3       A    No.

4       Q    And did you communicate with anyone from the

5    Palestinian Youth Movement?

6       A    Rhiannon.

7       Q    And what's her last name?

8       A    Hammam.  H-A-M-M-A-M.

9       Q    Did you anyone else from the Palestinian

10   Youth Movement?

11      A    I don't think so.

12      Q    The Party for Socialism and Liberation, do

13   you communicate with anyone from that group?

14      A      John.

15      Q      And his last name again was?

16      A      Siebels.

17      Q      Siebels?  Any -- did you communicate with

18      anyone else?

19      A      No.

20      Q      And Students for a Democratic Society, did

21      you communicate with anyone from the Students for a

22      Democratic Society?

23      A      No.

24      Q      Do you know who from the PSC communicated

25      with the SDS?

↑

                                                    239

1       A      I think, I mean, I think on here it said --

2       I think it said Jenna reached out to them.

3       Q      Jenna?

4       A      Yeah.

5       Q      Okay.  This, or if we're looking at Exhibit

6       7, it also references "Need to work on mobilizing

7    MSA."  What does MSA stand for?

8         A    Where?  Where is this?

9         Q    Sure.  Page 2, middle of the page, "General

10   body need to work on mobilizing MSA/ASA"?

11        A    Yes.

12        Q    What does MSA stand for?

13        A    MSA stands for Muslim Student Association.

14        Q    And what does the ASA stand for?

15        A    The Arab Student Association.

16        Q    And do you know if anyone reached out to

17   those organizations?

18        A    I don't know.

19        Q    Then it says below that, "Support for

20   community PYM," which refers to Palestinian Youth

21   Movement; correct?  "FJP," which is Faculty for

22   Justice and Palestine; correct?

23        A    Correct.

24        Q    And then A4PC, what is that?

25        A    A4PC stands for Austin for Palestine

240

1    Coalition.

2        Q    And what is that?

3        A    It's a coalition of several of the

4    aforementioned organizations.

5        Q    Is there a person who's sort of organizes

6    the A4PC?

7        A    I think the way it works is each

8    organization has like a representative that will

9    attend meetings when there are meetings of the

10   coalition.

11       Q    Do you know who from the PSC attended those

12   meetings?

13              THE WITNESS:  I'm not sure if this is

14   right, but I think Raneem.

15   BY MR. GIBSON:

16       Q    Raneem?

17       A    I think Raneem.

18       Q    Okay.  So did you ever communicate with the

19   Muslim Student Association about April 24th?

20       A    No.

21       Q    And just again, you never stood -- you never

22   communicated with the Arab Student Association

23   regarding April 24th; did you?

24       A    No.

25      Q    Okay.  I just want to confirm.  So I want to
↟

                                                    241

1    go through the organizations.  You mentioned

2    communicating with the Party for Socialism and

3    Liberation, John Siebels.  How did you communicate

4    with him?

5         A    In person on -- on the day.

6         Q    Did you have any communications with him

7    prior to that?

8         A    No.

9         Q    How did they know to show up?

10              MR. HEALEY:  Object to the form.

11              THE WITNESS:  I think there were other

12   members of PSC who had been communicating with him.

13   BY MR. GIBSON:

14        Q    Who was -- who else was communicating with

15   them?

16        A    I'm not sure.

17        Q    Okay.  Why do you think other members of PSC

18    were communicating with them?

19         A    I -- I think they -- people said they were -

20    - I'm not sure.  I'm not sure who.  I'm not sure who

21    it was, but it wasn't me.  So it was someone had to

22    for -- for him to like show up.

23         Q    Okay.  Had you worked with him before?

24                   MR. HEALEY:  Object to the form.

25                   THE WITNESS:  He had attended

                                                    242

1     demonstrations before and been like in a similar

2     capacity as like a helper with security.  I hadn't

3     really worked with him at any of those.

4     BY MR. GIBSON:

5          Q    Okay.  Had you communicated to with him at

6     all prior to April 24th other than in person?

7          A    No.

8          Q    Have you communicated with him since April

9     24th?

10         A    Yes.

11      Q      How have you communicated with him?

12      A      I communicated with him through Signal.

13      Q      About what?

14      A      About my disciplinary hearings.

15      Q      Did you produce those Signal chats in this

16   case?

