1          ROUGH DRAFT, NOT CERTIFIED

2   CASE NAME:  AMMER QADDUMI VS JAMES E. DAVIS, UT AUSTIN

3   PRESIDENT, in his official capacity

4   WITNESS:  JENNA HOMSI

5   DATE OF DEPOSITION:  NOVEMBER 17, 2025

6                    WARNING!

7   This unedited rough draft of the proceedings was produced

8   in instant form and is not certified.  The rough draft

9   transcript may not be cited or used in any way or at any

10  time to rebut or contradict the certified transcription of

11  proceedings.  There will be discrepancies in this form and

12  the final form, because this instant form has not been

13  edited, proofread, corrected finalized, indexed, bound or

14  certified.  There will also be a discrepancy in page

15  numbers appearing on the unedited rough draft and the

16  edited, proofread, corrected and certified final.

17

18

19

20

21

22

23

24

25

⬆

2

03:02 1      Q.  (BY MR. JOZWIAK)  Good afternoon, Ms. Homsi.  My

03:02 2  name is Daniel.  I represent the University of Texas at

03:02 3  Austin in this case.

03:02 4      A.  Good afternoon.

03:02 5      Q.  Do you mind spelling your name for the record?

03:02 6      A.  Yes.  My first name is Jenna, J-E-N-N-A.  Last

03:02 7  name Homsi, H-O-M-S-I.

03:02 8      Q.  And Ms. Homsi, have you ever had your deposition

03:02 9  taken before?

03:02 10      A.  No, first time.

03:02 11      Q.  Okay.  So, hang on, I'm trying to figure out why

03:02 12  I'm like --

03:02 13              MR. HEALEY:  You've become a silhouette.

03:02 14              MR. JOZWIAK:  Yeah.  Give me one sec.

03:02 15  That's very strange.  Let me adjust my blinds behind me.

03:03 16  Maybe that will do something.

03:03 17              MR. HEALEY:  I mean, it looks like some kind

03:03 18  of filter.

03:03 19              THE REPORTER:  Do you want to go off the

03:03 20  record?

03:03 21              MR. JOZWIAK:  Yeah, let's go off the record.

03:03 Sorry about this.

03:03 (Discussion off the record.)

03:04 Q. (BY MR. JOZWIAK) Sorry about that. Thanks for
03:04 your patience.

03:04 Bear with me while I go over a few ground
03:04 rules for the deposition. I asked, you know, first of
03:04 all, that you please respond verbally instead of shaking
03:04 your head side to side or nodding if you're responding to
03:05 a question.

03:05 We have a court reporter, Ms. Janalyn, who
03:05 is with us here today and she can't transcribe those head
03:05 nods or shakes. Is that fair?

03:05 A. That's fair. I'll try.

03:05 Q. Okay. And this is challenging for me especially.
03:05 But I ask that you please wait until I finish asking my
03:05 question before starting your response just to keep the
03:05 transcript clear.

03:05 A. Okay.

03:05 Q. Okay. If you don't understand any questions that
03:05 I ask, please tell me. I'm happy to try and rephrase it.
03:05 But if you do answer a question, I will assume that you
03:05 understood the question that I'm asking. Is that fair?

03:05 A. That's fair.

03:05 20     Q.  Okay.  And if you ever need a break or just want

03:05 21  to take, you know, ten minutes to get off the record, I'm

03:05 22  happy to pause.  I just ask that you finish answering

03:05 23  whatever question that I've asked and then we take our

03:06 24  break.

03:06 25     A.  Okay.

4

03:06  1     Q.  Okay.  Do you have any questions for me before we

03:06  2  get going?

03:06  3     A.  No.

03:06  4     Q.  Okay.  Have you ever been deposed before?

03:06  5     A.  I have not.

03:06  6     Q.  Okay.  Is there anything preventing you from

03:06  7  giving truthful testimony today?

03:06  8     A.  There is not.

03:06  9     Q.  Okay.  Do you understand that you've been sworn

03:06 10  in by the court reporter and so the testimony that you

03:06 11  give today is the same as if you were speaking to a judge?

03:06 12     A.  Yeah.

03:06 13     Q.  Okay.  I'm going to use a couple of acronyms in

03:06 14  the deposition today.  If I use the acronym PSC, do you

03:06 15  understand that that is the Palestine Solidarity Committee

03:06 16  at the University of Texas at Austin?

03:06 17     A.  Yes.

03:06 18       Q.  Okay.  And then if I use the acronym PYM I'm

03:06 19   referring to the Palestine Youth Movement.  Is that a fair

03:07 20   understanding?

03:07 21       A.  Would that be the Palestine Youth Movement

03:07 22   generally or a specific chapter?

03:07 23       Q.  Generally, but that's a good catch.  I will

03:07 24   specify when I am referring to a specific chapter.

03:07 25       A.  Okay.  Thank you.

                                                              5

03:07  1       Q.  And then same for the SJP, I'm referring to the

03:07  2   national Students For Justice in Palestine organization

03:07  3   when I say SJP.  If I'm referring to any other subchapter

03:07  4   I'll refer to it by that subchapter's university most

03:07  5   likely.

03:07  6       A.  Okay.  Yeah, I refer to it as NSJP.  But if you

03:07  7   refer to another specific chapter you'll specify.  I got

03:07  8   it.

03:07  9       Q.  Sounds good.  And then when I say UT I mean the

03:07 10   University of Texas at Austin.

03:07 11       A.  Okay.

03:08 12       Q.  Okay.  What did you do to prepare for your

03:08 13   deposition today?

03:08 14       A.  I did not.  Can you specify if I -- if you mean

03:08 15   anything in terms of, like, personal preparation?

03:08 16      Q.  Yeah.  Did you do anything to prepare for your

03:08 17  depo today?

03:08 18      A.  No.  I e-mailed Mr. Healey about making sure the

03:08 19  time would be accurate and if we needed to talk about

03:08 20  anything specific beforehand.  And that's it.

03:08 21      Q.  Okay.  Did you have any conversations with

03:08 22  Mr. Healey before the deposition today?

03:08 23      A.  Yes, just briefly about what to expect.  What a

03:08 24  deposition -- what the deposition will be like, the kinds

03:09 25  of topics that we would be talking about.

⬆                                                                        6


03:09  1      Q.  What kinds of topics did he specify?

03:09  2      A.  Mostly that just the fact that -- or there would

03:09  3  be questions about the events that occurred on the 24th,

03:09  4  about any, like, if -- I would be questioned on

03:09  5  communications with any other parties, stuff like that.

03:09  6      Q.  Did Mr. Healey tell you how to answer any

03:09  7  questions?

03:09  8      A.  No.

03:09  9      Q.  Did he suggest any particular ways you answer

03:09 10  questions?

03:09 11      A.  No.  He just would tell me what kinds of

03:09 12  questions to expect.

03:09 13      Q.  Okay.  Did you speak with anyone else about your

03:09 14    deposition today?

03:09 15        A.  I've spoken to, like, casually about the fact

03:10 16    that I was subpoenaed to, like, a couple of people that

03:10 17    were subpoenaed earlier prior in the case and who are not

03:10 18    being deposed.  But there are no details that I believe I

03:10 19    even had to share.

03:10 20        Q.  Okay.  Who are those people?

03:10 21        A.  By name?

03:10 22        Q.  Yeah.

03:10 23        A.  So there is two people that I have talked to very

03:10 24    briefly.  The ones that were subpoenaed, Harmet as

03:10 25    /SAO*EURBG and Jay Sid /SA*EU /TEU.  I believe they're

7

03:10 1    both subpoenaed in terms of evidence and I just let them

03:10 2    know that I was being subpoenaed for a deposition and that

03:10 3    they -- I asked if they were and they were not.

03:11 4                And I spoke to briefly my brother, actually,

03:11 5    who is a lawyer who just said, you know, give me advice

03:11 6    to, like you know, just like talk to the lawyers and

03:11 7    remain, like, calm, it's not a stressful situation.

03:11 8                And another associate I guess of mine who is

03:11 9    also pretty knowledgeable about law, but hasn't really --

03:11 10    doesn't have any connection enough to give me specific

03:11 11    advice for this deposition.  Just similarly to, like,

03:11 12    remain calm and that it's matter of just knowing what

03:11 13    concerns me.  And that's it.

03:11 14        Q.  What's the name of that associate?

03:11 15        A.  Oh, her name is Reannan.  I don't remember if I

03:12 16    remember her last name.  Starts with an H I believe.

03:12 17        Q.  Is she employed by the University of Texas at

03:12 18    Austin?

03:12 19        A.  Yes, I believe so.

03:12 20        Q.  Okay.  Anyone else other than Mr. Healey,

03:12 21    Mr. Zakzog, Ms. Saiti, your brother, or Reannan?

03:12 22        A.  I don't believe so.

03:12 23        Q.  Okay.  What's your e-mail address?

03:12 24        A.  "HomsiJenna@Gmail.com."

03:12 25        Q.  Do you have access to that e-mail account today?

                                                                    8

03:12 1        A.  I can, yes.

03:12 2        Q.  I'm not asking you to pull it up.

03:12 3        A.  I do.  I do.

03:12 4        Q.  Just if you have access.  Okay.  And are you

03:12 5    represented by -- strike that.

03:13 6                Do you have an attorney?

03:13 7        A.  No.

03:13 8        Q.  Did you have any conversations at the law firm of

03:13 9    Ahmad, Zavitsanos & Mensing other than Mr. Healey?

03:13 10      A.  No.  Just in the e-mail thread that included him.

03:13 11      Q.  Okay.  Do you recall receiving a subpoena to

03:13 12  produce documents on October 27, 2024?

03:13 13      A.  I believe that I didn't receive them that day.  I

03:13 14  received them late.  But it was dated on there.

03:13 15      Q.  Okay.  What day did you receive the subpoena?

03:13 16      A.  Excuse me.  Sorry.  Can you restate the question?

03:13 17      Q.  Yeah.  Do you recall receiving a subpoena to

03:13 18  produce documents in the matter of Ammer Qaddumi versus UT

03:14 19  president James Davis?

03:14 20      A.  Yes. What day?

03:14 21      Q.  October 7th.

03:14 22      A.  I have the subpoena behind me.  Do you mind me

03:14 23  checking?

03:14 24      Q.  You can.  I'll show it to you here in a minute.

03:14 25  I'm less interested in the date other than --

9

03:14  1      A.  Okay.  Yes.

03:14  2      Q.  -- your confirmation that you received it.

03:14  3      A.  Yes.  I was just making sure that I'm not

03:14  4  mistaking.

03:14  5      Q.  Okay.  Do you remember responding to that

03:14  6  subpoena?

03:14  7      A.  Yes, I responded with objections to the request

03:14  8    for evidence.

03:14  9        Q.  Did you produce any documents in response to the

03:14 10    subpoena?

03:14 11        A.  No.

03:14 12        Q.  Why not?

03:14 13        A.  We objected.  I objected on the basis that

03:14 14    there's vague requests and that it was either irrelevant

03:15 15    or that the evidence that you were asking for you would

03:15 16    already have been given by Ammer.

03:15 17        Q.  I'm going to pull up and share my screen if I can

03:15 18    figure this out.

03:15 19              MR. JOZWIAK:  Ms. Janalyn, this will be

03:15 20    Exhibit 1.

03:15 21              (Exhibit No. 1 was marked.)

03:16 22        Q.  (BY MR. JOZWIAK)  Okay.  Ms. Homsi, can you see

03:16 23    my screen?

03:16 24        A.  Not yet.  Oh, I see it now, yes.

03:16 25        Q.  Okay.  I'm just going to quickly page through

                                                              10


03:16  1    this document.  Does this document look like the one you

03:16  2    submitted in response to the subpoena that you received on

03:16  3    October 7th?

03:16  4        A.  Yes.

03:16  5        Q.  Okay.  Who wrote this document?

03:16 6 A. I had communication with Reannan was given advice

03:16 7 about how to address that it was irrelevant. And I had

03:17 8 essentially been assigned -- like, using all of the

03:17 9 requests under the same sort of criteria that it was

03:17 10 irrelevant and not -- and/or not needed by me.

03:17 11   So I had submitted my responses that way.

03:17 12 And also with coordinating with both who ma'am /SA*G and

03:17 13 hate /TEU.

03:17 14 Q. Did you write your responses or did someone else?

03:17 15 A. I did.

03:17 16 Q. Okay. Did you share this document with anyone

03:17 17 else?

03:17 18 A. No.

03:17 19 Q. Okay. What do you mean when you say you inquired

03:17 20 with Ms. Saiti and Mr. Zakzog?

03:17 21 A. So they, like, through -- through talking we were

03:18 22 all on the same page about what to put, like, for each

03:18 23 request, right, we would just -- like, we talked to the

03:18 24 criteria of each request and that way we'd be a lot more

03:18 25 confident in the fact that we were consistent with what we

                11

03:18 1 submitted.

03:18 2 Q. Did you or someone else perform case law

03:18 3 research? For example, I see in re: American Optical

03:18 4    Corp., 988 Southwestern 2d 711713, a Texas Supreme Court

03:18 5    case from 1998 cited and your response to objection number

03:18 6    one.  Did you perform that legal research or did someone

03:18 7    else?

03:18 8        A.  So I was given advice by -- well, advice -- wait.

03:18 9    Wait.  Knowledge that -- that these were the cases that

03:19 10   were relevant when I spoke to Reannan.

03:19 11       Q.  Did Reannan give you these cases to put in your

03:19 12   objections?

03:19 13       A.  She didn't give me the cases but I was, you know,

03:19 14   I have a lot of, like, not just her, but I know people

03:19 15   who, like, are familiar with a lot of these cases and how

03:19 16   to look up what is relevant.  Like, these cases what is

03:19 17   relevant to the request, if that makes sense.

03:19 18       Q.  How did you look up these cases?

03:19 19       A.  So I know there's a lot of, like, legal

03:19 20   resources, like, I guess legal AI if you will, to where

03:19 21   when you are -- are trying to cite certain things for

03:19 22   your, like, explanations it will give you specific cases.

03:20 23       Q.  Did you use AI to draft this document?

03:20 24       A.  No.  I just know that it helps to refine the,

03:20 25   like, resources.  But no.

                                                                12

03:20 1        Q.  Who told you about in re:  American Optical

03:20  2    Corp.?

03:20  3        A.  Could you rephrase that question.

03:20  4        Q.  Did someone tell you about the case in re:

03:20  5    American Optical Corp.?

03:20  6        A.  Nobody specific, no.  I just, like I said.

03:20  7        Q.  How did you find in re: American Optical Corp.?

03:20  8        A.  Like I said, this is information that is

03:20  9    available through -- available online.  But is this -- are

03:20 10    we questioning my -- my objections to the evidence or are

03:20 11    we past that point?

03:21 12        Q.  We'll get there.  I'm just trying to understand

03:21 13    how you put this document together.  So, I mean, did you

03:21 14    use a legal AI tool to draft these responses?

03:21 15        A.  To do my -- to do research about what these cases

03:21 16    were.

03:21 17        Q.  Okay.  Did you read the cases?

03:21 18        A.  Sir, there's a lot of -- of aspects that went

03:21 19    into my objections.  And I felt that just objecting, like,

03:21 20    given that I have the right to object, just objecting with

03:21 21    nothing else is also not comprehensive enough.

03:21 22                So there is, of course, like I said,

03:21 23    coordination, some questions for the, like, those who are

03:22 24    more knowledgeable on law.  But there was multiple things

03:22 25    that went into this.

13

03:22 1                    I was not just given the entirety and I did

03:22 2    not submit, like, the document that was given to me

03:22 3    entirely to send to you.

03:22 4        Q.  I appreciate that.  And, you know, I understand

03:22 5    it took some time to probably put this together.  But my

03:22 6    question was just if you read in re:  American Optical

03:22 7    Corp.?

03:22 8        A.  Not in its entirety.

03:22 9        Q.  Okay.  So on the top of the page do you see

03:22 10   Request For Production No. 1?

03:22 11       A.  Yes.

03:22 12       Q.  Okay.  And that says (Reading:)  Produce all

03:22 13   documents reflecting communications with Ammer Qaddumi

03:22 14   relating to April 24, 2024 protest including, without

03:22 15   limitation, communications relating to the planning of the

03:23 16   protest, the notice of cancellation from UT Austin,

03:23 17   communications with UT Austin officials, the decision to

03:23 18   hold the protest, attendance at the protest, and

03:23 19   communications relating to what occurred at the protest.

03:23 20                    Did I read that correctly?

03:23 21       A.  Yes.

03:23 22       Q.  Okay.  And then at the bottom you wrote

03:23 23   (Reading:)  Subject to and without waiving the foregoing

03:23 24   objection, I respond that I have no responsive materials.

03:23 25                    Do you see that?

14

03:23  1          A.  Yes.

03:23  2          Q.  Are you withholding any documents based on the

03:23  3  objections that you state in Response to Request For

03:23  4  Production No. 1?

03:23  5          A.  Could you rephrase?  Because I'm confused about

03:23  6  if -- if you're asking if I was allowed to object or if

03:23  7  I -- could you rephrase?

03:24  8          Q.  Yeah.  My question is just do you have documents

03:24  9  that are responsive to Request for Production No. 1?

03:24 10          A.  So I cannot answer that at this time because I

03:24 11  have objected on the basis that there -- like it was

03:24 12  burdensome, you know, like it says.  There's a lot that I

03:24 13  feel, you know, allows me to object.  I don't know if

03:24 14  there's any specific documents that I might have that you

03:24 15  don't already have.

03:24 16          Q.  Did you look to see if you had any documents?

03:24 17                    MR. HEALEY:  Object to the form.

03:25 18                    I don't know if anyone told you this at the

03:25 19  start.  If one of us objects at the form to the other

03:25 20  one's question, you can still go ahead and answer.  The

03:25 21  question is still live.

03:25 22                    THE WITNESS:  So do I have to?

03:25 23                    MR. JOZWIAK:  Yes.

03:25 24                    THE WITNESS:  Okay.  Sorry.  I was not

03:25 25  aware.

15

03:25  1                    So if you're asking if I looked for

03:25  2  communications relating to April, I've looked several

03:25  3  times in the past even regardless of the subpoena and in

03:25  4  terms of the subpoena.  And like I said, it was either too

03:25  5  vague for me to produce specific documents or it was not

03:25  6  relevant or it would necessitate providing the information

03:25  7  of others that were not also subpoenaed.

03:25  8                    And on top of that, these were documents

03:26  9  that already include Ammer, which he would be from my

03:26 10  understanding needing to show.

03:26 11     Q.  (BY MR. JOZWIAK)  Would it surprise you to know

03:26 12  that Mr. Qaddumi may not have produced all documents

03:26 13  responsive to our discovery requests?

03:26 14                    MR. HEALEY:  Object to the form.

03:26 15                    THE WITNESS:  Yeah.  I don't know what he is

03:26 16  or is not doing so therefore I cannot be surprised or not

03:26 17  surprised.

03:26 18     Q.  (BY MR. JOZWIAK)  Okay.  What about Request for

03:26 19  Production No. 1 is vague?

03:26 20     A.  So for example, in terms of communications with

03:26 21   UT officials and making -- planning and making decisions

03:27 22   and attendance, all of -- there's quite a bit of overlap.

