IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AMMER QADDUMI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:24-CV-1002-RP |
| | § | |
| UT AUSTIN PRESIDENT JAMES | § | |
| E. DAVIS, *in his official capacity*, | § | |
| | § | |
| Defendant. | § | |

**ORDER**

Before the Court is the Motion for Summary Judgment filed by Defendant the University of

Texas at Austin President James E. Davis, in his official capacity, ("Davis" or "UT"). (Dkt. 157).

Plaintiff Ammer Qaddumi ("Qaddumi") filed a response, (Dkt. 163), UT filed a reply, (Dkt. 165),

and Qaddumi filed a sur-reply upon leave of the Court, (Dkt. 179). Having considered the parties'

submissions, the record, and the applicable law, the Court will deny the motion.

**I. BACKGROUND**

Qaddumi challenges his suspension (and the ongoing disciplinary record resulting from it)

from UT as a violation of his First Amendment rights. The parties cite record evidence of the

following facts. Qaddumi was involved in planning a protest, to include a "walk out of class," "guest

speaker," and two "teach-in[s]," against ongoing violence in Gaza in April 2024 as a member of the

Palestine Solidarity Committee ("PSC"). (Resp., Dkt. 163, at 3). The planned protest activities were

peaceful in nature. (*Id.*). UT, however, preemptively ordered the protest cancelled the night before it

was scheduled to occur. (*Id.*). UT alleges that it understood PSC to have the same plans for its

protest as those organized at other universities by Students for Justice in Palestine ("SJP"), a separate

national group, of which PSC is not a chapter. (*Id.* at 4, 11). UT says it observed indicators that PSC

aimed to set up tents and stay overnight in the outdoor areas of campus, in violation of UT rules.

1

(*See* Mot., Dkt. 157, at 10). UT cites statements made in PSC's social media posts about intending to "occupy" campus, and the fact that at other universities around the country, SJP protesters had set up encampments causing, in UT's view, substantial disruption to those campuses. (*Id.* at 20).

More specifically, then-UT Austin President Jay Hartzell instructed UT staff members to email PSC leadership directing them to cancel the protest. (Resp., Dkt. 163, at 4). PSC responded to the email, noting that their demonstration would comply with UT rules and would not involve an overnight encampment. (*See* Dkt. 163-9, at 68 (testimony of student demonstrator)). Also, on April 23, 2024, the Texas Department of Public Safety, when considering its response to the event, conducted an analysis of the planned protest and found that there were "no indicators of planned or potential disruptive activity or credible threats at this time." (Dkt. 163-4, at 1).

Qaddumi, along with other PSC members and UT students, proceeded with the April 2024 protest despite UT's emailed directive to cancel it. (Resp., Dkt. 163, at 5). Qaddumi and the other students testify they agreed with UT officials, who approached them at the scene, to use "no masks, no tents, and no amplified sound" at the protest. (*Id.*). The protestors began to march and received an order from members of the UT Police Department to disperse. (*Id.* at 6). Qaddumi relayed the directive and spoke with an officer about how to direct the protestors off campus. (*Id.*). UT disputes this account and says that Qaddumi did not comply with the dispersal orders and instructions. (Mot., Dkt. 157, at 11). UT police officers subsequently arrested Qaddumi as well as other students protesting with PSC. (Resp., Dkt. 163, at 6).

UT initiated proceedings against Qaddumi for disruption, incitement, and failure to comply with directives. (*Id.*). The UT conduct official responsible for pursuing Qaddumi's case, Melissa Wommack, argued Qaddumi was a leader of the protest and the messaging behind it, and responsible for "university-wide" disruption as a result. (*Id.* at 7). The Student Conduct Board found that Qaddumi should be subject only to a deferred suspension which would allow him to return to

2

campus. (*Id.*). Wommack appealed the panel decision. (*Id.*). On appeal, UT Appellate Office John Dalton found that Qaddumi should be suspended for his presence and involvement in the demonstration as a leader. (*Id.* at 8). Dalton also found that Qaddumi did not comply with police dispersal orders. (*Id.*).

Qaddumi was suspended for three semesters and banned from campus. He returned to campus in August 2025. UT retains a permanent disciplinary record of Qaddumi's suspension pursuant to its Institutional Rules. (*Id.*). As such, Qaddumi may be required to disclose it on future graduate school applications or professional licensing applications. (*See id.*).

