IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AMMER QADDUMI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:24-CV-1002-RP |
| | § | |
| UT AUSTIN PRESIDENT JAMES E. DAVIS, *in his official capacity*, | § | |
| | § | |
| | § | |
| Defendant. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

From May 11 through May 13, 2026, the Court held a bench trial in this matter. (Dkts. 200, 201, 202). Plaintiff Ammer Qaddumi, ("Qaddumi") and Defendant University of Texas at Austin President James E. Davis, in his official capacity, ("UT") submitted post-trial proposed findings of fact and conclusions of law, (Def. Proposed Findings of Fact, Dkt. 210; Pl. Proposed Findings of Fact, Dkt. 211). Having considered the evidence and testimony presented at trial, the arguments of counsel, the briefing, and the governing law, the Court enters the following findings of fact and conclusions of law.

## I. BACKGROUND

Qaddumi challenges his suspension (and the ongoing disciplinary record resulting from it) from UT as a violation of his First Amendment rights. (2d. Am. Compl., Dkt. 30, at 12−15). As a full-time student at UT during the 2023−2024 academic year, Qaddumi was on the steering committee of the Palestine Solidarity Committee ("PSC"). (Stipulated Facts, Dkt. 192, at 1). PSC announced an April 24, 2024, event on April 23, 2024, to involve a "walk out of class," a "march to occupy the lawn," and "establishing the Popular University for Gaza and demanding our administration divest from death." (*Id.* at 2.). UT preemptively ordered the protest cancelled the night before it was scheduled to occur. To do so, the Dean of Students' Office sent a letter to

another PSC leader at 10:41 P.M. telling her that the event "may not proceed as planned" and that if students protested, they would be subject to arrest and suspension under the Institutional Rules. (*Id.*).

As this Court explained at the summary judgment phase, because UT is a public university, (*id.* at 1), UT students retain their First Amendment rights on campus and may not be subject to either viewpoint discrimination by UT or disciplinary action for protected speech. (Order on Mot. for Summary J. ("MSJ Order"), Dkt. 180, at 7−8). However, the Supreme Court has held that a school may "justify prohibition of a particular expression of opinion" upon a showing that the expression would cause a "substantial disruption or material interference with school activities." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509, 515 (1969). UT argues that it forecast that the protest would cause a substantial disruption to campus, such that it was permitted to cancel the protest under *Tinker.* (Def. Proposed Findings of Fact, Dkt. 210, at 40). At the summary judgment phase, the Court found the question of whether *Tinker* enabled UT to cancel the April 24, 2024 protest consistent with the First Amendment to be a factual dispute appropriate for resolution at trial. (MSJ Order, Dkt. 180, at 14−15).

Qaddumi, along with other PSC members and UT students, proceeded with the April 24, 2024 protest despite UT's emailed directive to cancel it, including by going to the plaza outside of UT's Gregory Gymnasium, proceeding onto Speedway Drive, and continuing toward UT's library. (Stipulated Facts, Dkt. 192, at 3). At the protest, UT police officers arrested Qaddumi. (*Id.*). Later, UT initiated proceedings against Qaddumi for engaging in disruptive conduct, promoting or inciting disruptive conduct, and failure to comply with the directive to cancel the protest. (*Id.*). After a two-day hearing, the Student Conduct Panel ("SCP") found that Qaddumi should be subject to a deferred suspension which would allow him to return to campus. (*See id.* at 4). UT appealed the decision, and on appeal, UT Senior Appellate Office John Dalton imposed a three-semester

suspension. (*Id.*). Qaddumi was suspended for three semesters and returned to campus in August 2025, attending classes in Fall 2025 and Spring 2026; he graduated in May 2026. (*See id.*). UT retains a permanent disciplinary record of this suspension. (*Id.*).

Pursuant to 42 U.S.C. § 1983, Qaddumi brings a content and viewpoint discrimination claim and First Amendment retaliation claim, seeking injunctive relief against President Davis in his official capacity. (2d. Am. Compl., Dkt. 30, at 13−15). Qaddumi argues that the suspension was a violation of his constitutional rights, such that this Court should enjoin the ongoing enforcement of the suspension: specifically, the presence of the suspension on his disciplinary record. (*See id.*). At the summary judgment stage, the Court found that Qaddumi's case involved factual issues not appropriate for resolution at the summary judgment phase, including the application of *Tinker*. (MSJ Order, Dkt. 180, at 14−15).

## II. SUMMARY OF THE EVIDENCE

In response to Israel's military campaign in Gaza following Hamas's October 2023 attack in Israel, *see Def. for Child. Int'l-Palestine v. Biden*, 714 F. Supp. 3d 1160, 1162−63 (N.D. Cal.), *aff'd*, 107 F.4th 926 (9th Cir. 2024) (describing background of the conflict and claims of international law violations), college student groups, including those affiliated with the national Students for Justice in Palestine ("SJP") organization, began organizing on their campuses in protest. (Day 3 Tr., 22:19−23:4; Day 1 Tr., 294:22−298:25).

On March 27, 2024, Texas Governor Greg Abbott signed Executive Order GA-44 "relating to addressing acts of antisemitism in institutions of higher education." (Day 3 Tr., 21:24−22:3; Ex. D-12, at 1). GA-44 instructed Texas universities to "review and update their free speech policies to address the sharp rise in antisemitic speech and acts on university campuses," and to "[e]nsure that these policies are being enforced on campuses and that groups such as the [PSC] and [SJP] are disciplined for violating these policies." (*Id.* at 3).