17      A      No.

18      Q      Why not?

19      A      Because I just asked him if he would be

20   available to attend for a hearing.  He said, "Yeah."

21   That was the extent of that conversation.

22      Q      And you've had no other communications with

23   him on Signal?

24      A      No.

25      Q      Rhiannon Hammam?  Did I --

⬆

                                                    243

1       A      Yeah.

2       Q      Did you communicate with her about April

3    24th prior to the event?

```
 4      A    I don't -- I don't think so.

 5      Q    Is it possible?

 6           MR. HEALEY:  Object to the form.

 7           THE WITNESS:  I think it's more likely

 8  that -- I think it's more likely that Raneem had been

 9  communicating with her.

10  BY MR. GIBSON:

11      Q    Raneem?

12      A    Yes.

13      Q    I apologize.  How do you spell Raneem's

14  name?

15      A    It's R-A-N-E-E-M, N as in Nancy, E-E-M as in

16  Mary.

17      Q    Got it.  Thank you.  So you think Raneem was

18  communicating with Rhiannon Hammam?

19      A    Yes.

20      Q    Do you know how they communicated?

21      A    No.

22      Q    How were you communicating with Karma Chavez

23  from the FJP?

24           MR. HEALEY:  Object to the form.

25           THE WITNESS:  I had spoken with her in
```

244

1    person at a few events, like throughout the year.

2    BY MR. GIBSON:

3        Q    Did you email with her?

4        A    No.

5        Q    Did you communicate by text with her?

6        A    No.

7        Q    Did you communicate by Signal with her?

8        A    No.

9        Q    Have you ever -- did you -- so how did you

10   contact her about April 24th?

11             MR. HEALEY:  Object to the form.

12             THE WITNESS:  I think -- I think, well,

13   according to the document, Karma was out of town so

14   there was someone else in FJP who I -- I don't know

15   who -- who someone else in PSC reached out to about

16   bringing or some representative from their group to do

17   a teach-in, a non-scholastic aside.

18   BY MR. GIBSON:

19       Q    Who's Lena referred to?  Lena?

20       A    Lena.  I think Lena is -- I think she's a

21   community member.  She's a community member with PYM.

22      Q    Have you had any communications with Lena

23   about prior to April 24th about April 24th?

24      A    No.

25      Q    Do you have any communications since then

^

                                                        245

1    about April 24th?

2       A    No.

3       Q    Any communications at all with Lena?

4       A    I -- I'd see her in person sometimes, but

5    nothing I don't think, aside from that.

6       Q    And I don't think I asked the following

7    questions.  Have you had any communication since April

8    24th with Rhiannon Hammam?

9       A    Yes.

10      Q    About what?

11      A    About my disciplinary proceedings.

12      Q    And what did you communicate with her about

13   your disciplinary proceeding?

14      A    I asked her to help me, I think, interpret

15    maybe like a document or like an email UT sent me

16    maybe like interpret like the suspension or kind of

17    things to that effect.

18         Q    Is she a lawyer?

19         A    She works at the law school.

20         Q    She works at the law school?  Got it.

21         A    I'm -- I'm not sure if she's -- if she's was

22    -- she could be a lawyer.  I mean, I think she's a

23    lawyer.

24         Q    To your knowledge, was she at the protest?

25         A    Yeah.  I think so.

                                                           246

1          Q    Was Karma Chavez at the protest?

2          A    No.  According to the document, Karma was

3     out of town.

4          Q    Okay.  Have you had any other communication

5     since April 24th with Rhiannon Hammam about anything

6     other than the ones you just disclosed to me?

7                    MR. HEALEY:  Ammer, I'll tell you

8    again.  If you consulted her for legal advice in her

9    capacity as a lawyer, then you don't have to disclose

10   that.  But otherwise, you can answer the question.

11            THE WITNESS:  Yeah.  I'd also see her

12   in person occasionally, but then nothing really

13   outside of -- outside of that about asking her for

14   help interpreting some things UT sent me.

15   BY MR. GIBSON:

16       Q    Did you engage Rhiannon Hammam for legal

17   advice?

18       A    No.

19       Q    Okay.  Have you limited your answer in any

20   way based on the instruction from your attorney?

21       A    No.

22       Q    Okay.  Just want to make clear.  How have

23   you -- how did you communicate with Rhiannon Hammam?