03:27 23   So if I'm being asked to produce documents in

03:27 24   communication to Ammer and that's about communications

03:27 25   with other people, there -- there's either just -- it's

16

03:27 1   either too, like, muddled or -- or it is communications

03:27 2   that I haven't -- I don't have, like, accessible.

03:27 3                  As in, like, a lot of times in my -- at

03:27 4   least from what I remember, a lot of these communications

03:27 5   were just in person.  And on top of that, like,

03:27 6   communications relating to what occurred at the protest.

03:28 7   What occurred could be anything, right.  So I could be

03:28 8   talking about the fact that there were horses, you know,

03:28 9   pooping on the road in the protest.  Does this apply to

03:28 10  this?

03:28 11       Q.   I would say yes.  But I'm just looking for your

03:28 12  understanding.  What about Request For Production No. 1 is

03:28 13  irrelevant?

03:28 14       A.   Well, like I said, I mean, from my understanding

03:28 15  I would think that, you know, talking about the fact that

03:28 16  there are horses, you know, pooping on the roads in the --

03:28 17  in the university, I would think that would be irrelevant,

03:28 18  right.

03:28 19          So it's the requests are not quite specific

03:28 20  enough for me to be able to offer any, like, specific

03:28 21  evidence.

03:28 22     Q.  How could the request be more specific to help

03:28 23  you produce documents that you have in this case that you

03:28 24  are withholding based on your objections?

03:28 25          MR. HEALEY:  Objection, form.

                                                              17


03:29 1           THE WITNESS:  Well, yeah, that's not my job.

03:29 2   So I'm not really sure if I have an answer to that.

03:29 3      Q.  (BY MR. JOZWIAK)  Okay.  Do you believe you have

03:29 4   to produce any documents in response to the subpoena?

03:29 5      A.  I believe if their relevant then I am allowed to.

03:29 6   But I'm also allowed to object, so therefore, I did.

03:29 7      Q.  Okay.  Do you have any communications with Ammer

03:29 8   Qaddumi relating to the April 24, 2024 protest?

03:29 9      A.  Like I said, from my -- from what I remember,

03:29 10  many of those communications were in person.  I am not

03:30 11  sure if I had anything -- anything that would be able to

03:30 12  document and to send.

03:30 13     Q.  You don't have any text messages?

03:30 14     A.  Not that I remember.  And also, if I have to go

03:30 15  through -- this was two years ago, right?  So I don't have

03:30 16  these things.  Even if I, like, you know, that would be my

03:30 17    question maybe for -- for Apple.  I don't know if that's

03:30 18    even possible.

03:30 19        Q.  Do you have an iPhone?

03:30 20        A.  Yes.

03:30 21        Q.  What is your record retention policy on your

03:30 22    iPhone?

03:30 23        A.  I don't know.

03:30 24        Q.  Okay.  Do you -- do all your text messages get

03:30 25    deleted after 90 days?

18

03:30  1        A.  I'm not sure.  Some there are messages that --

03:31  2    I'm not sure.

03:31  3        Q.  Are messages stored on your phone indefinitely?

03:31  4        A.  Like I said, I'm not sure.  There's -- I'm sure I

03:31  5    have used that setting at times in the past if my storage

03:31  6    is full.  I can't tell you if it is like that right now or

03:31  7    not or if it was like that or not at a certain time.

03:31  8        Q.  Did you ever look to see whether you had

03:31  9    communications with Ammer Qaddumi via text message

03:31 10    regarding the April 24, 2024 protest?

03:31 11        A.  Like I said, I have checked about things in the

03:31 12    past not relating to this case and either I have not found

03:31 13    anything or I have not had the time to scroll to messages

03:31 14    that have been from two years ago.

03:31 15      Q.  So is that a no to my question, that you didn't

03:31 16   look for any text messages between yourself and Ammer

03:32 17   Qaddumi on April 24, 2024?

03:32 18                  MR. HEALEY:  Object to the form.

03:32 19                  THE WITNESS:  So if I have looked, you know,

03:32 20   there's a feature in iMessage where you can -- you can,

03:32 21   like, search for words and whatnot and if I haven't been

03:32 22   able to find anything on my own just by opening my phone

03:32 23   and looking through the messages, then I don't believe

03:32 24   anything popped up that way either that offers any

03:32 25   reassurance.

                                                               19


03:32  1      Q.  (BY MR. JOZWIAK)  Can you search by date using

03:32  2   that feature?

03:32  3      A.  I don't think so.  I don't know, actually.

03:32  4   That's a good question.

03:32  5      Q.  Okay.  Do you have any communications with Ammer

03:32  6   Qaddumi regarding the planning of the April 24 protest?

03:32  7      A.  That is of the same -- like it's the same thing.

03:33  8   So if I have to restate my answer, if I have not been able

03:33  9   to look, like, if I have not been able to see, excuse me,

03:33 10   anything related to planning directly in communication

03:33 11   with him, then -- or if it was irrelevant, like, I

03:33 12   objected to it.

03:33 13                    This is -- I'm just giving the same answer

03:33 14       regardless of if it was on the day of the 24th or if it

03:33 15       was before the day of the 24th and, you know, in our

03:33 16       planning.

03:33 17          Q.  What about responding to the subpoena was

03:33 18       burdensome?

03:33 19          A.  Well, I'm describing it now how there's a lot of

03:34 20       request that are very vague and they overlap with, you

03:34 21       know, communications that Ammer if he has been in

03:34 22       communication I wouldn't think that it would be something

03:34 23       that I would have time to be going through searching

03:34 24       through my phone for messages from two years ago if I --

03:34 25       if I can't easily find them.  That would be very

                                                                        20


03:34  1       burdensome.

03:34  2                    If I, you know, have any other commitments

03:34  3       in my life and I don't quite know if, you know, like I'm

03:34  4       going keep using this example of horses pooping is

03:34  5       relevant, then, you know, just deciding things like that

03:34  6       is quite burdensome, speciality when any communications

03:34  7       with Ammer could be turned in through him.

03:35  8          Q.  So sitting here today you don't know whether you

03:35  9       have documents that are responsive to the subpoena, right?

03:35 10          A.  I know that I have objected on the grounds that I

03:35 11   have in my responses.  Aside from that, I don't know what

03:35 12   else to tell you.

03:35 13       Q.  So you don't know whether you have documents

03:35 14   responsive to the subpoena because of your objections.  Do

03:35 15   I understand your testimony correctly?

03:35 16            MR. HEALEY:  Object to the form.

03:35 17            THE WITNESS:  The objections should explain

03:35 18   my either -- my intentions of not -- of sharing evidence

03:36 19   regardless of how sure I am or how hopeful I am that I

03:36 20   might have evidence that I can't easily search for.

03:36 21       Q.  (BY MR. JOZWIAK)  So sitting here today, you

03:36 22   don't know whether you have responsive documents to the

03:36 23   subpoena based on the objections that you asserted in this

03:36 24   response; is that right?

03:36 25       A.  I don't believe that I have responsive documents

21

03:36 1    according to the criteria that I have objected on.

03:36 2        Q.  Okay.  You understand that having an objection

03:36 3    and having responsive documents are two different things,

03:36 4    right?

03:36 5        A.  Yes.  But I also understand that I have the right

03:36 6    to object.  So why would I have the right to object if I'm

03:36 7    being questioned on my understanding of if I have

03:37 8    documents or not.

03:37 9      Q.  And you've exercised your right to object which

03:37 10  has been respected so far.  But if you don't have

03:37 11  responsive documents to the subpoena, why don't you just

03:37 12  say that?

03:37 13                  MR. HEALEY:  Object to the form.

03:37 14                  THE WITNESS:  Because that's not -- because

03:37 15  I would have the same question if -- if it's just -- if

03:37 16  the subpoena is just about if I would have responsive

03:37 17  documents or not, why would they offer the ability to

03:37 18  object --

03:37 19      Q.  (BY MR. JOZWIAK)  well, typically objections are

03:37 20  used after someone realizes that they have responsive

03:37 21  documents but producing them would be burdensome.  Here

03:37 22  I'm just trying to understand whether you have responsive

03:37 23  documents or not.  Do you?

03:37 24                  MR. HEALEY:  Objection.

03:37 25                  THE WITNESS:  I think I've already answered

                                                                    22

03:37 1   that question.

03:37 2       Q.  (BY MR. JOZWIAK)  I don't think you have.

03:37 3       A.  Okay.  So it's not my business how often

03:38 4   objections are used.  I'm not a lawyer.  I am using the

03:38 5   objection with, right to object for multiple reasons, not

03:38 6   just because you think that I have responsive documents.

03:38 7            Like I said, it is not just burdensome, but

03:38 8    it is also vague and I would need some more specificity

03:38 9    about what documents exactly you might need.  And also --

03:38 10   but also it's not my job to share how that could be

03:38 11   possible, how it could be more specific.

03:38 12            I've also never gotten a subpoena before, so

03:38 13   I don't know exactly what you might have expected from

03:39 14   somebody who might have received a subpoena.

03:39 15        Q.  Are you withholding any documents on the basis

03:39 16   that the Request for Production No. 1 infringes on

03:39 17   protected freedoms to speak, assemble, associate, and

03:39 18   petition the state under the First Amendment?

03:39 19        A.  Sorry.  Could you resay that?

03:39 20            MR. JOZWIAK:  Ms. Janalyn, do you mind

03:39 21   reading that back?

03:41 22            (Requested question was read.)

03:41 23            MR. JOZWIAK:  Sorry.  Ms. Janalyn, were you

03:41 24   able to read that question back?

03:41 25            MR. HEALEY:  She did.

23

03:41 1         Q.  (BY MR. JOZWIAK)  Okay.  Then I missed whatever

03:41 2    response Ms. Homsi provided.  I'm sorry about that.

03:41 3         A.  That's okay.  I haven't provided a response.  I

03:41 4    was thinking about what the question meant.  And am I

03:41 5    correct in understanding that it's -- that the question is

03:41 6    I have not shared documents because the Request Number 1

03:41 7    has infringed on my First Amendment rights?

03:42 8                    I think you froze again.

03:42 9        Q.  Sorry.  I'm learning about the perils of remote

03:42 10    depositions today, apparently.

03:42 11                   MR. HEALEY:  It has not all been 100 percent

03:42 12    smooth.  Is now a good time with all the technical

03:42 13    difficulties to just, like, take a very short break.  I

03:42 14    mean, up to you, Daniel.

03:42 15                   MR. JOZWIAK:  Let me finish asking about

03:42 16    this RFP number 1 and then I think we'll be at a good

03:42 17    stopping point.  So let me just get a clean question out.

03:42 18        Q.  (BY MR. JOZWIAK)  Ms. Homsi, are you not

03:42 19    producing documents because you believe that Request for

03:42 20    Production No. 1 is overbroad, unduly burdensome, and

03:42 21    seeks irrelevant documents?

03:42 22        A.  I've objected to it because of that reason, yes.

03:43 23        Q.  Okay.  Are you withholding any documents on the

03:43 24    basis that Request For Production Number 1 infringes on

03:43 25    protected freedoms to speak, assemble, associate, and

                                                                    24


03:43 1    petition the state under the First Amendment?

03:43 2        A.  Again, forgive me.  The second question, are you

03:43  3    asking if I'm withholding documents because I believe that

03:43  4    it is infringing upon my -- the First Amendment rights?

03:43  5        Q.  Yes.

03:43  6        A.  Oh, I see.  I don't know if that applies.  But I

03:43  7    think the first question makes more sense to me.  I don't

03:43  8    think that it's fair to say that I'm withholding documents

03:43  9    because it in fringes on my First Amendment rights.  I'm

03:44 10    not sure that's a statement that I implied.

03:44 11        Q.  Okay.  Well, when you put that you object to this

03:44 12    request on the ground that it infringes on protected

03:44 13    freedoms to speak, assemble, associate, and petition the

03:44 14    state under the First Amendment what did you mean by that?

03:44 15        A.  Right.  But that's why it was an objection not

03:44 16    that -- I didn't say that I was withholding documents on

03:44 17    that basis.  I said that I objected on that basis.

03:44 18        Q.  Right.  And why did you object on that basis?

03:44 19        A.  I feel like we're going in circles.  Because I

03:44 20    have the right to and it's a really burdensome and vague

03:44 21    and infringes upon the First Amendment rights.

03:44 22        Q.  Do you understand that those are each separate

03:44 23    objections, though?

03:44 24        A.  I guess I'm not understanding the question.

03:45 25        Q.  Okay.

                                                                      25

03:45  1                  MR. JOZWIAK:  Let's take a -- Sean, you want

03:45  2  to do five minutes?

03:45  3                  MR. HEALEY:  Gave minutes work for me.  All

03:45  4  right.  Thanks.

03:45  5                  MR. JOZWIAK:  See everyone back in five.

03:45  6                  THE REPORTER:  We're off the record.

03:45  7                  (Brief recess.)

03:50  8      Q.  (BY MR. JOZWIAK)  Okay, Ms. Homsi.  Did you have

03:50  9  any conversations with anyone on that short break?

03:51 10      A.  No.

03:51 11      Q.  Okay.  I want to take a step back.  I'm really

03:51 12  just looking for an answer to a simple question.  After

03:51 13  you received the subpoena, did you conduct any search to

03:51 14  determine whether you had responsive documents?

03:51 15      A.  Yes.  I couldn't find anything that was relevant

03:51 16  or that I thought was relevant.

03:51 17      Q.  Okay.  What did you do when you made that search?

03:51 18      A.  I don't -- like, I just -- I looked.  Is that

03:51 19  what you're asking me?

03:51 20      Q.  Where did you look?

03:51 21      A.  Yeah.  So in messages because, like, I guess

03:51 22  iMessages if I can be more specific that way.  I don't

03:52 23  remember seeing anything that I was able to check for at

03:52 24  that time.

03:52 25                  And also, keep in mind, I have received a

03:52  1   subpoena a little bit late.  I didn't actually receive it

03:52  2   on the date that it was dated on the 7th.  I didn't

03:52  3   receive it right away.  So I tried to look whenever I had

03:52  4   the availability.

03:52  5                    But in terms of, like, if I missed

03:52  6   something, if I couldn't find something.  Also I don't

03:52  7   remember talking to -- to anybody else that I -- like any

03:52  8   other third parties like if it was asking about UT

03:52  9   administration.  I don't remember -- I don't remember

03:52 10   doing that over messaging or anything.

03:52 11        Q.  It sounds likeliest, but did you look through

03:53 12   your phone for responsive documents?

03:53 13        A.  Yeah, I mean, I don't normally use much else.

03:53 14        Q.  Okay.  Did you look through your e-mail?

03:53 15        A.  I don't remember looking through my e-mail.  I

03:53 16   actually don't remember.  I believe anything that -- yeah,

03:53 17   I believe anything that was related to Ammer was -- that I

03:53 18   tried looking for didn't come up.  I don't remember.

03:53 19        Q.  Did you look through any paper files for

03:53 20   responsive documents?

03:53 21        A.  I don't think I have paper files.

03:53 22        Q.  Fair enough.  Do you have any text messages from

03:53 23   April 23, 2024 on your phone right now?

03:53 24    A.  Like I said, because it was so long ago I don't

03:53 25  remember seeing them.  I don't even know if they saved.  I

27

03:54 1  don't remember seeing any.

03:54 2    Q.  Did you look for any text threads with Ammer

03:54 3  Qaddumi?

03:54 4    A.  Text threads as in direct messages, iMessage?

03:54 5    Q.  IMessages, yeah.

03:54 6    A.  That was, I guess, rephrasing of the first

03:54 7  question.  Did I look through any messages with Ammer

03:54 8  Qaddumi?  Briefly, yeah.  Well, so yes.  And also because

03:54 9  when you look through iMessages kind of anything can come

03:54 10  up.  Don't remember seeing anything relating to him.  That

03:54 11  is, if it saves.

03:54 12    Q.  Okay.  Sitting here today, do you know whether

03:54 13  your phone has text messages on it from April 23, 2024?

03:54 14    A.  I don't know because I don't know if they saved

03:55 15  or if they load.

03:55 16    Q.  Okay.  Did you look for any text messages or text

03:55 17  threads with Mohammed Zakzog?

03:55 18    A.  I don't remember either.  Again, I also don't

03:55 19  remember every specific request.  But if I believed that

03:55 20  it was not regarding Ammer's case, then I would not have

03:55 21  looked through it, right.

03:55 22    Q.  Do you delete e-mails after you receive them or

03:55 23  do you typically open them and then leave them in your in

03:55 24  box?

03:55 25    A.  Depends on the e-mail.  I delete many.  I -- I

                                                                  28

03:55  1  will archive or delete many or they'll -- especially if

03:55  2  they're old I'll just, like, get rid of them.

03:56  3    Q.  Did you ever e-mail with Ammer Qaddumi?

03:56  4    A.  I am not sure if I did in, like, generally

03:56  5  speaking.  I don't know if I ever needed to e-mail him.

03:56  6    Q.  Okay.  Do you have any text messages on your

03:56  7  phone to or from Ammer Qaddumi right now?

03:56  8    A.  I'm sure there has been stuff that's come up,

03:56  9  yes.

03:56 10    Q.  Okay.

03:56 11    A.  Like, from personal encounters or whatnot.

03:56 12    Q.  Sure.  Do you have any text messages referencing

03:56 13  the April 24, 2024 protest?

03:56 14    A.  So any of those messages that will be referencing

03:56 15  that protest are likely very old because I haven't had any

03:56 16  communications regarding that recently.  At least I don't

03:57 17  think so.  I try not to just because I'm so tired of this

03:57 18  subject.

03:57 19    Q.  Okay.  Do you know whether you have any e-mails

03:57 20  referencing the April 2020 -- excuse me, the April 24,

03:57 21  2024 protest?

03:57 22      A.  Not sure.

03:57 23      Q.  Okay.  Did Reannan or anyone else tell you to

03:57 24  make any objections to this subpoena?

03:57 25      A.  No, she didn't tell me to.  I was more that,

29

03:57  1  like, I wanted to and I felt that, you know, like, if I

03:57  2  had any conversation with her or my brother or -- or the

03:58  3  other two that were subpoenaed, it was more of just, like,

03:58  4  what seemed most -- we seemed most confident in.  I wasn't

03:58  5  told or ordered by anyone.

03:58  6      Q.  Okay.  So sitting here today do you think that

03:58  7  you have anything; text, e-mails, anything that mentions

03:58  8  the April 24, 2024 protest?

03:58  9      A.  So like I said, I do not know if I still have

03:58 10  those messages.  And if I do or I don't.  I did not submit

03:58 11  them because of the -- of a burdensome process to look or

03:58 12  fail to look for them and also because of the vague

03:58 13  request.

03:59 14      Q.  Okay.  Do you have anything -- understand if your

03:59 15  answer is the same.  But do you have anything, text

03:59 16  e-mails or anything that mentions the PSC's preparation

03:59 17  for the April 24, 2024 protest?

03:59 18      A.  I believe my message -- I mean, excuse me, my

03:59 19   response is the same because I don't remember messaging

03:59 20   about planning.

03:59 21      Q.  Okay.

03:59 22      A.  Yeah.  Or sorry, the second half I have to think.

03:59 23   The second half of that answer was or -- or if there was

03:59 24   any discussion, like I said, it was not relevant to what

03:59 25   was being -- or at least in my, you know, what I thought

                                                                  30


03:59  1   was not relevant.

03:59  2      Q.  How did you determine what was relevant or not?