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotations marks and citation omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and

3

unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 174 (5th Cir. 2000).

### III. DISCUSSION

Pursuant to 42 U.S.C. § 1983, Qaddumi brings a content and viewpoint discrimination claim and First Amendment retaliation claim, seeking injunctive relief against Davis in his official capacity.[1] (2d. Am. Compl., Dkt. 30, at 13−15). Qaddumi argues that the suspension was a violation of his constitutional rights, such that this Court should enjoin the ongoing enforcement of the suspension: specifically, the presence of the suspension on his disciplinary record. (*See id.*).

### A. Mootness

Although Qaddumi's suspension ended, and he returned to campus in August 2025, Qaddumi's case is not (as UT argues) moot. (Mot., Dkt. 157, at 22). In the context of a challenge to

---

[1] The claim against Davis is treated as a claim against UT. *Kentucky v. Graham,* 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.") (quotation marks omitted). UT (via Davis in his official capacity) may be held liable under Section 1983 if "(1) there is a constitutional violation; (2) an official policy or custom; and (3) a showing that the official policy or custom was the operational force behind the constitutional violation." *See Bellard v. Gautreaux,* 675 F.3d 454, 462 (5th Cir. 2012); *see also Jingping Xu v. Univ. of Texas M.D. Anderson Cancer Ctr.,* 595 F. App'x 341, 344 (5th Cir. 2014) (applying same to UT). The Court held at the motion to dismiss stage that Qaddumi could bring a claim against Davis in his official capacity, (Order, Dkt. 60, at 15), and in their briefs, the parties do not dispute that an official policy or custom of UT is the operational force behind Qaddumi's suspension and the disciplinary record thereof.

a school disciplinary proceeding under the Due Process Clause of the Fifth Amendment, the Fifth Circuit has held that a student's suit to expunge a negative mark on a permanent disciplinary record presents a live controversy, regardless of the student's enrollment status. *Overdam v. Texas A&M Univ.*, 43 F.4th 522, 529 (5th Cir. 2022) ("So long as a plaintiff alleges a cognizable liberty interest (*e.g.*, continued reputational harm that may impede future employment), courts have regularly entertained due process challenges to university proceedings after the student has graduated."). In so holding, the Fifth Circuit cited cases finding the same in the context of a challenge to disciplinary actions under the First Amendment. *Id.* (citing *Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007) and *Hatter v. Los Angeles City High Sch. Dist.*, 452 F.2d 673, 674 (9th Cir. 1971)). These cases teach that a disciplinary record is a concrete injury because it follows a student, carries reputational harm, and may impact one's employment, school admissions, or career. *Overdam*, 43 F.4th at 529; *Hatter*, 452 F.2d at 674; *see also Esfeller v. O'Keefe*, 391 F. App'x 337, 340 (5th Cir. 2010) (per curiam) (citations omitted) (holding that a former student's claims are not moot where he "received a disciplinary sanction, reflected on his academic record and [] seeks to prevent the University from enforcing that punishment" because the "blemish on his academic record . . . is an actual, concrete injury sufficient to satisfy Article III").

UT argues that the Family Educational Rights and Privacy Act ("FERPA") renders Qaddumi's claim moot because FERPA prevents disclosure of Qaddumi's disciplinary record without his permission, (Reply, Dkt. 165, at 10−11), but this argument belies the above Fifth Circuit precedent. Indeed, UT's argument does not meaningfully address the potential consequences of Qaddumi's suspension. The problem Qaddumi raises—and the caselaw appears to anticipate by discussing the risk of reputational harm from a negative mark on a record, *Overdam*, 43 F.4th at 529; *Hatter*, 452 F.2d at 674—is that certain professional opportunities would *require* Qaddumi to disclose his UT record, even if UT would not publicly disclose it of its own accord. Assuming Qaddumi

could decline to ever disclose his disciplinary record to an outside entity, he may forego

opportunities—such as obtaining a professional license or attending certain graduate schools—to do

so. In sum, the Fifth Circuit's holding in *Overdam* controls, and Qaddumi's case is not moot, despite

the existence of FERPA.