PSC at UT is not an official chapter of the SJP, but the SJP provides support and materials to PSC; Qaddumi testified that SJP acts as a "guiding body" to PSC on occasion and is connected to PSC by providing ideas for messaging and resources in pursuit of campaigns, including a recent campaign for divestment. (Day 2 Tr., 150:24−153:13, 229:23−230:9). UT officials testified at trial that they believed SJP had disrupted operations at Columbia University, where students had set up "encampments," i.e., tents set up on campus areas for longer-term protests on campus. (Day 1 Tr., 294:22−295:17, 46:7−11, 53:12−18; Day 2 Tr., 29:18−32:9, 40:3−18, 77:2−78:14, 104:4−105:16). SJP's social media posts called for a Popular University campaign, its term for a "coordinated mass movement of students, faculty, and staff dedicated to preventing our universities from performing their daily functions," with the stated intent to "disrupt university operations, usurp [the university's] existing structures, and undermine its reputation until our demands are met." (Ex. D-28, at 1).

On April 20, 2024, PSC reposted language from the Popular University campaign to its own social media account, using similar language, and saying "WE ARE ALL SJP!" (Ex. P-16, at 1). The post said that PSC sought to "take back our university" and "demand our administration to divest, for the people of Gaza." (Ex. P-16). The post said that PSC would follow "[i]n the footsteps of our comrades at Rutgers-New Brunswick SJP, Tufts SJP, and Columbia SJP." (*Id.*). Qaddumi testified that he and the other PSC organizers intended that language figuratively and that the post was a "message of solidarity," which is corroborated by the PSC organizers' discussions at the time. (*See* Day 2 Tr., at 158:8−22 (testifying the "take back" phrase was "sort of figurative" and referred to "taking back the direction of the university away from this morally corrupted path"); *see also* Ex. D-39, at 5 ("why did they say 'we will not allow our campus to be taken' do they know it's not literal like [crying emoji]…")).

On April 23, 2024, PSC announced a protest it would hold on April 24, 2024, titled "Reclaim Our Space on Wed Apr 24," "Class is Canceled." (Ex. P-25, at 1). The post described the

protest's goals as "reclaiming our space" and "marching to occupy the South Lawn." (*Id.*). The post said that students would "establish[] the POPULAR UNIVERSITY FOR GAZA and demand[] our administration divest from death" "[i]n the footsteps of our comrades at Columbia SJP, Rutgers-New Brunswick, Yale, and countless others across the nation." (*Id.* at 2). The caption said "[w]e will be occupying the space throughout the entire day so be sure to bring blankets, food and water, face masks, and lots of energy." (*Id.*). It concluded, "as a reminder, please be sure to respect our space and listen to organizers in order to help keep us all safe." (*Id.*).

UT officials were aware of other protests which had occurred at other universities leading to longer-term encampments following the same Popular University for Gaza movement. (Day 2 Tr., 52:17−53:21, 82:19−83:9; Ex. D-89, at 2; Day 1 Tr., 46:7−47:1, 53:12−18, 110:7−21, 193:18−194:3). On April 22, 2024, student protesters at UT Dallas entered a campus building during working hours, which in UT's view disrupted campus operations at UT Dallas because students entered administrative offices and "took over" a building. (Day 2 Tr., 82:19−83:9; Ex. D-89, at 3; Day 1 Tr., 46:7−47:1, 53:12−18, 110:7−21; Day 1 Tr., 193:18−194:3).

Jay Hartzell, who was president of UT at the time, was the key decision-maker in deciding to prevent PSC from protesting on April 24, 2024. (Day 2 Tr., 11:12−12:15, 77:2−5, 118:15−18). Hartzell inferred that the PSC protesters intended to break campus rules by setting up tents for a longer-term protest. (Day 2 Tr., 37:23−38:6). UT's institutional rules prohibit camping on university property. (*Id.*; *see also* Ex. P-64, at 2 (stating that, under the Institutional Rules, individuals could not "[c]amp or attempt to camp . . . including bringing tents on campus . . . later than 10:00 p.m."); Ex. P-62, at 3 (confirming that handout reflected at Ex. P-64 "re-states" the then-existing Institutional Rules)). Hartzell was concerned that student protesters would erect tents in violation of the Institutional Rules against camping. (Day 2 Tr., at 12:16−24, 98:13−99:19, 104:4−105:16; *see also* Ex. D-89 (internal UT slide deck about the decision noting "[e]ncampments are [a] stated and celebrated

goal of SJP, and are consistent with UT PSC statements" and "[e]ncampments are against UT Austin policy since at least 2012," and "[i]f we don't enforce rules and allow encampments, [it] creates difficult precedent for future groups seeking to build them")).

Hartzell was aware that words like "occupy" and "take back" can be used figuratively. (Day 2 Tr., 53:14−54:4). However, taken in conjunction with "what was happening elsewhere" at anti-war, pro-divestment protests organized by other student organizations, Hartzell believed those phrases were calling for similar campus disruption at UT. (*Id.*). Hartzell considered there to be similarities between PSC's protest announcement and those at other campuses. (*Id.* 98:13−99:19, 104:4−105:16). Because other universities had protesters setting up longer-term tents and encampments, Hartzell believed the April 24, 2024 protest would cause substantial disruption at UT's campus in the form of a widespread violation of campus rules. (*Id.*).

Hartzell testified that he was not subject to any political pressure when he decided to cancel the protest. (*See id.* 19:15−20:4, 76:2−78:14, 87:13−15, 100:19−22). More specifically, Hartzell testified that he did not speak to Governor Greg Abbott or anyone in state government about the protest or about GA-44, other than when UT asked for police to come to the protest. (*Id.* 19:15−20:4, 76:2−77:1). Hartzell testified that his decision was not based on PSC's viewpoint but rather on his inference that PSC intended to "occupy" campus in the form of the longer-term encampments described above. (*Id.* 12:16−24, 84:20−85:24, 98:13−99:19, 104:4−105:16). UT's Dean of Students Katie McGee similarly testified that the decision to cancel the protest was not based on GA-44 but rather on the perceived intent of the protesters to set up an "encampment." (Day 1 Tr., 45:16−21, 48:1−18, 105:13−114:10).