24       A    Also over Signal.

25       Q    Have you produced any of those Signal

1    messages in this case?

2        A    No.

3        Q    Why not?

4        A    I didn't think they were responsive to -- to

5    the discovery requests.

6        Q    Didn't we request all documents related to

7    your disciplinary proceeding?

8             MR. HEALEY:  Object to the form.

9             THE WITNESS:  I'm not sure what -- what

10   the -- what the wording of the request was.

11   BY MR. GIBSON:

12       Q    Okay.  Did you communicate with her via

13   Signal, you said?

14       A    Yeah.

15       Q    And you still have those Signal chats?

16       A    I think so.

17       Q    You still have your Signal chats with John

18   Siebels?

19       A    I'm not sure.  I have to check.

20       Q    Any other Signal chats with anyone else

21   about -- we'll start on April 24th.  About April 24th.

22   Sorry.  Do any other Signal communications with anyone

23   else we haven't talked about today regarding the

24   protest on April 24th?

25       A    Not -- not to my recollection.  No.

⌂

248

1      Q    What about any other Signal communications

2   that we haven't discussed today about your

3   disciplinary proceeding?

4      A    I don't think so.

5      Q    Did did you text with Jenna Homsi about

6   April 24th?

7      A    No.

8      Q    Did you text with Jenna at all?

9      A    Generally, I mean, yes.

10     Q    Did you look through your text messages with

11  Jenna to determine whether you had any responsive

12  communications to her discovery requests?

13     A    Yes.

14     Q    And you didn't find any?

15     A    No.

16     Q    Okay.  What about with your sister, Lamar?

17  Do you text with your sister?

18     A    No.

19      Q    Do you communicate with your sister through

20   any messaging app?

21      A    Are you asking did I or do I?

22      Q    Do you?

23      A    I do.

24      Q    Did you text with your sister about April

25   24th?
⌃

                                                    249

1       A    No.

2       Q    Your sister testified that she texted you on

3    April 24th about the events of April 24th?

4       A    Oh.  I mean, I don't recall.  I mean, I have

5    to go check.

6       Q    Okay.  Did did you check your texts with

7    your sister when in responding to discovery request in

8    this case?

9       A    Maybe not.  I mean, she wasn't part of PSC

10   at the time and I wasn't coordinating with her about

11   anything aside from the phone call where she asked me

12    to come back to the front to help with the dispersal.

13         Q    You -- there's a video that you produced of

14    you and your sister and I think some other people in a

15    car.  Do you know what video I'm talking about?  And

16    you're singing a song?

17         A    Oh.  Did I really -- okay.  Well, I guess I

18    did.  Yeah.

19              MR. HEALEY:  Object to the form.

20    BY MR. GIBSON:

21         Q    Do you recall that video?

22              MR. HEALEY:  Object to the form.

23              THE WITNESS:  I -- I do recall that

24    video.

25    //

↟

                                                        250

1    BY MR. GIBSON:

2         Q    Is that on April 24th?

3         A    That was on April 25th, I believe.

4         Q    After you got out of prison?

 5                    MR. HEALEY:  Object to the form.

 6    BY MR. GIBSON:

 7         Q    Or jail?  I should say --

 8         A    After I was out of jail?

 9         Q    Jail, not prison.  You're -- thank you.  You

10    were not in prison?  You were in jail?

11         A    Yeah.  Correct.

12         Q    So were you in jail overnight?

13         A    I was.

14         Q    Okay.  So that video is you at sort of going

15    home from being in jail overnight?

16         A    Correct.

17         Q    Okay.  Do you also -- do you communicate in

18    any other way with your sister other than text

19    messages and phone calls, like via any other kind of

20    chat messaging system?

21         A    No.

22         Q    Do you communicate with Jenna in any other

23    way, any other sort of chat messaging system besides

24    normal text?

25         A    No.

251

1       Q    You don't communicate with Jenna on Signal?

2       A    Only in the PSC group chat.

3       Q    And you don't communicate with Lamar on

4   signal?

5       A    No.

6       Q    Okay.  What about your father?  Do you

7   communicate with him via text?

8       A    I do.

9       Q    Did you check your texts with your father

10  for documents responsive to our discovery requests?

11      A    Yes.

12      Q    Did you produce any documents responsive to

13  our discovery request from based on texts with your

14  father?