04:00  3      A.  Yeah.  So like I said a little while ago, there's

04:00  4   a lot of overlap between, like, just what happened at that

04:00  5   time and what you might consider to be, you know, planning

04:00  6   for a protest.

04:00  7            I remember, like, there were a lot of things

04:00  8   on my mind about how I, you know, might have been stressed

04:00  9   at the time or I might have -- not necessarily regarding

04:00 10   specifically any planning.  So that, you know, wouldn't --

04:00 11   to me wouldn't be relevant to Ammer himself.

04:00 12      Q.  Okay.  Do you understand that relevance is not a

04:00 13   legitimate objection to a request for production of

04:00 14   documents?

04:01 15            MR. HEALEY:  Object to the form.

04:01 16                     THE WITNESS:  Yeah, I'm not sure.  I guess

04:01 17    it depends on what you define to be relevant.  If I'm

04:01 18    being asked to provide something that I feel is not what

04:01 19    you were asking, then I would not offer anything.

04:01 20        Q.  (BY MR. JOZWIAK)  So, I mean, sitting here today,

04:01 21    it seems like you don't know whether you have responsive

04:01 22    documents or not.  Does that mean that you haven't looked

04:01 23    to check to see if you do?

04:01 24                     MR. HEALEY:  Object to the form.

04:01 25                     THE WITNESS:  Like I said, if I have looked,

                                                                    31

04:01  1    whether it was after I received the subpoena or before,

04:01  2    anything that I might have seen did not seem worthy of

04:01  3    being relevant to submit.  I'm sorry if you feel that that

04:01  4    was the wrong decision.  I understand why you would have

04:02  5    that perspective.

04:02  6        Q.  (BY MR. JOZWIAK)  Okay.  Did you attend the

04:02  7    University of Texas at Austin as a student?

04:02  8        A.  Yes.

04:02  9        Q.  What years?

04:02 10        A.  From 2021, I believe, until 2024 I think was --

04:02 11    because I had technically graduated a semester earlier.

04:02 12        Q.  All right.  What -- when did you graduate?

04:02 13        A.  Excuse me.  When?

04:02 14     Q.  Yeah.

04:02 15     A.  The fall semester of -- sorry.  The reason I'm

04:02 16  hesitating to answer is because I always get -- I always

04:02 17  forget.  Oh, I believe I finished school at the very end

04:03 18  of 2023, the beginning of 2024.

04:03 19     Q.  Okay.

04:03 20     A.  I think the reason is I was still living there

04:03 21  during 2024 so...

04:03 22     Q.  Okay.  So you weren't a student in April of 2024,

04:03 23  right?

04:03 24     A.  I was not enrolled in classes at that time.

04:03 25     Q.  Okay.  How are you familiar with the PSC?

32

04:03 1     A.  Am I?  Or how am I?

04:03 2     Q.  How are you familiar with the PSC?

04:03 3     A.  I am familiar in the sense that I attended many

04:03 4  protests, teach-ins, social events.  And for a little

04:03 5  while as well, I was helping to coordinate events.

04:04 6  Familiar I guess in many different ways.

04:04 7     Q.  Okay.  When did you first become involved with

04:04 8  the PSC?

04:04 9     A.  Pretty much when I started in 2021.

04:04 10     Q.  Okay.  Did you organize PSC events?

04:04 11     A.  Sometimes.  There's different, like, levels of

04:04 12    involvement, right.  So depending.

04:04 13        Q.  What events did you organize?

04:04 14        A.  Oh, I couldn't tell you off the top of my head.

04:04 15    Like there were some things where I would help bring

04:04 16    snacks to social events, bring supplies.  I don't remember

04:04 17    specifically, like, the names of these events if that's

04:04 18    what you're looking for.

04:04 19        Q.  Do you recall any specific event that you helped

04:05 20    organize during your time on the PSC?

04:05 21        A.  I could probably recall a few.  Like, I remember

04:05 22    being involved in choosing, you know, what movie we might

04:05 23    show for a film screening or helping to present meetings

04:05 24    to start off the semester.

04:05 25        Q.  Okay.

                                                                    33


04:05 1        A.  Yeah.

04:05 2        Q.  Are you familiar with an event called Cafe

04:05 3    Resistance?

04:05 4        A.  I am familiar, yes.

04:05 5        Q.  Did you help organize that event?

04:05 6        A.  Which one?  Because there -- I believe there

04:05 7    would have been more than one called Cafe Resistance.

04:05 8        Q.  Any?

04:05 9        A.  Yes.  There was one I did indeed help with setup

04:06 10    and deciding, you know, how -- we'd have -- we had

04:06 11    performances, helped decide how we would to that.

04:06 12        Q.  Okay.  Did you attend PSC events that you didn't

04:06 13    help organize?

04:06 14        A.  Yeah, I believe several times.

04:06 15        Q.  Okay.  What's the PSC Steering Committee?

04:06 16        A.  The steering committee, at least when I was

04:06 17    involved, I'm not sure if it's -- I guess it differs -- is

04:06 18    like a leadership committee.  So their -- I guess their --

04:06 19    in terms of involvement is a little bit higher than people

04:07 20    who go to like only one or two events or view their posts

04:07 21    on social media.  So they have more of a hand in helping

04:07 22    postings or helping, yeah, make decisions.  Does that

04:07 23    answer your question?

04:07 24        Q.  It does.  Thank you.

04:07 25            Were you a recognized officer of the PSC

                                                                34

04:07 1    during your time at UT?

04:07 2        A.  So we didn't have certain office or positions.

04:07 3    Like, we would have, like, the steering so I was part of

04:07 4    steering.  But it wasn't like publicly listed officer

04:07 5    positions.  To me it makes a difference.  I don't know if

04:07 6    it does to you.

04:07 7        Q.  Do you recall communicating with the dean of

04:07  8   students office at UT during the spring of 2024?

04:08  9        A.  I'm not sure.  I know they approached us probably

04:08  10  a couple of times.  You'd have to be more specific.

04:08  11       Q.  I'm just asking if you generally recall speaking

04:08  12  with the dean of student s office in the spring of 2024.

04:08  13       A.  So like I said, I believe they -- they approached

04:08  14  us a couple of times.  I don't remember exactly what,

04:08  15  like, throughout the entire semester, I don't remember.

04:08  16            But I'm sure that some people from UT

04:08  17  administration had approached us.  Sometimes they would

04:08  18  not necessarily -- I would not know if they're explicitly

04:08  19  from the dean of students or not.

04:08  20       Q.  I mean, it -- it sounds like you do generally

04:08  21  recall there being some type of communication; is that

04:08  22  right?  Even if you don't remember the specifics of it?

04:08  23       A.  The likelihood of me speaking with dean of

04:09  24  students is high, yes.

04:09  25       Q.  Okay.  Why is that if you weren't a student in

                                                                        35

04:09  1   the spring of 2024?

04:09  2        A.  Because I was still living there and I was still

04:09  3   active in -- in PSC and I was on campus because I had

04:09  4   campus-related activities, like, many people that I know.

04:09  5        Q.  Okay.

04:09  6        A.  I don't know if they thought they were

04:09  7    approaching me as a student.  That's a different question.

04:09  8        Q.  Yeah, I wasn't asking that.  I'm asking if you

04:09  9    remember generally having conversations with them.

04:09 10        A.  Right.  Yeah.

04:09 11        Q.  Okay.  Give me one second here.  There we go.

04:10 12    Okay.  Can you see my screen?

04:10 13        A.  I can.

04:10 14        Q.  Okay.  Take a look at this document and let me

04:10 15    know once you've read through it.

04:10 16        A.  I've read through it, yeah.

04:10 17        Q.  Okay.  Do you recall meeting with Sade

04:10 18    Dawson-Love on February 21, 2024?

04:11 19        A.  Her name does ring a bell.  I don't know what the

04:11 20    February 21st call sounded like or was about.

04:11 21        Q.  All right.  Do you recall anything about this

04:11 22    meeting?

04:11 23        A.  Look, I recall meeting with her.  I don't know if

04:11 24    this was what I'm thinking of.

04:11 25        Q.  Okay.  What -- what are you thinking of?

                                                                    36


04:11  1        A.  I have talked to her on a couple of occasions.

04:11  2    Like multiple different occasions asking about if we'd be

04:11  3    able to set up exhibits.  But that was not necessarily at

04:11 4    this time.

04:11 5        Q.  Do you recall having any conversations with Sade

04:11 6    Dawson-Love in February 2024 or about that time frame?

04:11 7        A.  I have a really bad sense of times.  I don't know

04:12 8    what we were doing in February 24, 2024.

04:12 9        Q.  Fair enough.  So you don't remember anything

04:12 10   about a meeting on February 21st; is that right?

04:12 11       A.  Not specifically that day.

04:12 12       Q.  Okay.  Do you recall ever having a discussion

04:12 13   with Ms. Dawson-Love about how the PSC could host events

04:12 14   in compliance with UT rules?

04:12 15       A.  Honestly, I don't know.  I feel as if, you know,

04:12 16   that could have come up, but I can't confidently answer

04:12 17   that question.  I don't remember.  I have a very bad

04:12 18   memory.  I don't know if you can tell.

04:12 19       Q.  All right.  Fair enough.  Would you agree with me

04:13 20   that the dean of students office was willing to work with

04:13 21   the PSC whenever the PSC wanted?

04:13 22       A.  No, I think that's a very -- I don't know, I feel

04:13 23   like that's a very general statement that I'm not sure if

04:13 24   that applied at all times.

04:13 25       Q.  All right.  What times did it not apply?

37

04:13 1        A.  That's not quite what I mean.  I guess what I'm

04:13  2  saying is that I don't think that they were meeting on our

04:13  3  time.  I think that we would meet at very specific times

04:13  4  very few times.  I don't think they were doing exactly,

04:14  5  like, what we would ask of them.

04:14  6       Q.  What did they not do that you asked of them?

04:14  7            MR. HEALEY:  Object to the form.

04:14  8            THE WITNESS:  I don't know.  I feel like

04:14  9  that's still -- that's a little bit vague.  I don't know

04:14 10  if I can recall, like, specific moments where they did or

04:14 11  did not, you know, work very easily with us.

04:14 12            I do actually remember one time where

04:14 13  they -- we had a reservation.  I don't think this is very

04:14 14  relevant, but maybe it's an example.  We had a reservation

04:14 15  for a space to present an exhibit.

04:14 16            And while they were at least some people who

04:14 17  were working with us at the time did give us the

04:14 18  reservation, our materials were shortly after stolen and

04:14 19  actually put in the trash and we were not given an answer

04:14 20  as to who did it.  But I was told vaguely that it was a

04:15 21  faculty truck.

04:15 22            So at times like that I guess they were

04:15 23  absolutely not doing anything in favor for us.  That was

04:15 24  like, hundreds of dollars worth of equipment.

04:15 25       Q.  (BY MR. JOZWIAK)  What did you want them to do?

04:15  1      A.  To not throw away our -- our things?

04:15  2      Q.  Is it your testimony that the dean of students

04:15  3  office threw away your exhibits?

04:15  4      A.  My testimony is that if they know anything about

04:15  5  who did it, if it was or was not them, they did not offer

04:15  6  us any knowledge or conversation despite them having

04:15  7  cameras.

04:15  8            And the person that I had spoke with in

04:15  9  order to get me those materials back did briefly tell me

04:15 10  that it was a UT employed vehicle that took them to the

04:15 11  trash.

04:15 12      Q.  Who did you speak with at the dean of students

04:16 13  office about that?

04:16 14      A.  I remember at the time speaking with Sade, she

04:16 15  was very helpful.  I wasn't able to get in contact with

04:16 16  anybody else.  I'm not sure if she wasn't able to offer me

04:16 17  any more information -- I mean, any more context.  She was

04:16 18  the only person that I was able to talk to aside from UT

04:16 19  PD.

04:16 20      Q.  Did you speak with UT PD?

04:16 21      A.  I did.

04:16 22      Q.  What did they say?

04:16 23      A.  They didn't really offer me much information.

04:16 24  They just told me that they would unfortunately not likely

04:16 25   have footage even though I know that there's cameras.  But

04:16  1   that's about it.

04:16  2        Q.  Okay.  Are you familiar with Governor Abbott's

04:17  3   executive order GA 44 or the executive order regarding

04:17  4   antisemitism?

04:17  5        A.  I'm generally familiar with that, yes.

04:17  6        Q.  How are you familiar?

04:17  7        A.  I'm familiar in the sense that he put out the

04:17  8   executive order and that it was quite -- quite the I guess

04:17  9   infringement on the First Amendment rights.  I'm familiar

04:17 10   in that sense.  I'm familiar in the sense that I wasn't

04:17 11   happy when he gave out the executive order.

04:18 12        Q.  Okay.  Do you know whether Governor Abbott issued

04:18 13   that executive order, about when; not asking for specific

04:18 14   dates?

04:18 15        A.  I'm assuming that was before either early 2024 or

04:18 16   late 2024 if I'm not mistaken.

04:18 17        Q.  I'll represent to you that Governor Abbott issued

04:18 18   the executive order in March of 2024.  Does that sound

04:18 19   right?

04:18 20        A.  Yeah, that sounds like it could be right.

04:18 21        Q.  Okay.  Do you know if you met with the dean of

04:18 22   students office after Governor Abbott issued Executive

04:18 23   Order GA 44?

04:18 24        A.  I'm not sure.

04:18 25        Q.  Okay.  Do you know whether the dean of students

                                                          40

04:19  1   office scheduled a meeting to meet with you after the

04:19  2   executive order was issued?

04:19  3        A.  I'm also not sure, but when you say meet, do you

04:19  4   mean me personally or the PSC?

04:19  5        Q.  Either.  Fair point.

04:19  6        A.  The reason I ask, yeah, is because I don't

04:19  7   remember if they specifically asked to meet with me.  But

04:19  8   I could have not seen it because it wasn't sent to me.

04:19  9        Q.  All right.  I'm going to mark Exhibit 3.

04:19 10             (Exhibit No. 3 was marked.)

04:19 11        Q.  (BY MR. JOZWIAK)  Give me a second while I pull

04:19 12   it up.  Let me know when you see it.

04:20 13        A.  Yes, I do see it.

04:20 14        Q.  Okay.  Feel free to read through this document.

04:20 15        A.  Okay.  I remember this.

04:20 16        Q.  Okay.  Do you recall attending this meeting?

04:20 17        A.  I believe I wanted to reschedule.  Either

04:20 18   something came up or I wasn't -- something came up where I

04:20 19   needed to reschedule for another reason.  So I believe I

04:20 20   e-mailed them back, but I didn't end up getting a response

04:20 21   or getting a reschedule -- rescheduled meeting.

04:20 22       Q.  Who did you e-mail asking to reschedule the

04:20 23   meeting?

04:20 24       A.  I don't remember that.  Most likely anybody who

04:20 25   is mentioned here.

41

04:21 1        Q.  Okay.  Do you know whether anyone from PSC

04:21 2    attended this meeting on April 5th?

04:21 3        A.  Because I rescheduled we wouldn't have met with

04:21 4    them on April 5th, no.

04:21 5        Q.  Okay.  You mentioned that you didn't like the

04:21 6    governor's executive order; is that right?

04:21 7        A.  Right.

04:21 8        Q.  Okay.  Considering that the governor, maybe seven

04:21 9    to ten days, that's an approximation, issued GA 44 --

04:21 10   strike that.

04:21 11           So about a week before this meeting that was

04:22 12   scheduled for April 5th, Governor Abbott issued his

04:22 13   executive order on March 27th.  In light of the governor's

04:22 14   executive order, do you believe that this meeting would

04:22 15   have been a good opportunity for the PSC to discuss its

04:22 16   concerns about the executive order with the dean of

04:22 17   students office?

04:22 18       A.  I don't know if it would have been a good

04:22 19    opportunity.  I think it would have been an opportunity.

04:22 20    That's why I rescheduled, because I wanted it to be an

04:22 21    opportunity of some kind.

04:22 22         Q.  Was the meeting ever rescheduled?

04:22 23         A.  From what I remember, when I had responded to

04:22 24    them they didn't respond back with another meeting time.

04:22 25    So I don't think it happened.

↥

42

04:22 1          Q.  Okay.  And you don't remember who you e-mailed in

04:22 2     the dean of students office to try to get the meeting

04:22 3     rescheduled; right?

04:22 4          A.  Not exactly.  But I thought it would be somebody

04:23 5     in this -- in this exhibit.

04:23 6          Q.  Okay.  So you were a member of PSC for three and

04:23 7     a half years or so; is that right?

04:23 8          A.  I'd say so, yeah.

04:23 9          Q.  Okay.  And then after you graduated you continued

04:23 10    to be active in the PSC in the spring of 2024, right?

04:23 11         A.  Somewhat active, yes.

04:23 12         Q.  How did PSC members communicate with one another?

04:23 13         A.  Mostly during meetings.  Like in-person meetings

04:23 14    preferred.

04:23 15         Q.  Okay.  Anything else?

04:23 16         A.  If not in-person meetings, then phone calls

04:23 17    like -- or like meetings like online format.

04:24 18        Q.  Like Zoom calls like we're doing right now?

04:24 19        A.  Zoom calls or something similar, yeah, depending

04:24 20    on what we used.

04:24 21        Q.  Okay.  Did you use Zoom or did you use a

04:24 22    different platform?

04:24 23        A.  It ranged for multiple things, yeah.

04:24 24        Q.  Okay.  Did PSC members to communicate with one

04:24 25    another in a Signal chat?

                                                                      43


04:24  1        A.  Depending on topics, sometimes we did.  We didn't

04:24  2    prefer, right, because that's not quite a meeting.  But if

04:24  3    we ever needed to update each other.

04:24  4        Q.  What made Signal an appropriate medium for

04:24  5    communication in some instances but not others?

04:24  6                MR. HEALEY:  Object to the form.

04:24  7                THE WITNESS:  Yeah, it's not necessarily

04:25  8    better than others.  I'd change it if I could.  It's just

04:25  9    nicer than Slack, for example, on the eyes.

04:26 10        Q.  (BY MR. JOZWIAK)  What topics were discussed on

04:25 11    Signal that you recall?

04:25 12        A.  Like I said, that's really broad.  I don't

04:25 13    remember.  It could have been anything from how my day was

04:25 14    going to the fact that we were busy with exams or, you

04:25 15    know, scheduling meeting times.

04:25 16        Q.  Did the PSC only use Signal for certain types of

04:25 17    communications?

04:25 18        A.  What do you mean by that?

04:25 19        Q.  Like are there particular topics that the PSC

04:25 20    only discussed on Signal?

04:25 21        A.  Well, since we didn't like to message on multiple

04:26 22    different platforms at the same time, it was mostly just

04:26 23    for anything that we could mention or talk to each other

04:26 24    about.

04:26 25                    But like I said, again we prefer to speak in

                                                                        44


04:26  1    person or in a meeting.  So that's just a matter of time

04:26  2    constraints, I guess.

04:26  3        Q.  Are there specific topics that PSC members only

04:26  4    talked about on Signal?

04:26  5                    MR. HEALEY:  Object to the form.

04:26  6                    THE WITNESS:  No.

04:26  7        Q.  (BY MR. JOZWIAK)  Okay.  Did PSC members e-mail

04:26  8    with one another?

04:26  9        A.  I don't think I e-mailed many of who I know in

04:26 10    person.