The Court also disagrees with UT that Qaddumi did not plead a claim for restoring his

academic record. Qaddumi seeks injunctive relief to prohibit any ongoing discipline against him and

restore his standing at UT. (*See* 2d. Am. Compl, Dkt. 30, at 14). The Court understands Qaddumi's

pleading to request that this Court enjoin ongoing consequences of the suspension: specifically,

now, its presence on his permanent academic record. This Court has already found that Qaddumi

could request an injunction to restore his good academic standing, (Order on Mot. Dismiss, Dkt. 60,

at 15), negating any argument from UT that Qaddumi's request to clear his academic record was not

part of this case in earlier phases and during discovery.

### B. First Amendment Claims

Qaddumi challenges his suspension, and the record of his suspension on his academic

record, as resulting from (1) viewpoint discrimination and (2) retaliation for his First Amendment-

protected acts of expression. Qaddumi also brought a claim of (3) content-based discrimination, (2d.

Am., Compl, Dkt. 30, at 12), to which the parties do not devote independent briefing from the

viewpoint-discrimination analysis. The Court takes each challenge in turn, finds that Qaddumi has

cited record evidence which could reasonably support a finding in his favor, and therefore concludes that summary judgment should be denied as a result.

### i. Viewpoint Discrimination

The First Amendment "prohibits viewpoint discrimination in a limited public forum."[2] *Heaney v. Roberts*, 846 F.3d 795, 801 (5th Cir. 2017) (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001)). This First Amendment right extends to the campuses of state universities. *See Widmar v. Vincent*, 454 U.S. 263, 268−69 (1981). Viewpoint discrimination exists "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction" on speech. *Heaney*, 846 F.3d at 802 (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)). That includes applying a facially neutral policy for the purpose of suppressing protected expression. *See Crawford v. Board of Ed. of Los Angeles*, 458 U.S. 527, 544 (1982); *Texas A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 804−05 (S.D. Tex. 2025). It also includes "denying student organizations access to school-sponsored forums because of the groups' viewpoints." *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 667–68 (2010) (collecting cases). Beyond having the right to not have one's expression suppressed based on its viewpoint, "disciplinary action," such as suspension, "may not be based on [] disapproved content of [] protected speech," such as an on-campus demonstration. *Shamloo v. Mississippi State Bd. of Tr. of Insts. of Higher Learning*, 620 F.2d 516, 522 (5th Cir. 1980).

---

[2] "The constitutionality of speech restrictions in a limited public forum are judged under the reasonableness standard, while speech restrictions in a traditional or designated public forum are subject to strict scrutiny." *Pro-Life Cougars v. Univ. of Houston*, 259 F. Supp. 2d 575, 581 (S.D. Tex. 2003) (citing *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001)). At UT, the "open, outdoor portions of the campus" are a "designated forum for student expression, subject only to time, place, and manner regulations and a small number of enumerated content-based restrictions." *See Justice for All v. Faulkner*, 410 F.3d 760, 768−69 (5th Cir. 2005). However, "viewpoint-based restrictions are unconstitutional whether the forum is a designated or limited public forum." *Texas A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 804−05 (S.D. Tex. 2025). As such, the designation of UT's open, outdoor portions of the campus is not material for purposes of the Court's analysis of this motion.

UT may restrict students' expression through content- and viewpoint-neutral time, place, and manner restrictions, narrowly tailored to serve a significant government interest, which leave open alternative channels of communication. *Justice for All v. Faulkner*, 410 F.3d 760, 768–69 (5th Cir. 2005). Though UT "may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not condition that speech on obtaining" permission from a school official "in that official's boundless discretion." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988). It is also "viewpoint discrimination" for university officials to censor speech because it is "offensive or inappropriate" in their "subjective judgment." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019); *see also Texas A&M Queer Empowerment Council*, 772 F. Supp. 3d at 805.

Despite the First Amendment's protections against viewpoint discrimination in a state university setting, the Supreme Court has held that a school may "justify prohibition of a particular expression of opinion" upon a showing that the expression would cause a "substantial disruption or material interference with school activities." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509, 515 (1969). In *Tinker*, a school district prohibited students from wearing black armbands on their sleeves to exhibit their disapproval of the war in Vietnam; the Supreme Court found this restriction unconstitutional. *Id.* at 508. To justify such a particular ban on speech, a school official "must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509. However, the students in *Tinker* were junior high and high school aged students. *Id.* at 504. As such, it is not clear that UT is correct in arguing, (Mot., Dkt. 157, at 15), while citing *Morgan v. Plano Indep. Sch. Dist.*, 489 F.3d 740, 745 (5th Cir. 2009) (a case involving a school district rather than a university), that *Tinker* provides the test to evaluate content- or viewpoint-based restrictions at UT. This Court has observed that neither the Fifth Circuit or Supreme Court has squarely held whether *Tinker* governs viewpoint-based speech restrictions at the university level. *Students for Just. in*