Internally, PSC discussed but decided not to bring tents and had decided amongst themselves not to set up an overnight encampment. (*See* Ex. D-27 at 7−8 (stating that "it would be cool to have multiple" tents and that "maybe just 3" tents might be "nice for representation" and

that "1 might be lame"); Ex. D-39, at 4 (after receiving cancellation notice, noting "I think they don't understand that we're not making an encampment")). After PSC announced its protest plans, other groups and the general student body supported PSC in its protest plans, including another student not involved in the PSC Steering Chat who had offered to bring tents. (Ex. D-27, at 5−7). Rather than use the tents to sleep, cook, store personal belongings, or set up an encampment, Qaddumi testified that PSC intended to use tents for symbolic purposes to represent the displacement of Palestinians and to express solidarity with other students protesting on other campuses. (Day 2 Tr., at 176:1−177:25).

Though UT personnel concluded there would be substantial disruption because of the context of other universities' protests combined with the language in PSC and SJP's posts, the UT Police Department ("UTPD"), in a written internal analysis it conducted prior to the cancellation notice, determined that PSC had an "intent to peacefully demonstrate," citing PSC's post telling protesters to "be sure to respect our space and listen [to] organizers in order to keep us safe." (Ex. P-90, at 4; Day 3 Tr., at 88:16−23). UTPD also noted that "no open source information indicat[ed] PSC intends to occupy the South Lawn long term" and that PSC was "anticipated to stay only during the daytime if allowed to." (Ex. P-90, at 4). UTPD's memo further explained that it would enforce suspected criminal offenses but not violations of the student handbook, rather, UTPD would refer any student handbook violations to the Dean of Students. (*Id.*). Moreover, UTPD also considered the national context of protests at other campuses, noting that New York's "demonstrations haven't been violent overall" and that in general, related to the planned PSC protest, "[c]laims of extreme violence or riotous behavior appear to [be] exaggerated or isolated." (*Id.*). UTPD described PSC as a historically "non-violent, rule compliant organization." (*Id.*). The Texas Department of Public Safety ("DPS") also conducted its own risk analysis concluding that there were "no indicators of planned or potential disruptive activity or credible threats at this time."

(Ex. P-30, at 10). Similarly to UTPD, DPS's internal assessment said that their goal in policing the protest was to monitor for criminal behavior, such as assault or vandalism. (*Id.*).

Hartzell communicated with DPS and UTPD before the protest and was "probably indirectly" aware of the UTPD's internal analysis but did not have a copy of its reports at the time. (Day 2 Tr., 66:10−15, 68:15−20, 111:1−112:15). Again, Hartzell testified that his decision was not based on the written reports of DPS or UTPD, which he did not receive at the time, but rather his impression that PSC's protest would cause the kinds of disruption he perceived at other universities such as Columbia University. (*Id.* 29:18−30:13). Before the April 24, 2024, cancellation directive, Hartzell had never canceled a protest. (*Id.* 115:10−12). Before the event, Hartzell asked DPS and the Austin Police Department ("APD") to police the protest because Hartzell believed the UTPD police force, consisting of about forty officers on campus at any moment, would not be enough staff to police the PSC's protest. (*Id.* 12:25−13:9, 18:1−20:4, 94:16−95:11).

UT, after deciding to cancel the protest preemptively, issued a notice to an organizer from PSC to cancel the protest. UT officials decided to cancel the protest around 5:45 P.M., (Day 1 Tr., at 66:4−25), and the cancellation letter was sent at 10:41 P.M., (*id.*; Ex. P-18, at 1). In that notice, UT relied on the posts described above. (*Id.* at 2). The cancellation letter directed that the April 24, 2024, protest could not proceed and that students who proceeded with protesting would be subject to discipline including suspension. (*Id.*). The letter also stated, "**[i]f you are interested in organizing an event that adheres to our University policies and rules, we are happy to connect you with a staff member that can answer your specific questions and assist you in understanding what conduct is and is not permitted on our campus.**" (*Id.* (emphasis added)). A student organizer from PSC, Jenna Homsi, responded to the cancellation notice and said that PSC was "not organizing or encouraging an overnight encampment" and that the planned event "is a peaceful gathering with educational programming planned." (Ex. P-28). Hartzell testified that this statement

was "not credible or persuasive enough to change [his] mind" about his decision. (Day 2 Tr., 103:19–20).

Qaddumi received the cancellation directive the next morning. (Ex. D-39, at 4). Despite having received the cancellation letter, Qaddumi and PSC moved forward with holding the event. (Day 1 Tr., 305:3–23). A crowd of about 250 people, including Qaddumi, other members of PSC, and other students and individuals, met on UT's Gregory Plaza and marched onto Speedway Drive toward 21st Street and then toward South Lawn. (*Id.* 76:21–25, 122:10–125:5, 209:13–216:5, 279:11–15, 306:4–20, 310:19–311:11, 311:24–312:19; Day 3 Tr., 68:10–75:20).

UTPD officers told Qaddumi and other PSC members to disperse the protesters. (Day 3 Tr., 68:10–71:19). The parties dispute how clearly the dispersal order was given, whether Qaddumi complied, and whether Qaddumi was able to comply or had been blocked from the pathway to disperse and forced onto a different route. (Def. Proposed Findings of Fact, Dkt. 210, at 18–20; Pl. Proposed Findings of Fact, Dkt. 211, at 22–26). However, it is undisputed that Qaddumi at one point told the crowd to disperse and was arrested less than a minute later. (Day 2 Tr., at 213:8–14; Ex. P-49). UT witnesses testified that the protest later became "like a riot," though the record also shows that the behavior UT believed was riot-like escalated after Qaddumi's arrest, which was a "turning point in the escalation." (Day 1 Tr., at 247:5–8).