15              MR. HEALEY:  Object to the form.

16              THE WITNESS:  No.

17  BY MR. GIBSON:

18      Q    Is that --

19      A    Well, actually, I'm not sure.  I'm not sure.

20  I think -- I think for his deposition, he -- he

21  produced a couple of of texts.

22      Q    But you didn't produce any texts?

23      A    No.

24      Q    Why not?

25      A    I didn't think they were responsive.

252

1      Q    But he did?

2      A    He did.

3      Q    Do you communicate with your father via

4    Signal?

5      A    No.

6      Q    You communicate with any -- or did you as of

7    April 24, 2024, communicate with any of the other

8    members of the PSC steering committee on Signal

9    outside of the PSC committee Signal group chat?

10      A    No.

11      Q    Did you text with them through normal

12    texting messages?

13      A    Some of them.

14      Q    Did you text -- did you check each of those

15    text threads to determine whether or not any

16    responsive texts or any texts with those individuals

17    were responsive to our discovery requests?

18        A    Yes.

19        Q    And you did not produce any such text with

20    other members of the PSC steering committee; did you?

21        A    No.

22        Q    Is that because you determined that there

23    were no responsive documents in those text streams?

24        A    Correct.

25        Q    Okay.  Are you paying your attorneys in this
↟

                                                    253

1    case?

2        A    I'm not -- I haven't checked the -- the

3    attorneys in a -- in a while, but I believe so.

4        Q    You are personally paying the bills?

5        A    No.  There's a -- no.

6        Q    Is someone else funding the costs of this

7    case for you?

8        A    The community had -- had contributed to a

9    fund for legal cases such as this.

10        Q    What fund is that?

11        A    It's just a fund, just -- it just exists for

12   needs like this.

13        Q    Does it have a name?

14        A    No.

15        Q    Who controls that fund?

16             MR. HEALEY:  Object to the form.

17             THE WITNESS:  I'm not sure.  I'm not

18   sure who -- who controlled it.

19   BY MR. GIBSON:

20        Q    Who organizes that fund?

21             MR. HEALEY:  Object to the form.

22             THE WITNESS:  I'm not sure if it's

23   really organized.

24   BY MR. GIBSON:

25        Q    Do you know anything about the fund other
⌃

                                                           254

1    than that there's a fund that's paying your legal

2   fees?

3                    MR. HEALEY:  Object to the form.

4                    THE WITNESS:  I think it's like, I

5   mean, it's like -- there's like a bank account, I

6   think.

7   BY MR. GIBSON:

8       Q    And whose name is the bank account?

9                    MR. HEALEY:  Object to the form.

10                   THE WITNESS:  The last time I checked,

11  it was -- it was Rawan.

12  BY MR. GIBSON:

13      Q    Who's Rawan what is Rawan's last -- well,

14  first, what's Rawan's last name and how do you spell

15  his name?

16      A    So her, her name.

17      Q    Her name.  Sorry.

18      A    Is is R-A-W-A-N, and then her last name is C

19  -H-A-N-A-A.

20      Q    Okay.  And who is Rawan Chanaa?

21      A    Chanaa.

22      Q    Who is she?

23      A    She was a former student at UT.

24      Q    What does she do now to your knowledge?

25      A    I'm not sure.

255

1     Q     How do you know Rawan?

2     A     I was friends with her and she contributed

3     to PSC's activities while she was a student.

4     Q     Do you know, has anyone told you who

5     contributed to this fund?

6     A     From my knowledge, no.  I mean, from my

7     knowledge, it's community donations.

8     Q     No one's disclosed to you anyone that's

9     contributed?

10    A     No.

11    Q     You don't know a single person who's

12    contributed to this?

13    A     I don't know any individuals who have

14    contributed.

15    Q     How would we go about finding that out to

16    your knowledge?

17    A     I am not -- I'm not sure how -- how it was

18    set up, so I'm not sure.

19    Q     Did you sign an agreement with anyone

20    regarding payment of these fees by this fund?

21        A    No.

22        Q    Do you know if your attorneys have signed an

23    agreement with anyone regarding payment of these fees?

24             MR. HEALEY:  Ammer, are you going to

25    answer to the extent that it doesn't involve any
⬆

                                              256

1     conversations we've had?

2              THE WITNESS:  Yeah.  I -- no.

3              MR. GIBSON:  Are you instructing him

4     not to answer the question?