04:26 11        Q.  Did the PSC have a gmail account?

04:26 12        A.  I believe so.  Did or does?  You said did.

04:26 13    Q.  Did.

04:26 14    A.  Yes.  So we did at the time not always in use,

04:26 15    depending.

04:27 16    Q.  Does the PSC still have a gmail account?

04:27 17    A.  That's what I don't know.

04:27 18    Q.  Okay.  Who controlled the PSC's gmail account?

04:27 19    A.  Nobody in particular controlled it.

04:27 20        THE WITNESS:  Sorry.  Did I speak over

04:27 21    somebody?

04:27 22        MR. HEALEY:  I just making an objection to

04:27 23    the form.  You can answer.

04:27 24        THE WITNESS:  Okay.  I don't believe anybody

04:27 25    controlled it.  It was mostly just like if we were

                                                                45

04:27  1    expecting e-mails at the time.  It wasn't really anybody's

04:27  2    responsibility in particular.

04:27  3    Q.  (BY MR. JOZWIAK)  Did everyone have the password

04:27  4    to the PSC's gmail?

04:27  5    A.  I don't know.  I did not always keep up with who

04:27  6    was signed in.

04:27  7    Q.  Did you have the password to the PSC's gmail

04:27  8    account?

04:28  9    A.  At some point, yes.  And again, it -- it varies

04:28 10    because sometimes they will sign you out and I don't

04:28 11    remember passwords.  So sometimes yes, sometimes no.

04:28 12        Q.  All right.  In the spring of 2024 do you think

04:28 13    that you would have had access to the PSC's gmail account?

04:28 14        A.  I don't know specifically when during that

04:28 15    semester I did or did not.  Like I said, it really was

04:28 16    annoying how sometimes we would not have access because of

04:28 17    things being signed out.  So I was not opening and

04:28 18    checking it daily.  I did not necessarily have

04:28 19    notifications on.

04:28 20        Q.  Not asking you if you checked it daily or even

04:28 21    if, like, you, you know, continuously maintained access to

04:28 22    it.  I just want to know if you had access to the gmail

04:28 23    account in spring of 2024?

04:28 24        A.  Yes.  So I don't know when I did or did not is

04:28 25    what I'm saying.  I didn't always check if I had access.

46

04:29 1    I'm sure at some points I did.

04:29 2        Q.  Okay.  Do you know whether Ammer Qaddumi had

04:29 3    access to the PSC's gmail account?

04:29 4        A.  I also don't know what he was and was not doing.

04:29 5    I'm sure that he did at some point if he was ever free and

04:29 6    available.  If he was busy, I don't know if he was ever

04:29 7    checking.

04:29 8        Q.  Did PSC members ever communicate on a social

04:29  9    media platform other than Signal?

04:29 10        A.  I don't think we used social media to

04:29 11    communicate.

04:29 12        Q.  You never sent a direct message on Instragram,

04:29 13    for example, to another PSC member?

04:29 14        A.  Are you asking about me personally or are you

04:29 15    asking if PSC was communicating with others through their

04:29 16    Instragram?

04:30 17        Q.  Good point.  Let's start with you.  Did you ever

04:30 18    communicate with another PSC member via direct message on

04:30 19    Instragram?

04:30 20        A.  I don't think so, no.  I don't like using

04:30 21    Instragram.

04:30 22        Q.  Okay.  Do you know whether any other PSC members

04:30 23    communicated with one another using Instragram's direct

04:30 24    message feature?

04:30 25        A.  I have no idea, actually.

                                                                        47

04:30  1        Q.  Okay.  Did the PSC have a Google Drive?

04:30  2        A.  Yes.

04:30  3        Q.  Okay.  What documents were stored in that Google

04:30  4    Drive?

04:30  5        A.  That is a very vague question.  It could have

04:30  6    been any kind of documents.  I don't know.

04:30 7     Q.  Do you know any documents that the PSC had?

04:30 8     A.  I, for example, I know we had photos of, like,

04:30 9  alumni.  Like very old documents.  I don't remember every

04:31 10  single document or anything in particular that comes to

04:31 11  mind.

04:31 12     Q.  Did you ever use the PSC's Google Drive?

04:31 13     A.  Yeah.

04:31 14     Q.  What do you recall about the PSC's Google Drive?

04:31 15          MR. HEALEY:  Object to the form.

04:31 16          THE WITNESS:  Yeah.  So I didn't submit any

04:31 17  evidence from the PSC's Google Drive.

04:31 18     Q.  (BY MR. JOZWIAK)  I'm going to stop you.  I'm

04:31 19  just asking what you remember about it, not whether you

04:31 20  submitted any documents to it.

04:31 21     A.  So I don't remember anything specific because

04:31 22  it's just such as vague question.  I know that sometimes

04:31 23  we took pictures and stored pictures.  Sometimes we would

04:31 24  make presentations that were educational, things along

04:31 25  that nature.

                                                              48


04:32 1     Q.  Do you know who controlled -- strike that.

04:32 2          Do you know who had access to the PSC's

04:32 3  Google Drive?

04:32 4     A.  Similarly to the gmail, I don't know who had

04:32 5   access when.

04:32 6        Q.  Did only steering committees have access to --

04:32 7   we'll call it the Google account that will include the

04:32 8   Google Drive and the gmail account or did everyone in the

04:32 9   organization have access to the account?

04:32 10                MR. HEALEY:  Object to the form.

04:32 11                THE WITNESS:  I don't think that many people

04:32 12  had access to it outside of the steering committee.  I

04:32 13  don't know if that -- that could have, you know, changed

04:32 14  day to day according -- depending on, you know, who needed

04:32 15  resources.  I'm not sure that that was ever something that

04:32 16  came up.

04:32 17       Q.  (BY MR. JOZWIAK)  Who are all the people that you

04:32 18  remember that had access to the Google account?

04:33 19       A.  Like I said, I don't know exactly.  But if you --

04:33 20  I guess if we can include the steering members, which were

04:33 21  not consistent from year to year.  So are you maybe asking

04:33 22  about a certain time?

04:33 23       A.  So did steering committee members in the academic

04:33 24  year of 2023 to 2024 all have access to the PSC's Google

04:33 25  account?

                                                              49


04:33 1        A.  At varying times I believe they did.  I don't

04:33 2   know if everybody was signed in and using the account.

04:33  3         Q.  I'm not asking if everyone was signed in and

04:33  4   using the account.  I'm just asking who you know could

04:33  5   sign in and access the account.  And it sounds like

04:34  6   steering committee members could, right?

04:34  7         A.  Yes.  Yes.

04:34  8         Q.  Anyone else?

04:34  9         A.  Like I said, I don't recall.  I don't know if it

04:34 10   was ever shared.  I don't think so.  There's also -- the

04:34 11   reason I'm mentioning this -- like, there is still a

04:34 12   likelihood of some people in the steering who might not

04:34 13   have had access because they were not actively using it.

04:34 14   So if that explains why I'm phrasing it that way.  I can

04:34 15   only vouch for myself and say that I had access at varying

04:34 16   times to this account.

04:34 17         Q.  Okay.  But if a PSC steering committee member

04:34 18   wanted to use or access the Google account, to your

04:34 19   understanding that they could have, right?

04:34 20         A.  They had the right to, yes.

04:34 21         Q.  Okay.  Are you familiar with the NSJP?

04:35 22         A.  I am familiar with them.

04:35 23         Q.  How?

04:35 24         A.  I know they are a national organization and that

04:35 25   they are an organization that is for the advocacy of

50

04:35  1  Palestine.

04:35  2      Q.  Do you know any members of the NSJP?

04:35  3      A.  Currently I do not know who is part of NSJP.

04:35  4      Q.  Have you ever known anyone who has ever been a

04:35  5  member of the NSJP?

04:35  6      A.  I don't remember names.  I remember -- yeah.  No,

04:35  7  I don't -- I only remember, like, in 2022 or something

04:36  8  just like meeting a couple of them just by coincidence.  I

04:36  9  don't really know anything about them.

04:36 10      Q.  Where did you meet them?

04:36 11      A.  I have -- I don't remember.

04:36 12      Q.  You met people from the NSJP but you don't

04:36 13  remember where you met them, but it was probably sometime

04:36 14  in 2022; is that right?

04:36 15              MR. HEALEY:  Object to form.

04:36 16              THE WITNESS:  When I say "meet," I'm saying,

04:36 17  like, I encountered people that, you know, that work with

04:36 18  NSJP.  It probably was in Austin.

04:36 19              I don't remember just because I know I've

04:36 20  seen, like, faces of these people.  I don't have any

04:36 21  personal connection.  I don't know who was undertaking

04:36 22  what role at what time.

04:36 23      Q.  (BY MR. JOZWIAK)  Do you know the names of anyone

04:37 24  who has been a member or is a member of the NSJP?

04:37 25      A.  I believe I -- like I said, I believe I know

04:37  1  people distantly who were in NSJP.

04:37  2       Q.  I just want to know if you know anyone's names.

04:37  3  That's all.

04:37  4       A.  That's why I'm saying I don't know their names

04:37  5  and I don't know anything about them.

04:37  6       Q.  Okay.  So how would you know by someone's face

04:37  7  that they were a member of the NSJP?

04:37  8       A.  Probably just by being introduced to them.

04:37  9       Q.  Okay.  Are you familiar with someone named Nura

04:37 10  Bawab?

04:37 11       A.  Oh, yes, I do know Nura Bawab.

04:38 12       Q.  Did you know that Nura Bawab was a member of the

04:38 13  NSJP?

04:38 14       A.  I actually was not aware.  She was an alumni from

04:38 15  PSC.  I didn't realize she was -- when was she in NSJP?

04:38 16       Q.  You didn't know that -- you didn't know that Nura

04:38 17  Bawab was a member of the NSJP?

04:38 18       A.  I didn't realize or maybe I forgot from a long

04:38 19  time ago.  But I know her as alumni from -- excuse me,

04:38 20  alumni of UT and PSC.

04:38 21       Q.  Understood.  Are you familiar with the Popular

04:38 22  University for Gaza campaign?

04:38 23       A.  Yes.

04:38 24    Q.  How are you familiar with the Popular University

04:38 25  For Gaza campaign?

                                                                52

04:38  1    A.  I remember it as something that was being

04:39  2  campaigned for on social media.  There were a lot of

04:39  3  universities that were sharing information and media that

04:39  4  I outlined with this campaign.

04:39  5    Q.  Did the PSC host its own Popular University For

04:39  6  Gaza event?

04:39  7    A.  We had an event during that time, yes.  I don't

04:39  8  remember what it was called.

04:39  9    Q.  Okay.  Was it inspired by the Popular University

04:39 10  For Gaza campaign?

04:39 11    A.  Yeah.  It was inspired by a larger movement, yes.

04:39 12  Not necessarily anything specific about that campaign.  I

04:39 13  don't remember if there were terms or anything that we

04:39 14  distinctly followed, though.

04:39 15    Q.  Okay.  Are you familiar with the PSC event on

04:40 16  April 24, 2024?

04:40 17    A.  Yes.

04:40 18    Q.  How are you familiar with that event?

04:40 19    A.  I remember that it was an event that was posted

04:40 20  and planned to -- to be a mixture of study hall and

04:40 21  teach-ins like educational events and cultural events.

04:40 22   And unfortunately, it was very heavily suppressed and

04:40 23   there were many people that were arrested that day.

04:40 24        Q.  It was also a walkout, right?

04:40 25        A.  Yes.  It did start -- well, it was supposed to

                                                                      53

04:40  1   start with a walkout, yes.

04:40  2        Q.  Okay.  Who organized the event on April 24, 2024?

04:40  3        A.  Generally PSC steering along with, I guess, the

04:41  4   help of various individuals who wanted to support that

04:41  5   day.

04:41  6        Q.  And did PSC reach out to any other organizations

04:41  7   regarding the event on April 24, 2024?

04:41  8        A.  I don't know if I remember speaking to -- me,

04:41  9   personally any -- excuse me, like me as part of PSC

04:41 10   speaking to any organizations.  I don't remember that.

04:41 11   There is a likelihood that we -- any of us could have been

04:41 12   inviting other organizations.

04:41 13              MR. JOZWIAK:  Sorry.  Ms. Janalyn, do you

04:41 14   mind reading that back.  I lost connection for a minute

04:41 15   there.

04:42 16              (Requested question was read.)

04:42 17        Q.  (BY MR. JOZWIAK)  Okay.  Did Ammer Qaddumi help

04:42 18   organize the PSC event on April 24, 2024?

04:42 19        A.  Yes.

04:42 20     Q.  Did he have a particular role with respect to the

04:42 21 event that day?

04:42 22     A.  I don't remember if he had particular roles.  So

04:42 23 I can't say with confidence if he did.

04:42 24     Q.  Do you recall ever communicating with Ammer

04:42 25 Qaddumi about the event on April 24th?

54

04:42  1     A.  I believe he was part of conversations that we

04:43  2 were having.  I don't think I'd had any need to talk to

04:43  3 him specifically.

04:43  4     Q.  Do you recall what those conversations were

04:43  5 about?

04:43  6     A.  I'm sure.  You know, our meetings last a little

04:43  7 while.  They were probably along the lines of discussing

04:43  8 logistics and program.  Who to, you know, to have -- help

04:43  9 lead certain educational programs.  How, you know, we can

04:43 10 sufficiently, you know, put out information on social

04:43 11 media.  How we can design our fliers, anything like that.

04:44 12     Q.  Earlier we talked about the PSC's Instragram

04:44 13 account.  Do you recall that?

04:44 14     A.  Yes.

04:44 15     Q.  Okay.  Who controlled the PSC's Instragram

04:44 16 account?

04:44 17          MR. HEALEY:  Object to the form.

04:44 18             THE WITNESS:  So nobody in particular

04:44 19    controlled the account.  Similarly with the drive and the

04:44 20    Google account generally, a lot of people had the right to

04:44 21    use the account like steering had the right to use the

04:44 22    account dependent on the thing that we're posting.

04:44 23        Q.  (BY MR. JOZWIAK)  Do you recall who posted on the

04:44 24    PSC's Instragram account host advertising the April 24th

04:44 25    event?

                                                                    55


04:44  1        A.  I don't know who posted it, no.

04:44  2        Q.  Okay.  Did any one person in particular host on

04:44  3    the PSC's Instragram account?

04:44  4        A.  Multiple of, like, many of us did is what I'm

04:45  5    saying.

04:45  6        Q.  I guess I'm confused.  Because on the one hand

04:45  7    you said many of us posted on the PSC's Instragram account

04:45  8    but you don't know who posted on the Instragram account?

04:45  9        A.  Well, you were asking me who posted on the 24th,

04:45 10    right?

04:45 11        Q.  In the days leading up to the 24th.

04:45 12        A.  Yeah.  So it could have been anybody on steering.

04:45 13    I don't know who posted what exactly.

04:45 14        Q.  Okay.  Have you ever posted anything on the PSC's

04:45 15    Instragram account?

04:45 16      A.  Yes.

04:45 17      Q.  Okay.  Do you recall posting anything at all on

04:45 18 the PSC's Instragram account in April 2024?

04:45 19      A.  I don't know if I, like, posted the -- what was

04:46 20 it called?  The main post that went out before the 24th.

04:46 21 I don't know.  There were likely several, like, story

04:46 22 posts.  I'm not sure if that also counts.

04:46 23      Q.  Sure.  Yeah.

04:46 24      A.  Yeah.  I think that I could have easily posted

04:46 25 some of them.  But like I said, I am not the only one who

                                                          56


04:46  1 had access and it could literally be anybody who's, you

04:46  2 know, open -- opening the app.

04:46  3      Q.  Do you know whether Ammer Qaddumi ever posted on

04:46  4 the PSC's Instragram account?

04:46  5      A.  I don't know for sure.  The likelihood of him

04:47  6 posting something is there, like stories and whatnot

04:47  7 because he had access to it.

04:47  8      Q.  How do you know he had access to the PSC's

04:47  9 Instragram account?

04:47 10      A.  So similar to the Google account, leadership had

04:47 11 the right to access.  But I don't know if he ever -- or

04:47 12 for anybody for that matter -- ever, you know, was even

04:47 13 actively remotely caring to have access to it.  I know --

04:47 14     Q.  Did the steering committee have any approval

04:47 15  process in place for what could or could not be posted on

04:47 16  the PSC's Instragram?

04:47 17     A.  That's a good question.  It was more so up to --

04:48 18  what's the word -- like a conversational decision rather

04:48 19  than, like, a checklist to follow.

04:48 20     Q.  Sure.  So say the PSC had that conversation about

04:48 21  posting content on its Instragram account.  How would it

04:48 22  be determined who would eventually make the post?

04:48 23     A.  I mean, similarly to how -- like depending on who

04:48 24  has time, who wants to, who is available.  I don't have

04:48 25  any specific answer to that.

❦

                                                                57


04:48 1      Q.  Do you recall any conversations about posting on

04:48 2   the PSC's Instragram account in the days before -- in the

04:49 3   few days before April 24, 2024?

04:49 4      A.  That's honestly such a specific thing for me to

04:49 5   remember.  I don't remember.  I just know that there had

04:49 6   to have been a conversation in order to post on the

04:49 7   account, even if it was just about the style of the post

04:49 8   that we'd be putting out.  I don't remember.

04:49 9      Q.  Okay.  But it's fair to say that this was a

04:49 10  collective decision about what would be posted on the

04:49 11  PSC's Instragram, right?

04:49 12              MR. HEALEY:  Object to the form.

04:49 13              THE WITNESS:  Yes.  At times it would be

04:49 14  delegated to one or two people depending on the post,

04:49 15  though.

04:49 16      Q.  (BY MR. JOZWIAK)  All right.  Do you recall any

04:49 17  delegation about the post in the few days before April 24,

04:50 18  2024?

04:50 19      A.  Excuse me.  Say that one more time.

04:50 20      Q.  Do you recall the PSC delegating to anyone in

04:50 21  particular the responsibility to post on the PSC's

04:50 22  Instragram in the few days before April 24, 2024?

04:50 23      A.  Like I said, I don't remember whose job it was

04:50 24  because there's so many posts that go out.

04:50 25      Q.  Okay.  Are you familiar with someone by the name

                                                              58

04:50  1  of Ward Deeb, W-A-R-D, D-E-E-B?

04:50  2      A.  I am very minimally familiar with that name.

04:50  3      Q.  All right.  Do you recall having any

04:50  4  conversations with Ward Deeb about the event on

04:50  5  April 24th?

04:50  6      A.  I don't believe so.

04:50  7      Q.  Okay.  Are you familiar with someone named Jake

04:50  8  Holtzman?

04:50  9      A.  Yes.

04:51 10    Q.  How are you familiar with that person?

04:51 11    A.  I believe he was in another organization called

04:51 12  SDS.  I don't know if he had a specific role in that

04:51 13  organization or if it was a general membership.

04:51 14    Q.  Do you recall communicating with Mr. Holtzman

04:51 15  about the event on April 24th?

04:51 16    A.  Not specifically.

04:51 17    Q.  What about vaguely?

04:51 18        MR. HEALEY:  Object to the form.

04:51 19        THE WITNESS:  It's not so much about

04:51 20  specifically or vaguely.  It's just that -- I know you

04:51 21  must be frustrated, but I don't remember who I was.