*Palestine, at Univ. of Houston v. Abbott*, 756 F. Supp. 3d 410, 425 (W.D. Tex. 2024). UT cites two Fifth Circuit cases to support their argument that *Tinker* applies at the university level. (Mot., Dkt. 157, at 15 n. 74). One is unpublished. *See Esfeller*, 391 F. App'x at 341. The other, *Shamloo*, analyzes *Tinker*, but the case was ultimately decided on void-for-vagueness grounds, and the Court did not reach the First Amendment issue. 620 F.2d at 523–24.

In keeping with *Esfeller*, 391 F. App'x at 341, which is persuasive, the Court assumes that *Tinker* does apply, but that the environment of a university, as a center of debate and free expression, must be taken into account when evaluating what constitutes a substantial and material disruption, and that this is likely a distinct standard from what disrupts an elementary, middle, or high school environment. *See Students for Just. in Palestine*, 756 F. Supp. 3d at 426; *Healy v. James*, 408 U.S. 169, 180 (1972) (First Amendment analysis at the university level must be done "in light of the special characteristics of the environment in the particular case" as the Supreme Court "made clear in *Tinker*" (internal quotation marks and citations omitted)). The Supreme Court has long recognized that universities are "vital centers for the Nation's intellectual life," and "danger . . . from the chilling of individual thought and expression" "is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 835−36. As a result, what may be a substantial disruption in a secondary school environment may not be a substantial disruption in a university environment; what may disrupt a secondary school could even be fundamental to universities. *See Students for Just. in Palestine*, 756 F. Supp. 3d at 426; *see also Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 627 (E.D. Va. 2016). The characteristic of universities as an environment for vigorous debate may be "outcome determinative" when deciding whether a restriction on student speech is viewpoint discrimination versus a valid restriction of foreseeable disruption to campus activities. *See Students for Just. in Palestine*, 756 F. Supp. 3d at 425–26.

*Healy* also addressed the *Tinker* substantial/material disruption standard in a university context and applied a separate doctrine to it: the *Brandenburg* test for what speech may be constitutionally restricted because it incites unlawful behavior. *Healy*, 408 U.S. at 188 (discussing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)). In *Healy*, the Supreme Court held that a university's refusal to officially recognize a student group was unconstitutional because "there was no substantial evidence that these particular individuals acting together would constitute a disruptive force on campus," citing *Tinker*, and because "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Healy*, 408 U.S. at 190−91. In *Healy*, the Court also cited the *Brandenburg* test for classifying speech which may be restricted because it is "inciting or producing imminent lawless action," to explain what constitutes a "substantial disruption" under *Tinker* in the university context. *Id.* at 188−89. In *Brandenberg*, the Court held that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where:" (1) "such advocacy is directed to inciting or producing imminent lawless action," and (2) the speech "is likely to incite or produce such action." 395 U.S. at 447.[3] As to the first prong, the Court in *Healy* acknowledged that in a school environment, a government could prohibit speech likely to incite or produce "lawless action" "not limited to acts of a criminal nature" under *Tinker*, such that "[a]ssociational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *Healy*, 408 U.S. at 189.[4]

---

[3] *Brandenberg*, which arose in the context of a criminal conviction, has also been applied to civil cases. The Fifth Circuit has held that no civil liability can attach for speech on the basis that it did not constitute "incitement" under *Brandenburg. Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1021–22, 1025 (5th Cir. 1987).

[4] Also, in *Shamloo*, the Fifth Circuit commented that finding a "demonstration had a disruptive effect with respect to other students' rights" was "not enough to conclude that the demonstration was not protected by the First Amendment." 620 F.2d at 522. Rather, a court must also conclude "(1) that the disruption was a material disruption of classwork or (2) that it involved substantial disorder or invasion of the rights of