On July 3, 2024, the Dean of Students' Student Conduct and Academic Integrity Office ("SCAI") initiated disciplinary proceedings against Qaddumi for his speech and participation in the April 24 protest. (Ex. P-70, at 1). SCAI accused Qaddumi of failing to comply with University directives, engaging in disruption, and inciting disruption in violation of the Institutional Rules. (Ex. P-70). UT imposed a three-semester suspension on Qaddumi based on his participation in the April 24, 2024 protest. (Ex. P-73, at 1–2). Following SCAI's decision, Qaddumi requested that the case be heard by a SCP, which then conducted a two-day hearing regarding Qaddumi's disciplinary matter

beginning on August 30, 2024 and concluding on September 6, 2024. (Ex. P-78, at 2). As described above, the SCP found that Qaddumi should be subject to a deferred suspension which would allow him to return to campus. (Ex. P-78, at 10). UT appealed the decision, and on appeal, UT imposed the three-semester suspension. (Stipulated Facts, Dkt. 192, at 3).

Though Qaddumi returned to campus in August 2025 and graduated in May 2026, UT retains a permanent disciplinary record of his suspension, as described above. (Stipulated Facts, Dkt. 192, at 4). Qaddumi testified that the harm created by this disclosure is ongoing and will continue to have negative consequences for his future. (Day 2 Tr., 228:10–23). Qaddumi also testified that his future academic and professional endeavors would require him to grant third parties access to his disciplinary record, including licensing bodies and future employers. (*Id.* (testifying that the consequences of the suspension will extend beyond his imminent enrollment in law school to include when he "appl[ies] to the Bar" or "to jobs after that")).

## III. DISCUSSION

### A. Jurisdiction

Qaddumi's case is not barred by sovereign immunity because it falls under the *Ex parte Young* exception. To assert a viable claim under *Ex parte Young*, and thereby invoke an exception to sovereign immunity, "[t]he suit must: (1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; (3) allege a violation of federal, not state, law" and (4) "seek equitable relief." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020). The Court finds that (1) President Davis is a proper official capacity defendant with the requisite connection with the enforcement of the challenged act; (2) Qaddumi is seeking prospective relief to redress the ongoing enforcement of his suspension, namely in the form of his disciplinary record; and (3) Qaddumi has alleged violations of federal law and his constitutional rights. (*See* Order, Dkt. 60, at 14–15). Thus, pursuant to *Ex parte Young*, sovereign immunity does

not bar his claims. (*Id.*).

Further, although Qaddumi's suspension ended, and he returned to campus in August 2025, Qaddumi's case is not moot. In the context of a challenge to a school disciplinary proceeding under the Due Process Clause of the Fifth Amendment, the Fifth Circuit has held that a student's suit to expunge a negative mark on a permanent disciplinary record presents a live controversy, regardless of the student's enrollment status. *Overdam v. Texas A&M Univ.*, 43 F.4th 522, 529 (5th Cir. 2022) ("So long as a plaintiff alleges a cognizable liberty interest (*e.g.*, continued reputational harm that may impede future employment), courts have regularly entertained due process challenges to university proceedings after the student has graduated."). In so holding, the Fifth Circuit cited cases finding the same in the context of a challenge to disciplinary actions under the First Amendment. *Id.* (citing *Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007) and *Hatter v. Los Angeles City High Sch. Dist.*, 452 F.2d 673, 674 (9th Cir. 1971)).

As this Court previously found, these cases teach that a disciplinary record is a concrete injury because it follows a student, carries reputational harm, and may impact one's employment, school admissions, or career. (MSJ Order, Dkt. 180, at 4−5); *Overdam*, 43 F.4th at 529; *Hatter*, 452 F.2d at 674; *see also Esfeller v. O'Keefe*, 391 F. App'x 337, 340 (5th Cir. 2010) (per curiam) (citations omitted) (holding that a former student's claims are not moot where he "received a disciplinary sanction, reflected on his academic record and [] seeks to prevent the University from enforcing that punishment" because the "blemish on his academic record . . . is an actual, concrete injury sufficient to satisfy Article III"). The Court finds that Qaddumi's case is not moot based on Qaddumi's undisputed testimony that his suspension will remain on his permanent academic record and that he

plans to apply for the Bar and seek legal employment. (Day 2 Tr., at 228:10−23).

**B. First Amendment Claims**

Qaddumi challenges his suspension, and the record of his suspension on his academic record, as resulting from (1) viewpoint discrimination, (2) retaliation for his First Amendment-protected acts of expression, and (3) content-based discrimination. (2d. Am., Compl, Dkt. 30, at 12). At trial, UT raised the defense that it was permitted to prevent the April 24, 2024 protest because under *Tinker*, school officials' actions in restricting student speech are protected (even if restricting a particular viewpoint) if they can (a) demonstrate facts which would reasonably have led school authorities to forecast substantial disruption of or material interference with school operations or (b) show that the disruption in fact occurred. 393 U.S. at 514; *see also Bell v. Itawamba County School Bd.*, 799 F.3d 379, 390 (5th Cir. 2015) (the *Tinker* standard "can be satisfied either by showing a disruption has occurred, or by showing demonstrable factors that would give rise to any reasonable forecast by the school administration of substantial and material disruption") (quotations omitted). In the university context, the *Tinker* standard is informed by *Healy v. James*, 408 U.S. 169 (1972), and requires specific evidence of likely substantial disruption involving violations of campus rules, not merely undifferentiated fear or apprehension. *Healy*, 408 U.S. at 190−91. For the reasons described below, while noting that UT's handling of the protest gave Qaddumi substantial reasons to be concerned that UT was violating his First Amendment rights, the Court finds that UT has met the *Tinker* standard.