5              MR. HEALEY:  No.

6              MR. GIBSON:  Are you instructed him to

7     limit?

8     BY MR. GIBSON:

9         Q    The question is are you aware of any

10    agreement between your attorneys and this fund to pay

11    your legal fees?

12        A    There -- there is no agreement.

13      Q    To your -- so to your -- there's no

14  agreement?

15      A    No.

16      Q    Have you signed an engagement agreement with

17  your attorneys?

18      A    Yes.

19      Q    Have you produced that in this case?

20      A    An engagement agreement?  I don't --

21      Q    With your attorneys?

22      A    I don't -- I'm not sure.  I'm not sure.

23      Q    Do you know why you haven't produced your

24  engagement agreement?

25      A    I don't think that was part of the discovery
⌃

                                                    257

1   request.

2       Q    Okay.  To your knowledge, are your

3   attorney's working pro bono?

4       A    No.

5       Q    Are they working at reduced rates to your

6  knowledge?

7      A    Maybe.

8      Q    Do you know what reduced rates they're

9  receiving?

10     A    No.  No.

11     Q    Is that in your engagement agreement?

12     A    I -- I'm not sure.

13     Q    Are you aware of any groups who have

14  contributed to or any or organizations who have

15  contributed to your legal defense fund?

16     A    No.

17     Q    Have you paid any money to your attorneys in

18  connection with the representation of you in this

19  case?

20     A    Yes.

21     Q    How much?

22     A    I think 30,000.

23     Q    And you personally paid that or did you

24  personally pay that?

25     A    No.

258

1    Q    Who paid that?

2    A    It came from the fund.

3    Q    Oh.  The fund has paid your attorneys

4  $30,000?  Have your -- but have you personally paid

5  your attorneys any money in this case?

6    A    I -- I mean, I pay as if it's my own money,

7  but it -- it comes from this fund.

8    Q    Okay.  Other than the $30,000 that have been

9  paid to your attorneys, are you aware of any other

10  payments to your attorneys?

11    A    No.

12    Q    Okay.  Do you know how many -- how much in

13  attorney's fees has been incurred to date on this case

14  by your attorneys?

15    A    No.

16    Q    Have they sent you invoices for that?

17    A    I'm not sure.

18    Q    You don't recall seeing any?

19    A    No.

20    Q    Okay.  Who is -- let's go to hopefully the

21  final exhibit.  I think's Exhibit 14.  These are your

22  supplemental Rule 26 disclosures.  If you could turn

23  to page -- let's start with page 5.  I think we

24    discussed Jenna Homsi and Audrey -- Aubrey McCabe and

25    John Siebel today.  Who is Yara Bitar?
↟

                                                              259

1                    (Exhibit 14 was marked for

2                     identification.)

3        A    She -- she's a friend.  She's a -- she's a

4    friend who -- who's a student.

5        Q    She's a student at UT Austin?

6        A    Yes.

7        Q    Why did you list her on your disclosures?

8        A    She was -- she was present at the protest

9    and she testified in my disciplinary proceedings.

10       Q    Okay.  Hiya Saidi is -- was she a -- did we

11   discuss her?  Is she a member of the planning steering

12   committee?

13       A    Yes.

14       Q    Okay.  Daniel O'Leary, who is Daniel

15   O'Leary?

16       A    He's a -- an attorney who is witness to

17    protests that have happened at UT.

18        Q    Was he present for the, to your knowledge,

19    present for the April 2024 protest?

20        A    I'm not sure.  I didn't know him at the time

21    of the protest.

22        Q    How did you come to know him?

23        A    Through, I think, through Rhiannon.

24        Q    Did Rhiannon introduce you to Brian

25    McGiverin?

⬆

                                                    260

1        A    She did.

2        Q    And did Brian introduce you to Daniel?

3             MR. HEALEY:  I'd instruct you to answer

4    to the extent you don't have to disclose any of your

5    privileged conversations with Brian McGiverin.

6             THE WITNESS:  Sure.

7             Can you repeat the -- the question,

8    please?

9    BY MR. GIBSON:

10      Q    Did Brian introduce you to Daniel?

11             MR. HEALEY:  Object to the form, and

12   the same instruction?

13             THE WITNESS:  I'm not sure if that's --

14   if that's privileged or not.