04:51 22    Q.  (BY MR. JOZWIAK)  Yeah.  I mean, this is -- I

04:51 23  don't mean to interrupt you.  I apologize for that.  But

04:51 24  if you don't remember something, like I am perfectly fine

04:52 25  with you saying you don't remember.  Like, if that's your

59

04:52 1  testimony and it's truthful, please say that.  You know, I

04:52 2  am just trying to exhaust your memory about who you

04:52 3  remember speaking with about the April 24th event.  Fair?

04:52 4    A.  Yes.

04:52 5    Q.  Okay.  All right.  What about Hasti Rostami?  Do

04:52 6  you recall speaking with Hasti Rostami about the event on

04:52 7  April 24th?

04:52  8      A.  I don't think that name is familiar.

04:52  9      Q.  Okay.  Are you familiar with someone named

04:52 10  Sameeha Rizvi?

04:52 11      A.  Yes.

04:52 12      Q.  Okay.  How are you familiar with Sameeha Rizvi?

04:52 13      A.  I know that I know her from attending a couple of

04:52 14  events.  I don't know what events exactly, but just in the

04:52 15  past.

04:52 16          She was also just largely active as a

04:53 17  student and so she was in many different organizations, I

04:53 18  believe.  I don't know --

04:53 19      Q.  Do you recall speaking with Sameeha Rizvi about

04:53 20  the April 24th event?

04:53 21      A.  I don't remember.

04:53 22      Q.  Okay.  Are you familiar with Elias Nasser?

04:53 23      A.  I'm not sure.  I don't recognize the last name.

04:53 24      Q.  N-A-S-S-E-R?

04:53 25      A.  Yeah.  I'm still not sure.

                                                              60


04:53  1      Q.  Okay.  Are you familiar with someone named Maher

04:53  2  Naofal, M-A-H-E-R, N-A-O-F-A-L?

04:53  3      A.  Yes, I'm familiar.

04:53  4      Q.  How are you familiar with Maher Naofal?

04:54  5      A.  He was also a part of PSC on this.

04:54 6    Q.  Was he a member of the steering committee?

04:54 7    A.  Oh, yes, at this time, yes.

04:54 8    Q.  Okay.  Do you recall communicating with him about

04:54 9  the April 24th event?

04:54 10    A.  So not specifically with him, but he was part of

04:54 11  conversations likely leading up to that event.

04:54 12    Q.  All right.  Did those conversations take place in

04:54 13  person or through a messaging platform of any kind?

04:54 14    A.  Most likely in person or through online meeting.

04:54 15    Q.  So both or one or the other or neither?  Sorry.

04:54 16              MR. HEALEY:  Object to the form.

04:54 17              THE WITNESS:  So I don't know.  There could

04:54 18  have been multiple meetings leading up to the 24th.

04:54 19  That's a little bit of a vague timeline.

04:55 20    Q.  (BY MR. JOZWIAK)  All right.  Do you remember any

04:55 21  of the meetings?

04:55 22    A.  Not much of them, no.

04:55 23    Q.  Do you remember anything about them?

04:55 24    A.  So, like, I remember that there were meetings.  I

04:55 25  don't remember what happened from beginning to end, I

                                                              61

04:55 1  don't remember where they were, I don't remember what days

04:55 2  they were, what times.

04:55 3    Q.  Okay.  I don't want to know about, like, dates,

04:55 4    times, anything like that.  What do you recall about those

04:55 5    conversations leading up to April 24th?

04:55 6        A.  Yes.  So like I said earlier, those meetings were

04:55 7    likely about logistics, talking about how we would collect

04:55 8    enough resources to host an event.  Resources, I mean, as

04:55 9    in, like, educational resources.  Or how we would like our

04:56 10   event to look like for the general public.  If we would,

04:56 11   you know, have a certain program in place, essentially.

04:56 12       Q.  Okay.  Do you recall any specific conversations

04:56 13   at all about the planning of the April 24, 2024 event?

04:56 14       A.  All I remember is essentially what I just

04:56 15   explained; that the conversations we had were about

04:56 16   programming, hosting, availability, logistics, things like

04:56 17   that.

04:56 18       Q.  All right.  So you mentioned logistics,

04:56 19   collecting educational resources, and what the event might

04:56 20   like like for the general public.

04:57 21              It's fair to say that you don't have any

04:57 22   specific memories of those conversations, right.  They

04:57 23   were just about you know conversations happened and they

04:57 24   were about those general topics?

04:57 25              MR. HEALEY:  Object to the form.

62

04:57 1               THE WITNESS:  So I guess so because --

04:57 2    because of a memory issue.  I don't want to say that I

04:57 3    remembered something very specific if, you know -- if

04:57 4    that's not how it went.  I just know that it was topics of

04:57 5    programming, logistics.

04:57 6        Q.  (BY MR. JOZWIAK)  Do you recall having any

04:57 7    conversations about the April 24 event with Ammer Qaddumi?

04:57 8        A.  So similar to Maher, he would have been part of

04:57 9    conversations as PSC steering.  I don't remember if there

04:58 10   was any reason for me to be messaging him or talking to

04:58 11   him specifically.  If there were many meetings he should

04:58 12   have been in those meetings.

04:58 13       Q.  Okay.  What about Rawan Channaa, R-A-W-A-N,

04:58 14   C-H-A-N-N-A-A.  Are you familiar with that person?

04:58 15       A.  Yes, I'm familiar.  She was also in PSC with us.

04:58 16   She was at that time I believe part of steering as well.

04:58 17       Q.  Okay.  And no other specific memories of

04:58 18   conversations with radio want other than what you've

04:58 19   already discussed, right?

04:58 20                 MR. HEALEY:  Object to the form.

04:58 21                 THE WITNESS:  Yes, I don't remember anything

04:58 22   aside from the fact that she would have been part of

04:58 23   meetings.  I'm not sure if she was or was not.  That also

04:58 24   goes with the others.  I don't know exactly the attendance

04:58 25   of each meeting, right.  So my expectation though is if we

04:59  1   were in conversation it would be during these meetings.

04:59  2        Q.  (BY MR. JOZWIAK)  How about Haya Saidi?

04:59  3        A.  Same for her, I am familiar as well.

04:59  4        Q.  Okay.  Do you recall any specific conversations

04:59  5   with Haya Saidi about the event on April 24th?

04:59  6        A.  Nothing specifically with her outside of her

04:59  7   being part of those conversations in those meetings.

04:59  8        Q.  Okay.  What about Raneem Mahrouq?

04:59  9        A.  The same goes for her.

04:59 10        Q.  No specific memories of any conversations about

04:59 11   the April 24th event?

04:59 12        A.  Not specifically.  What I remember is that she

04:59 13   was also part of conversations that we've had during

04:59 14   larger conversations, yes.

04:59 15        Q.  Okay.  What about Mohammed Zakzok?

04:59 16        A.  Same applies for him.  We tried to limit all

04:59 17   these conversations to happen all together so there's no

05:00 18   confusion.

05:00 19        Q.  What do you mean by that?

05:00 20        A.  I meant to kind of summarize it.  The reason I

05:00 21   don't have specific memories of these individuals is

05:00 22   because for consistency we would like the meet and have

05:00 23   these conversations.  And so for all of these people that

05:00 24   you're listing I remember that we would have these

05:00 25  conversations in meetings and not individually.

64

05:00 1      Q.  Okay.  Fair enough.

05:00 2           Did the Dean of students office ever reach

05:00 3  out to you and cancel the April 24 event in advance?

05:00 4      A.  So the Dean of students reached out to me the

05:00 5  night before the 24th.  I believe like at night in the

05:00 6  evening.  And I did not see it until the morning of the

05:01 7  24th.  Yeah, or wait until you ask further questions.

05:01 8      Q.  I appreciate that.  Do you recall responding to

05:01 9  the Dean of students office via e-mail on the evening of

05:01 10 April 23rd?

05:01 11     A.  Oh, no.  So I saw that e-mail the morning of the

05:01 12 24th.  I believe I responded to it then.

05:01 13     Q.  Okay.  Okay.  Can you see my screen?

05:01 14     A.  Yes, I can.

05:01 15     Q.  Does this look like the cancel lakes letter that

05:01 16 you received from the Dean of students office?  I can

05:01 17 scroll through it?

05:02 18     A.  Can you scroll back up a little bit.  Yes, so I

05:02 19 believe this is the P the if they sent, not the e-mail

05:02 20 itself, yeah.

05:02 21     Q.  Yeah, correct.  This is a letter?

05:02 22     A.  Yes.

05:02 23    Q.  That they sent you.  Do you recall receiving this

05:02 24    letter?

05:02 25    A.  Yes, I do.

65

05:02 1    Q.  Do you see that it's addressed to home say Jenna

05:02 2    at G mail dot come?

05:02 3    A.  Yes.

05:02 4    Q.  Why didn't you produce this document in response

05:02 5    to the subpoena you received on October 7th?

05:02 6    A.  Yeah.  So under the criteria that we objected on,

05:02 7    this was something that was -- that you could have gotten

05:02 8    from Ammer and I did not need to offer.  Again, if that is

05:03 9    not what you would have preferred I apologize.

05:03 10    Q.  Okay.  I appreciate that.  Do you recall looking

05:03 11    to see whether you had any e-mails regarding the

05:03 12    April 24th protest when you -- after you received the

05:03 13    subpoena?

05:03 14    A.  I don't remember if I looked for this e-mail

05:03 15    because I don't usually use my e-mail for things regarding

05:03 16    PSC, I try not to.

05:03 17    Q.  Why do you try not to?

05:03 18    A.  Just because it's -- it would just kind of, like,

05:03 19    clutter my personal.

05:03 20    Q.  Okay.  Apologize, miss Janalyn, I think we're on

05:04 21    Exhibit 4.  This is the Bates number U the Austin 000833?

05:04 22                (Exhibit No. 4 was marked.)

05:04 23    Q.  (BY MR. JOZWIAK)  After you received this

05:04 24    cancellation letter, did you inform anyone else on the PSC

05:04 25    about it?

05:04  1    A.  Yes, I believe the morning of when I had

05:04  2    responded to the e-mail I had also of course let everybody

05:04  3    else know that I received it.

05:04  4    Q.  How did you let everyone else know that you

05:04  5    received it?

05:04  6    A.  I could have messaged them.  I saw them in the

05:04  7    morning, though.  It might have been in person

05:05  8    conversation as well.  I don't entirely recall.

05:05  9    Q.  Okay.  Did you talk with Ammer Qaddumi about this

05:05 10    letter?

05:05 11    A.  I also don't recall if I had spoke with him

05:05 12    directly about it.

05:05 13    Q.  Did the PSC host the event on April 24th anyway

05:05 14    despite this cancellation letter?

05:05 15                MR. HEALEY:  Object to the form wilt witness

05:05 16    so we did attempt to host the event, yes.

05:05 17    Q.  (BY MR. JOZWIAK)  Okay.  And that included Ammer

05:05 18    Qaddumi?

05:05 19                    MR. HEALEY:  Object to the form.

05:06 20                    THE WITNESS:  I mean, I believe that he was

05:06 21    there, right, so.

05:06 22        Q.  (BY MR. JOZWIAK)  So Mr. Qaddumi did proceed with

05:06 23    the event on April 24th?

05:06 24        A.  He did attend, yes.

05:06 25        Q.  Okay.  And you informed Mr. Qaddumi about this

                                                               67


05:06  1    letter on the morning of the 24th, right?

05:06  2        A.  Sorry.  What about this letter?  I did not catch

05:06  3    that.

05:06  4        Q.  You informed Mr. Qaddumi about this letter on the

05:06  5    morning of April 24th, right?

05:06  6        A.  One second.  I think I'm having audio sorry about

05:06  7    that.  Could you ask the question again.

05:06  8        Q.  No worries.

05:06  9                    You informed Mr. Qaddumi about this letter

05:06 10    on the morning of April 24th, right?

05:07 11        A.  A, so I believe that if I communicated it to PSC

05:07 12    he would have been part of that.  I don't know if I

05:07 13    specifically, you know, singled him out and talked to him

05:07 14    individually.  I don't think so.

05:07 15        Q.  Okay.  Fair enough.  Did you and the PSC begin

05:07 16    the event anyway?

05:07 17                    MR. HEALEY:  Object to the form.

05:07 18                    THE WITNESS:  Yes.  So we attempted to hold

05:07 19   the event.

05:07 20        Q.  (BY MR. JOZWIAK)  Okay.  Do you recall speaking

05:07 21   with officials from UT on Gregory plaza on April 24th?

05:07 22        A.  I believe a couple of faculty.  I don't know who

05:07 23   they were had tried to approach some of us.  Whenever

05:07 24   somebody had approached me, I -- they weren't offering

05:08 25   much information.  I believe I tried to ask them about the

                                                                    68


05:08  1   cancellation and they were not entirely knowledgeable

05:08  2   about it.

05:08  3        Q.  But they told you that you couldn't host the

05:08  4   event, right?

05:08  5        A.  So I don't remember what they told me.  But I

05:08  6   tried to take the opportunity to ask on the basis of the

05:08  7   cancellation and they said that they did not know about

05:08  8   it.

05:08  9        Q.  I'm showing you what's going to be Exhibit 5.

05:08 10   It's a declaration that you submitted in a lawsuit in the

05:08 11   case number 24 C V 523.  Do you recognize this document?

05:08 12                    MR. HEALEY:  Sorry to interrupt.  Daniel,

05:09 13   have you produced this to us.

05:09 14                    MR. JOZWIAK:  No.  It's on Pacer.  You can

05:09 15   find it there.

05:09 16            THE WITNESS:  I believe this is -- yes, this

05:09 17   looks familiar.

05:09 18        Q.  (BY MR. JOZWIAK)  Okay.  And this is your

05:09 19   signature here at the bottom right?

05:09 20        A.  Yes, that is me.

05:09 21        Q.  Okay.  Take a moment to read through Paragraphs B

05:09 22   1 and 2.  And just let memo when you're done.  I'm

05:10 23   finished?

05:10 24        Q.  Okay.  Do you see the first sentence of

05:10 25   Paragraph 2 in section B where you wrote (Reading:)  The

                                                              69

05:10  1   next day as we began the event anyway, officials

05:10  2   approached UT PSD and told us we could not hold the event.

05:10  3            Did I read that right?

05:10  4        A.  Yes.

05:10  5        Q.  Okay.  So UT officials approached the PSC on the

05:10  6   morning of April 24th and told you that you could not hold

05:10  7   the event, right?

05:10  8        A.  That's what I said, yes.  But to be more

05:10  9   specific, the reason I'm saying that I don't know that

05:10 10   they told me that is because they could have told other

05:10 11   members of PSC which is what I'm stating here.

05:10 12        Q.  What do you mean?  I'm confused?

05:10 13    A.  So there were several people, it was a large

05:10 14  crowd.  There were several different I guess members of

05:10 15  faculty that talked to different people.  So I don't know

05:11 16  what -- I don't remember what they told me exactly or I

05:11 17  don't know what they told others.  But when I tried to

05:11 18  address this cancellation notice, the person that I was

05:11 19  speaking with told me that they did not understand the

05:11 20  basis of the cancellation -- excuse me.  They told me that

05:11 21  they did not know what I was referring to.

05:11 22    Q.  Who told you that?

05:11 23    A.  So I don't know their name.  But it was one of

05:11 24  the faculty that approached me that day.

05:11 25    Q.  Okay.  But in your declaration here you wrote

70

05:11 1  that officials approached UT P S D and told you that you

05:11 2  couldn't host the event, right?

05:11 3    A.  Told us as PSC, not necessarily me specifically.

05:11 4    Q.  Was Ammer Qaddumi with you when you were speaking

05:11 5  with UT officials?

05:11 6    A.  I -- we went like next to each other the whole

05:12 7  time.  I don't know where he was.

05:12 8    Q.  The UT officials told you that the event was

05:12 9  cancelled regardless of your explanation that you gave

05:12 10  them regarding the mass policy, right?

05:12 11          MR. HEALEY:  Objection.

05:12 12      A.  They told me it was cancelled before I could

05:12 13  respond to the mask policy.  They didn't respond after

05:12 14  that.

05:12 15      Q.  So in the second sentence you write I told the

05:12 16  officials and I responded to the officials stating that

05:12 17  wer not violating any mask policy or having an encampment.

05:12 18  The official directing us to stop did not know what

05:12 19  policies I with us talking about and stated the event was

05:12 20  canceled anyway.

05:12 21          Are those two even senses true?

05:12 22      A.  Yes.  Sorry to interrupt.  But do we know how

05:13 23  long this takes just so I know I'm in a quiet environment.

05:13 24          MR. JOZWIAK:  I have probably -- I've got

05:13 25  one page of my outline left.  It is single space but I

                                                            71


05:13  1  will try to move as fast as I can.  I man in 20 to 25 more

05:13  2  minutes of questions from me.

05:13  3          MR. HEALEY:  Okay.

05:13  4          MR. HEALEY:  And sorry.  I'll have some

05:13  5  questions after that.  I was just trying to give you kind

05:13  6  of an estimate.  So some overlap so I'm not going to have

05:14  7  to do -- I mean, I don't think my question should take

05:14  8  longer than 45 or 50 minutes.  Okay.  In just a few

05:14  9  moments I think I might need to take a bit of a break if

05:14 10  that's okay just so I can re -- like address my set up

05:14 11  because I'm in my house and my parents are likely to come

05:14 12  in.  So would it be okay if at that time I would leave the

05:14 13  zoom call and then rejoin it.

05:14 14           MR. HEALEY:  Sure.  How long of a break are

05:14 15  we talking.

05:14 16           MR. JOZWIAK:  Five, ten minutes, probably

05:14 17  nothing greater than that.

05:14 18           MR. JOZWIAK:  Yeah.  That's fine.  Do you

05:14 19  know when they're expected.  Probably around in the next

05:14 20  15 minutes so if you'd prefer to keep questioning me that

05:14 21  would be okay for now.

05:15 22     Q.  (BY MR. JOZWIAK)  Okay.  I'll try to move quickly

05:15 23  and just let us know if we need to take a break I'm happy

05:15 24  with stopping.  Okay?

05:16 25           Ms. Homsi, do you see my screen?

                                                              72

05:16  1     A.  I do.

05:16  2     Q.  And this will be Exhibit -- this will be

05:16  3  Exhibit 5 I think we're on?

05:16  4           THE REPORTER:  No, it's 6.

05:16  5     Q.  (BY MR. JOZWIAK)  6.  Thank you?

05:16  6           (Exhibit No. 6 was marked.)

05:16 7     Q.  Has the Bates number UT Austin 124921.  Are you

05:16 8  familiar with this Instragram post at the top?

05:16 9     A.  Yes.

05:16 10     Q.  Do you know who posted it?

05:16 11     A.  I don't remember actually.  I don't know if it

05:16 12  was multiple person effort or not either.  I don't believe

05:16 13  it was me.

05:16 14     Q.  Do you have any idea who it was?

05:16 15     A.  I don't remember.

05:17 16     Q.  Okay.  On the post it says we will be occupying

05:17 17  the space throughout the entire day so be sure to bring

05:17 18  blankets food and water face masks and lots of energy.  Do

05:17 19  you see that?

05:17 20     A.  Yes.

05:17 21     Q.  Okay.  Why did the PSC encourage people to bring

05:17 22  face masks?