As to the second prong, applying the *Brandenberg* analysis in the context of a criminal appeal, the Supreme Court has also held that amid a disruptive campus protest, a protester loudly stating "[w]e'll take the fucking street later" to a crowd could not be convicted for inciting legal violations without a specific showing that the statement was "likely to produce [] imminent disorder." *Hess v. Indiana*, 414 U.S. 105, 106–09 (1973); *see also Bailey v. Iles*, 87 F.4th 275, 285 (5th Cir. 2023) (under second *Brandenburg* prong, showing that speech had a "tendency to lead to" legal violations "is not enough" to warrant restricting it). Moreover, *Healy*, *Brandenberg*, and *Hess* articulate that speech likely to incite or produce lawless action—which in the university context, may include action that substantially interferes with other students' education, interrupts classes, or violates reasonable campus rules—may be prohibited by a university. But speech which generally promotes a rule-breaking action "at some indefinite future time" is "not sufficient" to constitute inciting speech because it would fail the second prong of *Brandenberg*. *Hess*, 414 U.S. at 107−09.

To summarize, this case raises the following issues. If UT's decision to cancel the PSC protest with which Qaddumi was involved, and subsequently suspend Qaddumi for protesting, targeted PSC's viewpoint, opinion, or ideology, as opposed to amounting to a viewpoint-neutral application of a UT policy, then Qaddumi's suspension constitutes viewpoint discrimination. *See Heaney*, 846 F.3d at 802; *Shamloo*, 620 F.2d at 522. However, UT may be able to show that a viewpoint-based restriction was warranted because it reasonably foresaw substantial disruption or material interference with the campus environment from the April 24, 2024 protest. *See Tinker*, 393 U.S. at 509−11; *Healy*, 408 U.S. at 180. That showing of a disruption must be substantial and material even considering that (1) as a university, UT is a center for vigorous debate and disagreement, such that speech that would disrupt a high school could be allowed at, and even

---

others;" in other words, "[i]t must constitute a material and substantial interference with discipline." *Id.*

fundamental to, UT; and (2) merely demonstrating in support of a disfavored or unpopular viewpoint is not a substantial, material disruption. *E.g.*, *Students for Just. in Palestine*, 756 F. Supp. 3d at 426. And, speech may be a substantial and material disruption where it is likely to incite or produce imminent lawless action, to include (in the university context) violations of reasonable university rules[5] or substantial interference to others' education. *See Healy*, 408 U.S. at 188−89. By contrast, speech is *not* a substantial disruption when it generally advocates future rule-breaking, without being likely to incite or produce an imminent, substantially disruptive action, like (as in *Hess*) announcing generally that one intends to violate a campus rule later. *See Hess*, 414 U.S. at 107−09. Finally, if Qaddumi experienced viewpoint discrimination by way of his suspension, and the *Tinker* substantial/material disruption standard as applied in the university context is not met, the Court may issue a permanent injunction removing the disciplinary action resulting from the April 24, 2024 protest from Qaddumi's academic record.[6]

As described in more detail below, these issues center on material fact questions appropriate for resolution at trial. Qaddumi cites record evidence (including UT Dean of Students Katie McGee's deposition testimony, (Dkt. 163-16, at 107), and the cancellation notice itself, (Dkt. 163-15, at 1)), that UT ordered the April 2024 protest cancelled based on PSC's messaging on social media and more specifically because PSC's messaging aligned with that of SJP, a national pro-Palestine

---

[5] Inciting others to protest in violation of a directive not to conduct a protest, without violation of another university policy, would *not* constitute inciting others to violate a reasonable university rule. *City of Lakewood* 486 U.S. at 764 (though state "may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not condition that speech on obtaining" permission from state official "in that official's boundless discretion."). Otherwise, a state university could cancel a protest at its sole discretion, then punish students for proceeding with a protest alone, without a showing of likely substantial, material disruption, as *Tinker* requires. In other words, the Court understands the reference to "reasonable campus rules" in *Healy*, 408 U.S. at 189, to mean those other than a directive forbidding the speech alone.

[6] To obtain a permanent injunction, a plaintiff must demonstrate: (1) that she has succeeded on the merits; (2) that she will suffer irreparable injury if an injunction is not granted; (3) that a balance of the hardships between the plaintiff and the defendant favors equitable relief; and (4) that an injunction will not harm the public interest. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021); *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

group. (Resp., Dkt. 163, at 11). Qaddumi also cites record evidence, including testimony of Wommack, (Dkt. 163-17, at 10), emails from the Dean of Students, (Dkt. 163-18), and photos of counter-protestors on April 24, 2024, (Dkt. 163-6), that students not from PSC were not restricted from protesting at the same time and in the same place and manner. (*Id.*). By contrast, UT argues that its officials neutrally applied time, place, and manner restrictions on speech. (Reply, Dkt. 165, at 3). McGee testified that the decision to cancel the protest was based on anticipated violations of university rules and "safety considerations." (Mot., Dkt. 157, at 18).[7] Among other facts, UT alleges this perception was based on PSC's messaging on social media, which said that "we will take back our university and force our administration to divest," in the "footsteps" of SJP chapters at other universities. (*Id.* at 9).