**i. Legal Standard**

The Court has previously set forth the legal standard governing this case and reiterates that standard here. (Order, Dkt. 180, at 7−12). The First Amendment "prohibits viewpoint discrimination in a limited public forum" or a designated public forum, such as UT's open, outdoor portions of its campus. *Heaney v. Roberts*, 846 F.3d 795, 801 (5th Cir. 2017) (citing *Good News Club v.*

*Milford Cent. Sch.*, 533 U.S. 98, 106 (2001)); *Justice for All v. Faulkner*, 410 F.3d 760, 768−69 (5th Cir. 2005); *see also Texas A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 804−05 (S.D. Tex. 2025). This First Amendment right extends to the campuses of state universities. *See Widmar v. Vincent*, 454 U.S. 263, 268−69 (1981). Viewpoint discrimination exists "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction" on speech. *Heaney*, 846 F.3d at 802 (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)). That includes applying a facially neutral policy for the purpose of suppressing protected expression. *See Crawford v. Board of Ed. of Los Angeles*, 458 U.S. 527, 544 (1982); *Texas A&M Queer Empowerment Council*, 772 F. Supp. 3d at 804−05. It also includes "denying student organizations access to school-sponsored forums because of the groups' viewpoints." *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 667–68 (2010) (collecting cases). Beyond having the right to not have one's expression suppressed based on its viewpoint, "disciplinary action," such as suspension, "may not be based on [] disapproved content of [] protected speech," such as an on-campus demonstration. *Shamloo v. Mississippi State Bd. of Tr. of Insts. of Higher Learning*, 620 F.2d 516, 522 (5th Cir. 1980).

UT may restrict students' expression through content- and viewpoint-neutral time, place, and manner restrictions, narrowly tailored to serve a significant government interest, which leave open alternative channels of communication. *Justice for All v. Faulkner*, 410 F.3d 760, 768–69 (5th Cir. 2005). Though UT "may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not condition that speech on obtaining" permission from a school official "in that official's boundless discretion." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988). It is also "viewpoint discrimination" for university officials to censor speech because it is "offensive or inappropriate" in their "subjective judgment." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019); *see also Texas A&M Queer Empowerment Council*, 772 F. Supp. 3d at 805.

Despite the First Amendment's protections against viewpoint discrimination in a state university setting, the Supreme Court has held that a school may "justify prohibition of a particular expression of opinion" upon a showing that the expression would cause a "substantial disruption or material interference with school activities." *Tinker*, 393 U.S. at 509. In *Tinker*, a school district prohibited students from wearing black armbands on their sleeves to exhibit their disapproval of the war in Vietnam; the Supreme Court found this restriction unconstitutional. *Id.* at 508. To justify such a particular ban on speech, the Supreme Court held that a school official "must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509.

This Court has observed that neither the Fifth Circuit nor the Supreme Court has squarely held whether *Tinker* governs viewpoint-based speech restrictions at the university level. *Students for Just. in Palestine, at Univ. of Houston v. Abbott*, 756 F. Supp. 3d 410, 425 (W.D. Tex. 2024). In keeping with *Esfeller*, 391 F. App'x at 341, which is persuasive, the Court assumes that *Tinker* does apply, but that the environment of a university, as a center of debate and free expression, must be taken into account when evaluating what constitutes a substantial and material disruption, and that this is likely a distinct standard from what disrupts an elementary, middle, or high school environment. *See Students for Just. in Palestine*, 756 F. Supp. 3d at 426; *Healy*, 408 U.S. at 180 (First Amendment analysis at the university level must be done "in light of the special characteristics of the environment in the particular case" as the Supreme Court "made clear in *Tinker*" (internal quotation marks and citations omitted)). The Supreme Court has long recognized that universities are "vital centers for the Nation's intellectual life," and "danger . . . from the chilling of individual thought and expression" "is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 835–36. As a result, what may be a substantial disruption in a secondary

school environment may not be a substantial disruption in a university environment; what may disrupt a secondary school could even be fundamental to universities. *See Students for Just. in Palestine*, 756 F. Supp. 3d at 426; *see also Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 627 (E.D. Va. 2016). The characteristic of universities as an environment for vigorous debate may be "outcome determinative" when deciding whether a restriction on student speech is viewpoint discrimination versus a valid restriction of foreseeable disruption to campus activities. *See Students for Just. in Palestine*, 756 F. Supp. 3d at 425–26.

The Court analyzed this legal standard as it applies to the case at bar at the summary judgment phase, (Order, Dkt. 180, at 11−12), and briefly reiterates its analysis here. If UT's decision to cancel the PSC protest with which Qaddumi was involved, and subsequently suspend Qaddumi for protesting, targeted PSC's viewpoint, opinion, or ideology, as opposed to amounting to a viewpoint-neutral application of a UT policy, then Qaddumi's suspension constitutes viewpoint discrimination. *See Heaney*, 846 F.3d at 802; *Shamloo*, 620 F.2d at 522. However, UT may show that a viewpoint-based restriction was warranted because it reasonably foresaw substantial disruption or material interference with the campus environment from the April 24, 2024 protest. *See Tinker*, 393 U.S. at 509−11; *Healy*, 408 U.S. at 189. That showing of a disruption must be substantial and material even considering that as a university, UT is a center for vigorous debate and disagreement, such that speech that would disrupt a high school could be allowed at, and even be fundamental to, UT. *E.g.*, *Students for Just. in Palestine*, 756 F. Supp. 3d at 426. Merely demonstrating is not a substantial disruption. *Id.* Rather, speech may be a substantial and material disruption where it is likely to produce violations of viewpoint-neutral university rules or substantial interference to others' education. *See Healy*, 408 U.S. at 188−89. By contrast, speech is not a substantial disruption when it generally advocates future rule-breaking, without being likely to incite or produce the disruption imminently, like announcing generally that one intends to violate a campus rule later. *See Hess v.*

*Indiana*, 414 U.S. 105, 106–09 (1973). With that standard in mind, the Court turns to the application of *Tinker* to UT's cancellation of the April 2024 protest.

**ii. *Tinker* Analysis**

The Court finds that this case begins and ends with the *Tinker* analysis, because *Tinker* enabled UT to cancel the April 24, 2024 protest based on the substantial disruption UT expected at the time, in the form of widespread, imminent violations of campus rules.