15   BY MR. GIBSON:

16      Q    How do you know that Daniel O'Leary was

17   present?  He said -- well, I'm sorry.  He says "Events

18   leading up to, during, and immediately following the

19   pro-Palestinian protest on UT Austin campus on April

20   24, 2024."  How do you have knowledge that he has

21   knowledge of those facts?

22             MR. HEALEY:  For the record, I'm going

23   to say this is not an up-to-date disclosures from us

24   and object to the form.

25             THE WITNESS:  Mr. O'Leary has provided

⬆

                                                    261

1   -- has provided -- what's the word?  He's provided

2   testimony regarding past protests, which -- which

3    demonstrate how UT's treatment of the pro-Palestinian

4    protests is different from how they treated other

5    protests in the past.

6    BY MR. GIBSON:

7        Q    To your understanding, how did Mr. O'Leary

8    have knowledge of prior protests?

9                MR. HEALEY:  Object to the form.

10               THE WITNESS:  Through sworn testimony

11   or through his sworn declaration.

12   BY MR. GIBSON:

13       Q    To your knowledge, the reason he's

14   identified here is based on his declaration?

15       A    Of -- of his and his knowledge of -- of

16   those past protests.

17       Q    Okay.  And Mr. McGiverin, did he represent

18   you in your student conduct hearing?

19       A    No.

20       Q    Do you have any knowledge as to how he has

21   personal knowledge of the events of your September 26,

22   2024, student conduct panel hearing?

23       A    He was in attendance, but it's a

24   mischaracterization to call it representing me.

25       Q    Okay.  What was he doing there?

262

```
 1      A    Observing.

 2      Q    Was he your lawyer at the time?

 3      A    Yes.

 4      Q    Did you have representation at the hearing?

 5           MR. HEALEY:  Object to the form.

 6           THE WITNESS:  In -- in the hearing, I -

 7   - I was allowed an advisor, which according to UT

 8   policy is someone who can interject if they believe

 9   there's a procedural error.  Aside from that, they're

10   not permitted to speak and can only observe.

11   BY MR. GIBSON:

12      Q    Was Mr. McGiverin your advisor?

13      A    Yes.

14      Q    Okay.  And you had also retained him at that

15   time to be your lawyer?

16      A    Correct.

17      Q    Did you pay Mr. McGiverin?

18      A    Yes.

19      Q    How much did you pay, have you paid Mr.

20   McGiverin?
```

21       A     I think I paid an initial retention fee and

22   then of -- of $1,000 and was billed for a time and

23   then he -- and then he decided to do a pro bono.

24       Q     During the time you were billed, how long,

25   how much did he charge you?

    &#x2191;

263

1        A     I can't recall.  I can't recall.

2        Q     You don't -- do you recall how much you paid

3    him?

4        A     No.

5        Q     Are we talking an additional -- is it more

6    than $10,000 that you paid him?

7        A     No.

8        Q     Less than five?

9              MR. HEALEY:  Object to the form.

10             THE WITNESS:  It was maybe something

11   around there.

12   BY MR. GIBSON:

13       Q     Around 5,000, maybe?

14        A    Perhaps.

15        Q    Okay.  Do you know if Mr. McGiverin -- did

16   you use the defense fund you mentioned earlier to pay

17   Mr. McGiverin?

18        A    I believe so.

19        Q    To your knowledge, has anyone else paid any

20   of your attorneys any money on your behalf in

21   connection with this case?

22        A    No.

23             MR. GIBSON:  Mr. Qaddumi, I'd like to

24   thank you for your time today.  I don't have any

25   further questions.

♠

264

1              Pass the witness.

2              MR. HEALEY:  We will reserve our

3   questions for trial.

4              And I'd like a read and sign and I

5   think I mentioned a rough transcript.

6              THE OFFICER:  Mr. Gibson, you wanted

 7    your rough also?

 8                    MR. GIBSON:  Yes.

 9                    THE OFFICER:  And the standard of 10

10    days, same as Mr. Healey?

11                    And -- okay.  We're good.

12                    THE VIDEOGRAPHER:  This concludes

13    today's testimony of Ammer Qaddumi.  Going off the

14    record.  The time is 4:51.

15                    (Signature reserved.)

16                    (Whereupon, at 4:51 p.m., the

17                    proceeding was concluded.)

18

19

20

21

22

23

24

25