05:17 23     A.  Yeah.  So like I tried telling the UT

05:17 24  administration, we tried to bring face masks to large

05:17 25  gatherings because since -- since reconvening as an

73

05:17 1  organization after COVID, we've been trying to be as

05:17 2  considered consider rate as possible and it happened

05:17 3  several people who have asked us in the past to, like,

05:17 4  mandate face masks.  And because of the nature of crowds

05:17 5  we've just stuck to that.

05:17 6      Q.  Who's asked you to mandate face masks?

05:18 7      A.  Just random individuals in the past.  I don't

05:18 8  remember who or nor did I know help.

05:18 9      Q.  Okay.  Are you familiar with how COVID is

05:18 10  transmitted?

05:18 11     A.  Yes.

05:18 12     Q.  Do you understand that COVID is rarely

05:18 13  transmitted outdoors?

05:18 14              MR. HEALEY:  Object to the form.

05:18 15     A.  I'm not a doctor.  I just know that despite being

05:18 16  indoors or outdoors that, you know, we would be -- we as

05:18 17  in anybody like people in general should be careful of

05:18 18  their proximity especially when talking.

05:18 19     Q.  Did PSC always host events where folks wore face

05:18 20  masks when they hosted events indoors?

05:18 21     A.  We tried to and a lot of times we bring face

05:18 22  masks and encourage them.  But we never forced anybody to

05:19 23  nor did we have, like, 100 percent, like -- sorry I'm

05:19 24  forgetting the word.  But not everybody always wanted to

05:19 25  either even if we did encourage it.

                                                              74


05:19 1      Q.  What was the goal of the April 24th protest?

05:19 2      A.  That's a good question.  There were several

05:19 3    different goals.  I don't remember what we explicitly

05:19 4    stated in our meetings but what I can remember from around

05:19 5    that time in the general movement it was mostly about

05:19 6    advocacy for Palestine and especially to call attention to

05:19 7    the complicity of universities in funding or excuse me,

05:19 8    investing in weapons manufacturers.

05:20 9         Q.  Okay.  For the April 24th event had the PSC

05:20 10   previously been reprimanded by the university for not

05:20 11   following university rules?

05:20 12                  MR. HEALEY:  Object to the form.

05:20 13                  THE WITNESS:  Define reprimanded.

05:20 14        Q.  (BY MR. JOZWIAK)  Did it ever receive a similar

05:20 15   letter like the one you received on April 23rd?

05:20 16                  MR. HEALEY:  Objection, form.

05:20 17                  THE WITNESS:  I don't believe we ever

05:20 18   received a cancellation notice.  I just know once I

05:20 19   believed -- now that you mention it I received an e-mail

05:20 20   along time ago during one of our protests on campus.  And

05:20 21   it was stated that we had been -- like a complaint was

05:21 22   filed against us by another organization, but that UT

05:21 23   concluded that we did nothing to screw late rules.  Yet,

05:21 24   they still give us the warning, but I don't think it held

05:21 25   any consequences.

75

05:21 1     Q.  (BY MR. JOZWIAK)  All right.  Can you see my

05:21 2     screen?

05:21 3         A.  Not yet.  Okay.  I can now.

05:21 4         Q.  This is Exhibit 7?

05:21 5             (Exhibit No. 7 was marked.)

05:21 6         Q.  UT Austin 000855.  This is a letter to you from

05:21 7     doctor Aaron Voyles and me Melissa Wommack of the office

05:21 8     of the Dean of students at UT.  And the letter states that

05:21 9     the office of the Dean of students received information

05:22 10    regarding a possible violation of the following

05:22 11    institutional rules by the PSC sites the two rules.  It

05:22 12    states after reviewing the documentation an conducting a

05:22 13    preliminary investigation our office has determined that

05:22 14    the organization will not be found in violation of the

05:22 15    institutional rules at this time?

05:22 16            Do you see that.

05:22 17        A.  Yes, I do.

05:22 18        Q.  Do you recall why the PSC received this letter?

05:22 19            MR. HEALEY:  Object to the form.

05:22 20            THE WITNESS:  So if you're asking, like, if

05:22 21    we had done anything specific to receive it, I mean, I

05:22 22    don't think we did anything to receive it at all.  But the

05:22 23    reasons would be stated here.

05:22 24        Q.  (BY MR. JOZWIAK)  Further down it says the office

05:22 25    of Dean of staff is available to assist your organization

05:22  1    in planning future events or demonstrations an provide

05:22  2    support to ensure your event can take place successfully

05:22  3    without causing a disruption to authorized activities.  Do

05:23  4    you see that?

05:23  5         A.  Yes.

05:23  6         Q.  This letter is dated April 15, 2024, right?

05:23  7         A.  Yes.

05:23  8         Q.  And it's nine days before the event on

05:23  9    April 24th?

05:23 10         A.  Yes.

05:23 11         Q.  Okay.  Did anyone from the PSC reach out to the

05:23 12    Dean of student's office for assistance in organizing the

05:23 13    April 24th event?

05:23 14         A.  No, we did not need to.

05:23 15         Q.  Why?

05:23 16         A.  Because no organization needs to ask Dean of

05:23 17    students to hold the organizational events but the Dean of

05:23 18    students was offering its assistance given what -- given

05:23 19    the complaint that had been filed against the PSC, right.

05:23 20              MR. HEALEY:  Object to the form.

05:23 21         A.  It was offing assistance.  But like you said,

05:23 22    that was under the guise of -- I mean, it was a complaint.

05:23 23    So it's not necessarily something that we need to take

05:23 24    into consideration anymore than any other organization

05:24 25    does.

77

05:24 1        Q. So the PSC didn't, right?

05:24 2        A.

05:24 3        Q. Objection?

05:24 4        A. It did not reach out.  Is that what you're

05:24 5    asking.

05:24 6        Q. It didn't take it into any further consideration,

05:24 7    right?

05:24 8        A. I don't know if we took it into consideration.

05:24 9    But what I'm stating is that we had no requirement to

05:24 10   reach out similarly to other organizations.

05:24 11       Q. This document was e-mailed to you?

05:24 12       A. Yes, this is my e-mail.

05:24 13       Q. Why didn't you produce this document in response

05:24 14   to subpoena?

05:24 15       A. So similarly to the other e-mail in falls under

05:24 16   also what I thought would be the category of things that

05:25 17   I -- things that would have been able to be retrieved from

05:25 18   Ammer and also I honestly forgot about it until you

05:25 19   mentioned it just now.  But yes.

05:25 20       Q. Would it surprise you to learn that Ammer never

05:25 21   had this document?

05:25 22                    MR. HEALEY:  Object to the form.

05:25 23                    THE WITNESS:  I'm not sure what Ammer had or

05:25 24  did not have.  I believe this was shared.  I don't know if

05:25 25  he kept it or wanted to submit it.

78

05:25 1       Q.  (BY MR. JOZWIAK)  How was it shared?

05:25 2       A.  Excuse me?

05:25 3       Q.  How was it shared?

05:25 4       A.  I don't remember if I had shown this to them in

05:25 5  person or spoke to them Oregon forwarded it or messaged

05:25 6  it, one of those.

05:25 7       Q.  So you either forwarded it, mess -- excuse me.

05:25 8  I'll rephrase that.

05:25 9                    You either forwarded it, you messaged it, or

05:26 10  you showed it to others in person; is that right?

05:26 11                   MR. HEALEY:  Object to the form.

05:26 12                   THE WITNESS:  Likely.  I'm not sure how.

05:26 13      Q.  (BY MR. JOZWIAK)  Did you check to see whether

05:26 14  you forwarded or messaged this to Ammer after you received

05:26 15  the subpoena?

05:26 16                   MR. HEALEY:  Object to the form.

05:26 17                   THE WITNESS:  So I don't think that I have

05:26 18  it still.  I'm actually not sure.  So -- and I would have

05:26 19  had to -- because this is not specific to the 24th or

05:26 20   Ammer's case, at least I had no impression that it was.

05:26 21   So this didn't appear to me.

05:26 22        Q.  (BY MR. JOZWIAK)  Well, it was sent to your

05:26 23   e-mail Homsi Jenna at G mail dot come, right?

05:26 24        A.  Right.

05:26 25        Q.  And you still have access to that e-mail account,

                                                            79

05:26  1   right?

05:26  2        A.  Right.

05:27  3        Q.  So did you check to see whether you had this

05:27  4   document or not when looking at the subpoena?

05:27  5        A.  So I don't think that I thought to check about it

05:27  6   because it was not relevant to the 24th.  This was

05:27  7   something that had happened before the 24th and I did

05:27  8   not -- it did not stick with me, my memory nor do I even

05:27  9   know if I kept it like I said.  I could have deleted it.

05:27 10   I don't know because I didn't use it further.

05:27 11        Q.  Dead you tack any photos or videos of the event

05:27 12   on April 24?

05:27 13        A.  I did.  I took -- sorry about mentioning this so

05:28 14   often.  I do remember specifically having a photo of what

05:28 15   the horses left on the walkways on campus and I didn't

05:28 16   submit that because I thought that it was not relevant,

05:28 17   yeah.  I just took it because I remember being frustrated

05:28 18    about the way that our campus was left.

05:28 19        Q.  Do you have any other photos or videos from the

05:28 20    24th other than that one?

05:28 21        A.  I'm not entirely sure.  It could have been of

05:28 22    similar -- similar nature if I have any others or just

05:28 23    like videos of just the chaos.

05:28 24        Q.  Did you check to see if you did or not after

05:29 25    receiving the subpoena?

                                                                    80


05:29  1        A.  Yes.  So I believe the reason I know I have like

05:29  2    the irrelevant videos is because I checked.  But, you

05:29  3    know, similar to everything else, I didn't believe it was

05:29  4    relevant nor applied to this case.

05:29  5        Q.  Do you recall receiving an e-mail from me asking

05:29  6    whether you had documents responsive to the subpoena?

05:29  7        A.  That was after I objected, correct.

05:29  8        A.  Correct.

05:29  9        Q.  Yes, I remember that?

05:29 10        Q.  Okay.  Do you recall me offering my assistance to

05:29 11    discuss any concerns regarding any objections you had to

05:30 12    the subpoena?

05:30 13        A.  I don't remember what you said in the e-mail, but

05:30 14    if you -- if that was part of it, then I remembered the

05:30 15    e-mail.

05:30 16     Q.  I'll represent to you that I offered to discuss

05:30 17  concerns regarding scope, burden, or confidentiality to

05:30 18  the subpoena.  Why didn't you take me up on that offer?

05:30 19     A.  So when you had e-mailed after I had already sent

05:30 20  in the objections, I was honestly confused why you were

05:30 21  asking me again about the request for evidence, the

05:30 22  evidence in general.  So I just restated that I already

05:30 23  sent to you my response.  And I thought maybe it could

05:30 24  have been a -- like something that you usually do just to

05:30 25  make sure that you have in writing again that I said,

                                                            81


05:31 1   like, my answer.  I didn't know if there was any specific

05:31 2   reason why you were responding repetitively.

05:31 3      Q.  Okay.  Did you after receiving the subpoena did

05:31 4   you look at your phone to see if you had any messages from

05:31 5   April 24th?

05:31 6      A.  So again, when I had looked at my phone I briefly

05:31 7   looked to see if there was anything to find and when I

05:31 8   realized that it was overly burdensome because those

05:31 9   messages are two years old, I thought about how I have the

05:31 10  right to object.  And so for that reason I did so.

05:31 11     Q.  Is that your same response if I asked you if you

05:32 12  look at your phone for messages from April 23, 2024?

05:32 13     A.  Yeah, I don't see why it would be different.

05:32 14     Q.  Okay.  Did you testify at Ammer's disciplinary

05:32 15 hearing?

05:32 16     A.  The student hearing.

05:32 17     Q.  Yes?

05:32 18     A.  Yes, I did.

05:32 19     Q.  Did you communicate with Ammer about the student

05:32 20 disciplinary hearing?

05:32 21     A.  I believe he told me about it in person.  If

05:32 22 there was any -- oh, I also believe that he had a group

05:32 23 chat of just people that he wanted to make aware of the

05:32 24 situation and so that we could know, like, the logistics

05:32 25 of when it was.  But I did not submit that because, again,

82

05:32  1 same issue as the other e-mail documents where that was

05:33  2 something that would have been -- I thought would have

05:33  3 been retrieved from him.

05:33  4     Q.  Would it surprise you to know that it was not

05:33  5 retrieved from him J object to the form?

05:33  6             THE WITNESS:  That's not my concern, I

05:33  7 guess.  I thought.

05:33  8     Q.  (BY MR. JOZWIAK)  Yeah, it's mine.

05:33  9             Are you familiar with individuals wearing

05:33 10 yellow vest at the April 24th event?

05:33 11     A.  Yes.  A lot of times during rallies or protest

05:33 12    there will be people with yellow vests.

05:33 13        Q.  Why were they there?

05:33 14        A.  So typically people who are Marshalls wear yellow

05:34 15    vests just so that they can -- I believe somebody is --

05:34 16    let me finance anybody this question really quickly and

05:34 17    then I have to take a break if you don't mind.

05:34 18        Q.  I'll re-ask the question at the owe when we come

05:34 19    back if that's okay?

05:34 20        A.  Okay that also works.  Again, I can leave the

05:34 21    zoom an rejoin, right.

05:34 22        Q.  Yeah, that's fine?

05:34 23        A.  Okay.  Thank you guys.

05:34 24        Q.  All right.  Let's go off the record.

05:43 25            (Brief recess.)

                                                                83


05:43 1        Q.  (BY MR. JOZWIAK)  Did you have any conversations

05:43 2    with anyone on our break?

05:43 3        A.  Oh, I'm sorry.  I don't know if one of us froze.

05:43 4    Are you asking if I've had any conversations?

05:44 5        Q.  Other than family members, did you have any

05:44 6    conversations with anyone on your break?

05:44 7        A.  No.  And also I'm sorry my camera is a little bit

05:44 8    fun hierarchy right now.  My computer is very old.

05:44 9        Q.  All good.  I was realized I was sitting in the

05:44 10    dark and turned a light on, too?

05:44 11        Q.  Before we broke we were talking about individuals

05:44 12    wearing yellow vest on April 24th.  Do you recall that?

05:44 13        A.  Oh, yes.

05:44 14        Q.  Okay.  Who at the PSC -- do you know what

05:44 15    organization those individuals wearing those yellow vest

05:44 16    belong to?

05:44 17        A.  No.  But they typically belong to different

05:44 18    organizations or no particular organization at all just

05:44 19    depends on who is available an willing to help.

05:44 20        Q.  How does the PSC solicit volunteers for Marshalls

05:45 21    at its events?

05:45 22                MR. HEALEY:  Objection.

05:45 23                THE WITNESS:  A lot of it is from just

05:45 24    knowing.

05:45 25                MR. HEALEY:  You're frozen, I think.

                                                            84


05:45 1                THE REPORTER:  Frozen.

05:45 2        A.  But whether it's is it me.

05:45 3                MR. JOZWIAK:  Yeah.  It was you this time.

05:45 4                MR. HEALEY:  I think we lost a little bit of

05:45 5    what you said there.

05:45 6        A.  I'm sorry about that.  Let memo if it happens

05:45 7    again and I have to move to a different location.

05:45  8     Q.  Will do?

05:45  9     A.  I was saying that it can either be that we ask

05:45 10  for volunteers in meetings or people will just volunteer

05:45 11  and approach us.  There's not really one way to go about

05:45 12  it.

05:45 13     Q.  Did the PSC reach out the anyone for assistance

05:46 14  for the event it hosted on April 24th?

05:46 15     A.  I believe it was just like other organizations

05:46 16  asking if they'd be able to attend.  I don't know if we

05:46 17  asked for any specific roles aside from, like, those

05:46 18  individuals we could have assigned for marshals.

05:46 19     Q.  What other organizations did the PSC reach out

05:46 20  to?

05:46 21     A.  The only one that I can really remember is you

05:46 22  mentioned a Jake from S D S.  I think has was probably an

05:46 23  organization that had multiple people who were wanting to

05:47 24  help.

05:47 25     Q.  Sorry what's S D S?

85

05:47  1     A.  They are called students for democratic society.

05:47  2     Q.  And did you reach out the the students for

05:47  3  democratic society or did anyone that you're aware of

05:47  4  reach out the the is the is?

05:47  5     A.  I don't know if anybody in particular did, like I

05:47  6   don't know who in particular did or if it was a matter of

05:47  7   S D S approaching us and volunteering.

05:47  8       Q.  Did you reach out on behalf of the PSC to any

05:47  9   other outside organizations for assistance with the

05:47 10   April 24th event?

05:47 11       A.  Not that I remember.

05:47 12       Q.  Did the PSC work with the Austin chapter of the

05:47 13   pal type movement or PYM?

05:47 14       A.  At the time they were not a chapter.

05:48 15       Q.  So if we were in communication with anybody that

05:48 16   was associated with PYM it probably was on a more personal

05:48 17   level so not about the Event on April 24th?

05:48 18       A.  You don't remember.  If there was anybody in

05:48 19   communication with PYM it would be not with PYM it would

05:48 20   be like close colleagues so I can't say for sure.

05:48 21       Q.  It wasn't an organization to organization

05:48 22   outreach it was more organic through people's social note

05:48 23   works?

05:48 24       A.  I don't know who reached out to who.

05:48 25       Q.  Did you speak with anyone at the NSJP about the

                                                                    86


05:48  1   April 24th event?

05:48  2       A.  I don't believe so.  I know you mentioned Volab.

05:49  3   If dhe was part of N S J at the time like she attended

05:49  4    that day so I was speaking to her then.  But she was more

05:49  5    of the like attendee.

05:49  6        Q.  Okay.  Anyone other than Nora Volab?

05:49  7        A.  I don't believe so.  I don't recall.

05:49  8        Q.  Okay.  Did you ever have any communication with

05:49  9    any other local chapters of the S J P or any individuals

05:49 10    affiliated with any local chapters of the S J P regarding

05:49 11    the April 24th event?

05:49 12            MR. HEALEY:  Object to the form.

05:49 13            THE WITNESS:  I don't recall that we needed

05:50 14    to or did.  And like other S J Ps in other cities, other

05:50 15    universities, excuse me.  Is that what you're asking?

05:50 16        Q.  (BY MR. JOZWIAK)  Yeah?

05:50 17        A.  Yeah.

05:50 18        Q.  Did you speak with them?

05:50 19        A.  I don't believe we did.

05:50 20        Q.  Go ahead.  Sorry?

05:50 21        A.  My bad as well.  I don't believe we did but I

05:50 22    don't recall at least if I was in communication, I don't

05:50 23    know if anyone else was.

05:50 24        Q.  Okay.  After the April 24th event you're still

05:50 25    able to host pro Palestenian talks and teachings at UT

87

05:50  1  Austin, right?

05:51 2      A.  What do you mean like by able?  Like did we

05:51 3  attempt to.  We did attempt to.

05:51 4      Q.  Were you able to?

05:51 5      A.  We were physically able to, yes, without getting

05:51 6  arrested.

05:51 7      Q.  Did you host a teach in in the few days after the

05:51 8  April 24th event?

05:51 9      A.  Did we?  I'm not sure.

05:51 10     Q.  Did you.  Not the PSC.  Did you?

05:51 11     A.  Oh, I don't host my own teach ins.  I don't know.

05:51 12  Oh, are you speaking about the events on the launder?