Qaddumi also argues that UT's typical practice of not punishing similar expression made on behalf of other groups or causes shows that it "selectively enforced its rules against [Qaddumi] based on his viewpoint," in violation of the First Amendment. (Sur-reply, Dkt. 179, at 5). He styles this as a "First Amendment selective enforcement" basis for finding viewpoint discrimination. (*Id.*); *see Frederick Douglass Foundation v. District of Columbia*, 82 F.4th 1122, 1143 (D.C. Cir. 2023) (protesters plausibly alleged viewpoint discrimination based on selective enforcement of a city ordinance on groups conveying a disfavored view). He cites record evidence that UT officials have not preemptively canceled similar protests sharing other viewpoints, and that UT has not made mass arrests of students or barred students from campus based on demonstrations similar in time, place,

---

[7] UT also devotes some briefing to arguing that on other instances between October 7, 2023 and April 24, 2024, UT allowed PSC to conduct other expressive activities, such as a film screening, a Palestine Cultural Night, and other protests, without interference. (Mot., Dkt. 157, at 16−17). The Court cautions that evidence that UT did *not* violate students' First Amendment rights on *other* occasions does not weigh into this Court's consideration of whether students' rights were violated as to the April 24, 2024 protest or Qaddumi's resulting suspension. Restrictions that amounted to viewpoint discrimination on a particular occasion would still be unconstitutional, even if people with the same views did not have their views suppressed on other occasions.

and manner. (Resp, Dkt. 163, at 12−13). This record evidence includes testimony from Hartzell that he did not think he had preemptively cancelled any other protest, (Dkt. 163-3, at 10), and disciplinary records showing that Qaddumi is one of very few UT Austin students who have ever been barred from campus for demonstration activity, (Dkt. 163-7, Dkt. 163-21). (*Id.*). According to Qaddumi, the April 2024 protest plans unfolded similarly to plans for other protests which had taken place on UT's campus unimpeded, including Black Lives Matter protests in 2014 and protests of programming featuring Henry Kissinger in 2016. (*Id.* at 4−5 (citing Dkt. 163-5 (declaration of UT staff member/former student Rhiannon Hamam who saw all three protests)).

By contrast, UT argues that "Qaddumi's comparator [protests] differ in material respects" and are not a valid basis for a finding of viewpoint discrimination. (Mot., Dkt. 157, at 19). According to UT, one such material respect in which PSC's protest differed from the Black Lives Matter protests, or other protests, is that PSC students "announced plans to 'occupy' campus in violation of Institutional Rules and [] adopted tactics from a national organization intended to disrupt university operations." (*Id.*). Again, UT asks the Court to weigh competing accounts of the April 24, 2024 protest and other protests, which is an appropriate question for a factfinder at trial. Qaddumi's selective enforcement argument hinges on fact questions inappropriate for resolution at this stage, and summary judgment on this point will be denied.

Similarly, whether *Tinker* enabled UT to cancel the April 2024 protest is a quintessential fact question inappropriate for resolution on summary judgment. Again, UT claims it foresaw disruption, specifically because of social media communications from PSC conveying an intent to "occupy" campus and disrupt campus operations, and applied its policies neutrally in cancelling the protest. (Reply, Dkt. 165, at 3). UT argues that it believed PSC would engage in a an "encampment-and-occupation" strategy, akin to the protestors at Columbia University organized by SJP. (Mot., Dkt. 157, at 8). According to UT, PSC "reposted SJP's campaign on its own Instagram account," and SJP

had declared an intent to "disrupt the university's operations" on other campuses, leading to UT's expectation of material and substantial disruption from PSC. (*Id.*). Qaddumi argues that PSC (as opposed to SJP) declared no intent to disrupt campus operations because, rather than announcing intent to create an encampment, PSC's messaging about its plans for April 24, 2024 conveyed an intent to host a peaceful protest in compliance with UT rules. (Sur-reply, Dkt. 168-1, at 3). Also, Qaddumi argues that PSC and SJP are "distinct organizations that merely share similar viewpoints," such that even substantial disruptions by a national group at other universities cannot lead to foreseeable disruption by PSC at UT. (Resp., Dkt. 163, at 16). Having reviewed the record described above and *supra* including PSC's social media messaging about the April 24, 2024 protest, testimony of student organizers and UT officials, and the Department of Public Safety's risk analysis of the event, (Resp., Dkt. 163, at 3−4), the Court finds that a reasonable factfinder could conclude that substantial or material disruption of campus operations was not foreseeable to UT at the time it issued the directive to cancel the April 24, 2024 protest, such that summary judgment is not warranted.