As an initial matter, the Court finds that several aspects of UT's handling of the protest and disciplinary proceedings gave Qaddumi valid reasons to believe that UT violated his First Amendment rights, leading him to bring a nonfrivolous case. For example, Qaddumi felt UT was wrong in assessing that PSC would set up an overnight encampment because he had planned to demonstrate on the South Lawn until about 7:00 P.M., not past 10:00 P.M., as would violate campus rules. (*See* Day 2 Tr., at 159:1−18; 162:2−7; Ex. P-25 (stating PSC intended to "occupy" the South Lawn "throughout the entire day")). Further, UT's behavior toward the protest was unusual: Hartzell had never cancelled a protest during his tenure. (Day 2 Tr., at 115:10−12). UT also gave the cancellation notice several hours after making the decision to cancel the protest; thus, while Qaddumi could have avoided discipline if he had taken steps to cancel the protest, or decided not to attend the protest, he also had only a short window to assess his rights and choose his next steps. (Ex. D-39, at 4; Ex. D-30). And despite the fact that UT's police department believed the protesters intended to act peacefully and that no disruption was apparent from a criminal perspective, (Ex. P-90, at 4; Day 3 Tr., at 88:16−23), UT also decided it needed more than its typical forty campus police officers on the scene to monitor for criminal violations, (Day 2 Tr., 12:25−13:9, 18:1−20:4, 94:16−95:11). Then, UTPD arrested Qaddumi shortly after he relayed directives to disperse, a turn of events on the day of the protest that appeared to surprise his fellow protesters and onlookers. (Day 2 Tr., at 213:8−14; Ex. P-49). In sum, UT's rushed, unusual process for cancelling the protest;

UT's larger-than-typical police presence on the scene; and Qaddumi's arrest while he felt he was taking steps to disperse the protest, gave rise to Qaddumi bringing nonfrivolous claims alleging UT had violated his First Amendment rights.

However, this Court finds UT had a reasonable forecast of a substantial, likely violation of its campus rules under *Tinker* based on the information available to it at the time, and that it was permitted to restrict the otherwise-constitutional demonstration as a result. *Tinker* affords universities considerable discretion to restrict student speech once certain preconditions are met. The *Tinker* standard "can be satisfied . . . by showing demonstrable factors that would give rise to *any reasonable forecast* by the school administration of substantial and material disruption." *Bell v. Itawamba County School Bd.*, 799 F.3d 379, 390 (5th Cir. 2015) (emphasis in original) (quoting *Shanley v. Ne. Indep. Sch. Dist., Bexar Cnty., Tex.,* 462 F.2d 960, 974 (5th Cir. 1972)). School officials are permitted to make forecasts based on the information available to them, and "[i]t is not necessary that the school administration stay a reasonable exercise of restraint 'until disruption actually occur[s].'" *Shanley*, 462 F.2d at 970−71 (5th Cir. 1972) (quoting *Butts v. Dallas Indep. Sch. Dist.*, 436 F.2d 728, 731 (5th Cir. 1971)).

In the university context, the *Tinker* standard is heightened and requires specific evidence of likely substantial disruption, not merely undifferentiated fear or apprehension. *Healy*, 408 U.S. at 190−91. As described above, a general, indefinite call for future rule-breaking is not enough to show a specific, likely substantial disruption. *Id.*; *Hess*, 414 U.S. at 106–09. Still, the *Tinker* standard remains a distinct standard from the *Brandenburg v. Ohio*, 395 U.S. 444 (1969),[1] test for inciting speech, in that a university may restrict speech when it forecasts a material disruption in the form of violations of

[1] In *Brandenberg*, the Supreme Court held that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where:" (1) "such advocacy is directed to inciting or producing imminent lawless action," and (2) the speech "is likely to incite or produce such action." 395 U.S. at 447.

campus rules and is not limited to restricting only inciting speech as defined in *Brandenburg*. *See Gay Student Servs. v. Texas A&M Univ.*, 737 F.2d 1317, 1327 (5th Cir. 1984) ("[U]niversity authorities have a legitimate interest in prohibiting student activities intended to and likely to incite or produce imminent lawless action or those that materially and substantially disrupt the work and discipline of the school."); *Krausse v. Rhodes*, 570 F.2d 563, 571 (6th Cir. 1977) ("Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.").

Here, the evidence shows that UT met the heightened *Tinker* standard in the university context. PSC described the April 24, 2024 protest as intended to disrupt campus operations, and this language combined with the surrounding context of affiliated protests at other universities gave rise to a reasonable inference of imminent violations of campus rules. As described above, UT was aware of contemporaneous SJP protests on other campus which involved actions, like setting up tents for long-term camping in campus spaces, which would have violated UT's rules. SJP's language called for disruption of campus operations via its Popular University campaign. (Ex. D-28, at 1). PSC's own announcements, while arguably intended figuratively, aligned its own April 24, 2024 protests with SJP's methods and with the Popular University campaign specifically. (Ex. P-25). PSC also said it wanted to follow "[i]n the footsteps of our comrades at Columbia SJP, Rutgers-New Brunswick, Yale, and countless others across the nation." (*Id.*). This language, combined with the existence of longer-term camping at affiliated protests on the other campuses referenced, led to a reasonable forecast of substantial disruption by UT.

The *Tinker* doctrine does not prohibit UT from forecasting substantial disruption based on disruption that has occurred on other campuses by affiliated student organizations. Rather, "past incidents arising out of similar speech" may be the basis for a reasonable forecast of disruption. *See Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 255 (3d Cir. 2002) (quoting *Saxe v. State Coll.*

*Area Sch. Dist.,* 240 F.3d 200, 211 (3d Cir. 2001)). Qaddumi argued that UT was unreasonable in forecasting a substantial disruption based on SJP's protests on other campuses, because PSC and SJP are distinct organizations who merely shared a viewpoint but otherwise share no affiliation. (2d. Am. Compl., Dkt. 30, at 5−6). The evidence at trial did not substantiate this argument: Qaddumi testified that PSC, while not an SJP chapter, received guidance from SJP and looked to it for ideas about the divestment campaign. (Day 2 Tr., 150:24−153:2, 229:23−230:9; Ex. P-25). PSC communicated with SJP about the April 2024 protests it planned and received guidance from SJP including a toolkit about encampment. (Day 2 Tr., 152:23−153:2, 232:18−235:4; Ex. D-18; Ex. D-28). As such, the Court finds that connecting SJP's goal of setting up encampments at campuses to PSC's goals for the April 24, 2024, protest, and therefore anticipating violations of UT rules, was not unreasonable on UT's part.

Qaddumi also argues that Hartzell ignored other aspects of PSC's posts, for instance, that UT failed to adequately consider that PSC also included language telling protesters to "be sure to respect our space and listen to organizers in order to keep us safe." (Pl. Proposed Findings of Fact, Dkt. 211, at 51). Qaddumi cites evidence that, per internal discussions between PSC members, they did not in fact plan a longer-term encampment. (*Id.*). Qaddumi argues that UT unreasonably did not consider the email from Ms. Homsi that the students did not plan to create an encampment. (*Id.* at 56). However, this argument asks the Court to supplant its own assessment of the evidence for UT's judgment at the time. The *Tinker* analysis does not tell the Court to reweigh the evidence and make its own assessment as to the likelihood of substantial disruption—***Tinker* instead asks the Court to assess whether school officials had a forecast of substantial disruption which was "reasonable" given the circumstances.** *Bell*, 799 F.3d at 390. Here, it would be reasonable to believe based on the posts and other information about the protest plans UT had access to, that students affiliated with the protest wanted to *both* keep protesters and the UT community safe, while

*also* disrupting campus as part of their planned demonstration. Further, it would also be reasonable to believe that even if Qaddumi or Ms. Homsi did not intend an encampment or rule violations, other protesters would intend to do so such that PSC's protest could lead to rule violations the protest's organizers did not intend. (Ex. D-27, at 5−7 (noting that other campus groups and students were mobilizing to support the protest, including by bringing tents)). As such, Qaddumi's evidence about PSC's intention to follow rules and peacefully protest does not make UT's assessment of a substantial or material disruption from the April 24, 2024, protest unreasonable at the time.

Qaddumi cites the DPS and UTPD analyses finding that the protest would be peaceful and not disruptive, but the Court finds that these also do not render UT's finding of a substantial, material disruption unreasonable. Based on Hartzell's testimony that he coordinated with UTPD and DPS at the time he decided to cancel the protest, the Court concludes that Hartzell likely had this information available to him at the time, even if he did not receive these written reports; so, the Court considers them. (Day 2 Tr., 66:10−15, 68:15−20, 111:1−112:15). *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 214–15 (5th Cir. 2019) ("While judicial review unavoidably looks backwards, our task is to assess [the determination] with the information available to the [school authorities] at the time of [their] decision.").

However, although different school officials could have different reasonable conclusions about the likelihood of substantial disruption, the parties identify no *Tinker* case law creating a rule that if *one* set of officials find there to be no likely substantial disruption, other school officials must necessarily follow that assessment. Indeed, what constitutes a material or substantial disruption from the perspective of the police—tasked with enforcing criminal law—may differ from what school administrators—tasked with enforcing campus rules—consider to be a material or substantial disruption. The DPS and UTPD reports acknowledge that the police's goals are to monitor

violations of criminal law, not campus rules. (Ex. P-90, at 4; Ex. P-30, at 10). While Qaddumi reasonably questions why UT would not have considered the police's conclusions that his planned protest activities were peaceful in nature, the Court does not find a basis in the *Tinker* case law to supplant the police's substantial-disruption analysis for the school administrators' conclusions. To the contrary, *Tinker* allows UT to consider campus rule violations when forecasting a substantial disruption. *Krausse*, 570 F.2d at 571; *Healy*, 408 U.S. at 189. The UTPD and DPS reports show that reasonable minds could disagree as to whether the April 24, 2024, protest would amount to a substantial disruption, but they do not show that Hartzell was unreasonable or outside the bounds of *Tinker* in forecasting substantial disruption.[2]

Qaddumi also argues that UT canceled the protest because of GA-44, Governor Abbott's instruction to more heavily discipline PSC and SJP's activities than other students sharing other viewpoints. Such a direct relationship between GA-44 and the protest cancellation would have changed the *Tinker* analysis—as this Court has explained, a reasonable inference of substantial disruption cannot arise from an assumption that merely demonstrating in support of a pro-Palestine viewpoint is inherently disruptive. *Students for Just. in Palestine*, 756 F. Supp. 3d at 426. However, the Court finds Hartzell credible in testifying that he made his decision without political pressure when he decided to cancel the protest, (Day 2 Tr., 19:15−20:4, 76:2−78:14, 87:13−15, 100:19−22), and

[2] Qaddumi highlights that *Tinker* in the university context requires specific evidence of likely substantial disruption involving violations of campus rules, not merely undifferentiated fear or apprehension. *Healy*, 408 U.S. at 190−91. (Pl. Proposed Findings of Fact, Dkt. 211, at 51 (arguing that "at worst, [PSC]'s language is consistent with disruption" and that "just as the phrase 'we'll take the fucking street later' was too amorphous and vague in *Hess* to constitute inciting speech, so too are social media posts to "reclaim our space" or to "occupy South Lawn during the day"). These statements in *Hess*, 414 U.S. at 106−09, are not directly comparable. First, the *Hess* Court was applying the *Brandenburg* standard in the context of a criminal appeal of punishing inciting words, rather than the *Tinker* standard in context of restricting a particular associational activity on a university campus. Second, the Court in *Hess* also addressed a general statement about taking the street later, *Hess*, 414 U.S. at 106−09, not a concretely planned disruptive activity. Here, UT responded to a specific planned protest PSC announced which would occur the next day and forecasted that the substantial disruption would occur at that time, so the anticipated campus rule violations were imminent and specific enough to meet the *Tinker* standard.

that he did not speak to Governor Greg Abbott or anyone in state government about GA-44 regarding the protest cancellation, (*id.*, 19:15−20:4, 76:2−77:1). So too, the Court finds Hartzell credible in his consistent testimony that his decision was not based on PSC's viewpoint but rather on his inference that PSC intended to "occupy" campus in the form of the longer-term encampments described above. (Day 2 Tr., 12:16−24, 98:13−99:19, 104:4−105:16). Other UT officials corroborated his testimony. (Day 1 Tr., 45:16−21, 48:1−18, 105:13−114:10). The fact that UT, in its cancellation notice, invited PSC to meet with them to discuss holding a different protest also corroborates Hartzell's testimony that the basis for his decision was the likelihood of campus rule violations—not GA-44's instruction to target PSC's specific viewpoint. (*See* Ex P-18, at 2 ("[i]f you are interested in organizing an event that adheres to our University policies and rules, we are happy to connect you with a staff member that can answer your specific questions and assist you in understanding what conduct is and is not permitted on our campus.")).

Hartzell did testify that he believed UT was subject to subject to GA-44 at the time and asked his lawyers to figure out how to comply with it, (Day 2 Tr., at 23:3−24:8; *id.* at 117:10−18:19), but again, this testimony does not give rise to an inference that GA-44 was the driving factor in his decision to cancel the protest. While relying on GA-44 would provide evidence of intent to discriminate against a pro-Palestine viewpoint, the Court cannot enact a bright-line rule that the existence of GA-44, without an evidentiary connection to Hartzell's decision to cancel the protest, makes UT's actions unconstitutional. In sum, the trial record does not support an inference that GA-44 drove UT's decision rather than the anticipated material and substantial disruption.

While *Tinker* gives university officials discretion to restrict student speech once certain preconditions are met, as they were here, this case should serve as a reminder that public universities, as vital centers for the country's intellectual life, should exercise that discretion carefully and with transparency to avoid raising viewpoint-discrimination allegations. *See Rosenberger*, 515 U.S.

at 835−36. A public university's decision to restrict student speech based on anticipated disruption should ideally be enforced in a manner designed to ensure students do not feel that they are being restricted from demonstrating based on their viewpoint alone, or subject to punishment that students with other viewpoints are not. It should alarm a public university when one of its students has several reasons to believe they face viewpoint discrimination from their school and can bring a nonfrivolous constitutional case against them as a result. The question before this Court is not whether UT *should* have handled the April 24, 2024, protest and Qaddumi's discipline in the manner that it did; it is UT and the public's place to confront that question. The Court's role is analyzing whether UT had a reasonable basis in their forecast of material, substantial disruption, in the form of widespread violations of campus rules, from the planned protest held on April 24, 2024. The record shows that they did, and this finding ends the Court's inquiry.

**ii. Retaliation for First Amendment Activity**

The Supreme Court has held that a state university cannot expel a student in retaliation for engaging in an activity protected by the First Amendment. *See Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 669–71 (1973). Thus, to establish a retaliation claim under the First Amendment, a plaintiff student has the burden to show that (1) his or her speech was constitutionally protected and (2) that the speech was a "substantial" or "motivating" factor in the challenged decision. *Oliver v. Univ. of Texas Sw. Med. Sch*, No. 3:18-CV-1549-B, 2019 WL 536376, at *19 (N.D. Tex. Feb. 11, 2019); *O'Neal v. Alamo Cmty. Coll. Dist.*, No. SA-08-CA-1031-XR, 2010 WL 376602, at *11 (W.D. Tex. Jan. 27, 2010); *Doe v. Harrell*, 841 F. App'x 663, 669 (5th Cir. 2021). If the plaintiff satisfies their initial burden, the burden shifts to the defendant to show by a preponderance of the evidence that it would have reached the same decision even in the absence of protected conduct. *Oliver*, 2019 WL 536376, at *19. Because the Court has found that *Tinker* permitted UT to cancel the protest because the precondition of an anticipated material or substantial disruption was met, the Court finds that

Qaddumi's speech does not fall under the first prong, i.e., it was not constitutionally protected from discipline by UT because UT was permitted to impose a speech restriction consistent with the First Amendment. The Court therefore need not reach the other prongs.

**iii. Content-Based Discrimination**

Content-based regulation "target[s] speech based on its communicative content," restricting discussion of a subject matter or topic. *Vidal v. Elster*, 602 U.S. 286, 292–93 (2024) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Viewpoint discrimination is a "particularly 'egregious form of content discrimination.'" *Id.* at 293 (quoting *Rosenberger*, 515 U.S. at 829). A viewpoint-based regulation targets not a subject matter, but "particular views taken by speakers on a subject." *Id.* The Court finds that its *Tinker* analysis above also forecloses Qaddumi's content-based claim, as *Tinker* allows schools to impose restrictions on speech that would otherwise be unconstitutionally viewpoint- or content-based. *See Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009) (holding that the court would apply *Tinker* "when a school imposes content or viewpoint-based restrictions"). If UT can take an action that would otherwise constitute viewpoint discrimination when they find a substantial disruption under *Tinker*, it necessarily follows that content-based restrictions are also allowed once UT meets the threshold *Tinker* inquiry.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that final judgment will be rendered in favor of Defendant.

**IT IS FURTHER ORDERED** that each party bear its own costs.[3]

**SIGNED** on September 24, 2026.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

[3] Under the Civil Rights Act, "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so," conditions which were not met here. *Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n*, 434 U.S. 412, 422 (1978).