05:51 13     Q.  What do you remember about the events on the

05:51 14  launder?

05:51 15            MR. HEALEY:  Form.

05:51 16            THE WITNESS:  So the reason why I ask that

05:52 17  is because I don't do teach ins that are not part of PSC.

05:52 18  I just know that to answer your question, there were

05:52 19  events after the April 24 protest that were in the style

05:52 20  of discussion and educational, yeah, discussion.

05:52 21     Q.  (BY MR. JOZWIAK)  And you were able to host those

05:52 22  events on UT's campus after April 24th, right?

05:52 23     A.  Able to as in it wasn't heavily suppressed an

05:52 24  arrested.  But we did have a large police presence an

05:52 25  drone presence and many counter -- like many instigators

05:52  1  that were harassing us and a lot of negative attention,

05:52  2  yes.

05:52  3       Q.  You still hosted events where you were able to

05:52  4  have a teach in and express your viewpoint, right?

05:53  5                 MR. HEALEY:  Object to form.

05:53  6                 THE WITNESS:  For the most part.  But the

05:53  7  reason why I said with much negative attention is because

05:53  8  a lot of that was interrupted.  So we did still with

05:53  9  confidence show up those days.

05:53  10      Q.  (BY MR. JOZWIAK)  Who interrupted those events?

05:53  11      A.  So we had -- I wasn't at all of them, but when I

05:53  12  was there there was a lot of non student -- non students

05:53  13  harassing us.  And there were also a lot of students

05:53  14  harassing us.  There were officers aside -- along side --

05:53  15  I believe it was Dean of students.  I would have assumed

05:53  16  it was Dean of students that were, like, on stand by that

05:54  17  would watch this happen unfortunately.  And most times I

05:54  18  don't believe they approached us in support.  I don't

05:54  19  believe they were cancelled any of those either, though.

05:54  20      Q.  What events were those that Dean of students

05:54  21  office staff just let -- let your event be disrupted by

05:54  22  other individuals?

05:54  23      A.  So I don't remember what they were called, but it

05:54  24  was -- there was, like, about a week of similar events

05:54 25  where we collected on the launder to do educational things

89

05:54 1  like like a presentation because we didn't have a screen

05:55 2  on Palestine or knowing your rights.  And there were a lot

05:55 3  of professors who would talk on historical -- like

05:55 4  historical examples of university open press and student

05:55 5  advocacy.

05:55 6      Q.  And so it's your testimony when those events were

05:55 7  interrupted the Dean of students office or UT officials

05:55 8  just stood by and didn't do anything?

05:55 9      A.  There were times when I was there, yes, there

05:55 10  were them and police officers were always, like, in

05:56 11  proximity.  They weren't speaking with us but they would

05:56 12  be watching and making sure that things go the way that

05:56 13  they like.  But there were instances, yes, where, like, we

05:56 14  were being harassed and they wouldn't intervene.

05:56 15      Q.  Did you file any reports about that?

05:56 16      A.  No, I don't think I had confidence to file

05:56 17  reports for the university that was putting us in danger.

05:56 18  So no.

05:56 19      Q.  Do you know which officials at the Dean of

05:56 20  students office just stood by and watched?

05:56 21      A.  No, I do not know.

05:56 22      Q.  Do you know what days this happened?

05:56 23     A.  I don't remember from the top of my head.  But I

05:56 24  believe that they would have been posted on our

05:56 25  Instragram.

90

05:56  1     Q.  Who would have posted it and the Instragram?

05:56  2     A.  Similar to all the other events, I don't remember

05:56  3  who posted what.

05:56  4     Q.  You mentioned a group chat with Ammer about his

05:57  5  disciplinary hearing.  Do you recall that?

05:57  6     A.  I recall that.

05:57  7     Q.  Did you look to see in response to the subpoena

05:57  8  whether you had that group chat or not?

05:57  9     A.  So I thought I had answered this.  It was similar

05:57 10  to the e-mails I believe I had not submitted.  I believed

05:57 11  that those were to be submitted or to be retrieved from

05:57 12  Ammer.  So I thought that that was not something that I

05:57 13  needed to be requested.

05:57 14     Q.  Understanding -- understand your objections.

05:57 15  We've talked about them.

05:57 16          But putting those aside, do you or do you

05:57 17  not have access to that group chat today?

05:58 18     A.  Oh, I don't know if I still have that group chat.

05:58 19  It's old an has been inactive since probably that day.  So

05:58 20  I don't know.

05:58 21     Q.  Did you look to see whether you had it after you

05:58 22  received the subpoena?

05:58 23     A.  I believe that was something I had seen.  But

05:58 24  like I said still did not submit because I thought it

05:58 25  would be retrieved from him.  I also actually I think that

91

05:58 1  if there was any other communications from that that I

05:58 2  would no longer have them.

05:58 3     Q.  So I mean -- clean out my message history?

05:58 4     Q.  I mean, to me it seems like there are three

05:58 5  possible scenarios here.  Either you have it, you don't

05:58 6  have it, or you don't know if you have it because you

05:59 7  haven't looked.  Which one does the group chat fall into?

05:59 8     A.  So that specific group chat is one that I know

05:59 9  that I that I looked for but did not think that it was

05:59 10  necessary for me to submit.

05:59 11     Q.  Okay.  Was that and I message group chat or?

05:59 12     A.  It's a good question.  I think it might have been

05:59 13  on Signal.  I am not entirely sure at the moment.

05:59 14     Q.  Okay.  My time that we agreed to given the court

06:00 15  reporter's constraints is up I'm going to pass the witness

06:00 16  to Mr. Healey?

06:00 17     Q.  (BY MR. HEALEY)  Thank you, Daniel.  Thank you

06:00 18  Ms. Homsi.  I'm going to try and keep within the 45

06:00 19   minutes here to the best of my ability.

06:00 20                    What do you do for a living, Ms. Homsi?

06:00 21        A.  I currently am applying for grad schools and for

06:00 22   jobs.  So I don't have a specific career right now.  After

06:00 23   I graduated from UT.

06:00 24        Q.  What kind of grad school?

06:00 25        A.  I am looking to pursue a master's in something

                                                                    92


06:00  1   see school by the related depending either counseling or

06:00  2   social work, depending on the school.

06:01  3        Q.  Nice.  No interest in pursueing the law?

06:01  4        A.  I did actually have interest for a little bit.

06:01  5   But that -- I think I got over that the past couple years,

06:01  6   no longer interested.

06:01  7        Q.  Do you have any legal training at all?

06:01  8        A.  No, I don't see why I would want to put myself

06:01  9   through that.

06:01 10        Q.  Fair enough.

06:01 11                    When you received UT Austin's subpoena for

06:01 12   documents that we looked at earlier, did you read the

06:01 13   whole subpoena?

06:01 14        A.  Yes.  I do know that there were some parts of it

06:01 15   like really fine prints that I was not understanding.  So

06:01 16   I can't confidently say that I read an understood all of

06:01 17    it.

06:01 18        Q.  Have you ever read Rule 45 of the federal rules

06:01 19    of civil procedure?

06:01 20        A.  I'm not sure.  Could you remind me what that is.

06:02 21        A.  I believe it was attached to the subpoena and

06:02 22    actually, Daniel, I don't know if it's possible for you to

06:02 23    e-mail the court reporter an myself the exhibits that are

06:02 24    live right now so that then I don't have to do due make

06:02 25    /T*EUF exhibits.  I can.  But it might be easiest just to

93

06:02 1    you know put them in the chat.  But for the time being,

06:02 2    it's the rule that's in the subpoena in the fine print,

06:02 3    one of them.  Did you read and understand the entire rule.

06:02 4        A.  I probably attempted to read it.

06:02 5        Q.  Okay.  Did you get any legal advice from anyone

06:02 6    on the difference between the right to object and the

06:02 7    obligation to produce documents?

06:03 8        A.  No.  I guess not because I -- yeah.  So I thought

06:03 9    that I had -- I thought that -- I guess those go hand in

06:03 10    hand where they're different.

06:03 11        Q.  Did you talk to a lawyer before trying do object

06:03 12    to the subpoena the try and understand what your rights

06:03 13    and obligations were?

06:03 14        A.  No more than like I didn't have a lawyer to

06:03 15    represent me.  Maybe I should have.  But my brother with

06:03 16    all his legal knowledge has nothing much to offer.  So I

06:03 17    don't -- I didn't want to burden him as well.

06:03 18        Q.  What is your brother's basis of legal knowledge?

06:03 19        A.  He is doing personal injury.

06:04 20        Q.  Okay.  Did he -- did he walk you through how to

06:04 21    respond to the subpoena line by line?

06:04 22        A.  No.

06:04 23        Q.  Did anyone?

06:04 24        A.  No.

06:04 25        Q.  Did Ryan H that you mentioned is that Ryan has

94

06:04  1    ma'am?

06:04  2        A.  Oh, yes, that is her last name.

06:04  3        Q.  Did she give you any legal advice?

06:04  4        A.  No.  She told us when we had conversations with

06:04  5    her she ultimately told us that it would be, like, up to

06:04  6    us, of course.  But that, you know, it would be a lot

06:04  7    of -- a lot of trouble, like, for us and if we felt that

06:04  8    there was something that we needed to share, right, that

06:04  9    it would be, you know, our right.  But at the end of the

06:05 10    day, anything -- we told her that, like, anything that we

06:05 11    have is, like, nothing unique from what acid already knows

06:05 12    an has because we were in the same organization, right.

06:05 13    So I don't personally have communications and what not

06:05 14    that have -- to offer any unique evidence.

06:05 15         Q.  What did Reannan say the significance of that

06:05 16    was?

06:05 17         A.  What did she say the significance of what?

06:05 18    Sorry.

06:05 19         Q.  The significance of what you just said about, you

06:05 20    know T documents being in shared possession and stuff,

06:05 21    what did she say that mattered?

06:05 22         A.  Well, because if -- I don't know if she -- if she

06:05 23    really went into detail or if I even understood.  But I

06:06 24    guess it was the fact that, you know, if evidence is

06:06 25    needed for the case, then it would be, like -- I guess

                                                                    95


06:06  1    what I'm saying is if I had any specific evidence that

06:06  2    would prevent -- like hinder the case or add to, then I,

06:06  3    you know, it's, like, the reason why I'm being subpoenaed.

06:06  4    But if the evidence is already there, then I would have no

06:06  5    need to submit something.  I would not be needed for that.

06:06  6         Q.  So did you think that if the evidence could come

06:06  7    from somewhere else then it didn't have to come from you?

06:06  8         A.  Essentially, yeah.  If you put it in a much

06:06  9    shorter way.

06:06 10         Q.  Okay.  Do you know what the difference is legally

06:06 11  speaking between relevance an responsiveness?

06:06 12      A.  Legally, no.

06:07 13      Q.  Do you know what the legal definition of

06:07 14  relevance is?

06:07 15      A.  No.

06:07 16      Q.  Okay.  You mentioned a few times messages or

06:07 17  conversations about I think I put it in quotes but tell me

06:07 18  if I'm misquoting it horses are pooping on the road.  Do

06:07 19  you remember that?

06:07 20      A.  I remember that.

06:07 21      Q.  Was that -- was that a real conversation or a

06:07 22  hypothetical conversation just given us an example?

06:07 23      A.  You mean, was the conversation of -- oh, of

06:07 24  discussing if I needed to submit?

06:07 25      Q.  No.  No.  When you said -- when you said, you

                                                              96

06:07 1  know, a conversation about horses are pooping on the road,

06:07 2  you said that wouldn't be relevant.  Did that conversation

06:07 3  really happen or was it just a fans say for example?

06:08 4      A.  I don't think I brought that up.  Because at the

06:08 5  time I thought that it genuinely wouldn't be relevant.  So

06:08 6  I don't think I needed to address that.

06:08 7      Q.  Okay.  I mean, my question was just whether that

06:08 8  was, like, actually a conversation that you thought you

06:08 9    didn't need to address or whether you were just giving an

06:08 10   example that you made up?

06:08 11        A.  Oh, yes.  Sorry.  My bad.  No, I brought that up

06:08 12   here for the first time because I genuinely was trying to

06:08 13   explain my understanding of relevance.

06:08 14        Q.  Okay.  I see.  So that's a good reflection of

06:08 15   your understanding of what relevance means?

06:08 16        A.  Yeah, in the end, yeah.

06:08 17        Q.  Okay.  There were some conversations earlier

06:08 18   about G A 44, the executive order.  Did you ever read that

06:08 19   document?

06:08 20        A.  In it entirety, no.  Well, how do you know about

06:09 21   it.  So I guess put it this way.  It's large part of my

06:09 22   purpose as if you will as an activist.  So when I put time

06:09 23   an energy into organizing if we're trying to keep up with

06:09 24   current events, current policy, whatnot, as these things

06:09 25   are put out, you know, like we need to keep up with their

                                                              97


06:09 1    not really what their text is in the executive order,

06:09 2    right, but what it actually might mean, what precedence it

06:10 3    sents.

06:10 4         Q.  What precedent did you think it set?

06:10 5         A.  Like I said earlier, like, it's -- it essentially

06:10 6    was attempting to put into stone that any criticism of

06:10 7    Israel would be deemed as anti semitic and would be hate

06:10 8    speech.  And so therefore it would be infringing on our

06:10 9    First Amendment rights.  And we had seen that right on a

06:10 10   lower level at UT adopting the I HR A definition of anti

06:10 11   semitism.  And so this was like a much larger more

06:10 12   dangerous version of that.

06:10 13       Q.  Did you notice that have any impact on how you or

06:11 14   other members of P S D were treated on campus between

06:11 15   March 27th when the order came out an April 24 when the

06:11 16   protest we've been talking about happened?

06:11 17            MR. JOZWIAK:  Object to form.

06:11 18       Q.  (BY MR. HEALEY)  You can still answer.

06:11 19       A.  So I -- I really to believe it started to

06:11 20   escalate a lot of the, like, anti Palestenian protest

06:11 21   policy, any rule changes, any -- any action that might

06:11 22   have been actually not put into place, like, in text.  So

06:11 23   when we would organize things that we had been organizing

06:12 24   in previous semesters we noticed small differences and in

06:12 25   terms of, like, how -- not how flexible, how successful,

                                                                    98

06:12 1    how supported we would be as an organization versus

06:12 2    afterwards how we were much more I guess like scrutinized

06:12 3    or much more easily, like, put under watch because of

06:12 4    things that, you know, we would be trying to organize that

06:12  5   we had been organizing.  I'm not sure if that answered

06:12  6   your question.

06:12  7        Q.  That did.  You mentioned small differences in the

06:12  8   way that you were treated.  Can you remember any specific

06:12  9   small differences?

06:12 10        Q.  Yeah.  So we -- I guess now since we've mentioned

06:13 11   how PSC received a complaint by another organization, that

06:13 12   was during one of the events that we hosted annually?

06:13 13        Q.  The Israel block party?

06:13 14             MR. JOZWIAK:  Object to form.

06:13 15        A.  Yes, the Israel block party counter protest at

06:13 16   least.  So we protested that every time the organization

06:13 17   that hosted it would have a block party and we would be

06:13 18   able to do it essentially without problem.  And we would

06:13 19   be able to do it in front of them because there was enough

06:13 20   space and it was an area that was safe for us and that

06:13 21   allowed people to pass by us easily.  And so we would make

06:13 22   sure that we were able to keep everybody safer that way.

06:14 23   And after the executive order we were not allowed to do so

06:14 24   and communication also with the student services or I

06:14 25   guess that falls under Dean of students was a lot harder,

                                                                   99

06:14  1   a lot less understanding and so I would be talking to

06:14  2   different people that I wasn't used to.  And they -- or

06:14 3    that I didn't, like, recognize.  And they would be citing

06:14 4    rules that they hadn't before or enforcing rules they

06:14 5    hadn't before.  And so we were made to be -- we were made

06:14 6    to protest that year that we got the complaint, made to

06:14 7    protest further away from the event and we were made to,

06:14 8    like, stand within the confines of a certain area despite

06:14 9    it being on a walkway which that was not our -- what we

06:14 10   wanted to do.  We wanted to not be on a walkway in the

06:14 11   first place.  And one of our displays during the protest

06:15 12   we wanted to walk along speed way without blocking the way

06:15 13   with, like, signs and which are allowed and, like, painted

06:15 14   red hands for symbolic purposes and we were told we

06:15 15   weren't allowed to and they had actually threatened

06:15 16   arrest.  But they didn't cite a violation.  And then in

06:15 17   the end when we got that document that we were complained

06:15 18   about they still didn't cite any violations.

06:15 19        Q.  You said a few things in there that I wanted to

06:15 20   follow up on.  You said they threatened arrest.  Who

06:15 21   threatened arrests?

06:15 22        A.  So we had -- I believe it was student services

06:15 23   who were communicating to us.  I don't know that they

06:16 24   would be the ones to say that they're going to order

06:16 25   arrest.

100

06:16  1      Q.  Sorry?

06:16  2      Q.  Do you remember what they did say about arrest?

06:16  3      A.  I think at that time that day they had talked to

06:16  4  one of our legal observers who I mean I'm sure you guys

06:16  5  know, but we have there to make sure that things are noted

06:16  6  and making sure that people are abiding by the law and

06:16  7  what not in case something happens in the future that we

06:16  8  need to bring up that evidence.  But I wish I had that

06:16  9  now.  But they were told and that was then forwarded to

06:16 10  us.  And I asked, like, what about this is breaking the

06:17 11  rules, what about this is violating the rules.  And she

06:17 12  had told me I don't know.  They are just saying that they

06:17 13  are going to start arresting you so I would -- I would

06:17 14  leave.

06:17 15      Q.  That was the legal observer that said that?

06:17 16      A.  That was the legal observer she was the student.

06:17 17      Q.  Were you at previous block parties like the 2023.

06:17 18  Were you at the Israel block party?

06:17 19      A.  Yes.

06:17 20      Q.  Did PSC or other protesters sorry counter

06:17 21  protesters involved in the Israel block party counter

06:17 22  protest, did they do things any differently in 2024 versus

06:17 23  2023?

06:17 24      A.  When you say did they do anything differently, do

06:17 25  you mean in the manner that they protested or the manner

06:17  1   that they were hosting the party.

06:17  2        Q.  I mean in the manner that people protested the

06:17  3   party?

06:17  4        A.  Actually in 2023 I do remember there was an

06:18  5   instance of like assault where one of the people attending

06:18  6   the block party had tried to, like, approach us as

06:18  7   protesters and took their -- the Israel flag an wrapped it

06:18  8   around one of the students an held them in a choke hold.

06:18  9   That was dispersed I believe there was an officer that

06:18 10   just told us to leave and the students really tried to

06:18 11   just like cakes it down.  And then in 2024 we weren't

06:18 12   allowed to be in the same space.  So that didn't happen.

06:18 13   But.

06:19 14        Q.  Okay.  I mean that answers my question.  Did

06:19 15   anything to your knowledge ever happen to the student from

06:19 16   the block party who committed the assault against the

06:19 17   protester?

06:19 18                 MR. JOZWIAK:  Object to form.

06:19 19                 THE WITNESS:  Not to my knowledge.  I just

06:19 20   know that the officer who was clothes to this -- to these

06:19 21   students had separated them and both the block party

06:19 22   student and the one that was protesting with us, I don't

06:19 23   know that they received any special consequences.  I think

06:19 24    that the protester that was on our side was also pulled

06:19 25    away from the event, though and then you were instructed

102

06:19  1    to disburse.

06:19  2                    MR. JOZWIAK:  Object to form.

06:19  3                    THE WITNESS:  Of that specific area we were

06:19  4    still able to hold the protest in 2023.  But just because

06:20  5    of the nature of, you know, of the assault, some people

06:20  6    were trying to, you know, like break it up.  And then this

06:20  7    was just a lot of by stander in the mix.  So we did

06:20  8    disburse that small area.  But overall we were stale able

06:20  9    to stay in the area that we had been protesting on.

06:20 10        Q.  (BY MR. HEALEY)  Okay was there any significant

06:20 11    difference that you remember in the number of protesters

06:20 12    who protested the to 23 block party versus the 2024 block

06:20 13    party?

06:20 14                    THE WITNESS:  On our end.

06:20 15        Q.  (BY MR. HEALEY)  That's right?

06:20 16        A.  Actually I believe there were more protesters in

06:20 17    2024 just because of unfortunately how there was the again

06:20 18    side unfolding.  So a lot of people felt the need to

06:20 19    support, I guess, in higher numbers.

06:20 20        Q.  How many more to the extent you can remember?

06:21 21                    MR. JOZWIAK:  Object to form.

06:21 22            THE WITNESS:  That's a good question.  I

06:21 23  would say triple in size at least.

06:21 24      Q.  (BY MR. HEALEY)  But there were no assaults or

06:21 25  physical altercation in 2024, block party counter protest?

                                                            103


06:21 1       A.  No, not that I remember.

06:21 2       Q.  Okay.  I want to ask you a little bit about the

06:21 3   relationship between PSC and NSJP.  What is the

06:21 4   relationship between those two organizations to the extent

06:21 5   you know?

06:21 6             MR. JOZWIAK:  Object to form.

06:21 7             THE WITNESS:  That's a good question.  I

06:21 8   don't know if I would even frame it as a relationship.  So

06:21 9   the way -- forgive me if I'm explaining things that you

06:21 10  already know.  But NSJP is more of a facilitative

06:21 11  organization so they have what I mean by that is they have

06:22 12  a role to make calls to action or to put out posts

06:22 13  regarding those calls to actions.  Putting out news and

06:22 14  they also -- I believe I actually don't know what they're

06:22 15  doing.  But they were for a little while in the process of

06:22 16  trying to create a national structure which would just

06:22 17  mean that S J Ps would be able -- better able to

06:22 18  communicate with each other.  But that -- at the time of

06:22 19  April 24th, there was no orders or large -- any really

06:22 20   communication between them an us in order to follow, like,

06:22 21   any specific rules because every university was doing

06:23 22   something completely different.

06:23 23        Q.  (BY MR. HEALEY)  So am I correct in understanding

06:23 24   that there was no national structure at that time 2024?

06:23 25        A.  As far as I'm aware there was not.  I don't think

                                                                  104

06:23  1   so.

06:23  2        Q.  Did NSJP have control over P S?

06:23  3             MR. JOZWIAK:  Object to form.

06:23  4             THE WITNESS:  No, they didn't have control

06:23  5   over us.  They wouldn't be able to.  Were there regularly

06:23  6   scheduled meetings that both PSC an N S J C were required

06:23  7   to attend.

06:23  8             MR. JOZWIAK:  Object to form.

06:23  9             THE WITNESS:  No.

06:23 10        Q.  (BY MR. HEALEY)  Did NSJP and PSC share any

06:23 11   social media accounts?

06:23 12        A.  No.  Share as in -- yeah, we didn't have any

06:23 13   accounts between both of the members from both

06:24 14   organizations, no.

06:24 15        Q.  That was my question.

06:24 16             Did the two organizations have any shared

06:24 17   property?

06:24 18    A.  No.

06:24 19    Q.  Any shared leadership, like, for instance, a

06:24 20 steering committee member who was also a member of NSJP?

06:24 21            MR. JOZWIAK:  Object to form.

06:24 22            THE WITNESS:  No, not for us, no.

06:24 23    Q.  (BY MR. HEALEY)  Okay.  Was there a chat that you

06:24 24 know of that contained both NSJP and PSC?

06:24 25            MR. JOZWIAK:  Object to form.

                                                    105

06:24 1            THE WITNESS:  I don't believe so.

06:24 2    Q.  (BY MR. HEALEY)  Okay.  When you talked about the

06:24 3 steering committee leadership for PSC, was there a higher

06:25 4 as hierarchy within the PSC leadership?

06:25 5    A.  No.  And that explains why there's never any

06:25 6 specific role for any specific event.  It depends event to

06:25 7 event.  So we're essentially entirely horizontal and/or we

06:25 8 were entirely essentially horizontal and if there were any

06:25 9 committees for any events or topics, they would be

06:25 10 determined accordingly.

06:25 11    Q.  Okay.  In terms of roles and social media post,

06:25 12 sitting here today can you remember any examples of Ammer

06:25 13 Qaddumi specifically posting on behalf of PSC on PSC's

06:25 14 Instragram account?

06:25 15    A.  Again, I cannot remember if he did.  I don't -- I

06:25 16    am not know level able if he did, no.

06:25 17        Q.  Okay.  When we were talking about the planning

06:26 18    for the April 24th protest, do you remember what was

06:26 19    planned for April 24th?

06:26 20        A.  So forgive me that I'll be repetitive again.  In

06:26 21    the meetings I remember that our conversations were

06:26 22    largely low physical and largely about the topics that we

06:26 23    might want to discuss and about availability.  So what we

06:26 24    posted in the end or what we determined was that we would

06:26 25    have a day of educational events mixed with a study hall,

                                                             106


06:26 1    mixed with cultural -- cultural events, I guess, why not.

06:26 2    And I don't remember the exact program.  I'm sure you guys

06:27 3    have the post anyways.  But we determined that it would be

06:27 4    starting with a walkout like we had done before in the

06:27 5    past without problem.  And we we'd be able to go to the

06:27 6    launder which is an area on campus that is typically for

06:27 7    studying.  A lot of people bring out blankets and what

06:27 8    not.  So we wanted to take advantage of that and say,

06:27 9    well, like contribute kind of to the culture of the

06:27 10   university that way.

06:27 11       Q.  You said that earlier that it was supposed to

06:27 12   start with a walkout.  Did the walkout happen?

06:27 13       A.  Zoo we did convene for a little bit of time,

06:27 14    right.  So like a walkout is typically as we list a time

06:28 15    for when everybody can collect and we say that glass is

06:28 16    cancelled or that you're walking out from class.  But

06:28 17    really people were in their own time able to just collect

06:28 18    with us in one space and then after that, after we just

06:28 19    give ground rules and give like welcoming speeches, if

06:28 20    any, then we will leave that area leave that as where and

06:28 21    go to the launder.

06:28 22        Q.  Okay.  So there wasn't an organized coordinated

06:28 23    walkout?

06:28 24            MR. JOZWIAK:  Object to form.

06:28 25            THE WITNESS:  Could you specify what you

107

06:28 1    think is an organized coordinated walkout.  I don't want

06:28 2    to say yes or no.

06:29 3        Q.  Sure.  Sure.  Did you personally walkout of class

06:29 4    with another group of students who walked out of class at

06:29 5    the same time?

06:29 6        A.  No.  So many of us didn't have class at this time

06:29 7    and we I'd time it to -- we timed it at the time to where

06:29 8    people would be able to finish their responsibilities

06:29 9    because they end at 2 one hour mark and then they'd be

06:29 10   able to collect during a passing period.

06:29 11       Q.  What do you mean like passing period?

06:29 12        Q.  So like typically if class once a Monday finish

06:29 13    on the hour, like, they're an hour long they go from noon

06:29 14    to one, one to two, whatever, you'd leave class about ten

06:29 15    minutes early.  And so we would time the walkout to

06:30 16    somewhat accordingly to whatever day it was so that way

06:30 17    people would be able to not be in the middle of an exam,

06:30 18    right.  So that way they'd be more free to join us and

06:30 19    also we'd be more free ourselves?

06:30 20        Q.  You schedule the protest so no one would have to

06:30 21    have their exam disrupted in order to attend?

06:30 22        A.  Yeah, pretty much.

06:30 23        Q.  And then when you were giving your ground rules,

06:30 24    I mean, did that happen in this case you gave grown rules

06:30 25    to the protester?

108

06:30 1            MR. JOZWIAK:  Objects to form.

06:30 2            THE WITNESS:  Yes.  So I definitely tried.

06:30 3    I do remember at that time I was the one speaking.  I

06:30 4    typically give the same ground rules or we typically give

06:30 5    the same ground rules which is just about safety and not

06:30 6    interacting with instigators and it was also just, like,

06:31 7    restating the purpose of why we were there to day and then

06:31 8    what we would do which was to be leaving that area and

06:31 9    then going to the launder for study hall.

06:31 10      Q.  (BY MR. HEALEY)  Was there any secret set of

06:31 11  ground rules or goals that were distributed to people not

06:31 12  verbally at the protest?

06:31 13             MR. JOZWIAK:  Object to form.

06:31 14             THE WITNESS:  No.  We -- if we shared

06:31 15  anything on social media or I mean I don't think we shared

06:31 16  anything in messages, but if -- if we were to share

06:31 17  anything not verbally it would have to be the same thing

06:31 18  as what we share verbally because otherwise we would have

06:31 19  people -- groups of people who are not sure of which to

06:31 20  do.  So we had the same grown rules.  There is nothing

06:31 21  secretive.  And the plan that was posted on our Instragram

06:31 22  was the plan has we ultimately wanted to carry out.

06:31 23      Q.  (BY MR. HEALEY)  Which plan is that to the best

06:32 24  you can describe it for me?

06:32 25      A.  The program that's listed on the post, I guess

109

06:32 1  that is supposed to be for the events on the 24th, it was

06:32 2  just like the program of study hall, educational

06:32 3  discussions, and cultural's owe I don't actually remember

06:32 4  what we did for culture.  But I think that we wanted to

06:32 5  include that.  And the -- the ground rules -- the ground

06:32 6  rules and when I had mentioned the program at the same

06:32 7  time, I had said I think just that.  But I had to cut it

06:32 8   short because I didn't want for too many people to --

06:33 9   like, I didn't want to be there for too long because we

06:33 10  were such as big group of people.  So I figured if we were

06:33 11  gaining a lot of traction it would be better to move to an

06:33 12  area that is meant for -- like a more relaxing area so we

06:33 13  or not like standing up and tense with a lot of UT

06:33 14  administration surrounding us.

06:33 15       Q.  Sure.  Was there a plan among PSC to have and

06:33 16  over night encampment?

06:33 17       A.  No.  We decided that that would not be feasible

06:33 18  or realistic in any way.

06:33 19       Q.  You said that you decided it wouldn't be feasible

06:33 20  or realistic.  Were there any other reasons you decided

06:33 21  not to do an encampment?

06:33 22       A.  Yeah, there were countless reasons.  I can't name

06:33 23  them all just because, you know, in the time of

06:33 24  determining, you know, your event, there's a million

06:34 25  things that you have to take into consideration.  We

                                                              110

06:34 1   didn't think it was worth the hassle.  We didn't think it

06:34 2   would be in line with our purpose an our goals.  And it

06:34 3   ultimately didn't make sense for us to carry that out nor

06:34 4   did we have any I guess obligation to.

06:34 5        Q.  Okay.  So was there any intent to have tents at

06:34  6   the protest?

06:34  7        A.  I don't believe so.  I know we wanted to have

06:34  8   blankets and things to make it comfortable.  I don't

06:34  9   remember if we would be getting tents if we didn't want to

06:35 10   camp.

06:35 11        Q.  Well, humor me.  Why would you get tents if you

06:35 12   didn't want to camp?

06:35 13                  MR. JOZWIAK:  Object to form.

06:35 14                  THE WITNESS:  I know there were some people

06:35 15   who -- well, I guess that's a fair question because I know

06:35 16   there were many universities who had used tents or

06:35 17   whatever and obviously still didn't -- like, what I'm

06:35 18   saying is if you're there in the middle of the day, our

06:35 19   event was at 1:00 p.m.  Obviously we're not going to sleep

06:35 20   there at 1:00 p.m. or nor do we need tents.  I believe in

06:35 21   were some people who were expecting to see an encampment

06:35 22   style event where there would maybe be like symbolic tents

06:36 23   or symbolic banners like you -- like they saw at other

06:36 24   universities.  But I don't remember if there was any

06:36 25   organized effort by us or anyone else to do so.

                                                              111


06:36  1        Q.  (BY MR. HEALEY)  What does that mean very briefly

06:36  2   symbolic tents?

06:36  3        A.  Symbolic as in there's a large movement happening

06:36 4    so if we understand the purpose of this movement and this

06:36 5    campaign, then we would need to make sure that our -- our

06:36 6    event is in line with our purpose in terms of taking

06:36 7    advantage of the opportunity to raise more awareness for

06:36 8    the general side that's happening.  And so if many other

06:37 9    universities are seen putting up tents and there are

06:37 10   people saying, oh, the students are, you know, protesting

06:37 11   and are no longer, like, going to be quite against their

06:37 12   universities, then a symbolic -- symbolic gesture would be

06:37 13   to him mike that, I suppose.

06:37 14       Q.  Okay.  I'm going pull up an exhibit and I don't

06:37 15   remember -- Janalyn, you'll have to remind me what Exhibit

06:37 16   No. We're on.  I wanted to just use the one that's already

06:37 17   in because it's the same.  It's the event cancellation

06:37 18   notice but Daniel I don't see an e-mail from you and I'll

06:37 19   share my screen and we'll pull it?

06:37 20                 THE REPORTER:  The next number is 8.

06:37 21                 MR. JOZWIAK:  It's Exhibit 4, Sean.

06:37 22                 MR. HEALEY:  Exhibit H.  Can we pull up

06:38 23   Exhibit 4.  Is that possible, Janalyn.

06:38 24                 MR. JOZWIAK:  You want me to.

06:38 25                 MR. HEALEY:  Actually, yeah.  If you

                                                                    112

06:38 1    wouldn't mind.  Just I wouldn't normally ask you to do

06:38  2   this but we're very short on time.

06:38  3                    MR. JOZWIAK:  Understood.  Is there

06:38  4   likelihood that we wound continuing another day.

06:38  5                    MR. HEALEY:  I mean, you know, I think

06:38  6   Daniel and I can probably agree we'd like to avoid it but

06:38  7   if we don't get through all our questions we may have to.

06:38  8                    MR. JOZWIAK:  I unfortunately think we're

06:38  9   going to have to given the lack of opportunity that I'm

06:38 10   going have to redirect on this.

06:38 11                    MR. HEALEY:  Yeah.  Okay.

06:38 12                    MR. JOZWIAK:  Let me state on the record

06:38 13   when we end.

06:38 14                    MR. HEALEY: Nd as we I'll find another time

06:38 15   where we can finish this up.  But I'll just get.

06:38 16                    MR. JOZWIAK:  You see my screen.

06:38 17      Q.  (BY MR. HEALEY)  I can see the screen.  So

06:39 18   Ms. Homsi, can you see the document that is marked

06:39 19   Exhibit 4?

06:39 20      A.  Yes.

06:39 21      Q.  When you received this document, I think you said

06:39 22   that it was -- you first saw it on the morning of

06:39 23   April 24, right?

06:39 24      A.  Yes, that's correct.

06:39 25      Q.  What did you understand this document to mean

                                                              113

06:39  1    when you got it?

06:39  2        A.  So obviously it was an attempt to prevent what

06:39  3    we'd be doing no matter what.  But it was a very confusing

06:39  4    attempt because it felt like they were not understanding

06:39  5    the purpose of our event and they were cancelling

06:39  6    something that didn't apply, if that makes sense.  And I

06:40  7    guess what I mean by that is their reasonings were

06:40  8    something that were not, like, in line with what we were

06:40  9    doing.  And so it didn't seem as if they were on the same

06:40  10   page.

06:40  11       Q.  Okay.  Well, one thing it looks like if you look

06:40  12   at footnote one where the sentence that end in footnote

06:40  13   one which is in the second paragraph, it says that the

06:40  14   event has declared intent to violate our policies an rules

06:40  15   an disrupts our campus operations.  Do you see that part?

06:40  16       A.  Yes.

06:40  17       Q.  And then if you follow footnote one there is the

06:40  18   text of one of PSC's Instragram posts and the it sized

06:40  19   text in there says in the footsteps of our comrads at

06:40  20   Rutgers New Brunswick toughs S J P and Columbia S J P we

06:41  21   will take back our university.  Do you see that part?

06:41  22       A.  Yes.

06:41  23       Q.  Do you remember, you know, discussing or talking

06:41  24   about with anyone in PSC that that language that's it

06:41 25  sized?

06:41  1        A.  I'm trying to remember I don't remember if we

06:41  2  were specifically like discussing this statement.  We

06:41  3  discussed the messages we put out so we would have had to

06:42  4  determine like, you know, approve essentially what we're

06:42  5  posting like multiple people have to see it and approve of

06:42  6  it.

06:42  7        Q.  Okay.  Well, do you remember what that phrase,

06:42  8  you know, to the extent that you remember conversations,

06:42  9  do you remember what that phrase take back was supposed to

06:42 10  mean?

06:42 11        A.  Well, aside from -- okay.  So I guess I see what

06:42 12  you're asking.  So aside from the just, in exact, like,

06:42 13  language, like, the tough S J P and Columbia S J P as we

06:42 14  were discussing what we would be posting and what we'd be

06:42 15  actually doing, we didn't say that we would be, like,

06:42 16  invading our own campus or taking taking anything from

06:42 17  ourselves more than we have the right to use this shared

06:43 18  space.  A large reason why we're even doing the event in

06:43 19  the first place was to -- to, like, raise awareness about

06:43 20  the fact that our university is putting essentially money

06:43 21  into something violent rather than putting money into its

06:43 22  own students.  And so that's what a large -- a large,

06:43 23    like, aspect, I guess, of our messaging was in general.

06:43 24         Q.  Okay?

06:43 25              MR. JOZWIAK:  Sorry.  My connection kicked

                                                                    115

06:43 1     me off and I missed probably the last 90 or so seconds.

06:43 2     Oh, I thought you looked very very still.  So.

06:43 3              MR. JOZWIAK:  Yeah.  We're in the last two

06:43 4     minutes here anyway.  So I think I'm not able to finish

06:43 5     the line of questioning I'm on an certainly Daniel you're

06:44 6     not going to have the opportunity today to ask follow ups.

06:44 7     So we will have to coordinate and find a time that we can

06:44 8     finish this up because Janalyn I don't want to keep you

06:44 9     any longer.

06:44 10             MR. JOZWIAK:  Agreed.  Yeah, that makes

06:44 11    sense to me for the same reasons that you stated.

06:44 12    Apologize, Ms. Homsi, for the trouble.

06:44 13             THE WITNESS:  That's all right.  That's all

06:44 14    right.

06:44 15             MR. HEALEY:  Same.

06:44 16             MR. JOZWIAK:  All right.  Well let's go off

06:44 17    the record and Sean and I can discuss next steps and

06:44 18    Ms. Homsi and Janalyn, feel free to hop off if you'd like.

06:44 19             (Deposition recessed.)

      20

21

22

23

24

25