### ii. Retaliation for First Amendment Activity

Likewise, a reasonable factfinder could find that Qaddumi's suspension resulted from retaliation for his First Amendment-protected activity. The Supreme Court has held that a state university cannot expel a student in retaliation for engaging in an activity protected by the First Amendment. *See Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 669–71 (1973). Thus, to establish a retaliation claim under the First Amendment, a plaintiff student has the burden to show that (1) his or her speech was constitutionally protected and (2) that the speech was a "substantial" or "motivating" factor in the challenged decision. *Oliver v. Univ. of Texas Sw. Med. Sch*, No. 3:18-CV-1549-B, 2019 WL 536376, at *19 (N.D. Tex. Feb. 11, 2019); *O'Neal v. Alamo Cmty. Coll. Dist.*, No. SA-08-CA-1031-XR, 2010 WL 376602, at *11 (W.D. Tex. Jan. 27, 2010); *Doe v. Harrell*, 841 F. App'x

663, 669 (5th Cir. 2021). If the plaintiff satisfies their initial burden, the burden shifts to the defendant to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct. *Oliver*, 2019 WL 536376, at *19.

For the same reasons that Qaddumi has alleged facts which could reasonably be found to prove a First Amendment viewpoint discrimination claim, as described above, the Court finds that Qaddumi's retaliation claim survives summary judgment. UT argues it had no "animus" toward Qaddumi's pro-Palestine views. (Mot., Dkt. 157, at 13). But this Court has already found that under the *Nieves v. Bartlett* standard, 587 U.S. 391, 398–99 (2019), proving a claim for First Amendment retaliation does not require retaliatory animus on the part of any individual. (Order, Dkt. 60, at 12). Rather, a plaintiff can also show retaliation via objective evidence that the plaintiff was punished when otherwise similarly situated individuals not engaged in the same sort of protected speech were not. *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024).[8] As described above, Qaddumi has offered that sort of evidence by identifying counter-protestors on the scene who were not disciplined and citing similar instances of students protesting on other issues in 2014 and 2016 who were not disciplined, (Resp., Dkt. 163, at 4), which creates a material dispute of fact as to Qaddumi's retaliation claim.

### iii. Content-Based Discrimination

The parties dispute whether UT forfeited moving for summary judgment on Qaddumi's content discrimination claim. (Resp., Dkt. 163, at 19; Reply, Dkt. 165, at 11). Content-based regulation "target[s] speech based on its communicative content," restricting discussion of a subject matter or topic. *Vidal v. Elster*, 602 U.S. 286, 292–93 (2024) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Viewpoint discrimination is a "particularly 'egregious form of content discrimination.'" *Id.* at 293 (quoting *Rosenberger*, 515 U.S. at 829). A viewpoint-based regulation

---

[8] For support on their point that animus is required, UT cites *Batyukova v. Doege*, 994 F.3d 717, 730 (5th Cir. 2021), (Reply, Dkt. 165, at 9), a case which was decided before *Gonzalez*, 602 U.S. at 658, and as such, does not account for its holding.

targets not a subject matter, but "particular views taken by speakers on a subject." *Id.* Both parties devote their briefing to addressing viewpoint discrimination, and neither party addresses why the analysis of Qaddumi's content-based claim would have a different outcome on summary judgment than his viewpoint-based claim. As the Court has denied summary judgment on Qaddumi's viewpoint discrimination claim, (an "egregious" form of content discrimination, *id.*), and UT provides no basis for the Court to dismiss the content discrimination claim independently, (*see* Reply, Dkt. 165, at 11), the Court will also deny summary judgment on this claim.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that UT's Motion for Summary Judgment, (Dkt. 157), is **DENIED**.

**SIGNED** on April 14, 2026.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE